UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MICHAEL CLYNES, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>HEBRON TECHNOLOGY CO., LTD., ANYUAN SUN, and CHANGJUAN LIANG,<br><br>Defendants. | Case No.  1:20-cv-04420-PAE<br><br>MEMORANDUM OF LAW: (1) IN FURTHER SUPPORT OF MOTION OF EDWARD A. DAHLKE FOR CONSOLIDATION, APPOINTMENT AS LEAD PLAINTIFF, AND APPROVAL OF LEAD COUNSEL; AND (2) IN OPPOSITION TO COMPETING MOTION OF MICHAEL CLYNES |
| EDWARD A. DAHLKE, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>HEBRON TECHNOLOGY CO., LTD., ANYUAN SUN, and CHANGJUAN LIANG,<br><br>Defendants. | Case No.  1:20-cv-04746-PAE |

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................................. 1

ARGUMENT ......................................................................................................................... 4

I.      Dahlke Should Be Appointed Lead Plaintiff ................................................................. 4

        A.      Dahlke Has The Largest Financial Interest In The Relief Sought By The Class Of
                Any Eligible Movant ......................................................................................... 5

        B.      Dahlke Satisfies The Requirements Of Rule 23 .................................................... 6

II.     Clynes Is Atypical And Subject To A Fatal Unique Defense ........................................... 6

CONCLUSION ..................................................................................................................... 17

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Amgen Inc. v. Conn. Ret. Plans & Trust Funds*,
568 U.S. 455 (2013)..................................................................................................12

*In re AOL Time Warner, Inc. Sec. Litig.*,
503 F. Supp. 2d 666 (S.D.N.Y. 2007)........................................................................12

*Aude v. Kobe Steel, Ltd.*,
17-CV-10085, 2018 U.S. Dist. LEXIS 57591 (S.D.N.Y. Apr. 4, 2018) ...........................2, 4, 6

*In re Bally Total Fitness Sec. Litig.*,
Nos. 04 C 3530 et al., 2005 U.S. Dist. LEXIS 6243 (N.D. Ill. Mar. 15, 2005).........................7

*Basic, Inc. v. Levinson*,
485 U.S. 224 (1988)............................................................................... *passim*

*Beck v. Maximus, Inc.*,
457 F.3d 291 (3d Cir. 2006)..........................................................................................7

*Berwecky v. Bear, Stearns & Co.*,
197 F.R.D. 65 (S.D.N.Y. 2000) ...................................................................................16

*Chahal v. Credit Suisse Grp. AG*,
18-CV-02268 (AT)(SN), 2018 U.S. Dist. LEXIS 104185 (S.D.N.Y. June 21,
2018) .............................................................................................................................5

*Clynes v. Hebron Technology Co., Ltd.*,
1:20-cv-04420-PAE .............................................................................................11, 13

*In re Critical Path, Inc. Sec. Litig.*,
156 F. Supp. 2d 1102 (N.D. Cal. 2001) ................................................................4, 17

*Dahlke v. Hebron Technology Co., Ltd.*,
1:20-cv-004746-PAE .........................................................................................11, 13

*Dookeran v. Xunlei Ltd.*,
18-cv-467 (RJS) et al., 2018 U.S. Dist. LEXIS 62575 (S.D.N.Y. Apr. 12,
2018) .........................................................................................................................2, 6

*Dura Pharms., Inc. v. Broudo*,
544 U.S. 336 (2005)....................................................................................................15

ii

*Faris v. Longtop Financial Techs. Ltd.*,
  11 Civ. 3658 (SAS) *et al.*, 2011 U.S. Dist. LEXIS 112970 (S.D.N.Y. Oct. 4,
  2011) ..................................................................................................................4, 16

*Foley v. Transocean Ltd.*,
  272 F.R.D. 126 (S.D.N.Y. 2011) .................................................................................5, 6

*Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
  903 F.2d 176 (2d Cir. 1990)..................................................................................16

*George v. China Auto Sys., Inc.*,
  No. 11-cv-7533, 2013 U.S. Dist. LEXIS 93698 (S.D.N.Y. July 3, 2013)...............................16

*Greenspan v. Brassler*,
  78 F.R.D. 130 (S.D.N.Y. 1978) ..................................................................................16

*Gross v. AT&T Inc.*,
  19-CV-2892 (VEC), 2019 U.S. Dist. LEXIS 128615 (S.D.N.Y. July 31, 2019) .....................7

*Howard v. Liquidity Servs.*,
  322 F.R.D. 103 (D.D.C. 2017)..................................................................................14, 15

*Kaplan v. Gelfond*,
  240 F.R.D. 88 (S.D.N.Y. 2007) ..................................................................................4, 6

*Lang v. Tower Grp. Int'l*,
  No. 13 Civ. 5852(AT), 2014 U.S. Dist. LEXIS (S.D.N.Y. June 17, 2014)........................4, 17

*Lentell v. Merrill Lynch & Co.*,
  396 F.3d 161 (2d Cir. 2005)..................................................................................12

*In re Netflix, Inc., Sec. Litig.*,
  Nos. 12-0225 SC et al., 2012 U.S. Dist. LEXIS 59465 (N.D .Cal. Apr. 26
  2012) ..................................................................................................................7

*Nurlybaev v. ZTO Express (Cayman) Inc.*,
  17-CV-06130 (LTS)(SN), 2017 U.S. Dist. LEXIS 187238 (Nov. 13, 2017) ...........................5

*In re Orion Secs. Litig.*,
  08 Civ. 1328 (RJS), 2008 U.S. Dist. LEXIS 55368 (S.D.N.Y. July 7, 2008) ...........................6

*In re Petrobras Sec. Litig.*,
  104 F. Supp. 3d 618 (S.D.N.Y. 2015)..................................................................................4, 16

*In re Petrobras Sec. Litig.*,
  862 F.3d 250 (2d Cir. 2017)..................................................................................11

*Rocco v. Nam Tai Electronics, Inc.*,
  245 F.R.D. 131 (S.D.N.Y. 2007) ..................................................................................16

iii

*Shaffer v. Horizon Pharma PLC*,
    No. 16-CV-1763, 2016 U.S. Dist. LEXIS 83175 (S.D.N.Y. June 27, 2016) ...........................7

*Steamfitters Local 449 Pension Fund v. Cent. European Distrib. Corp.*,
    Nos. 11-6247, 2012 U.S. Dist. LEXIS 118693 (D.N.J. Aug. 22, 2012)...................................7

*In re WorldCom, Inc. Sec. Litig.*,
    219 F.R.D. 267 (S.D.N.Y. 2003) ......................................................................................14

**Statutes**

15 U.S.C. § 78u-4(a)(3)(B) ................................................................................... *passim*

Private Securities Litigation Reform Act of 1995 ................................................. *passim*

**Rules**

Fed. R. Civ. P. 23 ................................................................................................... *passim*

U.S. Securities and Exchange Commission Rule 201  ....................................3, 9, 10, 13

**Other Authorities**

*Restat 2d of Torts* ........................................................................................................15

Movant Dahlke[1] respectfully submits this Memorandum of Law in further support of his motion for consolidation of the Related Actions, appointment as Lead Plaintiff and approval of his selection of Pomerantz as Lead Counsel (Dkt. No. 5); and in opposition to the competing motion of Michael Clynes ("Clynes") (Dkt. No. 9).

## PRELIMINARY STATEMENT

The Related Actions are putative class action securities fraud lawsuits on behalf of investors in Hebron securities.  As with all federal class action securities fraud lawsuits, a lead plaintiff must be appointed.  The PSLRA governs that process and, pursuant to the PSLRA, the Court must appoint as Lead Plaintiff the movant with the greatest financial interest in the outcome of the action; *and* who satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure.  15 U.S.C. § 78u-4(a)(3)(B)(iii)(I).

Here, that movant is Dahlke, having suffered approximately $5,332 in losses in connection with his Class Period purchases of Hebron securities as a result of the Defendants' alleged fraud. *See* Dkt. No. 8-1.  The table below sets forth the respective losses of Dahlke and Clynes, the only competing movant:

| Movant | Loss |
|---|---|
| Dahlke | $5,332 |
| ~~Clynes~~ | ~~$15,106~~ |

Although the only competing movant, Clynes, has alleged a slightly larger loss than Dahlke, a review of Clynes's transactions indicates that Clynes either (1) purchased his Hebron securities *after* the Defendants' malfeasance was disclosed on June 3, 2020, or (2) somehow purchased his Hebron securities *before* the corrective disclosures, at prices that were not available

---

[1] All capitalized terms herein are defined in Dahlke's moving brief, unless otherwise indicated. *See* Dkt. No. 7.

to other market participants.  For the reasons discussed below, either of the foregoing issues disqualifies Clynes from consideration for failure to satisfy the typicality requirement of Rule 23 and/or constitutes a disqualifying unique defense to which Clynes is subject.

In addition to his significant financial interest, Dahlke also satisfies the adequacy and typicality requirements of Rule 23.  Dahlke is aware of no conflict between his interests and those of the Class, his losses incurred as a result of the alleged fraud give him a sufficient stake in the outcome of this action to ensure vigorous advocacy, and in Pomerantz, Dahlke has retained qualified and experienced counsel.  *Dookeran v. Xunlei Ltd.*, 18-cv-467 (RJS) *et al.*, 2018 U.S. Dist. LEXIS 62575, at *6 (S.D.N.Y. Apr. 12, 2018).  Dahlke, like all members of the Class, purchased Hebron securities at prices artificially inflated by Defendants' misrepresentations or omissions, and was damaged upon disclosure of those misrepresentations or omissions.  *Aude v. Kobe Steel, Ltd.*, 17-CV-10085, 2018 U.S. Dist. LEXIS 57591, at *8 (S.D.N.Y. Apr. 4, 2018).

By contrast, the transaction history that Clynes submitted to the Court with his motion papers (Dkt. No. 11-2) indicates that either the timing of Clynes's purchases of Hebron securities or the prices at which he purchased them render him atypical within the meaning of Rule 23, and likewise subject him to a disqualifying unique defense.  All of Clynes's purchases of Hebron stock occurred on June 3, 2020, the last day of the Class Period in the Related Actions, and the day on which the investing public learned of Hebron's malfeasance.  Clynes made multiple purchases of Hebron stock on that day in two accounts.  In one account, Clynes purchased 1,500 shares of Hebron stock at $19.89 per share in a single transaction.  In a second account, Clynes made multiple purchases of Hebron stock, acquiring 1,302 more shares in total, all purchased at $17.75 per share or lower.  *Id.*  The news of Hebron's malfeasance began to reach the market slightly before 10:25 a.m. that day, when the principal of the self-described "activist short seller" Grizzly

2

Research unveiled his negative (*i.e.*, "short") thesis regarding Grizzly Research at a Virtual Investor Conference, hosted via streaming internet video by the hosts of the Contrarian Investor podcast. *See* Declaration of Jeremy A. Lieberman, Esq. in Further Support of Motion and in Opposition to Competing Motions ("Lieberman Opp. Decl."), Ex. B. News of Hebron's misconduct reached the market almost immediately, with the Company's stock price falling sharply enough by 10:26 a.m. to trigger the "circuit breaker" implemented by U.S. Securities and Exchange Commission ("SEC") Rule 201 ("Short Sale Rule 201"), which comes into effect in order to curtail short selling of a given stock after that stock's price has fallen more than 10% from the previous day's closing price. *See* Lieberman Opp. Decl., Ex. C.

Reviewing Clynes's purchases of Hebron stock on June 3, 2020 alongside a chart reflecting the market prices for Hebron stock on that day, there are only two possible explanations. Either (1) Clynes purchased his Hebron shares *after* news of the Grizzly Research report reached the market—*i.e.*, after the corrective disclosure that marked the end of the Class Period, when Hebron's stock price fell to the price ranges within which Clynes acquired his shares; or (2) Clynes somehow acquired his Hebron shares *before* the corrective disclosure, even though Hebron securities were at that point trading *above* the range within which Clynes purchased his shares, meaning that Clynes somehow acquired his Hebron shares at prices *not available to other market participants*. If the former scenario is true, then Clynes would have purchased Hebron securities after news of the Company's malfeasance had reached the market, meaning that he would not be entitled to the presumption of reliance established in *Basic, Inc. v. Levinson*, 485 U.S. 224 (1988), that "[a]n investor who buys or sells stock at the price set by the market does so in reliance on the integrity of that price. Because most publicly available information is reflected in market price, an investor's reliance on any public material misrepresentations . . . may be presumed for purposes

3

of a Rule 10b-5 action." *Basic*, 485 U.S. at 247. For this reason, courts decline to appoint as lead plaintiffs investors who purchased the relevant securities after the alleged corrective disclosure. *See*, *e.g.*, *Faris v. Longtop Financial Techs. Ltd.*, 11 Civ. 3658 (SAS) *et al.*, 2011 U.S. Dist. LEXIS 112970, at *8 (S.D.N.Y. Oct. 4, 2011); *In re Petrobras Sec. Litig.*, 104 F. Supp. 3d 618, 623 (S.D.N.Y. 2015). If the latter scenario is true, and Clynes purchased shares at prices unavailable to other investors, then Clynes's off-market purchases would still deprive him of the *Basic* fraud-on-the-market presumption and make Clynes atypical of the Class that he seeks to represent. For that reason, courts generally decline to appoint lead plaintiffs who acquired the relevant securities in private transactions and/or at non-market prices. *See*, *e.g.*, *Lang v. Tower Grp. Int'l*, No. 13 Civ. 5852(AT), 2014 U.S. Dist. LEXIS, at *10 (S.D.N.Y. June 17, 2014); *In re Critical Path, Inc. Sec. Litig.*, 156 F. Supp. 2d 1102, 110-11 (N.D. Cal. 2001). Under either scenario, the circumstances of Clynes's acquisitions of Hebron stock clearly disqualify him from consideration as Lead Plaintiff.

For the reasons set forth herein, Dahlke respectfully requests that the Court grant his motion in its entirety and deny Clynes's competing motion.

## ARGUMENT

### I.    Dahlke Should Be Appointed Lead Plaintiff

The PSLRA creates a strong presumption that the Lead Plaintiff is the "person or group of persons" that "has the largest financial interest in the relief sought by the class" and "otherwise satisfies the requirements of Rule 23." 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I). The movant that has the largest financial interest must "make a *prima facie* showing that they meet [the requirements] of Rule 23." *Aude*, 2018 U.S. Dist. LEXIS 57591, at *8; *see also Kaplan v. Gelfond*, 240 F.R.D. 88, 94 (S.D.N.Y. 2007). Once this presumption is triggered, it may be rebutted upon proof that

the presumptive Lead Plaintiff will not fairly represent the interests of the Class. 15 U.S.C. § 78u-4(a)(3)(B)(iii)(II). Here, the most adequate plaintiff is Dahlke.

### A. Dahlke Has The Largest Financial Interest In The Relief Sought By The Class Of Any Eligible Movant

The PSLRA requires a court to adopt a rebuttable presumption that "the most adequate plaintiff . . . is the person or group of persons that . . . has the largest financial interest in the relief sought by the class." 15 U.S.C. § 78u-4(a)(3)(B)(iii). While the PSLRA itself does not provide any guidance concerning the method of calculating which plaintiff has the "largest financial interest," courts recognize that the amount of financial loss is the most significant factor to be considered. *See*, *e.g.*, *Foley v. Transocean Ltd.*, 272 F.R.D. 126, 128 (S.D.N.Y. 2011) ("[W]e, as have other courts, shall place the most emphasis on . . . the approximate loss suffered by the movant"); *Chahal v. Credit Suisse Grp. AG*, 18-CV-02268 (AT)(SN), 2018 U.S. Dist. LEXIS 104185, at *12 (S.D.N.Y. June 21, 2018) (equating financial interest with economic loss); *Nurlybaev v. ZTO Express (Cayman) Inc.*, 17-CV-06130 (LTS)(SN), 2017 U.S. Dist. LEXIS 187238, at *3 (Nov. 13, 2017) (same).

Under the foregoing analysis, no movant eligible for appointment as Lead Plaintiff in the Action has a larger financial interest in the litigation than Dahlke. The following chart summarizes the financial interests of the two competing movants:

| Movant | Loss |
|---|---|
| Dahlke | $5,332 |
| ~~Clynes~~ | ~~$15,106~~ |

Having incurred a loss of over $5,300, Dahlke is clearly incentivized to pursue recovery of his and the Class's losses by vigorously prosecuting the securities fraud claims against the Defendants in this litigation. Although Clynes has alleged a slightly larger loss of $15,106, Clynes

is atypical within the meaning of Rule 23 and subject to unique defenses and thus disqualified from consideration, as discussed *infra* at Section II.

### B. Dahlke Satisfies The Requirements Of Rule 23

Dahlke has also made the requisite *prima facie* showing that he satisfies the typicality and adequacy requirements of Rule 23. *See Aude*, 2018 U.S. Dist. LEXIS 57591, at *8; *Kaplan*, 240 F.R.D. at 94. First, Dahlke's claims satisfy the typicality requirement of Rule 23(a)(3) because his claims against Hebron and the other Defendants are based on the same legal theory and arise from the same events and course of conduct as the Class's claims. *See*, *e.g.*, *In re Orion Secs. Litig.*, 08 Civ. 1328 (RJS), 2008 U.S. Dist. LEXIS 55368, at *12 (S.D.N.Y. July 7, 2008). Second, Dahlke satisfies the adequacy requirement of Rule 23(a)(4) because "(1) class counsel is qualified, experienced, and generally able to conduct the litigation; (2) there is no conflict between the proposed lead plaintiff and the members of the class; and (3) the proposed lead plaintiff has a sufficient interest in the outcome of the case to ensure vigorous advocacy." *Foley*, 272 F.R.D. at 131; *see also Dookeran*, 2018 U.S. Dist. LEXIS 62575, at *6.

To overcome the strong presumption entitling Dahlke to appointment as Lead Plaintiff, the PSLRA requires "***proof***" that the presumptive Lead Plaintiff is inadequate. 15 U.S.C. § 78u-4(a)(3)(B)(iii)(II) (emphasis added). No such proof exists in this case and any speculative arguments to the contrary should be flatly rejected.

Because Dahlke has the largest financial interest of any eligible Lead Plaintiff candidate in the relief sought by the Class and otherwise satisfies the requirements of Rule 23, he is the presumptive "most adequate plaintiff" of the Class within the meaning of the PSLRA.

## II. Clynes Is Atypical And Subject To A Fatal Unique Defense

Although Clynes has alleged a loss of $15,106 incurred as a result of Hebron's alleged fraud, Clynes cannot trigger the "most adequate plaintiff" presumption because he fails to satisfy

the typicality requirement of Rule 23.  Clynes's atypicality in this respect also makes him "subject to unique defenses that render [him] incapable of representing the class."  15 U.S.C. § 78u-4(a)(3)(B)(iii)(II)(bb).  "The PSLRA . . . provides that we ask simply whether [a movant] is likely to be 'subject to' the unique defense . . . ; we do not have to determine that the defense is likely to succeed."  *In re Bally Total Fitness Sec. Litig.*, Nos. 04 C 3530 et al., 2005 U.S. Dist. LEXIS 6243, at *19 (N.D. Ill. Mar. 15, 2005).  *See also Gross v. AT&T Inc.*, 19-CV-2892 (VEC), 2019 U.S. Dist. LEXIS 128615, at *6 (S.D.N.Y. July 31, 2019) ("Before disqualifying a potential lead plaintiff [as subject to a unique defense], the Court need not conclude that the defense is likely to or will succeed.  Rather, 'many courts have rejected appointments of lead plaintiffs based on *potential* risks.'") (quoting *Shaffer v. Horizon Pharma PLC*, No. 16-CV-1763, 2016 U.S. Dist. LEXIS 83175, at *10 (S.D.N.Y. June 27, 2016) (emphasis in original)); *In re Netflix, Inc., Sec. Litig.*, Nos. 12-0225 SC *et al.*, 2012 U.S. Dist. LEXIS 59465, at *17 (N.D .Cal. Apr. 26 2012) ("There is no requirement at this early stage to prove a defense, only to show a degree of likelihood that a unique defense might play a significant role at trial.  The point of this requirement is not to adjudicate the case before it has even begun, but rather to protect the absent class members from the expense of litigating defenses applicable to lead plaintiffs but not to the class as a whole.") (internal citations omitted); *Steamfitters Local 449 Pension Fund v. Cent. European Distrib. Corp.*, Nos. 11-6247 (JBS/KMW), 2012 U.S. Dist. LEXIS 118693, at *39 (D.N.J. Aug. 22, 2012) (denying motion by lead plaintiff movants subject to unique defense, "declin[ing] to decide [the issue] at this time," because "[t]o decide the lead plaintiff motions, the Court need only decide whether the issue of standing is a unique defense that is *likely* to become a major focus at litigation.") (emphasis added); *Beck v. Maximus, Inc.*, 457 F.3d 291, 297 (3d Cir. 2006) ("A

proposed class representative is neither typical nor adequate if the representative is subject to a unique defense that is likely to become a major focus of the litigation.").

Here, a review of the transaction history submitted by Clynes alongside a record of the prices at which Hebron stock traded throughout the day on which all of Clynes's purchases occurred—June 3, 2020, the last day of the Class Period—illustrates that one of two things must have occurred. Clynes either (1) purchased Hebron stock *after* the truth of the Company's malfeasance had already reached the market; or (2) purchased Hebron stock *before* the disclosure of the Company's fraud, but at prices unavailable to other investors.

The following chart reflects (i) the prices at which Hebron's stock traded and (ii) the timing of Clynes's purchases on June 3, 2020, the last day of the Class Period and the day on which Hebron's alleged malfeasance came to light, thereby ending the Class Period:



8

On June 2, 2020, Hebron's stock price closed at $22.55 per share. On June 3, 2020, Hebron's stock price opened at $22.50 per share—down modestly from the previous day's close—but by 10:26 a.m., a little more than a minute after the Grizzly Research Presentation, Hebron stock had already traded as low as $18.58 per share, representing a decline of 17.61% from the previous day's closing price, on dramatically higher trading volume. This more than sufficed to trigger the "circuit breaker" of Short Sale Rule 201, which was enacted to restrict short selling of a given stock when that stock is experiencing significant downward price pressure. Specifically, the circuit breaker triggers for a security on any day in which the price declines by 10% or more from the prior day's closing price, at which point an "alternative uptick" rule comes into effect, significantly curtailing further short sales with the goal of promoting market stability and preserving investor confidence.

The trigger of Short Sale Rule 201's circuit breaker was immediately preceded by Grizzly Research's presentation of its short thesis regarding Hebron—*i.e.*, by its discussion of the Company's evident malfeasance—at the Contrarian Investor's Virtual Investment Conference, which began at 9:30 a.m. on June 3, 2020. *See* Lieberman Opp. Decl., Ex. A. As the timestamp on the screenshot of the Grizzly Research presentation (included herein and as Lieberman Opp. Decl., Ex. B) indicates, the Grizzly Research presentation began approximately 54 minutes and 41 seconds after the start of the presentation. Accordingly, the Grizzly Research Presentation would have started at approximately 10:24:41 a.m. on June 3, 2020. The screenshot of the Grizzly Research Presentation is demonstrated below:

9



News of Hebron's malfeasance immediately permeated the market after 10:25 a.m.  In addition to the trigger of Short Sale Rule 201 at 10:26 a.m., at 10:28 a.m., a market observer posted on the website Stocktwits, under the username Tradesquawk: "$HEBT gRIZZLY rESEARCH NEG REPORT OUT"—*i.e.*, that Grizzly Research had already publicized its negative findings regarding Hebron (NASDAQ ticker symbol: HEBT).  *See* Lieberman Opp. Decl., Ex. D.  The Tradesquak post is demonstrated below:



Less than an hour later, at 11:20 a.m., the Contrarian Investor Podcast (the conference's host) published a tweet stating: "$HEBT shares down 24% after @ResearchGrizzly's presentation at our virtual investor conference", further reflecting the impact of the 10:25 a.m. presentation by

Grizzly Research. *See* Lieberman Opp. Decl., Ex. E. The post by Contrarian Investor Podcast is set forth below:



Concurrent with or shortly after the TradeSquawk and Contrarian Investor social media posts, Grizzly Research published on its website the negative report it had earlier presented regarding Hebron, announcing the report's publication via Twitter at 11:31 a.m. (*see* Lieberman Opp. Decl., Ex. F). The contents of the 10:25 a.m. Grizzly Research Presentation are described in relevant part in both of the Complaints in the Related Actions. *See Clynes v. Hebron Technology Co., Ltd.*, 1:20-cv-04420-PAE, Dkt. No. 1 ("*Clynes* Complaint") ¶ 21; *Dahlke v. Hebron Technology Co., Ltd.*, 1:20-cv-004746-PAE, Dkt. No. 1 ("*Dahlke* Complaint") ¶ 21.

Clynes has already alleged in his complaint that "the market for Hebron's securities was open, well-developed and efficient at all relevant times" and that consequently, "the market for Hebron's securities promptly digested current information regarding Hebron from all publicly available sources and reflected such information in Hebron's share price" (*Clynes* Complaint ¶¶ 35-38). Accordingly, the sudden decline in Hebron's share price beginning at 10:25 a.m. was clearly the result of Grizzly Research's presentation addressing Hebron's apparent malfeasance, which prompted Hebron investors to immediately start dumping their shares, and cause the Company's stock price to continue to fall throughout the trading session as news of Grizzly Research's findings continued to permeate the market. *See, e.g., In re Petrobras Sec. Litig.*, 862

11

F.3d 250, 276 (2d Cir. 2017) ("'The fraud-on-the-market theory rests on the premise that certain well developed markets are efficient processors of public information,' meaning that 'the market price of shares will reflect **all** publicly available information.'" (quoting *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 462 (2013) (internal quotations omitted) (emphasis added)); *In re AOL Time Warner, Inc. Sec. Litig.*, 503 F. Supp. 2d 666, 677 (S.D.N.Y. 2007) (loss causation adequately pleaded "by alleging that the market reacted negatively to a 'corrective disclosure,' which revealed an alleged misstatement's falsity or disclosed that allegedly material information had been omitted."; *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 175 (2d Cir. 2005 (same).

Clynes's transaction records indicate that all of his Class Period purchases of Hebron stock occurred on June 3, 2020 through a series of transactions via two accounts. Through one account, Clynes purchased 1,500 Hebron shares at a price of $19.89 per share. Through a second account, Clynes purchased another 1,302 shares as follows: 503 shares at a price of $17.75 per share; 330 shares at a price of $16.25 per share; and another 467 shares at a price of $16.00 per share— meaning that all of Clynes's purchases of Hebron shares in his second account were at purchase prices of $17.75 or lower. The following charts illustrates Clynes's purchases:

**Account 1**

| Date | Shares | Price Bought |
|---|---|---|
| 6/3/2020 | 1,500 | $19.8900 |

**Account 2**

| Date | Shares | Price Bought |
|---|---|---|
| 6/3/2020 | 500 | $17.7500 |
| 6/3/2020 | 3 | $17.7500 |
| 6/3/2020 | 100 | $16.2500 |
| 6/3/2020 | 20 | $16.2500 |
| 6/3/2020 | 100 | $16.2500 |
| 6/3/2020 | 110 | $16.2500 |
| 6/3/2020 | 247 | $16.0000 |
| 6/3/2020 | 169 | $16.0000 |
| 6/3/2020 | 26 | $16.0000 |
| 6/3/2020 | 3 | $16.0000 |
| 6/3/2020 | 10 | $16.0000 |
| 6/3/2020 | 2 | $16.0000 |
| 6/3/2020 | 12 | $16.0000 |

12

Considering together Clynes's purchases of Hebron stock and the prices at which Hebron stock traded on June 3, 2020, there are two possible scenarios:

**(1) Clynes purchased all of his Hebron shares on the open market <u>after</u> news of the Grizzly Research report had reached the market.** In his first account, Clynes purchased all of his Hebron shares at a price of $19.89 per share. Because Hebron's share price did not fall to a range of $18.58 to $20.42 per share—*i.e.*, a range that would include the $19.89 per share purchase price—until approximately 10:26 a.m., after Grizzly Research's conference presentation and the following Short Sale Rule 201 trigger, Clynes could not have made any of his Hebron share purchases in his first account on the open market any earlier than 10:26 a.m. In his second account, Clynes purchased all his Hebron shares at prices of $17.75 per share or lower. Because Hebron's share price did not fall to a range of $17.22 to $18.40 per share—*i.e.*, a range that would include the $17.75 per share purchase price—until approximately 10:47 a.m., well after the TradeSquawk post, Clynes could not have made any of his purchases of Hebron stock in his second account on the open market any earlier than 10:47 a.m. His additional purchases of Hebron stock at $16.25 per share and $16.00 per share, respectively, could only have occurred even later in the day, as the Company's share price continued to fall as the market digested the Grizzly Research report. Specifically, the Grizzly Research report characterized Hebron as an "insider enrichment scheme without economic basis," citing questionable transactions including an undisclosed related party transaction for nearly $26 million." *See Clynes* Complaint ¶ 21; *Dahlke* Complaint ¶ 21. The earliest that Clynes could have purchased Hebron stock in the price ranges $16.25 per share and $16.00 per share would have been approximately 11:57 a.m., when Hebron's share price traded between $16.03 per share to $16.35 per share, and 2:15pm, when Hebron's share price traded between $15.81 per share to $16.10 per share, respectively. Accordingly, assuming that Clynes

purchased his Hebron shares on the open market, all of his purchases must have occurred **after** the market had learned of Hebron's malfeasance.

**(2) Clynes purchased all of his Hebron shares <u>before</u> news of the Grizzly Research report came to light but <u>at prices unavailable to other investors</u>.**  As discussed above, on June 3, 2020, Hebron stock was not trading on the open market at the prices that Clynes paid until after the Company's fraud came to light.  Accordingly, if Clynes did purchase his Hebron shares before the corrective disclosures of June 3, 2020, he somehow managed to do so at prices that were not available to other investors purchasing on the open market—for example, via some private transaction.

Based upon Clynes's submissions to the Court, one of the two foregoing scenarios must be true, each of which renders Clynes atypical of the Class he seeks to represent and subject to unique defenses, because under either scenario, Clynes plainly cannot be entitled to rely on the *Basic* presumption of reliance premised upon "fraud-on-the-market."

> [T]he *Basic* Court established a rebuttable presumption of reliance, predicated on the notion that '[a]n investor who buys or sells stock at the price set by the market does so in reliance on the integrity of that price.  Because most publicly available information is reflected in market price, an investor's reliance on any public material misrepresentations . . . may be presumed for purposes of a Rule 10b-5 action."  To invoke Basic's presumption of reliance, "a plaintiff must prove that: (1) the alleged misrepresentations were publicly known, (2) they were material, (3) the stock traded in an efficient market, and (4) the plaintiff traded the stock between when the misrepresentations were made and when the truth was revealed."

*Howard v. Liquidity Servs.*, 322 F.R.D. 103, 116 (D.D.C. 2017) (citations omitted).  The *Basic* presumption is rebuttable if a defendant "can make 'any showing that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or his decision to trade at fair market price[.]'"  *In re WorldCom, Inc. Sec. Litig.*, 219 F.R.D. 267, 292 (S.D.N.Y. 2003) (quoting *Basic*, 485 U.S. at 248).

14

If Clynes purchased his Hebron shares at market prices *after* the truth was revealed on June 3, 2020, then Clynes clearly has not met the requirement to have "traded the stock between when the misrepresentations were made and when the truth was revealed", as necessary to invoke the *Basic* presumption. *Howard*, 322 F.R.D. at 116. Similarly in the seminal case *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336 (2005), the Supreme Court confirmed that a "person who 'misrepresents the financial condition in order to sell its stock' becomes liable to a relying purchasers 'for the loss' the purchaser sustains 'when the facts . . . become generally known' and 'as a results' share value 'depreciate[s].'" *Id.* at 344 (quoting Restat 2d of Torts, § 548A, Comment b, at 107). Here, Clynes' runs afoul of *Dura* because he only made his purchases after the truth began to "become . . . known". As discussed at length above, by 10:25 a.m. Grizzly Research had already publicized its negative thesis regarding Hebron, which immediately and severely impacted Hebron's market price, driving it from $20.45 to $18.52 in little more than a minute on extraordinarily high trading volume. Indeed, Defendants are nearly certain to argue that by purchasing his shares after the truth began to be revealed to the market provides the type of "investors insurance" that *Basic, Dura* and their progeny have cautioned against. *See*, *e.g.*, *Basic*, 485 U.S. at 252 (White, J., joined by O'Connor, Jr., concurring in part and dissenting in part) ("Allowing recovery in the face of 'affirmative evidence of nonreliance[]' . . . would effectively convert Rule 10b-5 into a scheme of investor's insurance. There is no support in the Securities [Exchange] Act, the Rule, or our cases for such a result.") (internal quotations and citations omitted); *Dura*, 544 U.S. at 345 (finding the federal securities laws "not to provide investors with broad insurance against market losses, but to protect them against those economic losses that ***misrepresentations actually cause***.") (emphasis added).

15

For this reason, courts decline to appoint as lead plaintiffs investors who purchased their securities after the revelation of the alleged fraud at issue. *See*, *e.g.*, *Faris v. Longtop Financial Techs. Ltd.*, 11 Civ. 3658 (SAS) *et al.*, 2011 U.S. Dist. LEXIS 112970, at *8 (S.D.N.Y. Oct. 4, 2011) (denying motion where movants "invested in Longtop securities notwithstanding notice of defendants' misstatements and omissions," finding that "[t]hese unusual trading patterns may well undermine the ability of these three members to assert the fraud-on-the-market presumption of reliance."); *Petrobras*, 104 F. Supp. 3d at 623 (denying motion where movant "made a significant investment in Petrobras securities . . . after the alleged fraud had been fully revealed"); *Berwecky v. Bear, Stearns & Co.*, 197 F.R.D. 65, 69 (S.D.N.Y. 2000) ("[A] person that increases his holdings in a security after revelations of an alleged fraud involving that security is subject to a unique defense that precludes him from serving as a class representative."); *Rocco v. Nam Tai Electronics, Inc.*, 245 F.R.D. 131, 136 (S.D.N.Y. 2007) (finding movant "clearly atypical of the rest of the proposed class" because "he made numerous post-class purchases of Nam Tai stock"). Indeed, it will be difficult for Clynes to argue that he was defrauded by Defendants' misrepresentations when he purchased shares after those misrepresentations began to be revealed to the market. *See*, *e.g.*, *George v. China Auto Sys., Inc.*, No. 11-cv-7533, 2013 U.S. Dist. LEXIS 93698, at *18-*19 (S.D.N.Y. July 3, 2013) (denying class certification, finding "named plaintiffs [who] continued to make purchases of the securities at issue" after the alleged fraud was revealed to the market to be "neither typical nor adequate"); *Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 903 F.2d 176, 180 (2d Cir. 1990) (affirming denial of class certification where proposed class representative continued to purchase subject securities "despite having notice of . . . the alleged fraud" and was thus subject to "unique defenses which threaten to become the focus of the litigation."); *Greenspan v. Brassler*, 78 F.R.D. 130, 132 (S.D.N.Y. 1978) (finding post-

16

disclosure purchase rendered named plaintiffs atypical and inappropriate as class representatives). The class should not be saddled with a lead plaintiff subject to these defenses which will face Clynes at every stage of the litigation.

In the alternative, if Clynes purchased his Hebron shares *before* the Company's fraud came to light, then he must have done so at prices unavailable to other investors—*i.e.*, at non-market prices—and thus clearly is not "an investor who [bought] . . . stock at the price set by the market . . . in reliance on the integrity of that price," as required to invoke the *Basic* presumption. This is precisely why courts decline to appoint investors who purchased their securities at non-market prices and/or in private transactions. *See*, *e.g.*, *Lang*, 2014 U.S. Dist. LEXIS, at *10 (denying lead plaintiff motion by investor who "acquired a significant amount of shares at a discount through a privately negotiated transaction," because "the class may lose the benefit of the fraud-on-the-market presumption and be subject to other unique defenses."); *Critical Path*, 156 F. Supp. 2d at 110-11 ("Appointing as lead plaintiff one who acquired its shares in a private transaction invites lengthy litigation both at the class certification stage and thereafter of whether that plaintiff is subject to unique defenses. Certainly the Court should not appoint as lead plaintiff one whose appointment will invite scrutiny of the details of a private transaction.").

Whatever the circumstances of Clynes's acquisitions of Hebron stock, there is no evident scenario in which he is *not* atypical and subject to unique defenses. There is no reason to saddle the investor Class in this action with a Lead Plaintiff so obviously subject to such fatal deficiencies.

## CONCLUSION

For the foregoing reasons and the reasons set forth in his motion brief (Dkt. No. 7), Dahlke respectfully requests that the Court issue an Order: (1) consolidating the Related Actions; (2) appointing Dahlke as Lead Plaintiff; and (3) approving proposed Lead Plaintiff's selection of Pomerantz as Lead Counsel for the Class.

17

Dated:  August 26, 2020

Respectfully submitted,

POMERANTZ LLP

*/s/ Jeremy A. Lieberman*
Jeremy A. Lieberman
J. Alexander Hood II
600 Third Avenue, 20th Floor
New York, NY 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
jalieberman@pomlaw.com
ahood@pomlaw.com

POMERANTZ LLP
Patrick V. Dahlstrom
10 South LaSalle Street, Suite 3505
Chicago, Illinois 60603
Telephone: (312) 377-1181
Facsimile: (312) 377-1184
pdahlstrom@pomlaw.com

*Counsel for Lead Plaintiff Movant Edward A.*
*Dahlke and Proposed Lead Counsel for the Class*

THE SCHALL LAW FIRM
Brian Schall
(*pro hac vice* application forthcoming)
1880 Century Park East, Suite 404
Los Angeles, CA 90067
Telephone: (424) 303-1964
brian@schallfirm.com

*Additional Counsel for Lead Plaintiff Movant*
*Edward A. Dahlke*

18