UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE HEBRON TECHNOLOGY CO., LTD. SECURITIES LITIGATION | 20 Civ. 4420 (PAE)<br><br>OPINION & ORDER |
| MICHAEL CLYNES, *individually and on behalf of all others similarly situated*,<br><br>                              Plaintiff,<br>            -v-<br>HEBRON TECHNOLOGY CO., LTD., ANYUAN SUN, and CHANGJUAN LIANG,<br><br>                              Defendants. | 20 Civ. 4420 (PAE) |
| EDWARD A. DAHLKE, *individually and on behalf of all others similarly situated*,<br><br>                              Plaintiff,<br>            -v-<br>HEBRON TECHNOLOGY CO., LTD., ANYUAN SUN, and CHANGJUAN LIANG,<br><br>                              Defendants. | 20 Civ. 4746 (PAE) |

PAUL A. ENGELMAYER, District Judge:

In June 2020, the above two putative class actions were filed, under the federal securities laws, on behalf of purchasers of certain Hebron Technology Co., Ltd. ("Hebron") securities between April 24, 2020, and June 3, 2020, inclusive (the "class period"). Plaintiffs in each case allege that Hebron and the individual defendants (each an officer of Hebron) made false and misleading statements about, and/or failed to disclose, the involvement of related parties in several of Hebron's recent acquisitions, and failed to maintain adequate disclosure controls

regarding related-party transactions. As a result, plaintiffs allege, Hebron's shares traded at artificially inflated prices during the class period. But, on June 3, 2020, after news broke exposing the involvement of related parties in various transactions, Hebron shares fell more than 37%, and another 18% the following day.

Pending before the Court are two sets of motions. One, unopposed, is to consolidate these two actions. The other consists of motions from two investors, each seeking appointment as lead plaintiff and appointment of their respective attorneys as lead counsel. These movants are each individuals: (1) Michael Clynes; and (2) Edward A. Dahlke.

For the reasons that follow, the Court (1) consolidates these two actions; (2) appoints Dahlke as lead plaintiff; and (3) appoints as lead counsel Dahlke's counsel, Pomerantz LLP.

## I.     Background

### A.     Factual Background[1]

Hebron is a British Virgin Islands corporation and maintains its principal executive offices in the People's Republic of China. Clynes Compl. ¶ 12; Dahlke Compl. ¶ 12. It conducts equipment and engineering operations focusing on the research, development, and manufacture of fluid equipment, including valves and pipe fittings; since 2019, it has also provided financial services. Clynes Compl. ¶ 16; Dahlke Compl. ¶ 16. Hebron's Class A common stock trades on the NASDAQ exchange under the symbol "HEBT." Clynes Compl. ¶ 12; Dahlke Compl. ¶ 12. At all relevant times, defendant Anyuan Sun was Hebron's CEO and defendant Chanjuan Liang was its CFO. Clynes Compl. ¶¶ 13–14; Dahlke Compl. ¶ 13–14.

---

[1] The following facts are drawn from Clynes's Complaint, *see* 20 Civ. 4420, Dkt. 1 ("Clynes Compl."), Dahlke's Complaint, *see* 20 Civ. 4746, Dkt. 1 ("Dahlke Compl."), and the parties' submissions on the lead-plaintiff motions, as cited herein. The Court takes these facts as true solely for the purpose of resolving these motions. Unless otherwise stated, docket citations in this decision refer to 20 Civ. 4420.

On April 24, 2020, the beginning of the class period, Hebron filed its annual report on Form 20-F with the Securities and Exchange Commission ("SEC") for the period ended December 31, 2019.  Clynes Compl. ¶ 17; Dahlke Compl. ¶ 17.  In that disclosure, Hebron purported to describe all related-party transactions, *i.e.*, transactions between Hebron and any of its officers or directors, for the years 2017–2019.  Clynes Compl. ¶ 17; Dahlke Compl. ¶ 17.  In addition, the report disclosed that, after an internal evaluation, Hebron had concluded that its "disclosure controls and procedures were ineffective . . . due to the presence of material weaknesses in internal control over financial reporting."  Clynes Compl. ¶ 18; Dahlke Compl. ¶ 18.

On May 22, 2020, Hebron announced its plans to acquire Nami Holding (Cayman) Co., Ltd. ("Nami") for approximately $25 million.  Clynes Compl. ¶ 19; Dahlke Compl. ¶ 19.  In addition, plaintiffs allege, Hebron made other acquisitions, including of a company called Beijing Hengpu, but the Complaints do not specify when those transactions occurred.  *See* Clynes Compl. ¶ 20; Dahlke Compl. ¶ 20.

On June 3, 2020, Siegfried Eggert, the CEO of Grizzly Research, presented a report at a streaming virtual investor conference (the "Contrarian Investor Conference"), which concluded that Hebron is an "insider enrichment scheme without economic basis."  Clynes Compl. ¶ 21; Dahlke Compl. ¶ 21.  According to a later article describing the report, Eggert stated during the presentation that Hebron's controlling shareholder, Bodang Liu, owned both Beijing Hengpu and Nami, along with other acquired companies, making their acquisitions undisclosed related-party transactions.  Clynes Compl. ¶ 21; Dahlke Compl. ¶ 21.  The conference, which began at 10:25 a.m., was open only to paying attendees, *see* Dkt. 20 ("Clynes Reply") at 3 & nn.3–4, but the news of Eggert's statements quickly began to spread.  By 10:26 a.m., after Hebron's share price fell more than 10% from its prior closing price the day before, the SEC's short-sale rule went

into effect. *See* Dkt. 15 ("Dahlke Opp'n") at 3; *see also* 17 C.F.R. 242.201(b)(1)(i); Dkt. 16-3. Between 10:26 a.m. and 10:32 a.m., Hebron's share price then briefly recovered. *See* Dahlke Opp'n at 8. But, over the next hour and for the rest of the day, Hebron's share price continued to decline amid "unusually heavy trading volume." Clynes Compl. ¶¶ 4, 22; Dahlke Compl. ¶¶ 4, 22. By market's close, Hebron's share price had fallen nearly 37%; the next day it fell another 18%. Clynes Compl. ¶¶ 4, 22; Dahlke Compl. ¶¶ 4, 22.

Clynes first purchased Hebron securities on June 3, 2020. He purchased 1,500 shares at 10:26 a.m., although he had entered his order to execute that trade earlier the same morning, at 6:38 a.m. *See* Dkt. 14-1. He also purchased approximately 1,300 additional shares sometime later that day. *See* Dkt. 13 ("Clynes Opp'n") at 6–7; Dkt. 11-2 ("Clynes Loss Chart"). On June 4, 2020, Clynes sold all those shares at a total loss of $15,105.68. *See* Clynes Loss Chart.

Dahlke purchased his 500 Hebron shares on June 1, 2020. He sold them all on June 4, 2020, for a loss of $5,332. *See* Dkt. 8-1 ("Dahlke Loss Chart").

### B.     Procedural Background

On June 9, 2020, Clynes filed a Complaint, *see* Clynes Compl., and published a notice of this action on *BusinessWire*, *see* Dkt. 11-1 ("Notice"), a "widely circulated national business-oriented wire service," 15 U.S.C. § 78u-4(a)(3)(A)(i).[2] On June 19, 2020, Dahlke filed his Complaint. *See* Dahlke Compl. Both plaintiffs allege that, throughout the class period, Hebron and the individual defendants made false and misleading statements, and failed to disclose material adverse facts about Hebron's business, operations, and prospects, causing its securities, at all relevant times, to be overvalued. *See* Clynes Compl. ¶¶ 29–31; Dahlke Compl. ¶¶ 29–31.

---

[2] *See, e.g.*, *In re Facebook, Inc., IPO Sec. & Derivative Litig.*, 288 F.R.D. 26, 32 (S.D.N.Y. 2012) (noting that *BusinessWire* is "a widely-circulated, national, business-orientated news reporting wire service").

> Specifically, Defendants failed to disclose to investors: (1) that many of Hebron's acquisitions, including Beijing Hengpu and Nami Holding (Cayman) Co., Ltd., involved undisclosed related parties; (2) that the Company's disclosure controls regarding related party transactions [were] ineffective; and (3) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects, were materially misleading and/or lacked a reasonable basis.

Clynes Compl. ¶ 20; *see also* Dahlke Compl. ¶ 20 (similar). Plaintiffs each allege violations of §§ 10(b) and 20(a) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78a, *et seq.* ("Exchange Act"), and Rule 10b-5. *See* Clynes Compl. ¶ 7; Dahlke Compl. ¶ 7.

On August 7, 2020, Dahlke moved to consolidate the two cases and for appointment as lead plaintiff in the consolidated action. *See* Dkt. 7 ("Dahlke Mem."). On August 10, 2020, Clynes did the same. *See* Dkt. 10 ("Clynes Mem."). On August 26, 2020, each plaintiff filed an opposition to the other's motion to serve as lead plaintiff. *See* Clynes Opp'n; Dahlke Opp'n. On September 2, 2020, with leave of the Court, Clynes filed a reply, *see* Clynes Reply, and on September 4, 2020, Dahlke did the same, *see* Dkt. 21 ("Dahlke Reply").

## II.   Consolidation

### A.   Legal Standard

Federal Rule of Civil Procedure 42(a) provides that, "[i]f actions before the court involve a common question of law or fact, the court may: (1) join for hearing or trial any or all matters at issue in the actions; (2) consolidate the actions; or (3) issue any other orders to avoid unnecessary cost or delay."

Rule 42(a) "empowers a trial judge to consolidate actions for trial when there are common questions of law or fact," and where consolidation will avoid needless costs or delay. *Johnson v. Celotex Corp.*, 899 F.2d 1281, 1284 (2d Cir. 1990); *see also Devlin v. Transp. Commc'ns Int'l Union*, 175 F.3d 121, 130 (2d Cir. 1999). "Typically, considerations of judicial economy favor consolidation, but 'the benefits of efficiency can never be purchased at the cost of

fairness.'" *M & T Mortg. Corp. v. White*, No. 04 Civ. 4775 (WFK) (VVP), 2012 WL 715896, at *1 (E.D.N.Y. Feb. 14, 2012) (quoting *Malcolm v. Nat'l Gypsum Co.*, 995 F.2d 346, 350 (2d Cir. 1993)), *report and recommendation adopted*, 2012 WL 954651 (E.D.N.Y. Mar. 5, 2012). Before a Court orders consolidation, it must consider several factors and determine, *inter alia*, whether the gains in efficiency and economy are outweighed by the "risks of prejudice and possible confusion." *Johnson*, 899 F.2d at 1284.

In the securities context, the Exchange Act provides that consolidation should occur where multiple actions assert "substantially the same claim." *Id.* § 78u-4(a)(3)(B)(ii).

**B.     Discussion**

Both plaintiffs seek consolidation, and consolidation is clearly merited. *See* Clynes Mem. at 3; Dahlke Mem. at 3–4. Both actions sue Hebron under the Exchange Act on behalf of "all persons and entities that purchased or otherwise acquired Hebron securities between April 24, 2020 and June 3, 2020, inclusive, and who were damaged thereby." Clynes Compl. ¶ 23; Dahlke Compl. ¶ 23. Both center on the same alleged facts: that Hebron violated the Exchange Act by failing to disclose acquisitions involving related parties; that Hebron's disclosure controls regarding related-party transactions were ineffective; and that these violations led to artificially inflated share prices, which, once the truth was revealed, collapsed to the financial detriment of the proposed class. *See* Clynes Compl. ¶¶ 20, 33; Dahlke Compl. ¶¶ 20, 33. In fact, the majority of each Complaint contains the exact same allegations, generally verbatim. The defendants in the two suits are also identical: They include Hebron and two officers, Sun and Liang. Clynes Compl. ¶¶ 13–14; Dahlke Compl. ¶¶ 13–14. The lawsuits, therefore, are overwhelmingly similar.

Courts routinely consolidate securities class actions arising from the same allegedly actionable statements. *See, e.g.*, *In re Braskem S.A. Sec. Litig.*, No. 15 Civ. 5132 (PAE), 2015 WL 5244735, at *3 (S.D.N.Y. Sept. 8, 2015); *Simmons v. Spencer*, No. 13 Civ. 8216

(RWS), 2014 WL 1678987, at *2 (S.D.N.Y. Apr. 25, 2014); *In re Tronox, Inc. Sec. Litig.*, 262 F.R.D. 338, 344 (S.D.N.Y. 2009); *Blackmoss Invs., Inc. v. ACA Cap. Holdings, Inc.*, 252 F.R.D. 188, 190 (S.D.N.Y. 2008). All relevant factors support consolidation here. Accordingly, the Court consolidates these actions.

### III.     Selecting the Lead Plaintiff

#### A.     Legal Standard

Motions for appointment of lead plaintiff and approval of lead counsel in putative class actions brought under the securities laws are governed by the Private Securities Litigation Reform Act ("PSLRA"). *In re Millennial Media, Inc. Sec. Litig.*, 87 F. Supp. 3d 563, 569 (S.D.N.Y. 2015); *Bo Young Cha v. Kinross Gold Corp.*, No. 12 Civ. 1203 (PAE), 2012 WL 2025850, at *2 (S.D.N.Y. May 31, 2012). The PSLRA directs the Court to appoint as lead plaintiff the party or parties "most capable of adequately representing the interests of class members." 15 U.S.C. § 78u-4(a)(3)(B)(i). Under the PSLRA, there is a rebuttable presumption that the most adequate plaintiff is the person or group of persons that: (1) has either "filed a complaint or made a motion in response to a notice"; (2) in the determination of the Court, has the "largest financial interest in the relief sought by the class"; and (3) "satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure," which governs class actions. *Id.* § 78u-4(a)(3)(B)(iii)(I)(aa)–(cc).

**B.     Discussion**

  **1.     Notice**

All putative lead plaintiffs satisfy the first requirement, as each has filed a complaint and submitted a timely motion for lead plaintiff status.  *Id.* § 78u-4(a)(3)(B)(iii)(I)(aa); *City of Monroe Emps.' Ret. Sys. v. Hartford Fin. Servs. Grp., Inc.*, 269 F.R.D. 291, 293 (S.D.N.Y. 2010).[3]

  **2.     Financial Interest**

In determining who has the largest financial stake in the litigation, courts in this Circuit have traditionally applied a four-factor test, first set forth in *Lax v. First Merchants Acceptance Corp.*, No. 97 Civ. 2715 (DHC), 1997 WL 461036, at *5 (N.D. Ill. Aug. 11, 1997).  These "*Lax*" factors include:

> (1) the total number of shares purchased during the class period;
> (2) the net shares purchased during the class period (in other words, the difference between the number of shares purchased and the number of shares sold during the class period);
> (3) the net funds expended during the class period (in other words, the difference between the amount spent to purchase shares and the amount received for the sale of shares during the class period); and
> (4) the approximate losses suffered.

*City of Monroe*, 269 F.R.D. at 293.

Of these factors, courts have consistently held that the fourth, the magnitude of the loss suffered, is most significant.  *See, e.g.*, *Kaplan v. Gelfond*, 240 F.R.D. 88, 93 (S.D.N.Y. 2007) ("Although courts have differed on how much weight to assign to each of the *Lax* factors, we, as have other courts, shall place the most emphasis on the last of the four factors: the approximate loss suffered by the movant."), *reconsidered on other grounds*, *In re IMAX Sec. Litig.*, No. 06 Civ. 6128 (NRB), 2009 WL 1905033 (S.D.N.Y. June 29, 2009); *Bo Young Cha*,

---

[3] Because Clynes published a notice of his action on June 9, 2020, *see* Notice, the deadline to file a motion for appointment as lead plaintiff was August 10, 2020.  15 U.S.C. § 78u-4(a)(3)(A)(i)(II).

2012 WL 2025850, at *2; *Reimer v. Ambac Fin. Grp. Inc.*, No. 08 Civ. 411 (NRB), 2008 WL 2073931, at *3 (S.D.N.Y. May 9, 2008); *Bhojwani v. Pistiolis*, No. 06 Civ. 13761 (CM) (KNF), 2007 WL 2197836, at *6 (S.D.N.Y. June 26, 2007); *Strougo v. Brantley Cap. Corp.*, 243 F.R.D. 100, 104 (S.D.N.Y. 2007); *see also Foley v. Transocean Ltd.*, 272 F.R.D. 126, 128 (S.D.N.Y. 2011) ("[I]n determining the largest financial interest, most courts simply determine which potential lead plaintiff has suffered the greatest total losses." (citation omitted)).

Here, the difference between the lead plaintiff candidates' losses is less dramatic than in many PSLRA cases. *See, e.g.*, *In re Braskem*, 2015 WL 5244735, at *5 (contrasting losses of $360, $1,440, $56,061, and $1.4 million); *Faris v. Longtop Fin. Techs. Ltd.*, No. 11 Civ. 3658 (SAS), 2011 WL 4597553, at *4 (S.D.N.Y. Oct. 4, 2011) (contrasting losses from $3.5 million to $214,000). According to the loss charts submitted by each plaintiff, Clynes lost $15,106 after Hebron's stock drop, and Dahlke lost $5,332. *See* Clynes Loss Chart; Dahlke Loss Chart. Clynes also purchased more shares than Dahlke, and each sold off all their holdings by January 4, 2020. *Compare* Clynes Loss Chart (roughly 2,800 shares purchased and sold), *with* Dahlke Loss Chart (500 shares purchased and sold). Even though these numbers, in absolute terms, are less striking than in the cases cited above, they clearly weigh in favor of Clynes. *See City of Monroe*, 269 F.R.D. at 293. His losses nearly triple Dahlke's, and he purchased almost six times as many shares. Thus, Clynes has the largest financial stake in this litigation.[4]

---

[4] Dahlke contends that Clynes cannot have the largest financial stake because he is not "eligible" to serve as lead plaintiff, given certain unique defenses that might apply to Clynes. *See* Dahlke Opp'n at 5 ("[N]o movant eligible for appointment as Lead Plaintiff in the Action has a larger financial interest in the litigation than Dahlke."); *see also infra*. But the PSLRA does not speak of eligibility, and Dahlke's approach would invert the PLSRA framework. *See* 15 U.S.C. § 78u-4(a)(3)(B)(iii). Rather, the PSLRA describes a presumption, discussed above, which may be rebutted by other plaintiffs seeking appointment as lead counsel. Thus, the assessment of the largest financial interest is independent of, and logically antecedent to, Dahlke's arguments about

### 3. Rule 23 Requirements

The PSLRA's final requirement is that the proposed lead plaintiff satisfy Rule 23's requirements for class certification: numerosity, commonality, typicality, and adequacy. At this early stage of litigation, however, "only the last two factors—typicality and adequacy—are pertinent." *Bo Young Cha*, 2012 WL 2025850, at *6 (quoting *Constance Sczesny Tr. v. KPMG LLP*, 223 F.R.D. 319, 324 (S.D.N.Y. 2004)). "When moving for appointment as lead plaintiff, 'the moving plaintiff must only make a preliminary showing that the adequacy and typicality requirements have been met.'" *Kux-Kardos v. VimpelCom, Ltd.*, 151 F. Supp. 3d 471, 477 (S.D.N.Y. 2016) (quoting *Janbay v. Canadian Solar, Inc.*, 272 F.R.D. 112, 120 (S.D.N.Y. 2010)).

Lead plaintiffs' claims are typical where "each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." *Sgalambo v. McKenzie*, 268 F.R.D. 170, 173–74 (S.D.N.Y. 2010) (citation omitted). "The claims of [a plaintiff] are typical of the class [when] their claims and injuries arise from the same conduct from which the other class members' claims and injuries arise." *In re Oxford Health Plans, Inc., Sec. Litig.*, 182 F.R.D. 42, 49–50 (S.D.N.Y. 1998). A lead plaintiff is adequate where he or she "does not have interests that are antagonistic to the class that he [or she] seeks to represent and has retained counsel that is capable and qualified to vigorously represent the interests of the class that he [or she] seeks to represent." *Glauser v. EVCI Ctr. Colls. Holding Corp.*, 236 F.R.D. 184, 189 (S.D.N.Y. 2006).

Both Dahlke and Clynes bring claims that are typical of the class they each propose to represent. Their claims arise from the same alleged conduct by defendants, and they make

---

unique defenses, which are properly considered in connection with Dahlke's attempt to rebut Clynes's presumptive status as lead plaintiff. *See, e.g.*, *Batter v. Hecla Mining Co.*, No. 19 Civ. 4883, 2020 WL 1444934, at *2–5 (plaintiff with largest financial interest was presumptively lead plaintiff, but other plaintiffs "successfully rebutted that presumption").

identical legal arguments regarding the defendants' liability.  They each purchased all their Hebron shares during the class period set out in both movants' Complaints, and each then sold them at a loss.  *See* Clynes Loss Chart; Dahlke Loss Chart.  That "is all that is required to demonstrate typicality at this stage." *In re Petrobas Sec. Litig.*, 104 F. Supp. 3d 618, 624 (S.D.N.Y. 2015).

Dahlke nevertheless contends that Clynes is "atypical" because of certain unique defenses that could apply to his purchases.  *See* Dahlke Opp'n at 6–7, 14.  But unique defenses such as these "are considered more appropriately as rebutting [movant's] status as presumptive lead plaintiff," not in the context of this preliminary assessment of the Rule 23 factors. *Batter*, 2020 WL 1444934, at *4.  None of the cases Dahlke cites are to the contrary.  Those either assessed typicality at the later, more rigorous class-certification stage, *see, e.g.*, *Rocco v. Nam Tai Elecs., Inc.*, 245 F.R.D. 131, 135–36 (S.D.N.Y. 2007); *Berwecky v. Bear, Sterns & Co., Inc.*, 197 F.R.D. 65, 69 (S.D.N.Y. 2000), or in the context of the PSLRA's rebuttal provision, *see, e.g.*, *Longtop*, 2011 WL 4597553, at *8 (discussing unique defenses outside the Rule 23 context); *Petrobas*, 104 F. Supp. 3d at 623 (same).

The Court therefore does not address these concerns in the context of the PSLRA's preliminary Rule 23 analysis, and finds both Clynes and Dahlke to be sufficiently typical to qualify for the PSLRA's presumptive lead-plaintiff provision.  *See Batter*, 2020 WL 1444934, at *4.

For similar reasons, both Clynes and Dahlke would be adequate class representatives. Neither party has interests "antagonistic" to the class.  *Glauser*, 236 F.R.D. at 189.  Each has a "sufficient interest in the outcome to ensure vigorous advocacy on behalf of the class." *Petrobas*, 104 F. Supp. 3d at 624 (citation omitted); *see Kux-Kardos*, 151 F. Supp. 3d at 478. And both have retained experienced and qualified proposed lead counsel.  Glancy Prongay &

Murray LLP (counsel for Clynes) and Pomerantz LLP (counsel for Dahlke) each have extensive experience as lead counsel in securities class actions. *See* Dkts. 8-4 ("Pomerantz LLP Firm Resume); 11-3 ("Glancy Prongay & Murray LLP Firm Resume"). Thus, both Clynes and Dahlke satisfy the PSLRA's preliminary assessment of Rule 23's adequacy requirement.[5]

### 4. Rebuttal

Because Clynes has the largest financial interest in this case and satisfies the PSLRA's preliminary Rule 23 analysis, he is entitled to presumptive lead status. *See* 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I). Dahlke contends, however, that the timing of Clynes's purchases of Hebron shares exposes him to unique defenses, which rebut that presumption. *See* Dahlke Opp'n at 15–16; *see also* 15 U.S.C. § 78u-4(a)(3)(B)(iii)(II)(bb). Specifically, he argues that, because Clynes bought all his Hebron shares on June 3, 2020, at almost precisely the same time that adverse news broke and sent Hebron's stock tumbling (and thereafter), Clynes may be subject to the unique defense that he did not rely on Hebron's alleged misrepresentations when making his purchases, or, that in establishing such reliance, Clynes may (unlike the putative class) be unable to invoke the presumption that, as an open-market purchaser of stock, he did so.[6] *See* Def. Opp'n at 3, 14–16 (citing *Basic, Inc. v. Levinson*, 485 U.S. 224, 247–48 (1988)).

Clynes disputes Dahlke's argument on various grounds. First, he contends that Dahlke improperly seeks to shorten the class period that both he and Clynes allege in their Complaints, by excluding those who purchased their shares on June 3, 2020. *See* Clynes Opp'n at 5–6.

---

[5] As with the typicality analysis, Dahlke's adequacy challenges to Clynes's lead-plaintiff motion, based on the same alleged unique defenses, "are considered more appropriately as rebutting [movant's] status as presumptive lead plaintiff." *Batter*, 2020 WL 1444934, at *4.

[6] Dahlke also originally speculated that, given the share prices identified in the Clynes Loss Chart, Clynes may have purchased shares in private sales or otherwise at non-market prices. *See* Dahlke Opp'n at 14, 17. However, Clynes rebutted this theory in his reply brief, *see* Clynes Reply at 2 n.2, and Dahlke appears to have abandoned it in his reply, *see* Dahlke Reply.

Second, he argues that the Contrarian Investor Conference at which Hebron's related-party transactions were first revealed at 10:26 a.m. was a private event, not open to the public, and so did not constitute a "public disclosure" of the damaging Grizzly Research presentation about Hebron until its findings were more broadly publicized, which was *after* Clynes bought 1,500 of his shares. *See* Clynes Reply at 3. Third, he notes that, although his trades in Hebron shares were *executed* after the Grizzly Research presentation began, he *placed the order* for those shares much earlier that morning. *See id.* at 2. Fourth, he argues that, even if the private Grizzly Research presentation began to affect the price of Hebron shares before the news officially became public, such "leakage" is not a corrective disclosure that subjects his later purchases to a unique defense. *Id.* at 4. Last, he argues that even if some disclosures from the first minutes of the Grizzly Research presentation (*i.e.*, before his 10:26 a.m. purchase) constituted public disclosures, they were merely *partial* corrective disclosures, and do not render Clynes subject to any unique defenses. *Id.* at 4–6.

    For the following reasons, the Court holds with Dahlke.

    "[T]o rebut the presumption in favor of the movant with the greatest financial loss, there must be 'proof' of a non-speculative risk that the movant will not be adequate." *Schaffer v. Horizon Pharma Plc*, No. 16 Civ. 1763 (JMF), 2016 WL 3566238, at *2 (S.D.N.Y. June 27, 2016). Courts in this District have recognized that the meaning of the PSLRA's term "proof" is "not firmly established," and have treated it as roughly "synonymous with 'evidence,'" *id.* (quoting *Kaplan*, 240 F.R.D. at 94). And, because the PSLRA requires proof that the movant is merely "subject to" unique defenses, "many courts have rejected appointments of lead plaintiffs based on *potential* risks." *Id.* at *3 (emphasis in original) (collecting cases). Thus, "[b]efore disqualifying a potential lead plaintiff on [the basis that he is subject to a unique defense], the Court need not

conclude that the defense is likely to or will succeed." *Gross v. AT & T Inc.*, No. 19 Civ. 2892 (VEC), 2019 WL 3500496, at *2 (S.D.N.Y. July 31, 2019). Rather, it must only find "at least a potential that the presumptively most adequate lead plaintiff will be subject to unique defenses." *Batter*, 2020 WL 1444934, at *7 (quoting *In re Surebeam Corp. Sec. Litig.*, No. 03 Civ. 1721 (JM), 2004 WL 5159061, at *7 (S.D. Cal. Jan. 5, 2004)). This approach protects members of the putative class, because even ultimately unsuccessful unique defenses may "divert attention from the substance of the basic claim," and class members are "entitled to be represented by someone unhindered by" such distractions. *Rocco*, 245 F.R.D. at 135 (quoting *Kline v. Wolff*, 88 F.R.D. 696, 699–701 (S.D.N.Y. 1981)).

As the debate between Clynes and Dahlke aptly illustrates, there is a real risk that the idiosyncrasies of Clynes's purchases would become just such a distraction at trial, were Clynes appointed lead plaintiff, with his trading serving as a proxy for the class. In this District, "a person that increases his holdings in a security after revelation of an alleged fraud involving that security is subject to a unique defense that precludes him from serving as a class representative." *Berwecky*, 197 F.R.D. at 69; *see In re Harcourt Brace Jovanovich Sec. Litig.*, 838 F. Supp. 109, 113 (S.D.N.Y. 1993) (a named class plaintiff "who is subject to an *arguable* defense of non-reliance on the market has been held subject to a unique defense" (emphasis added)); *see also Petrobas*, 104 F. Supp. 3d at 623 ("Similarly, all of [movant's] retained shares of common ADS were purchased on November 14, 2014, after *partial disclosures* were made and just two weeks *before the end of the class period*. *Id.* These transactions raise serious questions regarding [movant's] reliance on the alleged misrepresentations and omissions." (emphasis added)); *George v. China Auto. Sys., Inc.*, No. 11 Civ. 7533 (KBF), 2013 WL 3357170, at *6 (S.D.N.Y. July 3, 2013) ("A named plaintiff who has engaged in a post-disclosure purchase is subject to the defense that the

14

alleged misstatements or omissions were really not a factor in the purchasing decision but rather that other investment considerations drove the decision."); *Longtop*, 2011 WL 4597553, at *8.[7]

Here, Dahlke has adduced proof—*i.e.*, non-speculative evidence, *see Schaffer*, 2016 WL 3566238, at *3—that Clynes is subject to this arguable defense. Clynes does not dispute that the first time he purchased Hebron stock during the class period was June 3, 2020, at 10:26 a.m., just as the Grizzly Research presentation was revealing its thesis regarding Hebron. *See* Clynes Reply at 5–6. Nor does he seem to dispute that, after that initial purchase, he *continued* to purchase Hebron shares at least throughout the morning, and possibly into the afternoon. *See* Dahlke Opp'n at 12–13 (discussing additional purchases beyond initial 1,500 shares); Clynes Reply at 6 (discussing only first 1,500 shares); Clynes Loss Chart (showing 13 separate transactions purchasing roughly 1,300 additional shares). Therefore, whether Clynes's *first* transaction occurred just before or just after news regarding Hebron's insider dealings hit the

---

[7] Clynes has pointed to some authority narrowing this doctrine. *See, e.g.*, *Goldstein v. Puda Coal, Inc.*, 827 F. Supp. 2d 348, 354–55 (S.D.N.Y. 2011) (appointing lead plaintiff who purchased stock after a third-party report accused company of fraud); *Tronox*, 262 F.R.D. at 345–46 (S.D.N.Y. 2009) (appointing lead plaintiff who purchased stock after "merely *partial* corrective disclosures" that "neither [made] mention of fraud or government investigations" and did not make the movant "actually aware of the fraud" (emphasis in original)). However, *Tronox*, which *Goldstein* cites, specifically relied on the fact that the partial disclosures at issue did not mention fraud; here, on the other hand, the Grizzly Research presentation expressly concluded that Hebron was an "insider enrichment scheme without economic basis." Clynes Compl. ¶ 21. Similarly, while those cases emphasized the partial nature of early disclosures in comparison to later, full disclosures, *see Tronox*, 262 F.R.D. at 346, here the parties do not cite any disclosure other than the Grizzly Research presentation, and follow-on coverage of that presentation, providing more information to the market after the 10:25 a.m. presentation. In any event, that there is conflicting authority on this point does not show that Clynes is not subject to an *arguable* or *potential* unique defense. If anything, the conflicting authority on this point may enhance the risk that, were Clynes to lead the class, this issue would divert attention from the merits of the core claims in this case or saddle the class with a representative whose claims carried a unique infirmity.

market, there is little doubt that Clynes "increase[d] his holdings in a security after revelation of an alleged fraud." *Berwecky*, 197 F.R.D. at 69.[8]

Even as to the 10:26 a.m. purchase, the parties' briefing reveals substantial factual and legal questions about the timing and significance of Clynes's purchase, with potential to detain or derail the pursuit of his claims on behalf of the class. For example, Clynes and Dahlke vigorously dispute, down to the second, whether Clynes made his purchase before or after the Grizzly Research thesis became public. *See* Clynes Reply at 5–6 & n.6; *see also id.* at 6 (arguing that Clynes purchased the original 1,500 shares before the Grizzly Research presentation "except for possibly two statements (identified above) that Grizzly Research had not yet provided any evidence for"). They also dispute whether the time of Clynes's order (at 6:38 a.m., *see* Clynes Opp'n at 6) or his purchase (at 10:26 a.m., *see id.*) is the relevant time for assessing any potentially relevant unique defense. They appear further to dispute whether, if the Grizzly Research presentation did constitute a corrective disclosure, it was a full corrective disclosure, a partial disclosure, or a "series of corrective disclosures that occurred throughout the presentation," Clynes Reply at 5, and the legal effect of each permutation on Clynes's claims, *see, e.g., id.* at 6–7; Dahlke Reply at 4.

Without resolving any of these disputes at this early stage of the litigation, the Court finds that the cottage industry of issues surrounding Clynes's purchase of Hebron shares would saddle, or at least potentially saddle, his claims with unique defenses. These could well "divert attention

---

[8] Clynes contends that, even excluding these later purchases, he remains the presumptive lead plaintiff because his losses from the earlier 10:26 a.m. purchase exceed Dahlke's total losses. *See* Clynes Opp'n at 6–7. However, he does not cite any authority for segregating purchases in this way. Nor does he explain why, at a trial, his post-disclosure purchases would not be fodder for the defense's claim that none of his purchases, including the 10:26 a.m. purchases, were made in reliance on Hebron's alleged misrepresentations or omissions.

from the substance of the basic claim" and needlessly imperil the claims of the class. *Rocco*, 245 F.R.D. at 135 (quoting *Kline*, 88 F.R.D. at 700). That Clynes purchased shares of Hebron exclusively on the day that news of its fraud became public, did so in the minutes surrounding its revelation, and then continued to purchase additional shares after the disclosure allegedly caused Hebron's shares to plummet, taken together, is ready fodder for a defense keyed to his idiosyncratic circumstances.[9]

Thus, the Court holds that Dahlke has successfully rebutted Clynes's presumptive status as lead plaintiff. *See Schaffer*, 2016 WL 3566238, at *3 (collecting cases rejecting presumptive lead plaintiffs faced with unique defenses); *City Pension Fund for Firefighters & Police Officers in the City of Mia. Beach v. Aracruz Cellulose S.A.*, No. 08 Civ. 23317, 2009 WL 10664427, at *5 (S.D. Fla. Aug. 7, 2009) (same where presumptive lead plaintiff bought shares "after a potential corrective disclosure, affecting issues of reliance and causation"); *see also, e.g.*, *Gross*, 2019 WL 3500496, at *2; *Petrobas*, 104 F. Supp. at 623–24 & n.4 (presumption rebutted where "statements would provide fodder" for class-certification challenge); *In re Bally Total Fitness Sec. Litig.*, No. 04 Civ. 3530, 2005 WL 627960, at *6 (N.D. Ill. Mar. 15, 2005); *Surebeam*,

---

[9] The Court disagrees with Clynes's notion that recognizing this reality "*post hoc* shorten[s] the class period to end at some specified time on June 3, 2020." Clynes Opp'n at 5. The Court's decision as to the "most adequate plaintiff," 15 U.S.C. § 78u-4(a)(3)(B)(i), decides nothing about the appropriate parameters of the class period or the merits of the unique defenses identified herein. Rather, the Court's duty, in discharging its "gatekeeping function in class action litigation," is, "based on the evidence available at present," to make a "necessarily predictive and probabilistic" assessment of which proposed lead plaintiff would best further the interests of the putative class. *Schaffer*, 2016 WL 3566238, at *1, 3 (collecting cases); *see also Petrobas*, 104 F. Supp. 3d at 623 (purchases made after partial disclosure and two weeks before end of class period gave rise to unique defense). The Court has done so here.

2004 WL 5159061, at *7 (same where there is "at least a potential that [movant] will be subject to unique defenses and will not fairly and adequately protect the interests of the class").

Because the only other lead-plaintiff movant is Dahlke, whom the Court has already found to satisfy the Rule 23 factors for purposes of the PSLRA analysis,[10] *see supra*, the Court further finds that Dahlke is the "most adequate plaintiff" and appoints him lead plaintiff. 15 U.S.C. § 78u-4(a)(3)(B)(i).

## IV. Appointing Lead Counsel

The most adequate plaintiff may retain counsel to represent the class, subject to the Court's approval. *Id.* § 78u-4(a)(3)(B)(v). Clynes has selected the law firm of Pomerantz LLP. Having reviewed the firm's submissions as to its pertinent background and experience, including its experience litigating securities class actions, the Court finds that this firm is qualified to serve as lead counsel. Accordingly, the Court appoints Pomerantz as lead counsel.

## CONCLUSION

To summarize, these two cases (20 Civ. 4420 and 20 Civ. 4746) are now consolidated for all purposes, and shall proceed under the name, *In re Hebron Technology Co., Ltd. Securities Litigation*, and under the case number 20 Civ. 4420. Dahlke's motion seeking appointment as lead plaintiff is granted. Clynes's motion to serve as lead plaintiff is denied. The Court appoints Pomerantz LLP as lead counsel.

---

[10] The Court rejects Clynes's contention that Dahlke's challenge to his lead-plaintiff bid reveals Dahlke's propensity to "put his own interests above those of the class," rendering him inadequate under Rule 23. Clynes Reply at 7–8. Clynes bases this argument on the premise, rejected above, *see supra* note 9, that Dahlke's arguments require shortening the class period. It is unpersuasive in this context for the same reasons given above.

The Clerk of Court is directed to terminate the motions pending at dockets 5 and 9 in No. 20 Civ. 4420. In light of the consolidation, the Clerk of Court is also directed to close the original Dahlke case, 20 Civ. 4746.

The Court directs the parties promptly to meet and confer, and, by **Wednesday, September 23, 2020,** to submit a joint letter proposing an efficient schedule for next steps in this case—including proposed dates for the filing of (1) a consolidated amended complaint; and (2) defendants' response. If defendants anticipate that their response will take the form of a motion to dismiss, the parties shall include proposed dates for the opposition and reply briefs as well.

SO ORDERED.

_____
PAUL A. ENGELMAYER
United States District Judge

Dated: September 16, 2020
       New York, New York