# EXHIBIT 2

# (PART 2 of 4)

**Related party transactions**

In addition to the executive officer and director compensation arrangements discussed in "Executive Compensation," below we describe transactions since January 1, 2010, to which we have been a participant, in which the amount involved in the transaction is material to our company and in which any of the following is a party: (a) enterprises that directly or indirectly through one or more intermediaries, control or are controlled by, or are under common control with, our Company; (b) associates; (c) individuals owning, directly or indirectly, an interest in the voting power of our Company that gives them significant influence over our Company, and close members of any such individual's family; (d) key management personnel, that is, those persons having authority and responsibility for planning, directing and controlling the activities of our Company, including directors and senior management of companies and close members of such individuals' families; and (e) enterprises in which a substantial interest in the voting power is owned, directly or indirectly, by any person described in (c) or (d) or over which such a person is able to exercise significant influence.

There are no other related party transactions for the year ended December 31, 2019, 2018 and 2017, except the transactions mentioned below.

Starting on July 12, 2019, we rented office from NiSun Shanghai and incurred $63,749 rent expense for the year ended December 31, 2019. The annual rent from NiSun Shanghai is approximately $113,200.

As of December 31, 2019, we had due to related party balance of $7,345,399 due to Mr. Bodang Liu, our largest shareholder, of which, $7 million was related to purchase price payable for acquisition of NiSun BVI. The due to related party balance was non-interest bearing and due on demand. There was nil balance due to related party as of December 31, 2018 and 2017.

From time to time, our chief executive office and his immediate family members jointly provided guarantees or personal assets as collateral to our loan agreements, trade financing agreements, letters of guarantee, funding agreements and other credit agreements with commercial banks. For the years ended December 31, 2019, 2018 and 2017, the outstanding bank loan balance amounted to $861,846, $1,698,058 and $872,852, respectively, were guaranteed by the Group's chief executive officer and his immediate family members.

*Future Related Party Transactions*

Our Corporate Governance Committee of our board of directors (which consists solely of independent directors) have approved all related party transactions. All material related party transactions are made or entered into on terms that are no less favorable to use than can be obtained from unaffiliated third parties.

**C.  Interests of experts and counsel**

Not applicable for annual reports on Form 20-F.

**ITEM 8.** FINANCIAL INFORMATION

**A. Consolidated Statements and Other Financial Information**

Please refer to Item 18.

We incorporate by reference in the Registration Statement on Form F-3 (File No. 333- 222995) our consolidated balance sheets as of December 31, 2019 and 2018, and the related consolidated statements of operations and comprehensive income, changes in equity and cash flows for each of the years in the three-year period ended December 31, 2019, which appears in this Annual Report on Form 20-F.

**Legal and Administrative Proceedings**

We are currently not a party to any material legal or administrative proceedings and are not aware of any pending or threatened material legal or administrative proceedings against us. We may from time to time become a party to various legal or administrative proceedings arising in the ordinary course of our business.

**Dividend Policy**

We have never declared or paid any cash dividends on our common shares. We anticipate that we will retain any earnings to support operations and to finance the growth and development of our business. Therefore, we do not expect to pay cash dividends in the foreseeable future. Any future determination relating to our dividend policy will be made at the discretion of our Board of Directors and will depend on a number of factors, including future earnings, capital requirements, financial conditions and future prospects and other factors the Board of Directors may deem relevant.

Under British Virgin Islands law, we may only pay dividends from surplus (the excess, if any, at the time of the determination of the total assets of our company over the sum of our liabilities, as shown in our books of account, plus our capital), and we must be solvent before and after the dividend payment in the sense that we will be able to satisfy our liabilities as they become due in the ordinary course of business; and the realizable value of assets of our company will not be less than the sum of our total liabilities, other than deferred taxes as shown on our books of account, and our capital.

If we determine to pay dividends on any of our common shares in the future, as a holding company, we will be dependent on receipt of funds from our operating subsidiaries. Current PRC regulations permit our PRC subsidiaries to pay dividends to HK Xibolun only out of their accumulated profits, if any, determined in accordance with Chinese accounting standards and regulations. In addition, each of our subsidiaries in China is required to set aside at least 10% of its after-tax profits each year, if any, to fund a statutory reserve until such reserve reaches 50% of its registered capital. Each of such entity in China is also required to further set aside a portion of its after-tax profits to fund the employee welfare fund, although the amount to be set aside, if any, is determined at the discretion of its board of directors. Although the statutory reserves can be used, among other ways, to increase the registered capital and eliminate future losses in excess of retained earnings of the respective companies, the reserve funds are not distributable as cash dividends except in the event of liquidation. Our subsidiaries in China are required to set aside statutory reserves and have done so.

In addition, pursuant to the EIT Law and its implementation rules, dividends generated after January 1, 2008 and distributed to us by our PRC subsidiaries are subject to withholding tax at a rate of 10% unless otherwise exempted or reduced according to treaties or arrangements between the PRC central government and governments of other countries or regions where the non-PRC-resident enterprises are incorporated.

Under existing PRC foreign exchange regulations, payments of current account items, including profit distributions, interest payments and trade and service-related foreign exchange transactions, can be made in foreign currencies without prior approval of the State Administration of Foreign Exchange, or SAFE, by complying with certain procedural requirements. Specifically, under the existing exchange restrictions, without prior approval of SAFE, cash generated from the operations in China may be used to pay dividends to our company.

**B. Significant Changes**

We have not experienced any significant changes since the date of our audited consolidated financial statements included in this annual report.

ITEM 9.    THE OFFER AND LISTING

**A.  Offer and listing details**

Our common shares (or Class A common shares since March 19, 2018) have been listed and traded on the Nasdaq Capital Market since December 27, 2016 under the symbol "HEBT."

**B.  Plan of distribution**

Not applicable for annual reports on Form 20-F.

**C.  Markets**

Our Class A common shares are listed on the Nasdaq Capital Market under the symbol "HEBT."

**D.  Selling shareholders**

Not applicable for annual reports on Form 20-F.

**E.  Dilution**

Not applicable for annual reports on Form 20-F.

**F.  Expenses of the issue**

Not applicable for annual reports on Form 20-F.

96

ITEM 10.    ADDITIONAL INFORMATION

A.  **Share capital**

Not applicable for annual reports on Form 20-F.

B.  **Memorandum and articles of association**

The information required by this item is incorporated by reference to the material headed "Description of Share Capital" in our Registration Statement on Form F-1, File no. 333-208583, filed with the SEC on July 13, 2016, as amended. We incorporate by reference into this annual report our Third Amended and Restated Memorandum and Articles of Association filed as Exhibit 1.6 to our annual report on Form 20-F filed with the Securities and Exchange Commission on April 26, 2018.

C.  **Material contracts**

We have not entered into any material contracts other than in the ordinary course of business and otherwise described elsewhere in this annual report.

D.  **Exchange controls**

**Foreign Currency Exchange**

The principal regulations governing foreign currency exchange in China are the Foreign Exchange Administration Regulations. Under the PRC foreign exchange regulations, payments of current account items, such as profit distributions and trade and service-related foreign exchange transactions, may be made in foreign currencies without prior approval from SAFE by complying with certain procedural requirements. By contrast, approval from or registration with appropriate government authorities is required where RMB is to be converted into foreign currency and remitted out of China to pay capital expenses such as the repayment of foreign currency-denominated loans or foreign currency is to be remitted into China under the capital account, such as a capital increase or foreign currency loans to our PRC subsidiaries.

In August 2008, SAFE issued the Circular on the Relevant Operating Issues Concerning the Improvement of the Administration of the Payment and Settlement of Foreign Currency Capital of Foreign-Invested Enterprises, or SAFE Circular 142, regulating the conversion by a foreign-invested enterprise of foreign currency-registered capital into RMB by restricting how the converted RMB may be used. In addition, SAFE promulgated Circular 45 on November 9, 2011 in order to clarify the application of SAFE Circular 142. Under SAFE Circular 142 and Circular 45, the RMB capital converted from foreign currency registered capital of a foreign-invested enterprise may only be used for purposes within the business scope approved by the applicable government authority and may not be used for equity investments within the PRC. In addition, SAFE strengthened its oversight of the flow and use of the RMB capital converted from foreign currency registered capital of foreign-invested enterprises. The use of such RMB capital may not be changed without SAFE's approval, and such RMB capital may not in any case be used to repay RMB loans if the proceeds of such loans have not been used.

In November 2012, SAFE promulgated the Circular of Further Improving and Adjusting Foreign Exchange Administration Policies on Foreign Direct Investment, which substantially amends and simplifies the current foreign exchange procedure. Pursuant to this circular, the opening of various special purpose foreign exchange accounts, such as pre-establishment expenses accounts, foreign exchange capital accounts and guarantee accounts, the reinvestment of RMB proceeds by foreign investors in the PRC, and remittance of foreign exchange profits and dividends by a foreign-invested enterprise to its foreign shareholders no longer require the approval or verification of SAFE, and multiple capital accounts for the same entity may be opened in different provinces, which was not possible previously. In addition, SAFE promulgated the Circular on Printing and Distributing the Provisions on Foreign Exchange Administration over Domestic Direct Investment by Foreign Investors and the Supporting Documents in May 2013, which specifies that the administration by SAFE or its local branches over direct investment by foreign investors in the PRC shall be conducted by way of registration and banks shall process foreign exchange business relating to the direct investment in the PRC based on the registration information provided by SAFE and its branches.

We typically do not need to use our offshore foreign currency to fund our PRC operations. In the event we need to do so, we will apply to obtain the relevant approvals of SAFE and other PRC government authorities as necessary.

**SAFE Circular 75**

Under the Circular on Relevant Issues Concerning Foreign Exchange Control on Domestic Residents' Financing and Roundtrip Investment Through Offshore Special Purpose Vehicles, or SAFE Circular 75, issued by SAFE on October 21, 2005 and its implementation rules, a PRC resident (whether a natural or legal person) is required to complete an initial registration with its local SAFE branch before incorporating or acquiring control of an offshore special purpose vehicle, or SPV, with assets or equity interests in a PRC company, for the purpose of offshore equity financing. The PRC resident is also required to amend the registration or make a filing upon (1) the injection of any assets or equity interests in an onshore company or undertaking of offshore financing, or (2) the occurrence of a material change that may affect the capital structure of a SPV. SAFE also subsequently issued various guidance and rules regarding the implementation of SAFE Circular 75, which imposed obligations on PRC subsidiaries of offshore companies to coordinate with and supervise any PRC-resident beneficial owners of offshore entities in relation to the SAFE registration process.

**Regulation of Dividend Distribution**

The principal laws, rules and regulations governing dividend distribution by foreign-invested enterprises in the PRC are the Company Law of the PRC, as amended, the Wholly Foreign-owned Enterprise Law and its implementation regulations and the Equity Joint Venture Law and its implementation regulations. Under these laws, rules and regulations, foreign-invested enterprises may pay dividends only out of their accumulated profit, if any, as determined in accordance with PRC accounting standards and regulations. Both PRC domestic companies and wholly-foreign owned PRC enterprises are required to set aside as general reserves at least 10% of their after-tax profit, until the cumulative amount of such reserves reaches 50% of their registered capital. A PRC company is not permitted to distribute any profits until any losses from prior fiscal years have been offset. Profits retained from prior fiscal years may be distributed together with distributable profits from the current fiscal year.

**E.  Taxation**

The following sets forth the material British Virgin Islands, Chinese and U.S. federal income tax consequences related to an investment in our Class A common shares. It is directed to U.S. Holders (as defined below) of our Class A common shares and is based upon laws and relevant interpretations thereof in effect as of the date of this annual report, all of which are subject to change. This description does not deal with all possible tax consequences relating to an investment in our Class A common shares, such as the tax consequences under state, local and other tax laws.

The following brief description applies only to U.S. Holders (defined below) that hold Class A common shares as capital assets and that have the U.S. dollar as their functional currency. This brief description is based on the tax laws of the United States in effect as of the date of this annual report and on U.S. Treasury regulations in effect or, in some cases, proposed, as of the date of this annual report, as well as judicial and administrative interpretations thereof available on or before such date. All of the foregoing authorities are subject to change, which change could apply retroactively and could affect the tax consequences described below.

The brief description below of the U.S. federal income tax consequences to "U.S. Holders" will apply to you if you are a beneficial owner of shares and you are, for U.S. federal income tax purposes,

- an individual who is a citizen or resident of the United States;

- a corporation (or other entity taxable as a corporation for U.S. federal income tax purposes) organized under the laws of the United States, any state thereof or the District of Columbia;

- an estate whose income is subject to U.S. federal income taxation regardless of its source; or

- a trust that (1) is subject to the primary supervision of a court within the United States and the control of one or more U.S. persons for all substantial decisions or (2) has a valid election in effect under applicable U.S. Treasury regulations to be treated as a U.S. person.

## Generally

HEBT and Nisun BVI are a tax-exempt companies incorporated in the British Virgin Islands. HK Xibolun and Nisun HK are subject to Hong Kong profits tax rate. The rest of the Company's subsidiaries and VIEs and VIEs' subsidiaries in PRC are governed by PRC laws.

Our company pays PRC enterprise income taxes, value added taxes and business taxes in China for revenues from our subsidiaries, VIEs and VIEs' subsidiaries (The business tax has been incorporated into VAT since May 1, 2016.).

## People's Republic of China Enterprise Taxation

The following brief description of Chinese enterprise laws is designed to highlight the enterprise-level taxation on our earnings, which will affect the amount of dividends, if any, we are ultimately able to pay to our shareholders. See "Dividend Policy."

PRC enterprise income tax is calculated based on taxable income determined under PRC accounting principles. The Enterprise Income Tax Law (the "EIT Law"), effective as of January 1, 2008, enterprises pay a unified income tax rate of 25% and unified tax deduction standards are applied equally to both domestic-invested enterprises and foreign-invested enterprises.

Xibolun Automation and Hengpu are recognized as a High-technology Company by the Chinese government and is subject to a favorable income tax rate of 15%. Both Xibolun Automation and Hengpen's High-technology certificates are valid for three years starting from November 2018 and subject to renewal. In accordance with the implementation rules of the Income Tax Law of the PRC, for the enterprises newly established in the Horgos Development Zone within the scope of "preferential catalogue of income tax for key industries encouraged to develop in Xinjiang's difficult areas", the enterprise income tax shall be exempt for five years from the tax year of the first production and operations income. Khorgos is established in the Horgos Development Zone and its income tax is eligible to be exempt for five years starting from 2019. The rest of the Company's subsidiaries, VIEs and VIEs' subsidiaries are subject to corporate income tax at the PRC unified rate of 25%.

Under the EIT Law, an enterprise established outside of the PRC with "de facto management bodies" within the PRC is considered a resident enterprise and will normally be subject to the enterprise income tax at the rate of 25% on its global income. If the PRC tax authorities subsequently determine that we, HK Xibolun and NiSun HK or any future non-PRC subsidiary should be classified as a PRC resident enterprise, then such entity's global income will be subject to PRC income tax at a tax rate of 25%. In addition, under the EIT Law, payments from our subsidiaries and VIEs in PRC to us may be subject to a withholding tax. The EIT Law currently provides for a withholding tax rate of 20%. If HEBT or HK Xibolun or NiSun HK is deemed to be a non-resident enterprise, then it will be subject to a withholding tax at the rate of 10% on any dividends paid by its Chinese subsidiaries to such entity. In practice, the tax authorities typically impose the withholding tax rate of 10% rate, as prescribed in the implementation regulations; however, there can be no guarantee that this practice will continue as more guidance is provided by relevant government authorities. We are actively monitoring the proposed withholding tax and are evaluating appropriate organizational changes to minimize the corresponding tax impact.

According to the Sino-U.S. Tax Treaty which was effective on January 1, 1987 and aimed to avoid double taxation disadvantage, income that is incurred in one nation should be taxed by that nation and exempted from the other nation, but for the dividend that is generated in China and distributed to foreigner in other nations, a rate 10% tax will be charged.

Our Company will have to withhold that tax when we are distributing dividends to our foreign investors. If we do not fulfill this duty, we will receive a fine up to five times of the amount we are supposed to pay as tax or other administrative penalties from government. The worst case could be criminal charge of tax evasion to responsible persons. The criminal penalty for this offense depends on the tax amount the offender evaded, and the maximum penalty will be 3-7 years imprisonment plus fine.

**PRC Value Added Tax**

Pursuant to the Provisional Regulation of China on Value Added Tax and its implementing rules, issued in December 1993, all entities and individuals that are engaged in the businesses of sales of goods, provision of services and importation of goods into China are generally subject to a VAT at a rate ranging from 6% to 13% of the gross sales proceeds received, less any VAT already paid or borne by the taxpayer on the goods or services purchased by it and utilized in the production of goods or provisions of services that have generated the gross sales proceeds.

**PRC Business Tax**

Companies in China are generally subject to business tax and related surcharges by various local tax authorities at rates ranging from 3% to 20% on revenue generated from providing services and revenue generated from the transfer of intangibles. However, since May 1, 2016, the Business Tax has been incorporated into Value Added Tax in China, which means there will be no more Business Tax and accordingly some business operations previously taxed in the name of Business Tax will be taxed in the manner of VAT thereafter. In general, this newly implemented policy is intended to relieve many companies from heavy taxes under currently slowing down economy. In the case of Hebron's Chinese subsidiaries, even though the VAT rate ranges from 6% to 13%, with the deductibles the company may get in the business process, it will bear less burden than previous Business Tax.

**British Virgin Islands Taxation**

Under the BVI Business Companies Act as currently in effect, a holder of common shares who is not a resident of the British Virgin Islands is exempt from British Virgin Islands income tax on dividends paid with respect to the common shares and all holders of common shares are not liable to the British Virgin Islands for income tax on gains realized during that year on sale or disposal of such shares. The British Virgin Islands does not impose a withholding tax on dividends paid by a company incorporated or re-registered under the BVI Business Companies Act.

There are no capital gains, gift or inheritance taxes levied by the British Virgin Islands on companies incorporated or re-registered under the BVI Business Companies Act. In addition, shares of companies incorporated or re-registered under the BVI Business Companies Act are not subject to transfer taxes, stamp duties or similar charges.

There is no income tax treaty or convention currently in effect between the United States and the British Virgin Islands or between China and the British Virgin Islands.

**United States Federal Income Taxation**

The following does not address the tax consequences to any particular investor or to persons in special tax situations such as:

- banks;

- financial institutions;

- insurance companies;

- regulated investment companies;

- real estate investment trusts;

- broker-dealers;

- traders that elect to mark-to-market;

- U.S. expatriates;

- tax-exempt entities;

- persons liable for alternative minimum tax;

- persons holding our common shares as part of a straddle, hedging, conversion or integrated transaction;

- persons that actually or constructively own 10% or more of our voting shares;

- persons who acquired our common shares pursuant to the exercise of any employee share option or otherwise as consideration; or

- persons holding our common shares through partnerships or other pass-through entities.

Prospective purchasers are urged to consult their own tax advisors about the application of the U.S. Federal tax rules to their particular circumstances as well as the state, local, foreign and other tax consequences to them of the purchase, ownership and disposition of our common shares.

**Tax Treaties**

As above mentioned, according to the Sino-U.S. Tax Treaty which was effective on January 1, 1987 and aimed to avoid double taxation disadvantage, income that is incurred in one nation should be taxed by that nation and exempted from the other nation, but for the dividend that is generated in China and distributed to foreigners in other nations, a rate 10% tax will be charged.

**Taxation of Dividends and Other Distributions on our Common Shares**

Subject to the passive foreign investment company rules discussed below, the gross amount of distributions made by us to you with respect to the common shares (including the amount of any taxes withheld therefrom) will generally be includable in your gross income as dividend income on the date of receipt by you, but only to the extent that the distribution is paid out of our current or accumulated earnings and profits (as determined under U.S. federal income tax principles). The dividends will not be eligible for the dividends-received deduction allowed to corporations in respect of dividends received from other U.S. corporations.

With respect to non-corporate U.S. Holders, including individual U.S. Holders, dividends will be taxed at the lower capital gains rate applicable to qualified dividend income, provided that (1) the common shares are readily tradable on an established securities market in the United States, or we are eligible for the benefits of an approved qualifying income tax treaty with the United States that includes an exchange of information program, (2) we are not a passive foreign investment company (as discussed below) for either our taxable year in which the dividend is paid or the preceding taxable year, and (3) certain holding period requirements are met. Under U.S. Internal Revenue Service authority, common shares are considered for purpose of clause (1) above to be readily tradable on an established securities market in the United States if they are listed on The NASDAQ Capital Market. You are urged to consult your tax advisors regarding the availability of the lower rate for dividends paid with respect to our common shares.

Dividends will constitute foreign source income for foreign tax credit limitation purposes. If the dividends are taxed as qualified dividend income (as discussed above), the amount of the dividend taken into account for purposes of calculating the foreign tax credit limitation will be limited to the gross amount of the dividend, multiplied by the reduced rate divided by the highest rate of tax normally applicable to dividends. The limitation on foreign taxes eligible for credit is calculated separately with respect to specific classes of income. For this purpose, dividends distributed by us with respect to our common shares will constitute "passive category income" but could, in the case of certain U.S. Holders, constitute "general category income."

To the extent that the amount of the distribution exceeds our current and accumulated earnings and profits (as determined under U.S. federal income tax principles), it will be treated first as a tax-free return of your tax basis in your Class A common shares, and to the extent the amount of the distribution exceeds your tax basis, the excess will be taxed as capital gain. We do not intend to calculate our earnings and profits under U.S. federal income tax principles. Therefore, a U.S. Holder should expect that a distribution will be treated as a dividend even if that distribution would otherwise be treated as a non-taxable return of capital or as capital gain under the rules described above.

**Taxation of Dispositions of Common Shares**

Subject to the passive foreign investment company rules discussed below, you will recognize taxable gain or loss on any sale, exchange or other taxable disposition of a share equal to the difference between the amount realized (in U.S. dollars) for the share and your tax basis (in U.S. dollars) in the common shares. The gain or loss will generally be capital gain or loss. If you are a non-corporate U.S. Holder, including an individual U.S. Holder, who has held the Class A common shares for more than one year, you will generally be eligible for reduced tax rates. The deductibility of capital losses is subject to limitations. Any such gain or loss that you recognize will generally be treated as United States source income or loss for foreign tax credit limitation purposes.

**Passive Foreign Investment Company**

A non-U.S. corporation is considered a passive foreign investment company, or PFIC, for U.S. federal income tax purposes for any taxable year if either:

- at least 75% of its gross income is passive income, defined as income from interest, dividends, rents, royalties, gains on property producing foreign personal holding company income and certain other income that does not involve the active conduct of a trade or business; or

- at least 50% of the value of its assets (based on an average of the quarterly values of the assets during a taxable year) is attributable to assets that produce or are held for the production of passive income (the "asset test").

We will be treated as owning our proportionate share of the assets and earning our proportionate share of the income of any other corporation in which we own, directly or indirectly, at least 25% (by value) of the stock.

Based on the market price of our common shares, the value of our assets and the composition of our assets and income, we believe that we were not a PFIC for our taxable year ended December 31, 2019, December 31, 2018 or December 31, 2017. However, given the factual nature of the analyses and the lack of guidance, no assurance can be given. We do not expect to be a PFIC for our taxable year ending December 31, 2019. However, because PFIC status is a factual determination for each taxable year which cannot be made until the close of the taxable year, our actual PFIC status will not be determinable until the close of the taxable year and, accordingly, there is no guarantee that we will not be a PFIC for the current taxable year or any future taxable year.

We must make a separate determination each year as to whether we are a PFIC. As a result, our PFIC status may change. In particular, because the value of our assets for purposes of the asset test will generally be determined based on the market price of our common shares, our PFIC status will depend in large part on the market price of our common shares. Accordingly, fluctuations in the market price of the common shares may cause us to become a PFIC. In addition, the application of the PFIC rules is subject to uncertainty in several respects and the composition of our income and assets will be affected by how, and how quickly, we spend the cash we raised in our initial public offering. If we are a PFIC for any year during which you hold common shares, we will continue to be treated as a PFIC for all succeeding years during which you hold common shares. However, if we cease to be a PFIC, you may avoid some of the adverse effects of the PFIC regime by making a "deemed sale" election with respect to the common shares.

If we are a PFIC for any taxable year during which you hold common shares, you will be subject to special tax rules with respect to any "excess distribution" that you receive and any gain you realize from a sale or other disposition (including a pledge) of the common shares, unless you make a "mark-to-market" election as discussed below. Distributions you receive in a taxable year that are greater than 125% of the average annual distributions you received during the shorter of the three preceding taxable years or your holding period for the common shares will be treated as an excess distribution. Under these special tax rules:

- the excess distribution or gain will be allocated ratably over your holding period for the common shares;

- the amount allocated to the current taxable year, and any taxable year prior to the first taxable year in which we were a PFIC, will be treated as ordinary income, and

- the amount allocated to each other year will be subject to the highest tax rate in effect for that year and the interest charge generally applicable to underpayments of tax will be imposed on the resulting tax attributable to each such year.

The tax liability for amounts allocated to years prior to the year of disposition or "excess distribution" cannot be offset by any net operating losses for such years, and gains (but not losses) realized on the sale of the common shares cannot be treated as capital, even if you hold the common shares as capital assets.

A U.S. Holder of "marketable stock" (as defined below) in a PFIC may make a mark-to-market election for such stock to elect out of the tax treatment discussed above. If you make a mark-to-market election for the common shares, you will include in income each year an amount equal to the excess, if any, of the fair market value of the common shares as of the close of your taxable year over your adjusted basis in such common shares. You are allowed a deduction for the excess, if any, of the adjusted basis of the common shares over their fair market value as of the close of the taxable year. However, deductions are allowable only to the extent of any net mark-to-market gains on the common shares included in your income for prior taxable years. Amounts included in your income under a mark-to-market election, as well as gain on the actual sale or other disposition of the common shares, are treated as ordinary income. Ordinary loss treatment also applies to the deductible portion of any mark-to-market loss on the common shares, as well as to any loss realized on the actual sale or disposition of the common shares, to the extent that the amount of such loss does not exceed the net mark-to-market gains previously included for such common shares. Your basis in the common shares will be adjusted to reflect any such income or loss amounts. If you make a valid mark-to-market election, the tax rules that apply to distributions by corporations which are not PFICs would apply to distributions by us, except that the lower applicable capital gains rate for qualified dividend income discussed above under "Taxation of Dividends and Other Distributions on our Common shares" generally would not apply.

103

The mark-to-market election is available only for "marketable stock", which is stock that is traded in other than de minimis quantities on at least 15 days during each calendar quarter ("regularly traded") on a qualified exchange or other market (as defined in applicable U.S. Treasury regulations), including The NASDAQ Capital Market. If the common shares are regularly traded on The NASDAQ Capital Market and if you are a holder of common shares, the mark-to-market election would be available to you were we to be or become a PFIC.

Alternatively, a U.S. Holder of stock in a PFIC may make a "qualified electing fund" election with respect to such PFIC to elect out of the tax treatment discussed above. A U.S. Holder who makes a valid qualified electing fund election with respect to a PFIC will generally include in gross income for a taxable year such holder's pro rata share of the corporation's earnings and profits for the taxable year. However, the qualified electing fund election is available only if such PFIC provides such U.S. Holder with certain information regarding its earnings and profits as required under applicable U.S. Treasury regulations. We do not currently intend to prepare or provide the information that would enable you to make a qualified electing fund election. If you hold common shares in any year in which we are a PFIC, you will be required to file U.S. Internal Revenue Service Form 8621 regarding distributions received on the common shares and any gain realized on the disposition of the common shares.

You are urged to consult your tax advisors regarding the application of the PFIC rules to your investment in our common shares and the elections discussed above.

**Information Reporting and Backup Withholding**

Dividend payments with respect to our common shares and proceeds from the sale, exchange or redemption of our common shares may be subject to information reporting to the U.S. Internal Revenue Service and possible U.S. backup withholding. Backup withholding will not apply, however, to a U.S. Holder who furnishes a correct taxpayer identification number and makes any other required certification on U.S. Internal Revenue Service Form W-9 or who is otherwise exempt from backup withholding. U.S. Holders who are required to establish their exempt status generally must provide such certification on U.S. Internal Revenue Service Form W-9. U.S. Holders are urged to consult their tax advisors regarding the application of the U.S. information reporting and backup withholding rules.

Backup withholding is not an additional tax. Amounts withheld as backup withholding may be credited against your U.S. federal income tax liability, and you may obtain a refund of any excess amounts withheld under the backup withholding rules by filing the appropriate claim for refund with the U.S. Internal Revenue Service and furnishing any required information.

Under the Hiring Incentives to Restore Employment Act of 2010, certain United States Holders are required to report information relating to common shares, subject to certain exceptions (including an exception for common shares held in accounts maintained by certain financial institutions), by attaching a complete Internal Revenue Service Form 8938, Statement of Specified Foreign Financial Assets, with their tax return for each year in which they hold common shares. U.S. Holders are urged to consult their tax advisors regarding the application of the U.S. information reporting and backup withholding rules.

**F.  Dividends and paying agents**

Not applicable for annual reports on Form 20-F.

**G.  Statement by experts**

Not applicable for annual reports on Form 20-F.

**H.  Documents on display**

We are subject to the information requirements of the Exchange Act. In accordance with these requirements, the Company files reports and other information with the SEC. You may read and copy any materials filed with the SEC at the Public Reference Room at 100 F Street, N.E., Washington, D.C. 20549. You may obtain information on the operation of the Public Reference Room by calling the SEC at 1-800-SEC-0330. The SEC also maintains a web site at http://www.sec.gov that contains reports and other information regarding registrants that file electronically with the SEC.

**I.  Subsidiary Information**

Not applicable.

**ITEM 11.    QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK**

We are exposed to a variety of financial risks, including market risk (including currency risk, price risk and cash flow and fair value interest rate risk), credit risk and liquidity risk. Our overall risk management program focuses on preservation of capital and the unpredictability of financial markets and has sought to minimize potential adverse effects on our financial performance and position.

**Foreign Exchange Risk**

While our reporting currency is the U.S. Dollar, all of our consolidated sales and consolidated costs and expenses are denominated in the RMB. All of our assets are denominated in the RMB. As a result, we are exposed to foreign exchange risk as our sales and results of operations may be affected by fluctuations in the exchange rate between the U.S. Dollar and the RMB. If the RMB depreciates against the U.S. Dollar, the value of our RMB sales, earnings and assets as expressed in our U.S. Dollar financial statements will decline.

Assets and liabilities are translated at exchange rates at the balance sheet dates and revenue and expenses are translated at the average exchange rates and stockholders' equity is translated at historical exchange rates. Any resulting translation adjustments are not included in determining net income but are included in determining other comprehensive income, a component of stockholders' equity. We have not entered into any hedging transactions in an effort to reduce our exposure to foreign exchange risk.

The value of the RMB against the U.S. dollar and other currencies is affected by, among other things, changes in China's political and economic conditions. Since July 2005, the RMB has not been pegged to the U.S. dollar. Although the People's Bank of China regularly intervenes in the foreign exchange market to prevent significant short-term fluctuations in the exchange rate, the RMB may appreciate or depreciate significantly in value against the U.S. dollar or the Euro in the medium to long term. Moreover, it is possible that in the future, PRC authorities may lift restrictions on fluctuations in RMB exchange rate and lessen intervention in the foreign exchange market. The RMB depreciated approximately 2% in 2019.

**Interest Rate Risk**

Our interest rate risk arises from short and long-term borrowings. As of December 31, 2019 and 2018, we had no borrowings with variable rates and we were not exposed to cash flow interest rate risk. Borrowings issued at fixed rates expose us to fair value interest rate risk.

As of December 31, 2019 and 2018, we had no long-term interest-bearing assets or long-term interest-bearing liabilities.

**Credit Risk**

Our cash is invested primarily in savings and deposit accounts with original maturities of three months or less. Savings and deposit accounts generate a small amount of interest income.

Financial instruments that potentially subject the Company to significant concentrations of credit risk consist primarily of cash, contracts receivable, accounts receivable and retainage receivables. As of December 31, 2019 and 2018, $4,412,319 and $3,072,243 of the Group's cash and cash equivalents and restricted cash was on deposit at financial institutions in the PRC, which the management believes are of high credit quality. In May 1, 2015, China's new Deposit Insurance Regulation came into effect, pursuant to which banking financial institutions, such as commercial banks, established in China are required to purchase deposit insurance for deposits in RMB and in foreign currency placed with them. Such Deposit Insurance Regulation would not be effective in providing complete protection for the Group's accounts, as its aggregate deposits are much higher than the compensation limit. However, the Group believes that the risk of failure of any of these Chinese banks is remote. Bank failure is uncommon in China and the Group believes that those Chinese banks that hold the Group's cash and cash equivalents, restricted cash and short-term investments are financially sound based on public available information.

Contracts receivable, accounts receivable and retainage receivables are typically unsecured and derived from revenue earned from customers, thereby they are exposed to credit risk. The risk is mitigated by the Company's assessment of its customers' creditworthiness and its ongoing monitoring of outstanding balances.

**Inflation**

Inflationary factors such as increases in the cost of our product and overhead costs may adversely affect our operating results. Although we do not believe that inflation has had a material effect on our financial position or results of operations to date, a high rate of inflation in the future may have an adverse effect on our ability to maintain current levels of gross profit and selling, general and administrative expenses as a percentage of net sales if the selling prices of our products do not increase with these increased costs.

**ITEM 12.    DESCRIPTION OF SECURITIES OTHER THAN EQUITY SECURITIES**

With the exception of Items 12.D.3 and 12.D.4, this Item 12 is not applicable for annual reports on Form 20-F. As to Items 12.D.3 and 12.D.4, this Item 12 is not applicable, as the Company does not have any American Depositary Shares.

**PART II**

**ITEM 13.    DEFAULTS, DIVIDEND ARREARAGES AND DELINQUENCIES**

We do not have any material defaults in the payment of principal, interest, or any installments under a sinking or purchase fund.

**ITEM 14.    MATERIAL MODIFICATIONS TO THE RIGHTS OF SECURITIES HOLDERS AND USE OF PROCEEDS**

**Material Modifications to the Rights of Security Holders**

See "Item 10. Additional Information" for a description of the rights of shareholders, which remain unchanged.

**Use of Proceeds**

Not applicable as we disclosed application of all the offering proceeds in our Annual Report on Form 20-F, File 001-37829, filed with the SEC on May 15, 2019.

**ITEM 15.    CONTROLS AND PROCEDURES**

(a)  Disclosure Controls and Procedures.

We maintain disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934) that are designed to ensure that information required to be disclosed in our reports that we file or submit under the Security Exchange Act of 1934 is recorded, processed, summarized and reported, within the time period specified in the SEC's rules and forms, and is accumulated and communicated to our management, including our principal executive and principal financial officers, or persons performing similar functions, as appropriate, to allow for timely decisions regarding disclosure. In designing and evaluating the disclosure controls and procedures, management recognizes that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control objectives, and management is required to apply its judgment in evaluating the cost-benefit relationship of possible controls and procedures.

As of December 31, 2019, the end of the fiscal year covered by this report, our management, under the supervision and with the participation of our Chief Executive Officer and Chief Financial Officer, performed an evaluation of the effectiveness of our disclosure controls and procedures. Based on the evaluation, our Chief Executive Officer and Chief Financial Officer concluded that, as of December 31, 2019, our disclosure controls and procedures were ineffective. Such conclusion is due to the presence of material weakness in internal control over financial reporting as described below.

(b)  Management's annual report on internal control over financial reporting.

Management of the Company is responsible for establishing and maintaining adequate internal control over financial reporting. We assessed the effectiveness of the Company's internal control over financial reporting as of December 31, 2019. In making its assessment, management used the 2013 Internal Control—Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (the "2013 COSO Framework"). The 2013 COSO Framework outlines the 17 underlying principles and the following fundamental components of a company's internal control:,(i) control environment, (ii) risk assessment, (iii) control activities, (iv) information and communication, and (v) monitoring. Our management has implemented and tested our internal control over financial reporting based on these criteria and identified certain material weaknesses set forth below. Based on the assessment, management determined that, as of December 31, 2019, we did not maintain effective internal control over financial reporting due to the existence of the following material weaknesses:

- The Company does not have adequate internal accounting personnel with sufficient knowledge of the US GAAP and SEC reporting standards, which could lead to material misstatements being undetected in a timely manner.

(c)  Attestation report of the registered public accounting firm.

Not applicable.

(d)  Changes in internal control over financial reporting.

The following changes in our internal controls over financial reporting occurred during the twelve months ended December 31, 2019 and have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting:

- We have begun to maintain written policies and procedures, and prepare Board minutes and resolutions for significant transactions on a timely basis. We believe these efforts will improve our internal controls.

Although we believe there is room to improve our segregation of duties related to certain job responsibilities for initiating, authorizing, and recording of certain transactions, our ability to improve such segregation is limited as a small-size public company.

ITEM 15T.    CONTROLS AND PROCEDURES

Not applicable.

107

**ITEM 16.    [RESERVED]**

**ITEM 16A.    AUDIT COMMITTEE FINANCIAL EXPERT**

The Company's board of directors has determined that Ms. Haiying Xiang qualifies as an "audit committee financial expert" in accordance with applicable Nasdaq Capital Market standards. The Company's board of directors has also determined that Ms. Xiang and the other members of the Audit Committee are all "independent" in accordance with the applicable Nasdaq Capital Market standards.

**ITEM 16B.    CODE OF ETHICS**

The Company has adopted a Code of Business Conduct and Ethics that applies to the Company's directors, officers, employees and advisors. The Code of Ethics is attached as an exhibit to this annual report. We have also posted a copy of our code of business conduct and ethics on our website at www.hebrontechnology.com.

**ITEM 16C.    PRINCIPAL ACCOUNTANT FEES AND SERVICES**

Wei, Wei & Co., LLP was appointed by the Company on February 26, 2019 to serve as its independent registered public accounting firm for the year ended December 31, 2018 and re-appointed to serve for the year ended December 31, 2019. The Company's previous independent auditors, Friedman LLP ("Friedman"), was dismissed on February 26, 2019. During the years ended December 31, 2017 and 2016 through the dismissal of Friedman on February 26, 2019, there were no disagreements between the Company and Friedman on any matter of accounting principles or practices, financial statement disclosure, or auditing scope or procedure, which disagreements, if not resolved to the satisfaction of Friedman, would have caused it to make reference to the subject matter of the disagreements in connection with its report on the Company's consolidated financial statements for such periods. In addition, Friedman's reports on the financial statements for the years of 2017 and 2016 did not contain an adverse opinion or disclaimer of opinion and were not qualified or modified as to uncertainty, audit scope or accounting principles. During 2017 and 2016 through the dismissal of Friedman on February 26, 2019, there were no "reportable events" as that term is defined in Item 16F(a)(1)(v) of Form 20-F.

Audit services provided by Wei, Wei & Co., LLP for the years of 2019 and 2018 included the examination of the consolidated financial statements of the Company and services related to periodic filings made with the SEC.

**Fees Paid To Independent Registered Public Accounting Firm**

*Audit Fees*

Wei, Wei & Co., LLP's fees for the annual audit of our financial statements and review of the financial statements for fiscal 2019 was $275,000.

Wei, Wei & Co., LLP's fees for the annual audit of our financial statements and review of the financial statements for fiscal 2018 were $180,000.

*Audit-Related Fees*

The Company has not paid Wei, Wei & Co., LLP for audit-related services in fiscal 2019 and 2018.

*Tax Fees*

The Company has not paid Wei, Wei & Co., LLP for tax services in fiscal 2019 and 2018.

*All Other Fees*

The Company has not paid Wei, Wei & Co., LLP for any other services in fiscal 2019 and 2018.

*Audit Committee Pre-Approval Policies*

Before Wei, Wei & Co., LLP was engaged by the Company to render audit or non-audit services, the engagement was approved by the Company's audit committee. All services rendered by Wei, Wei & Co., LLP have been so approved.

*Percentage of Hours*

All hours expended on the principal accountants' engagement to audit our consolidated financial statements for 2019 were attributed to work performed by Wei, Wei & Co., LLP's full-time permanent employees.

**ITEM 16D.    EXEMPTIONS FROM THE LISTING STANDARDS FOR AUDIT COMMITTEES**

Not applicable.

**ITEM 16E.    PURCHASES OF EQUITY SECURITIES BY THE ISSUER AND AFFILIATED PURCHASERS**

Neither the Company nor any affiliated purchaser has purchased any shares or other units of any class of the Company's equity securities registered by the Company pursuant to Section 12 of the Securities Exchange Act during the fiscal year ended December 31, 2019.

**ITEM 16F.    CHANGE IN REGISTRANT'S CERTIFYING ACCOUNTANT**

Not applicable.

**ITEM 16G.    CORPORATE GOVERNANCE**

We are incorporated in the British Virgin Islands and our corporate governance practices are governed by applicable British Virgin Islands law. In addition, because our Class A common shares are listed on The Nasdaq Capital Market, we are subject to Nasdaq's corporate governance requirements.

Other than as described in this section, our corporate governance practices do not differ from those followed by domestic companies listed on the NASDAQ Capital Market. NASDAQ Listing Rule 5635 generally provides that shareholder approval is required of U.S. domestic companies listed on the NASDAQ Capital Market prior to issuance (or potential issuance) of securities equaling 20% or more of the company's common stock or voting power for less than the greater of market or book value. Notwithstanding this general requirement, NASDAQ Listing Rule 5615(a)(3)(A) permits foreign private issuers like the Company to follow their home country practice rather than this shareholder approval requirement. The Company, therefore, is not required to obtain such shareholder approval prior to entering into a transaction with the potential to issue securities as described above.

**ITEM 16H.    MINE SAFETY DISCLOSURE**

Not applicable.

**PART III**

ITEM 17.    FINANCIAL STATEMENTS

See Item 18.

ITEM 18.    FINANCIAL STATEMENTS

Our consolidated financial statements are included at the end of this annual report, beginning with page F-1.

ITEM 19.    EXHIBITS

| Exhibit No. | Description of Exhibit |
| --- | --- |
| 1.1[1] | Articles of Association of Hebron Technology Co., Ltd. |
| 1.2[2] | First Amended and Restated Articles of Association of Hebron Technology Co., Ltd. |
| 1.3[1] | Memorandum of Association of Hebron Technology Co., Ltd. |
| 1.4[1] | First Amended and Restated Memorandum of Association of Hebron Technology Co., Ltd. |
| 1.5[2] | Second Amended and Restated Memorandum of Association of Hebron Technology Co., Ltd. |
| 1.6[5] | Third Amended and Restated Memorandum of Association of Hebron Technology Co., Ltd. |
| 2.1[6] | Registrant's Form of Class A common share Certificate |
| 2.2[6] | Registrant's Form of Class B common share Certificate |
| 4.1 | Share Purchase Agreement dated April 16, 2019 among Hebron Technology Co., Ltd., Wise Metro Development Co., Ltd., Zuoqiao Sun Zhang, and NiSun International Enterprise Management Group Co., Ltd. (Cayman) (incorporated by reference to Exhibit 99.2 to Form 6-K filed with the Commission on June 4, 2019) |
| 4.2[7] | English Translation of Office Lease dated April 25, 2019 between Shanghai Ningsheng Enterprise Management Group Co., Ltd. and Fintech (Shanghai) Digital Technology Co., Ltd. |
| 4.3[7] | Trademarks, Technologies & Management and Consulting Services Agreement dated May 17, 2019 among NingChen (Shanghai) Enterprise Management Group Co., Ltd., Fintech (Shanghai) Digital Technology Co., Ltd., Shanghai Ningsheng Enterprise Management Group Co., Ltd. and Peng Jiang |
| 4.4[7] | Equity Interest Pledge Agreement dated May 17, 2019 among NingChen (Shanghai) Enterprise Management Group Co., Ltd., Fintech (Shanghai) Digital Technology Co., Ltd., Shanghai Ningsheng Enterprise Management Group Co., Ltd. and Peng Jiang |
| 4.5[7] | Equity Interest Holders' Voting Rights Proxy Agreement dated May 17, 2019 among NingChen (Shanghai) Enterprise Management Group Co., Ltd., Shanghai Ningsheng Enterprise Management Group Co., Ltd. and Peng Jiang |
| 4.6[7] | Exclusive Right and Option to Purchase Agreement dated May 17, 2019 among NingChen (Shanghai) Enterprise Management Group Co., Ltd., Fintech (Shanghai) Digital Technology Co., Ltd., Shanghai Ningsheng Enterprise Management Group Co., Ltd. and Peng Jiang |
| 4.7 | Form of Call Option Agreement (incorporated by reference to Exhibit 99.4 to Form 6-K filed with the Commission on June 4, 2019) |
| 4.8[7] | Share Purchase Agreement dated July 12, 2019 between Hebron Technology Co., Ltd. and Bodang Liu |
| 4.9 | Employment Contract dated August 8, 2019 between Hebron Technology Co. Ltd. and Changjuan Liang (incorporated by reference to Exhibit 10.1 to Form 6-K filed with the Commission on August 13, 2019) |
| 4.10[7] | English Translation of Cooperation Contract dated November 8, 2019 between NiSun International Enterprise Management Group (British Virgin Islands) Co., Ltd. and Tai'an Keyuan Basic Industry Investment and Construction Co., Ltd. |
| 4.11 | 2019 One Million Share Incentive Plan (incorporated by reference to Exhibit 99.1 to Form 6-K filed with the Commission on November 20, 2019) |
| 4.12[7] | Share Purchase Agreement dated December 6, 2019 among Hebron Technology Co., Ltd., Jupiter Trading Co., Ltd (BVI) and Loong Fang Trading Co., Ltd (BVI) |

| 4.13[7] | Share Exchange Agreement dated December 15, 2019 among Hebron Technology Co., Ltd., Beijing Hengtai Puhui Information Service Co. Ltd, Guoya Asset Management Co. Ltd. (BVI) and HongKong D&L Technology Co., Limited |
|---|---|
| 4.14[7] | Trademarks, Technologies & Management and Consulting Services Agreement dated December 31, 2019 among NingChen (Shanghai) Enterprise Management Group Co., Ltd., Beijing Hengtai Puhui Information Service Co. Ltd and Guoya Asset Management (Shenzhen) Co. Ltd. |
| 4.15[7] | Equity Interest Pledge Agreement dated Equity Interest Pledge Agreement dated December 31, 2019 among NingChen (Shanghai) Enterprise Management Group Co., Ltd., Beijing Hengtai Puhui Information Service Co. Ltd and Guoya Asset Management (Shenzhen) Co. Ltd. |
| 4.16[7] | Equity Interest Holders' Voting Rights Proxy Agreement dated December 31, 2019 between NingChen (Shanghai) Enterprise Management Group Co., Ltd. and Guoya Asset Management (Shenzhen) Co. Ltd. |
| 4.17[7] | Exclusive Right and Option to Purchase Agreement dated December 31, 2019 among NingChen (Shanghai) Enterprise Management Group Co., Ltd., Beijing Hengtai Puhui Information Service Co. Ltd and Guoya Asset Management (Shenzhen) Co. Ltd. |
| 4.18[7] | First Amendment to Share Exchange Agreement dated April 8, 2020 among Hebron Technology Co., Ltd., Beijing Hengtai Puhui Information Service Co. Ltd, Guoya Asset Management Co. Ltd. (BVI) and HongKong D&L Technology Co., Limited |
| 8.1[7] | List of Subsidiaries of the Registrant |
| 11.1[4] | Code of Business Conduct and Ethics |
| 12.1[7] | Certification of Chief Executive Officer Required by Rule 13a-14(a) |
| 12.2[7] | Certification of Chief Financial Officer Required by Rule 13a-14(a) |
| 13.1[7] | Certification of Chief Executive Officer Required by Rule 13a-14(b) and Section 1350 of Chapter 63 of Title 18 of the United States Code |
| 13.2[7] | Certification of Chief Financial Officer Required by Rule 13a-14(b) and Section 1350 of Chapter 63 of Title 18 of the United States Code |
| 15.1[7] | Consent Letter of Wei, Wei & Co., LLP. |
| 99.1[7] | Press release dated April 24, 2020 titled "Hebron Technology Co., Ltd. Reports Fiscal Year 2019 Financial Results" |
| 101.INS[7] | XBRL Instance Document. |
| 101.SCH[7] | XBRL Taxonomy Extension Schema Document. |
| 101.CAL[7] | XBRL Taxonomy Extension Calculation Linkbase Document. |
| 101.DEF[7] | XBRL Taxonomy Extension Definition Linkbase Document. |
| 101.LAB[7] | XBRL Taxonomy Extension Labels Linkbase Document. |
| 101.PRE[7] | XBRL Taxonomy Extension Presentation Linkbase Document. |

(1) Incorporated by reference to Form F-1 filed on April 29, 2016 (Accession No.: 0001144204-16-097715)
(2) Incorporated by reference to Form F-1 filed on June 13, 2016 (Accession No.: 0001144204-16-107930)
(3) Incorporated by reference to Form F-1 filed on December 16, 2015 (Accession No.: 0001144204-15-071344)
(4) Incorporated by reference to Form 20-F filed on April 11, 2017 (File No.: 001-37829)
(5) Incorporated by reference to Form 6-K filed on March 9, 2018 (File No.: 001-37829)
(6) Incorporated by reference to Form 20-F filed on April 26, 2018 (File No.: 001-37829)
(7) Filed herewith.

## SIGNATURES

The registrant hereby certifies that it meets all of the requirements for filing on Form 20-F and that it has duly caused and authorized the undersigned to sign this annual report on its behalf.

**Hebron Technology Co., Ltd.**

By: /s/ Anyuan Sun
    Name:   Anyuan Sun
    Title:   Chief Executive Officer

Date: April 24, 2020

112

**HEBRON TECHNOLOGY CO., LIMITED AND SUBSIDIARIES**
**TABLE OF CONTENTS**

|  | Page |
|---|---|
| **Consolidated Financial Statements** | |
| Report of Independent Registered Public Accounting Firm | F-2 |
| Consolidated Balance Sheets | F-3 |
| Consolidated Statements of Operations and Comprehensive Loss | F-4 |
| Consolidated Statements of Changes in Shareholders' Equity | F-5 |
| Consolidated Statements of Cash Flows | F-6 |
| Notes to Consolidated Financial Statements | F-7 |

F-1



CERTIFIED PUBLIC ACCOUNTANTS

• MAIN OFFICE
133-10 39ᵀᴴ AVENUE
FLUSHING, NY 11354
TEL. (718) 445-6308
FAX. (718) 445-6760

• CALIFORNIA OFFICE
36 W BAY STATE STREET
ALHAMBRA, CA 91801
TEL. (626) 282-1630
FAX. (626) 282-9726

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

To the Board of Directors and Shareholders of Hebron Technology Co., Ltd.

**Opinion on the Financial Statements**

We have audited the accompanying consolidated balance sheets of Hebron Technology Co., Ltd. and subsidiaries (the "Company") as of December 31, 2019 and 2018, and the related consolidated statements of operations and other comprehensive income (loss), changes in shareholders' equity, and cash flows for each of the two years in the period ended December 31, 2019, and the related notes (collectively referred to as the "financial statements"). In our opinion, the consolidated financial statements present fairly, in all material respects, the financial position of the Company as of December 31, 2019 and 2018, and the results of their operations and their cash flows for each of the two years in the period ended December 31, 2019, in conformity with accounting principles generally accepted in the United States of America.

**Basis for Opinion**

These consolidated financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's consolidated financial statements based on our audits. We are a public accounting firm registered with the Public Company Accounting Oversight Board (United States) (PCAOB) and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement, whether due to error or fraud. The Company is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting. As part of our audits, we are required to obtain an understanding of internal control over financial reporting, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion.

Our audits included performing procedures to assess the risks of material misstatement of the consolidated financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the consolidated financial statements. We believe that our audits provide a reasonable basis for our opinion.

/s/ Wei, Wei & Co., LLP

We have served as the Company's auditor since 2019.

Flushing, New York

April 24, 2020

F-2

**HEBRON TECHNOLOGY CO., LIMITED AND SUBSIDIARIES**
**CONSOLIDATED BALANCE SHEETS**
**(Stated In U.S. Dollars)**

| | December 31, 2019 | December 31, 2018 |
|---|---|---|
| **ASSETS** | | |
| **CURRENT ASSETS:** | | |
| Cash and cash equivalents | $ 3,452,647 | $ 947,588 |
| Restricted cash | 959,672 | 2,124,655 |
| Contracts receivable, net | 30,120,533 | 24,669,365 |
| Accounts receivable, net | 3,024,531 | 2,655,845 |
| Bank acceptance notes receivable | 22,660 | 81,611 |
| Inventories | 635,989 | 365,480 |
| Prepayments and advances to suppliers, net | 2,526,056 | 3,568,003 |
| Other receivables, net | 516,607 | 767,681 |
| Loans to third parties-current portion | 2,434,715 | - |
| Prepaid expenses and other current assets | 18,348 | 94,539 |
| **TOTAL CURRENT ASSETS** | 43,711,758 | 35,274,767 |
| | | |
| **NON-CURRENT ASSETS:** | | |
| Property and equipment at cost, net | 11,889,373 | 12,515,894 |
| Intangible assets, net | 5,124,264 | 969,339 |
| Retainage receivables, net | 2,408,070 | 3,146,986 |
| Right of use assets | 1,915,577 | - |
| Rent and other deposits | 85,999 | 43,633 |
| Loans to third parties – long term portion | 2,872,820 | - |
| Long term investments | 3,708,359 | 3,054,090 |
| Goodwill | 11,074,864 | - |
| Deferred tax assets | 2,008,173 | 1,648,967 |
| **TOTAL ASSETS** | $ 84,799,257 | $ 56,653,676 |
| | | |
| **LIABILITIES** | | |
| **CURRENT LIABILITIES:** | | |
| Short-term loans | $ 861,846 | $ 1,698,058 |
| Bank acceptance notes Payable | 929,148 | 2,117,382 |
| Accounts payable | 2,386,061 | 1,361,687 |
| Accrued expenses and other current liabilities | 3,725,149 | 2,112,472 |
| Operating lease liabilities | 188,557 | - |
| Loan payable - current | 156,574 | 177,291 |
| Advances from customers | 1,311,004 | 3,131,338 |
| Tax payable | 10,915,483 | 9,085,746 |
| Due to related party | 7,759,443 | - |
| **TOTAL CURRENT LIABILITIES** | 28,233,265 | 19,683,974 |
| | | |
| Loan payable – long-term | 54,726 | 212,351 |
| Operating lease liabilities – long term | 1,769,927 | - |
| Deferred tax liabilities | 805,826 | - |
| **TOTAL LIABILITIES** | 30,863,744 | 19,896,325 |
| Commitments and contingencies | | |
| **EQUITY:** | | |
| Class A common stock, $0.001 par value, 40,000,000 shares authorized, 17,710,471 and 8,491,177 shares issued and outstanding as of December 31, 2019 and 2018 respectively. | 17,710 | 8,491 |
| Class B common stock, $0.001 par value, 10,000,000 shares authorized, nil and 7,778,400 shares issued and outstanding as of December 31, 2019 and 2018 respectively. | - | 7,778 |
| Additional paid-in capital | 28,369,076 | 13,361,447 |
| Retained earnings | 27,472,766 | 24,732,776 |
| Accumulated other comprehensive income (loss) | (1,914,232) | (1,353,141) |
| **TOTAL SHAREHOLDERS' EQUITY** | 53,945,320 | 36,757,351 |
| Non-controlling interests | (9,807) | - |
| **TOTAL EQUITY** | 53,935,513 | 36,757,351 |
| | | |
| **TOTAL LIABILITIES AND SHAREHOLDERS' EQUITY** | $ 84,799,257 | $ 56,653,676 |

The accompanying notes are an integral part of these consolidated financial statements.

**HEBRON TECHNOLOGY CO., LIMITED AND SUBSIDIARIES**
**CONSOLIDATED STATEMENTS OF OPERATIONS AND OTHER COMPREHENSIVE INCOME (LOSS)**

| | For the Years Ended December 31, | | |
| --- | ---: | ---: | ---: |
| | 2019 | 2018 | 2017 |
| **REVENUE:** | | | |
| Installation service | $ 10,490,191 | $ 17,297,212 | $ 23,748,141 |
| Fluid equipment sales | 8,087,399 | 7,992,848 | 5,452,304 |
| Financial services | 2,525,524 | - | - |
| | 21,103,114 | 25,290,060 | 29,200,445 |
| **COST OF REVENUE** | | | |
| Cost of revenue | 12,882,094 | 17,458,252 | 18,080,777 |
| Business and sales related taxes | 164,399 | 253,856 | 675,507 |
| **GROSS PROFIT** | 8,056,621 | 7,577,952 | 10,444,161 |
| | | | |
| **OPERATING EXPENSES:** | | | |
| | | | |
| General and administrative | 2,566,831 | 3,298,188 | 3,683,594 |
| Selling and marketing | 985,252 | 1,337,321 | 2,187,253 |
| Bad debt | 2,079,837 | 7,913,442 | 187,715 |
| Research and development | 492,696 | 358,411 | 508,282 |
| Total operating expenses | 6,124,616 | 12,907,362 | 6,566,844 |
| **INCOME (LOSS) FROM OPERATIONS** | 1,932,005 | (5,329,410) | 3,877,317 |
| | | | |
| **OTHER INCOME (EXPENSE):** | | | |
| Other income, net | 1,255,149 | (426,585) | 377,174 |
| Interest expense | (158,119) | (208,306) | (56,953) |
| Income from investments | 153,554 | 168,534 | - |
| Total other income (expense), net | 1,250,584 | (466,357) | 320,221 |
| | | | |
| **INCOME (LOSS) BEFORE INCOME TAXES** | 3,182,589 | (5,795,767) | 4,197,538 |
| **PROVISION (BENEFIT) FOR INCOME TAXES** | 442,599 | (651,052) | (2,938,849) |
| | | | |
| **NET INCOME(LOSS)** | 2,739,990 | (5,144,715) | 7,136,387 |
| Net income (loss) attributable to non-controlling interests | - | - | - |
| **NET INCOME (LOSS) ATTRIBUTABLE TO SHAREHOLDERS** | 2,739,990 | (5,144,715) | 7,136,387 |
| | | | |
| **OTHER COMPREHENSIVE INCOME (LOSS)** | | | |
| Foreign currency translation (loss) income | (561,091) | (1,755,528) | 2,249,081 |
| **COMPREHENSIVE INCOME (LOSS)** | 2,178,899 | $ (6,900,243) | 9,385,468 |
| Total comprehensive loss attributable to non-controlling interests | - | - | - |
| **TOTAL COMPREHENSIVE INCOME (LOSS) ATTRIBUTABLE TO SHAREHOLDERS** | $ 2,178,899 | $ (6,900,243) | $ 9,385,468 |
| | | | |
| Basic and diluted earnings (loss) per common share | $ 0.17 | $ (0.33) | $ 0.49 |
| | | | |
| Weighted average number of shares outstanding-basic and diluted | 16,269,577 | 15,760,633 | 14,695,347 |

The accompanying notes are an integral part of these consolidated financial statements.

F-4

**HEBRON TECHNOLOGY CO., LIMITED AND SUBSIDIARIES**
**CONSOLIDATED STATEMENTS OF CHANGES IN SHAREHOLDERS' EQUITY**

| | Class A Common Stock | | Class B Common Stock | | Additional paid in capital | Retained Earnings | Accumulated Other Comprehensive Income (Loss) | Non-controlling Interests | Total |
|---|---|---|---|---|---|---|---|---|---|
| | Shares | Amount | Shares | Amount | | | | | |
| Balance at January 1, 2017 | 6,916,947 | $ 6,917 | 7,778,400 | $ 7,778 | $ 10,237,965 | $ 22,741,104 | $ (1,846,694) | - | $ 31,147,070 |
| Net income | - | - | - | - | - | 7,136,687 | - | - | 7,136,387 |
| Foreign currency translation gain | - | - | - | - | - | - | 2,249,081 | - | 2,249,081 |
| Balance at December 31, 2017 | 6,916,947 | 6,917 | 7,778,400 | 7,778 | 10,237,965 | 29,877,491 | 402,387 | - | 40,532,538 |
| Net (loss) | - | - | - | - | - | (5,144,715) | - | - | (5,144,715) |
| Foreign currency translation loss | - | - | - | - | - | - | (1,755,528) | - | (1,755,528) |
| Issuance of class A common stock for consulting services | 131,452 | 131 | - | - | 239,369 | - | - | - | 239,500 |
| Issuance of common stock for equity investment | 1,442,778 | 1,443 | - | - | 2,884,113 | - | - | - | 2,885,556 |
| Balance at December 31, 2018 | 8,491,177 | 8,491 | 7,778,400 | 7,778 | 13,361,447 | 24,732,776 | (1,353,141) | - | 36,757,351 |
| Net income | - | - | - | - | - | 2,739,990 | - | - | 2,739,990 |
| Foreign currency translation loss | - | - | - | - | - | - | (561,091) | - | (561,091) |
| Capital contribution by shareholder | - | - | - | - | 3,582,781 | - | - | - | 3,582,781 |
| Shares to be issued for acquisition | 1,440,894 | 1,441 | - | - | 11,424,848 | - | - | - | 11,426,289 |
| Non-controlling interests arising from business combination | - | - | - | - | - | - | - | (9,807) | (9,807) |
| Reclassification of common stock | 7,778,400 | 7,778 | (7,778,400) | (7,778) | - | - | - | - | - |
| Balance at December 31, 2019 | 17,710,471 | $ 17,710 | - | $ - | $ 28,369,076 | $ 27,472,766 | $ (1,914,232) | (9,807) | $ 53,935,513 |

The accompanying notes are an integral part of these consolidated financial statements.

F-5

**HEBRON TECHNOLOGY CO., LIMITED AND SUBSIDIARIES**
**CONSOLIDATED STATEMENTS OF CASH FLOWS**
(Stated In U.S. Dollars)

| | | For the Years Ended December 31, | |
| --- | ---: | ---: | ---: |
| | **2019** | **2018** | **2017** |
| **CASH FLOWS FROM OPERATING ACTIVITIES:** | | | |
| Net income (loss) | $ 2,739,990 | $ (5,144,715) | $ 7,136,387 |
| Adjustments to reconcile net income to net cash provided by (used in) operating activities: | | | |
| Depreciation and amortization | 1,225,977 | 1,195,161 | 939,995 |
| Loss on disposition of property and equipment | - | 283,487 | 12,179 |
| Deferred tax (benefit) expense | (418,131) | (1,471,938) | 11,526 |
| Equity investment income | (153,554) | (168,534) | - |
| Bad debt expense | 2,079,837 | 7,913,442 | 187,715 |
| *Changes in operating assets and liabilities:* | | | |
| Contracts receivable | (5,801,693) | (8,850,502) | (2,992,867) |
| Accounts receivable | (1,141,352) | (1,383,452) | (950,850) |
| Bank acceptance notes receivable | 58,390 | 593,674 | (378,205) |
| Retainage receivables | (489,283) | (748,903) | (80,360) |
| Prepayment and advances to suppliers | 1,392,426 | 93,149 | (7,127,018) |
| Inventories | (277,176) | 1,177,956 | 788,000 |
| Other receivables | 341,339 | (598,764) | (156,074) |
| Accounts payable | 822,461 | 146,546 | 26,450 |
| Bank acceptance notes Payable | (1,171,013) | 2,148,292 | 53,272 |
| Advances from customers | (1,828,259) | 429,217 | (370,964) |
| Deferred revenue | - | - | (1,071,355) |
| Taxes payable | 1,933,516 | 2,770,253 | (2,365,120) |
| Accrued expenses and other current liabilities | 1,021,758 | 890,551 | 240,505 |
| **NET CASH PROVIDED BY (USED IN) OPERATING ACTIVITIES** | 335,233 | (725,080) | (6,096,784) |
| | | | |
| **CASH FLOWS FROM INVESTING ACTIVITIES:** | | | |
| Acquisition of property and equipment | (394,988) | (74,210) | (3,126,777) |
| Loans to third parties | (3,611,682) | - | - |
| Payments for intangible assets | - | (41,000) | - |
| Cash acquired from business acquisitions | 2,043,176 | - | - |
| **NET CASH (USED IN) INVESTING ACTIVITIES** | (1,963,494) | (115,210) | (3,126,777) |
| | | | |
| **CASH FLOWS FROM FINANCING ACTIVITIES:** | | | |
| Proceeds from short-term bank loans | 911,968 | 1,995,763 | 295,954 |
| Repayment of short-term bank loans | (1,733,462) | (1,088,667) | - |
| Capital contribution | 3,582,781 | - | - |
| Proceeds from long-term loans | - | - | 173,873 |
| Repayment of long-term loans | - | - | (47,353) |
| (Repayment) proceeds from loan | (174,861) | (176,427) | 560,748 |
| Advances from and (repayments to) related parties | 566,360 | - | (66,582) |
| **NET CASH PROVIDED BY (USED IN) FINANCING ACTIVITIES** | 3,152,786 | 730,669 | 916,640 |
| | | | |
| **EFFECT OF EXCHANGE RATE CHANGE ON CASH AND CASH EQUIVALENT** | (184,449) | (94,239) | (292,869) |
| **NET (DECREASE) INCREASE IN CASH AND CASH EQUIVALENT** | 1,340,076 | (203,860) | (8,599,790) |
| **CASH AND CASH EQUIVALENT AND RESTRICTED CASH**-beginning of year | 3,072,243 | 3,276,103 | 11,875,893 |
| | | | |
| **CASH AND CASH EQUIVALENT AND RESTRICTED CASH**-end of year | $ 4,412,319 | $ 3,072,243 | $ 3,276,103 |
| | | | |
| **SUPPLEMENTAL CASH FLOW DISCLOSURES:** | | | |
| Cash paid for income taxes | $ 5,158 | $ 42,250 | $ - |
| Cash paid for interest | $ 147,900 | $ 91,917 | $ 75,704 |
| | | | |
| **Non-cash financing activities** | | | |
| Warrants issued to placement agent in connection with the Company's IPO | $ - | $ - | $ - |
| Payment by related party for NiSun BVI acquisition | $ 7,000,000 | - | - |
| Issuance of shares for business combination | $ 11,426,289 | $ - | $ - |
| Issuance of shares for consulting services | $ - | $ 239,500 | $ - |
| Issuance of shares for equity investment | $ - | $ 2,885,556 | $ - |
| | | | |
| **CASH AND CASH EQUIVALENTS COMPRISE OF THE FOLLOWING:** | | | |
| Cash and cash equivalent | $ 3,452,647 | $ 947,588 | $ 3,220,781 |
| Restricted cash | 959,672 | 2,124,655 | 55,322 |
| Total cash, cash equivalents and restricted cash | $ 4,412,319 | $ 3,072,243 | $ 3,276,103 |

The accompanying notes are an integral part of these consolidated financial statements.

F-6

**HEBRON TECHNOLOGY CO., LIMITED AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

### Note 1 — ORGANIZATION AND BUSINESS DESCRIPTION

*Organization and description of business*

Hebron Technology Co., Ltd, ("Hebron Technology" or the "Company") is an investment holding company established under the laws of the British Virgin Islands ("BVI") on May 29, 2012 and conducts its business mainly through its subsidiaries, variable interest entities ("VIEs") and subsidiaries of the VIEs (collectively referred to as the "Group") in the People's Republic of China ("PRC"). The Group is organized into two business segments consisting of equipment and engineering segment and the financial services segment.

- The equipment and engineering segment is engaged in research, development and manufacture of fluid equipment including valves, pipe fittings and other related products, with particular emphasis on the manufacture and installation of intelligent valves, used in the pharmaceutical, biological, food and beverage, and other clean industries. The products and services are primarily used in pharmaceutical engineering construction. The fluid equipment and engineering segment primarily conducts its operations in the PRC through the Group's subsidiaries including Wenzhou Xibolun Fluid Equipment Co., Limited ("Xibolun Equipment") and Zhejiang Xibolun Automation Project Technology Co., Ltd. ("Xibolun Automation")

- The newly acquired financial services segment primarily offers underwriting related advisory services to financial institutions and corporate clients and provides distribution and management services for direct banking products issued by small and medium commercial banks in the PRC. The financial services segments began to conduct its operations in 2019 through the Group's newly acquired entities, Fintech (Shanghai) Digital Technology Co., Ltd. ("Fintech") and Beijing Hengtai Puhui Information services Co., Ltd. ("Hengtai") and their subsidiaries.

On July 12, 2019, the Group acquired all of the equity of NiSun International Enterprise Management Group (British Virgin Islands) Co., Ltd. ("NiSun BVI") for $7 million. NiSun BVI effectively controls Fintech through a series contractual agreements ("VIE Agreements"). Fintech's wholly owned subsidiaries consists of Khorgos Fintech Network Technology Co., Ltd ("Khorgos"), Jilin Lingang Trade Co., Ltd ("Jilin") and NiSun Family Office (Guangzhou) Co., Ltd ("Guangzhou").

On December 31, 2019, the Group, through VIE agreements, started to effectively control Beijing Hengtai Puhui Information Service Co. Ltd. ("Hengtai") by issuance of 1,440,894 shares of our common stock to Hengtai's original shareholders. Hengtai owns 92% of Hangzhou Fengtai Technology Co., Ltd ("Fengtai") and 100% of Dunhua Midtown Assets management registration Center Co., Ltd ("Midtown").

As of December 31 2019, the Company's subsidiaries and consolidated VIEs are as follows:

| | Date of incorporation/ acquisition | Place of incorporation | Percentage of direct or indirect economic interest |
|---|---|---|---|
| **Subsidiaries** | | | |
| Hong Kong Xibolun Technology Limited ("HK Xibolun") | June 14, 2011 | Hong Kong | 100% |
| NiSun International Enterprise Management Group (British Virgin Islands) Co., Ltd.("NiSun BVI") | July 12, 2019 | BVI | 100% |
| NiSun International Enterprise Management Group (Hong Kong) Co., Limited (NiSun HK) | July 12, 2019 | Hong Kong | 100% |
| NingChen (Shanghai) Enterprise Management Co., Ltd.("NingChen") | July 12, 2019 | PRC | 100% |
| Shandong Taiding International Investment Co., Ltd. ("Taiding") | November 12, 2019 | PRC | 80% |
| Zhejiang Xibolun Automation Project Technology Co., Ltd. ("Xibolun Automation") | September 24, 2012 | PRC | 100% |
| Wenzhou Xibolun Fluid Equipment Co., Limited ("Xibolun Equipment") | January 25, 2005 | PRC | 100% |
| | | | |
| **VIEs** | | | |
| Fintech (Shanghai) Digital Technology Co., Ltd. ("Fintech") | July 12, 2019 | PRC | 100% |
| Beijing Hengtai Puhui Information Services Co., Ltd ("Hengpu") | December 31, 2019 | PRC | 100% |
| | | | |
| **Subsidiaries of the VIEs** | | | |
| Khorgos Fintech Network Technology Co., Ltd. ("Khorgos") | July 12, 2019 | PRC | 100% |
| Jilin Lingang Trade Co., Ltd. ("Lingang") | November 27, 2019 | PRC | 100% |
| NiSun Family Office (Guangzhou) Co., Ltd. ("Guangzhou") | October 29, 2019 | PRC | 100% |
| Hangzhou Fengtai Technology Co., Ltd. ("Fengtai") | December 31, 2019 | PRC | 92% |
| Dunhua Midtown Asset Management Registration Center Co., Ltd. ("Midtown") | December 31, 2019 | PRC | 100% |

**Note 2 — SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES**

*Basis of presentation*

The accompanying consolidated financial statements have been prepared in accordance with accounting principles generally accepted in the United States of America ("U.S. GAAP") and have been consistently applied.

*Basis of consolidation*

The consolidated financial statements include the financial statements of the Company, its subsidiaries, the VIEs and subsidiaries of the VIEs for which the Company or its subsidiary is the primary beneficiary.

A subsidiary is an entity in which the Company, directly or indirectly, controls more than one half of the voting power or has the power to govern the financial and operating policies, to appoint or remove the majority of the members of the board of directors, or to cast a majority of votes at the meeting of director under a statute or agreement among the shareholders or equity holders.

A consolidated VIE is an entity in which the Company, or its subsidiaries, through contractual arrangements, has the power to direct the activities that most significantly impact the entity's economic performance, bears the risks of and enjoys the rewards normally associated with ownership of the entity, and therefore the Company or its subsidiaries are the primary beneficiary of the entity.

All transactions and balances among the Company, its subsidiaries, the VIEs and subsidiaries of the VIEs have been eliminated upon consolidation.

*VIE companies*

*1)   Contractual Agreements with VIE*

The following is a summary of the VIE agreements between the Company's PRC subsidiary, NingChen, and the VIEs including Fintech and Hengpu and their nominee shareholders:

*Management and Consulting Service Agreement.*

Under the Consulting Services Agreement, NingChen has the exclusive right to provide management and consulting and other services to VIEs for a consulting service fee from VIEs and agrees to authorize VIEs to use the trademarks, technologies and related intellectual property rights held by NingChen. The VIEs agree to pay NingChen or the designated agent of NingChen for the management and consulting services in the amount equivalent to all of the VIEs net profits after tax. The agreement shall be effective as of the date of agreement and shall remain effective until the date when NingChen terminates such agreements and Fintech or Hengpu cease to exist.

*Equity Interest Pledge Agreements*

Pursuant to the Equity Pledge Agreements, each shareholder of the VIEs agreed to pledge their equity interest in the VIEs to NingChen to secure nominal loans provided to the shareholders of the VIEs for a loan term of 100 years. Each shareholder of the VIEs agrees that the repayment of loan can only occur on the loan maturity date or NingChen agrees to collect the loan repayment. If the VIEs or their shareholders breach their contractual obligations under these agreements, NingChen, as pledgee, will have the right to dispose of the pledged equity interests and will have priority in receiving the proceeds from the auction or sale of the pledged equity interests. NingChen is entitled to any dividends declared or paid in connection with the pledged equity interests during the term of these agreements. The VIEs and their shareholders have further agreed that they will not transfer or encumber the pledged equity interests without the prior written consent from NingChen during the term of this agreement. The Equity Pledge Agreement remains effective and no provision of this agreement may be amended, modified, supplemented discharged or terminated unless all parties consent thereto in writing.

*Voting Rights Proxy Agreement.*

Under the Voting Rights Proxy Agreement, each shareholder of the VIEs irrevocably authorizes NingChen to exercise rights and powers as the shareholders of the VIEs, including but not limited to, convening and attending shareholders' meetings, voting on all matters of the VIEs requiring shareholder approval and appointing directors and senior management members. The Voting Rights Proxy Agreements will remain in force unless otherwise terminated in writing by NingChen or with the written consent of all parties.

**Note 2 — SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES - continued**

*Exclusive Call Option Agreement.*

Under the Exclusive Call Option Agreement, the VIEs and their shareholders have irrevocably granted NingChen an exclusive option to purchase, or authorize their designated persons to purchase all or part of each shareholder's equity interests in the VIEs. The purchase price shall be equal to the minimum price required by the relevant PRC laws. Without prior written consent of NingChen, the VIEs shall not among other things, amend their articles of association, sell or otherwise dispose of their assets or beneficial interests, enter into transactions which may adversely affect their assets, liabilities, business operations, equity interests and other legal interests, or merge with any other entities or make any investments, or distribute dividends. NingChen has right to transfer the rights and obligations pursuant to the Exclusive Call Option Agreement to any third party, which does not require any prior consent of the VIEs and their shareholders. The Exclusive Call Option Agreement will remain effective until NingChen terminates this agreement with 30 days advance notice.

*2)   Risks in relation to the VIE structure*

The Company believes that the contractual arrangements with its VIEs and their respective shareholders are in compliance with PRC laws and regulations and are legally enforceable. However, uncertainties in the PRC legal system could limit the Company's ability to enforce the contractual arrangements. If the legal structure and contractual arrangements were found to be in violation of PRC laws and regulations, the PRC government could:

- revoke the business and operating licenses of the Company's PRC subsidiaries and VIEs;

- discontinue or restrict the operations of any related-party transactions between the Company's PRC subsidiaries and VIEs;

- limit the Company's business expansion in China by way of entering into contractual arrangements;

- impose fines or other requirements with which the Company's PRC subsidiaries and VIEs may not be able to comply;

- require the Company's PRC subsidiaries and VIEs to restructure the relevant ownership structure or operations; or

- restrict or prohibit the Company's use of the proceeds of a public offering to finance the Company's business and operations in China.

The Company's ability to conduct its financial services business may be negatively affected if the PRC government were to carry out of any of the aforementioned actions. As a result, the Company may not be able to consolidate its VIEs in its consolidated financial statements as it may lose the ability to exert effective control over the VIEs – Fintech, Hengpu and their respective shareholders and it may lose the ability to receive economic benefits from the VIEs. The Company, however, does not believe such actions would result in the liquidation or dissolution of the NiSun BVI, its PRC subsidiaries and VIEs.

The interests of the shareholders of VIEs may diverge from that of the Company and that may potentially increase the risk that they would seek to act contrary to the contractual terms, for example by influencing the VIEs not to pay the service fees when required to do so. The Company cannot assure that when conflicts of interest arise, shareholders of the VIEs will act in the best interests of the Company or that conflicts of interests will be resolved in the Company's favor. Currently, the Company does not have existing arrangements to address potential conflicts of interest the shareholders of the VIEs may encounter in their capacity as beneficial owners and directors of the VIEs, on the one hand, and as beneficial owners and directors of the Company, on the other hand. The Company believes the shareholders of the VIEs will not act contrary to any of the contractual arrangements and the exclusive option agreements provide the Company with a mechanism to remove the current shareholders of the VIEs should they act to the detriment of the Company. The Company relies on certain current shareholders of the VIEs to fulfill their fiduciary duties and abide by laws of the PRC and act in the best interest of the Company. If the Company cannot resolve any conflicts of interest or disputes between the Company and the shareholders of the VIEs, the Company would have to rely on legal proceedings, which could result in disruption of its business, and there are substantial uncertainties as to the PRC legal system and the outcome of any such legal proceedings.

**Note 2 — SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES - continued**

The following table sets forth the assets, liabilities, results of operations and changes in cash and cash equivalents of the VIE and its subsidiary taken as a whole, which were included in the Group's consolidated financial statements with intercompany balances and transactions eliminated between the VIE and its subsidiary:

| | As of December 31, 2019 | |
|---|---|---|
| Total current asset | $ | 5,988,899 |
| **Total assets** | $ | 9,793,910 |
| Total current liabilities | $ | 1,295,055 |
| **Total liabilities** | $ | 1,295,055 |

| | For the year ended December 31, 2019 | |
|---|---|---|
| Financial service revenue | $ | 2,525,524 |
| Net income | $ | 1,600,661 |

| | For the year ended December 31, 2019 | |
|---|---|---|
| Net cash provided by operating activities | $ | 824,462 |
| Net cash (used in) investing activities | $ | (3,132,684) |
| Net cash provided by financing activities | $ | 3,044,235 |

As of December 31 2019, there were no consolidated assets of the VIEs that are collateral for the VIEs' obligations and can only be used to settle the VIEs' obligations. There were no creditors (or beneficial interest holders) of the VIEs that have recourse to the general credit of the Company in the normal course of business. The Company neither provides nor intends to provide additional financial or other support not previously contractually required to the VIEs and subsidiaries of the VIEs. Relevant PRC laws and regulations restrict the VIEs from transferring a portion of its net assets, equivalent to the balance of its paid-in capital, capital reserve and statutory reserves, to the Company in the form of loans and advances or cash dividends. Please refer to Note 22 for disclosure of restricted net assets.

*Non-controlling interests*

Non-controlling interests are recognized to reflect the portion of the equity that is not attributable, directly or indirectly, to the Group. Non-controlling interests are presented as a separate component of equity in the consolidated balance sheet and earnings and other comprehensive income are attributed to controlling and non-controlling interests. As of December 31, 2019, the 20% non-controlling shareholder in Taiding has not contributed their capital and Taiding has not commenced operations. As of December 31, 2019, the Group's non-controlling interest balance represented the non-controlling shareholder shareholders' 8% equity interest in Fengtai, a subsidiary of Hengpu.

*Uses of estimates*

The preparation of consolidated financial statements in conformity with U.S. GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenue and expenses during each reporting period. Actual results could differ from those estimates. Significant accounting estimates reflected in the Company's consolidated financial statements include: the allowance for doubtful accounts, the valuation of inventory, realizability of deferred tax assets, costs to complete contracts, estimated useful lives and fair values in connection with the impairment of property and equipment, intangible assets, goodwill and accruals for income tax uncertainties.

**Note 2 — SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES - continued**

*Business combinations*

The Group accounts for business combinations using the purchase method of accounting in accordance with the Financial Accounting Standards Board ("FASB") Accounting Standards Codification ("ASC") topic 805, Business Combinations. The purchase method of accounting requires the consideration transferred to be allocated to the assets, including separately identifiable assets and liabilities the Group acquired, based on their estimated fair values. The consideration transferred in an acquisition is measured as the aggregate of the fair values at the date of exchange of the assets given, liabilities incurred, and equity instruments issued as well as the contingent considerations and all contractual contingencies as of the acquisition date. The costs directly attributable to the acquisition are expensed as incurred. Identifiable assets, liabilities and contingent liabilities acquired or assumed are measured separately at their fair value as of the acquisition date, irrespective of the extent of any non-controlling interests. The excess of (i) the total acquisition cost, fair value of the non-controlling interests and acquisition date fair value of any previously held equity interest in the acquiree over (ii) the fair value of the identifiable net assets of the acquiree, is recorded as goodwill. If the cost of the acquisition is less than the fair value of the net assets of the subsidiary acquired, the difference is recognized directly in earnings as a bargain purchase gain.

The determination and allocation of fair values to the identifiable assets acquired, liabilities assumed and non-controlling interests is based on various assumptions and valuation methodologies requiring considerable judgment from management. The most significant variables in these valuations are discount rates, terminal values, the number of years on which to base the cash flow projections, as well as the assumptions and estimates used to determine the cash inflows and outflows. The Group determines discount rates to be used based on the risk inherent in the related activity's current business model and industry comparisons. Terminal values are based on the expected life of assets, forecasted life cycle and forecasted cash flows over that period. The fair value of the identifiable assets acquired and liabilities assumed at the acquisition date is based on a valuation performed by an independent valuation firm engaged by the Group:

*Revenue recognition*

The Group adopted FASB ASC Topic 606 Revenue from Contracts with Customers ("ASC 606") on January 1, 2018 using the modified retrospective approach. Revenues for the years ended December 31, 2019 and 2018 were presented under ASC 606, and revenues for the year ended December 31, 2017 were not adjusted and continue to be presented under ASC Topic 605, Revenue Recognition. There was no adjustment to the opening balance of retained earnings at January 1, 2018 since there was no significant change to the timing and pattern of revenue recognition upon adoption of ASC 606. Under ASC 606, revenue is recognized when control of promised goods or services is transferred to the Company's customers in an amount of consideration to which an entity expects to be entitled to in exchange for those goods or services. All of the Company's contracts with customer do not contain cancelable and refund-type provisions.

Under the guidance of ASC 606, the Group is required to (a) identify the contract(s) with a customer, (b) identify the performance obligations in the contract, (c) determine the transaction price, (d) allocate the transaction price to the performance obligations in the contract and (e) recognize revenue when (or as) the Group satisfies its performance obligation. In determining the transaction price, the Group has included variable consideration only to the extent that it is probable that a significant reversal in the amount of cumulative revenue recognized would not occur. Revenues are recorded, net of sales related taxes and surcharges.

A.  *Equipment and engineering*

Revenues from the equipment and engineering segment are primarily derived from the following sources:

*Sales of products*: The Group is engaged in the manufacture of fluid equipment The Group recognizes revenue when the products are delivered and control is transferred. The transaction price is based on the fixed contractual price with the customer. Billings to the customer for the sale of products occur at the time the products are transferred to the customer. The Group's sales revenue consists of the invoiced value of goods, net of value-added tax ("VAT").

*Installation contracts*: The Group is engaged in the installation of intelligent valves used in the pharmaceutical, biological, food and beverage, and other clean industries. The Group recognizes revenue associated with these contracts over time as services are performed and the transfer of control occurs, based on a percentage-of-completion method using cost-to-cost input methods as a measure of progress. When the percentage-of-completion method is used, the Company estimates the costs to complete individual contracts and records as revenue that portion of the total contract price that is considered complete based on the relationship of costs incurred to date to total anticipated costs (the cost-to-cost approach).

Under the cost-to-cost approach, the use of estimated costs to complete each contract is a significant variable in the process of determining recognized revenue, requires judgment and can change throughout the duration of a contract due to contract modifications and other factors impacting job completion. The costs of earned revenue includes all direct material and labor costs and those indirect costs related to contract performance, such as indirect labor, supplies, tools and repairs. Provisions for estimated losses on uncompleted contracts are made in the period in which such losses are determined.

**Note 2 — SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES - continued**

The Group sometimes enters into installation service contracts in connection with product sales. The manufacture of fluid equipment control systems comprises two stages: (a) manufacture; and (b) installation. The Group always enters into separate product and installation contracts with the customer as the customer has the choice to use its own staff or external contractors to install the products based on product installation manuals provided by the Group when the products are delivered. The Group usually sells the product on a standalone basis and also is engaged by customers to install the systems they purchase from other suppliers. It is the Group's policy to sell its products at the set prices regardless of whether the customer separately enters into an installation contract with the Company. The Company always prices its installation services at market competitive rates regardless of whether the installation service relates to its own products or standalone installation services. Therefore, the Group determined there are two separate performance obligations, and recognizes product sales and installation revenue separately.

The Group generally provides a standard warranty for its product and installation service. The warranty period is typically 12-24 months upon delivery of product or the completion of the installation service in accordance with PRC national warranty standard. The Group determines that such warranty is not a separate performance obligation because the nature of warranty is to provide assurance that a product or service will function as expected and in accordance with the customer's specifications and the Group does not sell the warranty separately. From its past experience, the Group has not experienced any material warranty costs and, therefore, the Group does not believe an accrual for warranty cost is necessary for the years ended December 31, 2019, 2018 and 2017.

**B.  Financial services**

*Underwriting related advisory fees:* The Group earns one-time advisory fees from its services provided to underwriters, financial institutions or underlying corporate issuers for offerings on PRC provincial or national asset exchanges or other designated markets. The Group enters into one-time advisory fee agreements with underwriters, financial institutions and issuers, which specifies the key terms and conditions of the arrangement. Such agreements generally do not include rights of return, credits or discounts, rebates, price protection or other similar privileges. The Group earns a one-time advisory fee from its clients upon offerings on the PRC provincial or national asset exchanges or other designated markets. Revenue is calculated as a fixed charge rate with the amount of the offering (prorated by the period length). The Group believes such arrangement represents a performance obligation and is satisfied at point of time, therefore, the underwriting related advisory fees are recognized as revenue upon the closing of the offerings. For the year ended December 31, 2019, the Group's financial services revenue from underwriting related advisory fees amounted to $2,522,143.

*Recurring service fees:* The Group also provides ongoing user management services to small and medium commercial banks and financial institutions in distributing and sourcing funds for their direct banking and other financial products in exchange for a recurring service fee. Recurring service agreements do not include rights of return, credits or discounts, rebates, price protection or other similar privileges. Recurring service fees are calculated as a fixed percentage of the qualified investments made by users during the contractual investment period of the direct banking and other financial products. Payment of recurring service fees by commercial banks and financial institutions are normally on a regular basis (typically quarterly or annually). The Group believes such arrangement requires the Group to provide ongoing user management services, which represents a performance obligation that the Group satisfies over time. Therefore, the recurring service revenue is recognized over the contract term. For the year ended December 31, 2019, the Group's financial services revenue from recurring service fees amounted to $3,381.

Contract liabilities are presented as advances from customers on the consolidated balance sheet. Contract liabilities relate to payments received in advance of completion of performance obligations under a contract. Contract liabilities are recognized as revenue upon the completion of performance obligations. As of December 31, 2019 and 2018, the balance of advances from customers amounted to $1,311,004 and $3,131,338, respectively.

*Practical expedience*

The Group has applied the practical expedient for certain revenue streams to exclude the value of remaining performance obligations for (i) contracts with an original expected term of one year or less or (ii) contracts for which the Group recognizes revenue in proportion to the amount the Group has the right to invoice for services performed.

*Cash and cash equivalents*

Cash and cash equivalents consist of cash on hand, bank deposits and highly liquid investments in banking products placed with large reputable banks in China, which are readily convertible to known amounts of cash and unrestricted from withdrawal or use, and which have original maturities of three months or less when purchased.

F-12

**Note 2 — SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES - continued**

*Restricted Cash*

Restricted cash consists of cash equivalents used as collateral to secure bank borrowings and security deposits related to our financial services. The Group is required to keep certain amounts on deposit that are subject to withdrawal restrictions. The restricted cash balance is associated with The Group's short-term borrowings, thus, classified as a current asset. As of December 31, 2019 and 2018, the Group had restricted cash of $934,656 and $2,124,655, respectively, related to the bank acceptance notes payable in the equipment and engineering segment. As of December 31, 2019 and 2018, the Group had restricted cash of $25,016 and nil, respectively, related to our financial services segment.

In November 2016, the FASB issued Accounting Standards Update No. 2016-18, Statement of Cash Flows (Topic 230): Restricted Cash, which requires companies to include amounts generally described as restricted cash and restricted cash equivalents in cash and cash equivalents when reconciling beginning-of-period and end-of-period total amounts presented in the statement of cash flows. The Group adopted the new standard effective January 1, 2018, using the retrospective transition method.

*Fair value of financial instruments*

The Group follows the provisions of FASB ASC Section 820, "Fair Value Measurements and Disclosures" ("ASC 820"). ASC 820 clarifies the definition of fair value, prescribes methods for measuring fair value, and establishes a fair value hierarchy to classify the inputs used in measuring fair value as follows:

Level 1 — Inputs are unadjusted quoted prices in active markets for identical assets or liabilities available at the measurement date.

Level 2 — Inputs are unadjusted quoted prices for similar assets and liabilities in active markets, quoted prices for identical or similar assets and liabilities in markets that are not active, inputs other than quoted prices that are observable, and inputs derived from or corroborated by observable market data.

Level 3 — Inputs are unobservable inputs which reflect the reporting entity's own assumptions on what assumptions market participants would use in pricing the asset or liability based on the best available information.

The carrying amounts reported in the balance sheets for cash, contracts receivable, accounts receivable, bank acceptance notes receivable, retainage receivables, prepayments and advances to suppliers, other receivables, loans to third parties, accounts payable, advances from customers, tax payable, due to related party and accrued expenses and other current liabilities, approximate their fair value based on the short-term maturity of these instruments. The Group believes that the carrying amount of the short-term and long-term loans approximates fair value based on the terms of the borrowings and current market rates as the rates of the borrowings are reflective of the current market rate.

*Accounts and contract receivables*

Accounts and contract receivables from equipment sales, installation services and financial services are stated at net realizable value. An allowance for doubtful accounts is established based on the management's assessment of the recoverability of accounts and other receivables. Judgment is required in assessing the realizability of these receivables, including the current credit worthiness of each customer and the related aging analysis. An allowance is provided for accounts when management has determined that the likelihood of collection is doubtful. The Group writes off accounts and contract receivables against the allowance when a balance is determined to be uncollectible.

*Retainage receivables*

Retainage receivables represent the amount retained by the Group's customers to ensure the quality of the installation services and any possible follow-up maintenance related to the installation. If there is no dispute regarding the quality of the installation project during the year, such retainage receivable will be paid by the Group's customer based on contractual term, which is typically from one year to five years. Management regularly reviews the aging of retainage receivables and changes in payment trends and records an allowance when management believes collection of amounts due are at risk.

*Inventories*

Inventories are stated at the lower of cost or net realizable value. Inventories consist of raw materials, finished goods, work in process, low value consumables, and installation projects in process that have not been completed. Provision is made for slow-moving, obsolete or unusable inventory.

F-13

**Note 2 — SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES - continued**

*Advances to suppliers*

The Group advances funds to certain suppliers for purchases of raw materials, plant and equipment. These advances are interest free, unsecured and short-term in nature and are reviewed periodically to determine whether their carrying value has become impaired. For the years ended December 31, 2019, 2018 and 2017, the Group recorded a bad deb recovery of $1,192,142, and bad debt provisions of $7,609,244 and $386,563, respectively.

*Long term investments*

FASB ASU 2016-01 ("ASU 2016-01"), Recognition and Measurement of Financial Assets and Financial Liabilities amends certain aspects of recognition, measurement, presentation and disclosure of financial instruments. The main provisions require equity investments (except those accounted for under the equity method of accounting or those that result in consolidation of the investee) to be measured at fair value through earnings, unless they qualify for a measurement alternative. The Group adopted the new financial instruments accounting standard on January 1, 2019. Prior to January 1, 2019, the Company did not have any long-term investments.

*Equity investments without readily determinable fair values*

After the adoption of this new accounting standard, the Group elected to record equity investments without readily determinable fair values and not accounted for under the equity method at cost, less impairment, adjusted for subsequent observable price changes on a nonrecurring basis, and report changes in the carrying value of the equity investment in current earnings. Changes in the carrying value of the equity investment are required to be made whenever there are observable price changes in orderly transactions for the identical or similar investment of the same issuer. Reasonable efforts shall be made to identify price changes that are known or that can reasonably be known.

*Equity investments with readily determinable fair values*

Equity investments with readily determinable fair values are measured and recorded at fair value using the market approach based on the quoted prices in active markets at the reporting date.

*Equity investments accounted for using the equity method*

The Group accounts for its equity investment over which it has significant influence but does not own a majority equity interest or otherwise control, using the equity method. The Group adjusts the carrying amount of the investment and recognizes investment income or loss for its share of the earnings or loss of the investee after the date of investment. The Group assesses its equity investment for other-than-temporary impairment by considering factors including, but not limited to, current economic and market conditions, operating performance of the entity, including current earnings trends and undiscounted cash flows, and other entity-specific information. The fair value determination, particularly for investments in a privately held entity, requires judgment to determine appropriate estimates and assumptions. Changes in these estimates and assumptions could affect the calculation of the fair value of the investment and determination of whether any identified impairment is other-than-temporary.

Investments held by the Group as of December 31, 2019 is comprised of equity investments in two privately-held entities, in which the Company has significant influence. The Group recorded these investments under the equity method.

*Property and equipment, net*

Property and equipment are recorded at cost. Depreciation is provided in amounts sufficient to amortize the cost of the related assets over their useful lives using the straight-line method, as follows:

|  | Useful life |
| --- | --- |
| Buildings | 20 years |
| Machinery and equipment | 3 - 10 years |
| Transportation equipment | 4 years |
| Office equipment | 3 - 5 years |
| Electronic equipment | 3 - 5 years |
| Leasehold improvements | Shorter of remaining lease term or life of assets |

The Group charges maintenance, repairs and minor renewals directly to expense as incurred; major additions and betterments to equipment are capitalized.

F-14

**Note 2 — SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES - continued**

*Intangible assets, net*

Intangible assets acquired are recorded at cost less accumulated amortization. Amortization is provided in amounts sufficient to amortize the cost of the related assets over their useful lives using the straight-line method, as follows:

|  | Useful life |
|---|---|
| Land use right | 25 years |
| Software | 3 - 5 years |
| Trademark | 3-5 years |
| Customer relationships and user list | 5 years |
| Technology | 5-10 years |

The estimated useful lives of amortizable intangible assets are reassessed if circumstances occur that indicate the original estimated useful lives have changed.

*Impairment of long-lived assets*

Long-lived assets are evaluated for impairment whenever events or changes in circumstances (such as a significant adverse changes to market conditions that will impact the future use of the assets) indicate that the carrying amount may not be fully recoverable or that the useful life is shorter than the Group had originally estimated. When these events occur, the Group evaluates the impairment by comparing the carrying value of the assets to an estimate of future undiscounted cash flows expected to be generated from the use of the assets and their eventual disposition. If the sum of the expected future undiscounted cash flows is less than the carrying value of the assets, the Group recognizes an impairment loss based on the excess of the carrying value of the assets over the fair value of the assets. No impairment charge was recognized for the years ended December 31, 2019, 2018 and 2017.

*Goodwill*

Goodwill represents the excess of the consideration over the fair value of the identifiable assets and liabilities acquired at the date of acquisition. In January 2017, the FASB issued ASU 2017-04, "Intangibles—Goodwill and Other (Topic 350), simplifying the test for goodwill impairment". The guidance removes Step 2 of the goodwill impairment test, which requires a hypothetical purchase price allocation. Goodwill impairment will now be the amount by which a reporting unit's carrying value exceeds its fair value. The ASU should be adopted on a prospective basis for the annual or any interim goodwill impairment tests beginning after December 15, 2019. Early adoption is permitted for interim or annual goodwill impairment tests performed on testing dates after January 1, 2017. The adoption of this standard is not expected to have a material impact on the Group's consolidated financial statements. The Group tests goodwill at least annually for impairment at the reporting unit level. A reporting unit is the operating segment, or one level below that operating segment (the component level) if discrete financial information is prepared and regularly reviewed by segment management. However, components are aggregated as a single reporting unit if they have similar economic characteristics. The Group recognizes an impairment charge if the carrying amount of a reporting unit exceeds its fair value and the carrying amount of the reporting unit's goodwill exceeds the implied fair value of that goodwill. When a portion of a reporting unit is disposed, goodwill is allocated to the gain or loss on disposition based on the relative fair values of the business or businesses disposed and the portion of the reporting unit that will be retained. For the years ended December 31, 2019, 2018 and 2017, the Group did not recognize any goodwill impairment charges.

*Leases*

The Company adopted FASB ASU No. 2016-02, Leases (Topic 842) ("ASU 2016-02") on January 1, 2019 by using the modified retrospective method and did not restate the prior periods. The Company has elected the package of practical expedients, which allows the Company not to reassess (1) whether any expired or existing contracts as of the adoption date are or contain a lease, (2) lease classification for any expired or existing leases as of the adoption date and (3) initial direct costs for any expired or existing leases as of the adoption date. The Company also elected the practical expedient not to separate lease and non-lease components of contracts, except for bandwidth services included in internet data center ("IDC") facilities lease contracts. Lastly, the Company elected the short-term lease exemption for all contracts with lease terms of 12 months or less.

The Company determines if an arrangement is a lease or contains a lease at lease inception. For operating leases, the Company recognizes "right of use" asset ("ROU") and a lease liability based on the present value of the lease payments over the lease term on the consolidated balance sheets at commencement date. For finance leases, assets are included in property and equipment on the consolidated balance sheets. As most of the Company's leases do not provide an implicit rate, the Company estimates its incremental borrowing rate based on the information available at the commencement date in determining the present value of lease payments. The incremental borrowing rate is estimated to approximate the interest rate on a collateralized basis with similar terms and payments, and in the economic environment where the leased asset is located. The Company's leases often include options to extend and lease terms include such extended terms when the Company is reasonably certain to exercise those options. Lease terms also include periods covered by options to terminate the leases when the Company is reasonably certain not to exercise those options. Lease expense is recorded on a straight-line basis over the lease term.

**Note 2 — SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES - continued**

The Company recognized ROU assets of $1,915,577 and total lease liabilities (including current and non-current) $1,958,484 for operating leases as of December 31, 2019. The impact of adopting ASU 2016-02 on the Group's opening retained earnings and current year's net income was insignificant.

*Income taxes*

The Group's subsidiaries in China are subject to the income tax laws of the PRC and Hong Kong. No taxable income was generated outside the PRC and Hong Kong for the years ended December 31, 2019, 2018 and 2017. The Group accounts for income tax under the asset and liability method, which requires recognition of deferred tax assets and liabilities for the expected future tax consequences of the differences between financial statement carrying amounts of assets and liabilities versus the tax basis of assets and liabilities. Deferred tax assets are also provided for carryforward losses which can be used to offset future taxable income. Deferred income taxes will be recognized if significant temporary differences between tax and financial statements occur. A valuation allowance is established against net deferred tax assets when it is more likely than not that some portion or all of the net deferred tax asset will not be realized. The Group recorded a valuation allowance of $1,341,877 to reduce the amount of deferred tax assets as of December 31, 2019, and considered no valuation allowance is necessary as of December 31, 2018 and 2017.

The Group continually evaluates expiring statutes of limitations, audits, proposed settlements, changes in tax law and new authoritative rulings. An uncertain tax position is recognized as a benefit only if it is "more likely than not" that the tax position would be sustained in a tax examination, with a tax examination being presumed to occur. The amount recognized is the largest amount of tax benefit that has a greater than 50% likelihood of being realized on examination. For tax positions not meeting the "more likely than not" test, no tax benefit is recorded. Penalties incurred related to underpayment of income tax are classified as income tax expense in the period incurred. No significant penalties relating to income taxes have been incurred during the years ended December 31, 2019, 2018 and 2017. As of December 31, 2019, the tax years ended December 31, 2017 through December 31, 2019 for the Group's PRC subsidiaries remain open for statutory examination by PRC tax authorities.

Under the Provisional Regulations of the PRC Concerning Income Tax on Enterprises promulgated by the PRC, income tax is payable by enterprises at a rate of 25% of their taxable income. The Group believes that it has provided the best estimates of its accrued tax liabilities because those accruals are based on the prevailing tax rates stipulated by the laws (see Note 15).

*Value added tax ("VAT")*

Revenue represents the invoiced value of goods and service, net of VAT. The VAT is based on gross sales price and VAT rates range from 6% to 13%, depending on the type of goods or service provided. Entities that are VAT general taxpayers are allowed to offset qualified input VAT paid to suppliers against their output VAT liabilities. The net VAT balance between input VAT and output VAT is recorded in tax payable. All of the VAT returns filed by the Company's subsidiaries in China, have been and remain subject to examination by the tax authorities for five years from the date of filing.

*Foreign currency translation*

Since the Group operates primarily in the PRC, The Group's functional currency is the Chinese Yuan ("RMB"). The Group's financial statements have been translated into the reporting currency of the United States Dollar. Assets and liabilities of The Group are translated at the exchange rate at each reporting period end date. Equity is translated at historical rates. Income and expense accounts are translated at the average rate of exchange during the reporting period. The resulting translation adjustments are reported under other comprehensive income (loss). Gains and losses resulting from the translations of foreign currency transactions and balances are reflected in the results of operations.

The RMB is not freely convertible into foreign currency and all foreign exchange transactions must take place through authorized institutions. No representation is made that the RMB amounts could have been, or could be, converted into USDs at the rates used in translation.

The following table outlines the currency exchange rates that were used in creating the consolidated financial statements in this report:

| | December 31, 2019 | December 31, 2018 | December 31, 2017 |
|---|---|---|---|
| Balance sheet items, except for equity accounts | US$1=RMB 6.9618 | US$1=RMB 6.8755 | US$1=RMB 6.5074 |
| Items in the statements of income and cash flows | US$1=RMB 6.9081 | US$1=RMB 6.6090 | US$1=RMB 6.7578 |

*Comprehensive income (loss)*

Comprehensive income (loss) consists of two components, net income (loss) and other comprehensive income (loss). Other comprehensive income (loss) refers to revenue, expenses, gains and losses that under U.S. GAAP are recorded as an element of shareholders' equity but are excluded from net income (loss). Other comprehensive income (loss) consists of foreign currency translation adjustments resulting from the Group not using the U.S. dollar as its functional currencies.

**Note 2 — SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES - continued**

*Segment information*

The Group uses the management approach to determine operating segments. The management approach considers the internal organization and reporting used by the Group's chief operating decision maker ("CODM") for making decisions, allocating resources and assessing performance. The Group's CODM has been identified as the chief executive officer, who reviews consolidated results when making decisions about allocating resources and assessing performance of the Group. The Group believes it operates in two reportable segments consisting of (i) equipment and engineering and (ii) financial services.

*Credit risk and concentration*

Financial instruments that potentially subject the Group to significant concentrations of credit risk consist primarily of cash, contracts receivable, accounts receivable and retainage receivables. As of December 31, 2019 and 2018, $4,412,319 and $3,072,243 of the Group's cash and cash equivalents and restricted cash was on deposit at financial institutions in the PRC, which the management believes are of high credit quality. In May 1, 2015, China's new Deposit Insurance Regulation came into effect, pursuant to which banking financial institutions, such as commercial banks, established in China are required to purchase deposit insurance for deposits in RMB and in foreign currency placed with them. Such Deposit Insurance Regulation would not be effective in providing complete protection for the Group's accounts, as its aggregate deposits are much higher than the compensation limit. However, the Group believes that the risk of failure of any of these Chinese banks is remote. Bank failure is uncommon in China and the Group believes that those Chinese banks that hold the Group's cash and cash equivalents, restricted cash and short-term investments are financially sound based on public available information.

Contracts receivable, accounts receivable and retainage receivables are typically unsecured and derived from revenue earned from customers, thereby exposed to credit risk. The risk is mitigated by the Group's assessment of its customers' creditworthiness and its ongoing monitoring of outstanding balances.

Substantially all of the Group's revenue are derived from customers that are located primarily in China. The Group has a concentration of its revenues with specific customers. For the years ended December 31, 2019, three customers accounting for 24%, 21% and 16% of the Group's total revenue from the equipment and engineering segment. One customer accounting for approximately 100% of the Group's total revenue from the financial services segment. For the years ended December 31, 2018, four customers accounting for 13%, 12%, 11% and 10% of the Group's total revenue from the equipment and engineering segment. For the year ended December 31, 2017, four major customers accounted for approximately 22%, 21%, 13% and 10%, of the Group's total revenue from the equipment and engineering segment. For the year ended December 31, 2018 and 2017, no revenue was generated from the financial services segment.

*Earnings (loss) per share*

The Group computes earnings (loss) per share ("EPS") in accordance with FASB ASC 260, "Earnings per Share" ("ASC 260"). Basic EPS is measured as net income (loss) divided by the weighted average common shares outstanding for the period. Diluted EPS is similar to basic EPS but presents the dilutive effect on a per share basis of potential common shares (e.g., convertible securities, options and warrants) as if they had been converted at the beginning of the periods presented, or issuance date, if later. Potential common shares that have an anti-dilutive effect (i.e., those that increase income per share or decrease loss per share) are excluded from the calculation of diluted EPS. For the years ended December 31, 2019, 2018 and 2017, no unexercised Public Offering Warrants were dilutive and included in the computation of diluted EPS.

*Statements of cash flows*

In accordance with FASB ASC Topic 230, Statement of Cash Flows, cash flows from the Group are calculated based upon the local currencies and translated at the average exchange rates during the reporting period. As a result, amounts related to assets and liabilities reported on the Group's statements of cash flows will not necessarily agree with changes in the corresponding balances on the balance sheet.

*Reclassifications*

Certain prior year amounts have been reclassified for consistency with the current year presentation. These reclassifications had no effect on the reported results of operations.

**Note 2 — SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES - continued**

*Recent accounting pronouncements*

The Group considers the applicability and impact of all accounting standards updates ("ASUs"). Management periodically reviews new accounting standards that are issued.

In June 2016, the FASB amended guidance related to the impairment of financial instruments as part of ASU2016-13 Financial Instruments – Credit Losses (Topic 326): Measurement of Credit Losses on Financial Instruments, which will be effective January 1, 2020. The guidance replaces the incurred loss impairment methodology with an expected credit loss model for which a company recognizes an allowance based on the estimate of expected credit loss. In November 2018, the FASB issued ASU No. 2018-19, Codification Improvements to Topic 326, Financial Instruments - Credit Losses, which clarified that receivables from operating leases are not within the scope of Topic 326 and instead, impairment of receivables arising from operating leases should be accounted for in accordance with Topic 842. The Group is evaluating the impact this ASU will have on its consolidated financial statements.

In August 2018, the FASB issued ASU No. 2018-13, Fair Value Measurement (Topic 820): Disclosure Framework Changes to the Disclosure Requirements for Fair Value Measurement ("ASU 2018-13"). ASU 2018-13 modifies the disclosure requirements on fair value measurements. ASU 2018-13 is effective for public entities for fiscal years beginning after December 15, 2019, with early adoption permitted for any removed or modified disclosures. The removed and modified disclosures will be adopted on a retrospective basis and the new disclosures will be adopted on a prospective basis. The Group does not expect this guidance will have a material impact on its consolidated financial statements.

In October 2018, the FASB issued ASU No. 2018-17 ("ASU 2018-17"), Consolidation (Topic 810): Targeted Improvements to Related Party Guidance for Variable Interest Entities. The updated guidance requires entities to consider indirect interests held through related parties under common control on a proportional basis rather than as the equivalent of a direct interest in its entirety when determining whether a decision-making fee is a variable interest. The amendments in this update are effective for entities other than private companies for fiscal years beginning after December 15, 2019, and interim periods within fiscal years. These amendments should be applied retrospectively with a cumulative-effect adjustment to retained earnings at the beginning of the earliest period presented. The Group is currently evaluating the impact of adopting this standard on its consolidated financial statements.

Except for the above-mentioned pronouncements, there are no new recently issued accounting standards that will have material impact on the Group's consolidated financial position, statements of operations and cash flows.

**Note 3 — BUSINESS COMBINATIONS**

**a)  Acquisition of NiSun BVI**

Based on the shareholders' approval on June 14, 2019, the Group completed the acquisition of 100% of the equity interests of NiSun BVI on July 12, 2019 (the "closing date"). By virtue of NiSun BVI's 100% ownership of NiSun HK, NiSun HK's ownership of NingChen and NingChen's contractual control over Fintech, NiSun BVI effectively controls Fintech, a company that provides financial services to financial institutions in the PRC. The Group believes the acquisition provides an opportunity for the Group to offer comprehensive financial services in the market with significant growth potential.

The Group's acquisition of NiSun BVI was accounted for as a business combination in accordance with ASC 805. The purchase price was $ 7 million in cash, which is expected to be paid by the Group within 12 months (Note 19). Acquisition-related costs incurred for the acquisitions are not material. The following table summarizes the fair value of the identifiable assets acquired and liabilities assumed at the acquisition date, which represents the net purchase price allocation at the date of the acquisition based on a valuation performed by an independent valuation firm engaged by the Group:

|  | | Amount |
|---|---|---|
| Cash acquired | $ | 661,070 |
| Prepayments and deposits | | 45,605 |
| Property and equipment | | 15,520 |
| Intangible assets – technology and customer relationships | | 2,387,970 |
| Customer advances | | (29,070) |
| Accrued expenses and other current liabilities assumed | | (118,520) |
| Deferred tax liability | | (559,626) |
| Goodwill | | 4,597,051 |
| **Total consideration** | $ | 7,000,000 |

The goodwill is mainly attributable to the excess of the consideration paid over the fair value of the net assets acquired that cannot be recognized separately as identifiable assets, and comprise (a) the assembled work force with their knowledge and experiences in the industry and (b) the expected but unidentifiable business growth potential as a result of the synergy resulting from the acquisition. None of the goodwill is expected to be deductible for income tax purposes. The operating results of NiSun BVI have been included in the consolidated financial statements since July 12, 2019. For the year ended December 31, 2019, NiSun BVI's revenue amounted to $2,525,524 and its net income was $1,469,306.

**b)  Acquisition of Hengpu**

On December 31, 2019, the Group acquired Hengpu from its original shareholders through VIE agreements. Hengpu owns a 92% equity interest in Fengtai and 100% equity interest of Midtown. Upon completion of the acquisition, Hengpu, together with its subsidiaries, became a VIE of the Group. Hengpu and its subsidiaries provide financial advisory services for financial institutions and corporate clients in the PRC. The Group expects to achieve significant synergies from such acquisition which it plans will complement its financial services business.

The Group's acquisition of Hengpu was accounted for as business combination in accordance with ASC 805. The Group is required to issue 1,440,894 Class A common shares to the original shareholders of Hengpu as purchase consideration. The fair value of purchase consideration was approximately $11.4 million based on the weighted average of the closing share price of the Group for five trading days up to the date immediately prior to the signing date of purchase agreement. Acquisition-related costs incurred for the acquisitions are not material. The following table summarizes the fair value of the identifiable assets acquired and liabilities assumed at the acquisition date, which represents the net purchase price allocation at the date of the acquisition based on a valuation performed by an independent valuation firm engaged by the Group:

|  | | Amount |
|---|---|---|
| Cash and cash equivalents acquired | $ | 1,389,911 |
| Accounts receivable | | 423,789 |
| Prepayments and deposits | | 126,832 |
| Loan to third party | | 1,723,692 |
| Property and equipment | | 42,359 |
| Intangible assets – software, technology and customer relationships | | 2,060,530 |
| Long term investment – equity method investment | | 500,715 |
| Deferred tax assets | | 20,041 |
| Accounts payable | | (224,044) |
| Accrued expense and other current liabilities assumed | | (871,325) |
| Deferred tax liability | | (308,110) |
| Non controlling interest | | 9,807 |
| Goodwill | | 6,532,092 |
| **Total consideration** | $ | 11,426,289 |

**Note 3 — BUSINESS COMBINATIONS - continued**

The goodwill is mainly attributable to the excess of the consideration paid over the fair value of the net assets acquired that cannot be recognized separately as identifiable assets, and comprise (a) the assembled work force with their knowledge and experiences in the industry and (b) the expected but unidentifiable business growth potential as a result of the synergy resulting from the acquisition. None of the goodwill is expected to be deductible for income tax purposes. The remaining Class A common shares issuable to the original shareholders of Hengpu amount to 1,440,894 as of December 31, 2019.

**Note 4 — CONTRACT RECEIVABLES, NET**

The contracts receivable consists of the following:

| | December 31, 2019 | December 31, 2018 |
|---|---|---|
| Contract receivables | $ 30,120,533 | $ 24,669,365 |
| Less: allowance for doubtful accounts | - | - |
| | $ 30,120,533 | $ 24,669,365 |

The contract receivables are generally due when the Group completes the related installation project. The balance of contract receivables were related to two major general contractors, who accounted for 100%, 100% and 86% of total contract revenue for the years ended December 31, 2019, 2018 and 2017, respectively. The Group has not incurred any collection issues with these two general contractors in the past and considers these contracts receivable to be fully collectible. Thus, the Group did not provide any allowance for doubtful accounts for these outstanding contract receivables as of December 31, 2019 and 2018.

**Note 5 — ACCOUNTS RECEIVABLES, NET**

The accounts receivable consists of the following:

| | December 31, 2019 | December 31, 2018 |
|---|---|---|
| Accounts receivables – equipment and engineering | $ 3,222,350 | $ 2,953,585 |
| Accounts receivables – financial service | 1,307,012 | - |
| Less: allowance for doubtful accounts | (1,504,831) | (297,740) |
| | $ 3,024,531 | $ 2,655,845 |

The movement in the allowance for doubtful accounts can be reconciled as follows:

| | December 31, 2019 | December 31, 2018 |
|---|---|---|
| Beginning of the year | $ 297,740 | $ 296,302 |
| Recovery | (80,859) | - |
| Provision | 1,301,046 | 17,301 |
| Foreign exchange effect | (13,096) | (15,863) |
| At the end of the year | $ 1,504,831 | $ 297,740 |

**Note 6 — INVENTORIES**

The inventories consist of the following:

| | December 31, 2019 | December 31, 2018 |
|---|---|---|
| Raw materials | $ - | $ 46,009 |
| Finished goods | 635,989 | 251,869 |
| Installation projects in process | - | 67,602 |
| | $ 635,989 | $ 365,480 |

As of December 31, 2019 and 2018, the Group provided no inventory reserves.

**Note 7 — PREPAYMENTS AND ADVANCES TO SUPPLIERS, NET**

Prepayments and advances to suppliers consisted of the following:

| | December 31, 2019 | | December 31, 2018 | |
|---|---|---|---|---|
| Advances made to raw material suppliers [a] | $ | 5,902,315 | $ | 8,010,272 |
| Advances made to construction subcontractors [b] | | 2,558,252 | | 2,907,750 |
| Advances made for purchases of equipment | | 868,017 | | 910,872 |
| Prepaid consulting fees | | 62,410 | | - |
| Others | | 114,454 | | 3,906 |
| Subtotal | | 9,505,448 | | 11,832,800 |
| Less: allowance for doubtful accounts | | (6,979,392) | | (8,264,797) |
| | $ | 2,526,056 | $ | 3,568,003 |

(a)  The prepayments and deposits on raw materials are generally required by our suppliers for the purpose of ongoing business relationships. The prepayments and deposits are not directly associated with any specific purchase contract or any specific price but will be used to offset any accounts payable balance resulting from any specific purchase order priced at market.

(b)  Advances to construction subcontracts represent the prepayments made by the Group to our construction subcontractors at the beginning of our customer projects for the purpose of acquiring necessary construction materials, equipment and required deposits.

Changes of allowance for doubtful accounts for the years ended December 31, 2019 and 2018 are as follows:

| | December 31, 2019 | | December 31, 2018 | |
|---|---|---|---|---|
| Beginning balance | $ | 8,264,797 | $ | 692,635 |
| Provision | | - | | 7,609,244 |
| Recovery | | (1,192,142) | | - |
| Foreign exchange effect | | (93,263) | | (37,082) |
| Ending balance | $ | 6,979,392 | $ | 8,264,797 |

For the years ended December 31, 2019, 2018 and 2017, the Group recorded a bad deb recovery of $1,192,142, and bad debt provisions of $7,609,244 and $386,563, respectively.

**Note 8 — LOANS TO THIRD PARTIES**

Loans to third parties consist of the following:

| | As of December 31, | | | |
|---|---|---|---|---|
| | 2019 | | 2018 | |
| Jianuo Finance Lease (Shanghai) Co., Ltd (1) | $ | 1,723,692 | $ | - |
| Shandong Daohong Industry and Trade Co., Ltd (2) | | 711,023 | | - |
| Qingdao Manster Digital Technology Co., Ltd (3) | | 2,872,820 | | - |
| Total | | 5,307,535 | | - |
| Less: current portion | | (2,434,715) | | - |
| Loans to third parties – noncurrent portion | $ | 2,872,820 | $ | - |

(1) Hengpu, the Group's newly acquired VIE on December 31, 2019, had a loan receivable of $1,723,692 (or RMB 12 million) from Jianuo Finance Lease (Shanghai) Co., Ltd. The loan earns interest of 1.2% and its principal and interest are due on January 10, 2020. The Group fully collected the loan receivable on January 9, 2020.

(2) Taiding, a subsidiary of the Group, made a loan of $711,023 (or RMB 4.95 million) to Shandong Daohong industry and Trade Co., Ltd. ("Daohong") on December 26, 2019. The loan earns interest of 7% and its principal and interest are due on June 25, 2020.

(3) Fintech, the Group's newly acquired VIE on July 12, 2019, had a loan receivable of $2,872,820 (or RMB 20 million) from Qingdao Manster Digital Technology Co., Ltd ("Manster") earns interest of 4.8%. The principal of loan is due on December 9, 2024 and the interest is due on annual basis. Manster is a financial software and network services provider, which provides integrated financial management solutions and big data risk analytical systems in the PRC.

**Note 8 – LOANS TO THIRD PARTIES - continued**

The Group classifies loans to third parties as held-to-maturity investments, because the loans have a stated maturity and normally pay a prospective fixed rate of return. In addition, the Group has the positive intent and ability to hold them until maturity. Held-to-maturity investments are recorded at amortized cost and are classified as long-term or short-term according to their contractual maturity.

**Note 9 — PROPERTY AND EQUIPMENT, NET**

Property and equipment, net, consists of the following:

| | December 31, 2019 | | December 31, 2018 | |
|---|---|---|---|---|
| Buildings | $ | 10,895,449 | $ | 11,032,207 |
| Machinery and equipment | | 2,833,771 | | 2,858,928 |
| Transportation equipment | | 883,577 | | 518,612 |
| Office equipment | | 118,985 | | 37,518 |
| Leasehold improvements | | 613,717 | | 551,582 |
| Subtotal | | 15,345,499 | | 14,998,846 |
| Less: accumulated depreciation | | (3,456,126) | | (2,482,952) |
| Property, plant and equipment, net | $ | 11,889,373 | $ | 12,515,894 |

Depreciation expense was $931,422, $1,134,136 and $884,947 for the years ended December 31, 2019, 2018 and 2017, respectively. During the years ended December 31, 2018 and 2017, the Group disposed of certain obsolete machinery equipment for no proceeds and recognized a loss of $283,487 and $12,179 respectively.

**Note 10 — INTANGIBLE ASSETS, NET**

The following is a summary of intangible assets as of December 31, 2019 and 2018:

| | December 31, 2019 | | December 31, 2018 | |
|---|---|---|---|---|
| Land use right* | $ | 1,335,861 | $ | 1,352,629 |
| Software | | 241,730 | | - |
| Technology, customer relationship and user lists acquired through business combinations | | 4,266,138 | | - |
| Total intangible assets | | 5,843,729 | | 1,352,629 |
| Less: accumulated amortization | | (719,465) | | (383,290) |
| Intangible assets, net | $ | 5,124,264 | $ | 969,339 |

* The Group carries its land use right at cost less accumulated amortization. All land in China is government owned and cannot be sold to any individual or company. However, the government grants the user a "land use right" (the "Right") to use the land. The Group has the Right to use the land for 25 years and amortizes the Right on a straight-line basis over the period of 25 years.

The amortization expense was $294,555, $61,025 and $55,048 for the years ended December 31, 2019, 2018 and 2017, respectively. As of December 31, 2019, the expected amortization expense relating to the intangible assets for each of the next five years and thereafter is as follows:

| Year ending December 31, | | Amount |
|---|---|---|
| 2020 | $ | 923,550 |
| 2021 | | 923,550 |
| 2022 | | 923,550 |
| 2023 | | 923,550 |
| 2024 | | 700,625 |
| Thereafter | | 729,439 |
| Total estimated future amortization expenses | $ | 5,124,264 |

F-22

**Note 11 – LONG TERM INVESTMENTS**

Long term investments consist of the following:

| | Equity method investments in Weijia (a) | Equity method investments in Jinda (b) | Total |
|---|---|---|---|
| Balance as of January 1, 2018 | $ - | $ - | $ - |
| Additions (a) | 2,885,556 | - | 2,885,556 |
| Share of profit in equity method investee | 168,534 | - | 168,534 |
| Balance as of December 31, 2018 | 3,054,090 | - | 3,054,090 |
| Additions through acquisition of Hengpu on December 31, 2019 (b) | - | 500,715 | 500,715 |
| Share of profit of equity method investee | 153,554 | - | 153,554 |
| Balance as of December 31, 2019 | $ 3,207,644. | $ 500,715 | $ 3,708,359 |

(a) On March 10, 2018, The Group entered into a share acquisition agreement (the "Agreement") with the sole shareholder of Xuzhou Weijia Biotechnology Co., Ltd. ("Weijia") to acquire 49% of the equity in Weijia. Pursuant to the Agreement, The Group issued 1,442,778 unregistered Class A common shares (based on an agreed value of $2.00 per share, totalling $2,885,556) as a consideration to the individuals designated by the selling shareholder of Weijia. The Group accounts for its investment in Weijia under the equity method of accounting.

(b) Henpu, the Group's VIE acquired on December 31, 2019, owns 23.08% of the equity interest in Wenzhou Jinda Holding Co., Ltd ("Jinda"). The Group accounts for its investment in Jinda under the equity method of accounting.

The Group considers it has significant influence over Weijia and Jinda due to the level of ownership and its participation in their significant business operating and strategic decisions. Accordingly, the Group accounts for these investments using the equity method. For the years ended December 31, 2019, 2018 and 2017, the Group did not receive any dividends from the above two equity method investments.

**Note 12 — SHORT TERM LOANS**

Short term loans consisted of the following loans:

| Lender | December 31, 2019 | Term | Effective Interest Rate |
|---|---|---|---|
| Longwan Rural Commercial Bank Shacheng Branch | $ 287,282 | August 09, 2019 to August 08, 2020 | 4.50% |
| Industrial and Commercial Bank of China | 574,564 | August 15, 2019 to August 15, 2020 | 4.35% |
| Total | $ 861,846 | | |

| Lender | December 31, 2018 | Term | Effective Interest Rate |
|---|---|---|---|
| Bank of China Longwan Branch | $ 202,894 | April 13, 2016 to April 14, 2019* | 5.70% |
| Bank of China Longwan Branch | 186,168 | June 8, 2016 to April 14, 2019* | 5.70% |
| Industrial and Commercial Bank of China -Wenzhou Branch | 727,220 | July 17, 2018 to July 17, 2019 | 6.04% |
| Longwan Rural Commercial Bank Shacheng Branch | 290,888 | July 23, 2018 to July 17, 2019 | 8.71% |
| Longwan Rural Commercial Bank Shacheng Branch | 290,888 | July 25, 2018 to July 17, 2019 | 8.71% |
| Total | $ 1,698,058 | | |

All principal of the above loans as of December 31, 2019 are due upon maturity and interest payments are due on a monthly basis. All bank loans as of December 31, 2018 were fully repaid upon maturity. For these loans, the outstanding balances as of December 31, 2019 and 2018 were guaranteed by the Group's officer's immediate family members and unrelated third parties. Interest expense for these loans was $106,001, $91,977 and $48,730 for the years ended December 31, 2019, 2018 and 2017, respectively.

F-23

**Note 13 — BANK ACCEPTANCE NOTES PAYABLE**

Bank acceptance notes payable consisted of the following as of December 31, 2019 and 2018:

| | December 31, 2019 | December 31, 2018 |
|---|---|---|
| Bank acceptance notes payable | $    929,148 | $    2,117,382 |
| Total | $    929,148 | $    2,117,382 |

Bank acceptance notes are issued by financial institutions on the Group's behalf to vendors with a specific due date usually for a period within one year. These notes can either be endorsed by the vendor to other third parties as payment or can be factored to other financial institutions before becoming due.

Pursuant to the loan facility agreement signed on December 6, 2018 between the Group and China Zheshang Bank, the Group had bank acceptance notes of $929,148 with maturity dates of six or twelve months after the issuance date. The Group was also required to maintain restricted cash deposits of $934,656 to guarantee the bank notes as of December 31, 2019. The balance of bank acceptance notes payable as of December 31, 2018 was fully paid upon maturity and the related restricted deposit was also released upon the repayment. For years ended December 31, 2019 and 2018, the bank fee charge related to bank acceptance notes payable amounted to $464 and 1,059, respectively.

**Note 14 — SALES LEASEBACK**

On November 9, 2017, the Group entered into a sale leaseback agreement (the "Agreement") with Zhongli International Leasing Co., Ltd ("Zhongli"). Pursuant to the Agreement, the Group sold certain machinery purchased during the year to Zhongli for approximately $691,520 (RMB 4.5 million). The Group then leased back the machinery from Zhongli for 48 months with specified monthly payments over the lease term. The Group has a bargain purchase option at a price of Nil to buyback this equipment by the end of the lease term. All these machines are currently being used by the Group for its production purposes. The Group concluded this transaction does not qualify for sale-leaseback accounting and shall record under the lease financing method. Under the lease financing method, the assets remain on the Group's consolidated balance sheet and the proceeds from the transactions are recorded as a financing liability. The minimum payments of the lease term has 35 months from December 17, 2017 to November 17, 2021. For the years ended December 31, 2019 and 2018, the lease payments balance are as follows:

| | |
|---|---|
| Total lease payment as of January 1, 2018 | $    590,865 |
| Less: foreign exchange effect | (32,634) |
| Less: payments during the year | (168,589) |
| Other loan balance as of December 31, 2018 | 389,642 |
| Less: foreign exchange effect | (3,249) |
| Less: payments during the year | (175,093) |
| Loan balance as of December 31, 2019 | 211,300 |
| Less: loan payable – current portion | (156,574) |
| Loan payable – long term portion as of December 31, 2019 | $    54,726 |

According to the agreement, future obligations for payments of the above lease agreement are as below:

| Twelve months ended December 31, | Amount |
|---|---|
| 2020 | $    156,574 |
| 2021 | 54,726 |
| Total | $    211,300 |

Interest expense incurred for the year ended December 31, 2019, 2018 and 2017 amounted to $52,118, $85,186 and $8,223, respectively.

F-24

**Note 15 — INCOME TAXES**

Taxes payable consisted of the following:

| | December 31, 2019 | December 31, 2018 |
|---|---|---|
| Income tax payable | $ 6,550,713 | $ 5,763,945 |
| Value added tax payable | 2,973,549 | 2,024,902 |
| Business tax payable | 856,220 | 878,133 |
| Other taxes payable | 535,001 | 418,766 |
| Total taxes payable | $ 10,915,483 | $ 9,085,746 |

The total amount of unpaid tax liabilities was accrued based on the calculation using the current prevailing tax rates without including potential interest and penalties because management cannot be certain as to how much interest and penalties would be assessed, if any. Those potential interest and penalty liabilities are contingent upon the outcome of tax settlements and management estimates that the potential contingent loss related to potential interest and penalties could be Nil or as high as $2.0 million based on rates stipulated by the tax authority. Due to uncertainties associated with the status of examinations, including the protocols of finalizing audits by the relevant tax authorities, there is a high degree of uncertainty regarding the future cash outflows associated with the interest and penalties on these unpaid tax balances. The final outcome of this tax uncertainty is dependent upon various matters including tax examinations, interpretation of tax laws or expiration of the statute of limitations. As the ongoing settlement discussions continue, management believes that it is more likely than not that the Company will not have to pay any interest and penalties associated with the unpaid taxes.

**BVI**

Hebron Technology and Nisun BVI were incorporated in the BVI and are not subject to income taxes under the current laws of the BVI.

**Hong Kong**

HK Xibolun and Nisun HK are the companies registered in Hong Kong and subject to corporate income tax at 17.5% if revenue is generated in Hong Kong. No revenue was generated in Hong Kong for the years ended December 31, 2019, 2018 and 2017.

**PRC**

Under the PRC Enterprise Income Tax Law (the "EIT Law"), the standard enterprise income tax rate for domestic enterprises and foreign invested enterprises is 25%. Starting from the year ended December 31, 2018, Xibolun Automation is recognized as a High-technology Company by the Chinese government and is subject to a favorable income tax rate of 15%. Hengpu is also qualified as a High-technology Company and subject to a favorable income tax rate of 15%. Both Xibolun Automation and Hengpen's High-technology certificates are valid for three years starting from November 2018 and subject to renewal. In accordance with the implementation rules of the Income Tax Law of the PRC, for the enterprises newly established in the Horgos Development Zone within the scope of "preferential catalogue of income tax for key industries encouraged to develop in Xinjiang's difficult areas", the enterprise income tax shall be exempt for five years from the tax year of the first production and operations income. Khorgos is established in the Horgos Development Zone and its income tax is eligible to be exempt for five years starting from 2019. The rest of the Group's subsidiaries, VIEs and VIEs' subsidiaries are subject to corporate income tax at the PRC unified rate of 25%.

i)   The components of the income tax provision (benefit) are as follows:

| | For the year ended December 31, 2019 | For the year ended December 31, 2018 | For the year ended December 31, 2017 |
|---|---|---|---|
| Current tax provision | $ 860,730 | $ 820,886 | $ 2,024,388 |
| Current tax recovery | - | - | (4,974,763) |
| Deferred tax provision (benefit) | (418,131) | (1,471,938) | 11,526 |
| Total | $ 442,599 | $ (651,052) | $ (2,938,849) |

F-25

**Note 15 — INCOME TAXES - continued**

*ii)  The following table summarizes deferred tax assets resulting from differences between financial accounting basis and tax basis of assets and liabilities:*

|  | December 31, 2019 | December 31, 2018 |
|---|---|---|
| **Deferred tax assets** | | |
| Provision for doubtful accounts | $    1,988,132 | $    1,648,967 |
| Operating loss carryforwards | 1,361,918 | - |
| Total deferred tax assets | 3,350,050 | 1,648,967 |
| Less : valuation allowance | (1,341,877) | - |
| Net deferred tax assets | $    2,008,173 | $    1,648,967 |

|  | December 31, 2019 | December 31, 2018 |
|---|---|---|
| **Deferred tax liabilities** | | |
| Intangible assets acquired from business combinations | $    805,826 | $    - |
| Total deferred tax liabilities | $    805,826 | $    - |

The change in valuation allowance for the year ended December 31, 2019, 2018 and 2017 amounted to $1,341,877, nil and nil, respectively.

The following table reconciles the China statutory rates to the Group's effective tax rate for the years ended December 31, 2019, 2018 and 2017.

|  | For the year ended December 31, 2019 | For the year ended December 31, 2018 | For the year ended December 31, 2017 |
|---|---|---|---|
| China Income tax statutory rate | 25.0% | 25.0% | 25.0% |
| Effect of favorable income tax rates* | (12.9)% | 4.0% | - |
| Non-deductible items in China and others | 0.2% | 0.1% | 2.3% |
| Foreign loss not recognized in China | 2.9% | 9.7% | 69.0% |
| Effect of tax reversal for previous years | -% | -% | (166.3)% |
| Effective tax rate | 13.9% | (11.2)% | (70.0)% |

\* Xibolun Automation is subject to an income tax rate of 15% starting from fiscal 2018 and Khorgos is established in the Horgos Development Zone and its income is exempt from income tax for five years starting from 2019.

The Group continually evaluates expiring statutes of limitations, audits, proposed settlements, changes in tax law and new authoritative rulings. As of December 31, 2019, the tax years ended December 31, 2017 through December 31, 2019 for the Group's PRC subsidiaries remain open for statutory examination by PRC tax authorities.

**Note 16 — CONCENTRATION OF MAJOR CUSTOMERS AND SUPPLIERS**

For the year ended December 31, 2019, three customers accounted for 24%, 21% and 16% of the Group's total revenue from the equipment and engineering segment. For the year ended December 31, 2019, two major sub-contractors accounted for approximately 25% and 24% of subcontract costs in the equipment and engineering segment. As of December 31, 2019, two general contractors who engaged the Group in installation projects accounted for approximately 54% and 43% of the Group's total contracts receivable balance from the equipment and engineering segment. For the year ended December 31, 2019, three suppliers accounted for 22%, 15% and 11% of the Group's accounts payable balance for the equipment and engineering segment, and no individual supplier accounted for more than 10% of the Group's advances to suppliers balance.

Substantially all the financial services revenues were generated within China. For the year ended December 31, 2019, one customer accounted for approximately 100% of the Group's total financial services revenue.

**Note 16 — CONCENTRATION OF MAJOR CUSTOMERS AND SUPPLIERS - continued**

For the year ended December 31, 2018, four customers accounted for approximately 13%, 12%, 11% and 10% of the Group's revenue from equipment and engineer segment. For the year ended December 31, 2018, six major sub-contractors accounted for approximately 21%, 19%, 18%, 16%, 15% and 11% of subcontract costs in the equipment and engineering segment, respectively. As of December 31, 2018, two general contractors who provided the Group's installation projects accounted for approximately 58% and 42% of the contracts receivable balance from the equipment and engineering segment. For the year ended December 31, 2018, three suppliers accounted for 34%, 21% and 15% of the Group's accounts payable balance from the equipment and engineering segment, and no individual supplier accounted for more than 10% of the Group's advances to suppliers balance.

For the year ended December 31, 2017, four major customers accounted for approximately 22%, 21%, 13% and 10%, of the Group's total revenue from the equipment and engineering segment. For the year ended December 31, 2017, three major sub-contractors accounted for approximately 44%, 18% and 16% of subcontract costs from the equipment and engineering segment. As of December 31, 2017, two general contractors who provided for the Group's installation projects accounted for approximately 58% and 42% of the Group's total contracts receivable balance from the equipment and engineering segment. For the year ended December 31, 2017, only one supplier accounted for 18% of the Group's accounts payable balance for the equipment and engineering segment, and one supplier accounted for 17% of the Group's advance to suppliers balance.

**Note 17 — SHAREHOLDERS' EQUITY**

On December 26, 2016, The Group completed its initial public offering ("IPO") of 2,695,347 shares of its common stock at a public offering price of $4.00 per share. The gross proceeds from the offering were approximately $10.8 million before deducting placement agents' commissions and other offering expenses, resulting in net proceeds of approximately $10.1 million. In connection with the offering, The Group's common stock began trading on the NASDAQ Capital Market beginning on December 26, 2016 under the symbol "HEBT".

On November 20, 2017, the Board approved an amendment to The Group's Articles of Association to re-designate their common shares into Class A common shares and Class B common shares. The Class A common shares have one vote per share, and the Class B common shares have five votes per share. The Third Amended and Restated Memorandum of Association was filed with the BVI Registrar of Corporate Affairs on March 7, 2018

On June 14, 2019, the Shareholders of the Company approved a share transfer transaction by Wise Metro Development Co., Ltd., a British Virgin Islands company ("Wise") and Mr. Zuoqiao Sun Zhang, a citizen of Guatemala ("Sun Zhang"; and together with Wise, "Sellers") of all of such Sellers' Class B common shares of the Group to NiSun International Enterprise Management Group Co., Ltd., a company organized under the laws of Cayman Islands ("NiSun Cayman"). Upon the close of the transaction, NiSun Cayman purchased (i) Wise's 1,800,000 Class B common shares of The Group, par value $0.001 per share and (ii) Sun Zhang's 5,978,400 Class B common shares of The Group, which will together constitute approximately 47.8% of all of The Group's outstanding common shares at the time of the Closing on a fully diluted basis (Wise's and Sun Zhang's Class B common shares are referred to as the "Shares"). The Shares were automatically converted into Class A common shares upon transfer from the Sellers to the Buyer, and upon such transfer the Group had no remaining issued and outstanding Class B common shares. Upon this conversion, the Shares are entitled to one vote per share.

The Group had 50,000,000 authorized common shares at $0.001 par value per share, of which 17,710,471 Class A common shares were issued and outstanding as of December 31, 2019.

Public Offering Warrants

In connection with the IPO on December 26, 2016, The Group issued warrants equal to five percent (5%) of the shares issued in the IPO, totaling 134,768 shares to the placement agents (the "Public Offering Warrants"). The warrants carried a term of three years, and were not be exercisable for a period of six months from the closing of the IPO and were exercisable at $4.80 per share. Management determined that these warrants are equity instruments because the warrants are both a) indexed to its own stock; and b) classified in stockholders' equity. The warrants were recorded at their fair value on the date of grant as a component of stockholders' equity. As of December 31, 2019, all the warrants issued were forfeited and the total number of warrants outstanding was nil (December 31, 2018 - 134,768). The fair value of this Public Offering Warrants was $488,730. The fair value has been estimated using the Black-Scholes pricing model with the following weighted-average assumptions: risk free rate of 1.58%; expected term of 3 years; exercise price of the warrants of $4.80; volatility of 90.7%; and expected future dividends of nil.

Shares issued for equity investment in Weijia

On March 10, 2018, the Group entered into a share acquisition agreement (the "Agreement") with the sole shareholder of Xuzhou Weijia Biotechnology Co., Ltd. ("Weijia") to acquire 49% of the equity in Weijia. Pursuant to the Agreement, The Group issued 1,442,778 unregistered Class A common shares (based on an agreed value of $2.00 per share, totaling $2,885,556) as a consideration to the individuals designated by the selling shareholder of Weijia (Note 11).

**Note 17 — SHAREHOLDERS' EQUITY - continued**

Shares issued for Consulting Services

On January 13, 2016, the Group signed a consulting agreement with Weitian Group LLC ("Weitian"), to engage Weitian to provide certain consulting services. The agreement terminated on March 12, 2018. Pursuant to the agreement, The Group was required to pay Weitian $58,500 (the "Service Fee"). On March 15, 2018, The Group and Weitian signed a settlement agreement, pursuant to which The Group issued 31,452 unregistered Class A common shares to Weitian to settle the Service Fee on March 13, 2018 and The Group recorded a consulting fee of $58,500 included in general and administrative expenses for the year ended December 31, 2018.

On December 26, 2017, the Group signed a consulting agreement with Real Miracle Investments Ltd. ("Miracle"), to engage Miracle as its consultant to provide professional services related to The Group's business strategies, marketing development, business operations, and merger and acquisitions, etc. As of December 31, 2017, the consulting services were not performed. The agreement had a term for one year. Pursuant to the agreement, the Group agreed to pay total of 100,000 shares of the Group's common stock as compensation for the services within 90 days after signing of the agreement. The Group issued 100,000 unregistered Class A common shares to Miracle on March 12, 2018. The fair value of those shares was assessed at $181,000 based on the stock price of those shares upon issuance and the Group recorded consulting fee expense of $181,000 included in the general and administrative expenses for the year ended December 31, 2018.

Additional paid-in capital

On November 20, 2019, NiSun International Enterprise Management Group Co., Ltd. ("NiSun Cayman"), the controlling shareholder of the Group, contributed additional capital of $3,582,781 which has been shown as additional paid-in capital.

Shares to be issued for acquisition of Hengpu

In connection of the acquisition of Hengpu on December 31, 2019, the Group issued 1,440,894 Class A common shares to the original shareholders of Hengpu as purchase consideration. The fair value of the purchase consideration was $11,426,289 based on the weighted average of the closing share price of the Group for five trading days up to the date immediately prior to the signing date of purchase agreement.

Share incentive plan

The Board of directors approved a 2019 One Million Share Incentive Plan (the "2019 Plan") on December 20, 2019, which permits the grant of restricted shares and options to the employees, directors, officers and consultants to purchase the Company's Class A common shares. The maximum aggregate number of Class A common shares, which may be issued pursuant to all awards under the 2019 Plan, is 1 million shares The Plan is valid and effective for a term of ten years commencing from its adoption. As of December 31, 2019, no awards was granted under the Plan.

**Note 18 — SEGMENT INFORMATION**

For the years ended December 31, 2018 and 2017, the Group had only operated with one segment –equipment and engineering. Starting in July 2019, the Group's operations are organized into two segments, consisting of the equipment and engineering and financial services segments. The Group derives the results of the segments directly from its internal management reporting system. The CODM reviews the performance of each segment based on its operating results and uses these results to evaluate the performance of, and to allocate resources to, each of the segments. Because substantially all of the Group's long-lived assets and revenues are located in and derived from the PRC, geographical segments are not presented.

Segment information of the Group for the year ended December 31, 2019 as follows:

|  | Equipment and Engineering | Financial services | Consolidated |
|---|---|---|---|
| Revenue | $ 18,577,590 | $ 2,525,524 | $ 21,103,114 |
| Gross profit | 5,550,589 | 2,506,032 | 8,056,621 |
| Interest expenses | (158,119) | - | (158,119) |
| Depreciation and amortization | (983,567) | (242,410) | (1,225,977) |
| Capital expenditures | (394,988) | - | (394,998) |
| Segment profit (loss) | 1,270,684 | 1,469,306 | 2,739,990 |
| Goodwill | - | 11,074,864 | 11,074,864 |
| Segment assets of December 31, 2019 | $ 66,802,900 | $ 17,996,357 | $ 84,799,257 |

**Note 19 — RELATED PARTY TRANSACTIONS**

The table below sets forth major related parties of The Group and their relationships with the Group:

| Entity or individual name | Relationship with the Group |
|---|---|
| Shanghai NiSun Enterprise Management Group Co., Ltd ("NiSun Shanghai") | an entity under common control |
| Mr. Bodang Liu | the ultimate controlling shareholder of the Group |
| Mr. Anyuan Sun | Chief executive officer of the Group |

(a) The Group entered into the following related party transactions:

Starting on July 12, 2019, the Group rented an office from NiSun Shanghai and incurred $63,749 of rent expense for the year ended December 31, 2019. The annual rent from NiSun Shanghai is approximately $113,200.

(b) The Group had the following significant related party balances:

As of December 31, 2019, the Group had a due to related party balance of $7,345,399 due to Mr. Bodang Liu, the ultimate controlling shareholder of the Group, of which, $7 million was related to the purchase price payable for acquisition of NiSun BVI (Note 3). The due to related party balance is non-interest bearing and due on demand. There was no balance due to Mr. Liu as of December 31, 2018.

As of December 31, 2019, the Group had a due to related party balance of $414,044 due to Mr. Anyuan Sun, the chief executive officer of the Group. The due to related party balance is non-interest bearing and due on demand. There was no balance due to Mr. Sun as of December 31, 2018.

**Note 20 — COMMITMENTS AND CONTINGENCIES**

*Contingencies*

The Group may be involved in various legal proceedings, claims and other disputes arising from the commercial operations, projects, employees and other matters which, in general, are subject to uncertainties and in which the outcomes are not predictable. The Group determines whether an estimated loss from a contingency should be accrued by assessing whether a loss is deemed probable and can be reasonably estimated. As of December 31, 2019 and 2018, the Group was not aware of any litigation, lawsuits or claims against them.

*Operating lease*

Leases are classified as operating leases or finance leases in accordance with FASB ASC 842. The Group's operating leases mainly related to land and office facilities. For leases with terms greater than 12 months, the Group records the related asset and lease liability at the present value of lease payments over the term. Certain leases include rental escalation clauses, renewal options and/or termination options, which are factored into the Company's determination of lease payments when appropriate. As of December 31, 2019, the weighted average remaining lease term was 13.8 years and the weighted average discount rate was 4.75% for the Group's operating leases. The Group's lease costs are included within selling and administrative expenses on the consolidated statement of operations. For the year ended December 31, 2019, the lease cost amounted to $205,701.

The future undiscounted aggregate minimum lease payments under non-cancellable operating leases are as follows as of December 31, 2019:

| For the Year Ending December 31, | | |
|---|---|---|
| 2020 | $ | 275,516 |
| 2021 | | 256,505 |
| 2022 | | 261,676 |
| 2023 | | 225,479 |
| 2014 | | 116,886 |
| thereafter | | 1,557,507 |
| Total undiscounted future minimum lease payments | | 2,693,569 |
| Less: Amounts representing interest | | (735,085) |
| Total present value of operation lease liabilities | | 1,958,484 |
| Less: current portion of operating lease liabilities | | (188,557) |
| Non-current portion of operating lease liabilities | $ | 1,769,927 |

**Note 21 — SUBSEQUENT EVENTS**

On March 2, 2020, The Group filed Form S-8 under the Securities Act to register its Class A common shares, par value $0.001 per share, issuable pursuant to the 2019 Stock Incentive Plan( the "Plan"). The Plan was approved by the shareholders at the annual shareholder meeting on December 20, 2019 and can issue up to 1,000,000 shares. We expect to incur additional share-based compensation expenses related to share options or restricted shares in the future as we plan to grant share options or restricted shares to our employees and directors.

In December 2019, a novel strain of coronavirus (COVID-19) surfaced. COVID-19 has spread rapidly to many parts of the PRC and other parts of the world in the first quarter of 2020, which has caused significant volatility in the PRC and international markets. There is significant uncertainty around the breadth and duration of business disruptions related to COVID-19, as well as its impact on the PRC and international economies and, as such, the Group is unable to determine if it will have a material impact to its operations.

On December 9, 2019, the Group entered into a definitive share purchase agreement with certain investors for a private placement of approximately 1.05 million Class A common shares at $6.21 per share. The private placement was previously expected to be closed about December 23, 2019. However, due to the business disruptions related to COVID-19 and other matters, the close of the transaction was deferred. Due to uncertainties, the Group expects to close the private placement prior to the end of April 2020.

On April 6, 2020 (the "grant date"), the Board approved an aggregate of 300,000 restricted stock awards to three key officers of the Group including the CFO, Vice president of marketing and Vice president of operations with 100,000 restricted stock award for each individual. One-third of the restricted stock issued shall be vest on the grant date, one-third of the restricted stock issued shall vest on the first anniversary of the grant date and the remaining one-third of the restricted stock issued shall vest on the second anniversary of the grant date.

**Note 22 — RESTRICTED NET ASSETS**

The Group's ability to pay dividends is primarily dependent on the Group receiving distributions of funds from its subsidiaries and VIEs. Relevant PRC statutory laws and regulations permit payments of dividends by the Group's subsidiaries and VIEs incorporated in the PRC only out of their retained earnings, after required statutory reserves, if any, as determined in accordance with PRC accounting standards and regulations. The results of operations reflected in the financial statements prepared in accordance with U.S. GAAP differ from those reflected in the statutory financial statements of the Group's subsidiaries and VIEs.

In accordance with the PRC laws and regulations, statutory reserve funds shall be made and can only be used for specific purposes and are not distributable as cash dividends. As a result of these PRC laws and regulations that require annual appropriation of 10% of net after-tax profits determined in accordance with PRC accounting standards and regulations to be set aside prior to payment of dividends as a general reserve fund or statutory surplus fund, The Group's PRC subsidiaries and VIEs are restricted in their ability to transfer a portion of their net assets to The Group. For the years ended December 31, 2019 and 2018, the statutory reserve balance for the Group's entities established in the PRC was $516,193 and $15,069, respectively.

The Group performed a test on the restricted net assets of its consolidated subsidiaries and VIEs (the "restricted net assets") in accordance with Securities and Exchange Commission Regulation S-X Rule 4-08 (e) (3), "General Notes to Financial Statements". Such restricted net assets amounted to approximately $12.6 million, or 23.3% of the Group's total consolidated net assets, as of December 31, 2019.

### ADDITIONAL FINANCIAL INFORMATION OF PARENT COMPANY

a)  Condensed balance sheets

| | December 31, 2019 | December 31, 2018 |
|---|---|---|
| **Assets:** | | |
| Cash and cash equivalents | $ 5,213 | $ 607 |
| Prepayments and advances, net | 38,221 | - |
| Due from intercompany and others | 6,147,054 | 6,224,210 |
| TOTAL CURRENT ASSETS | 6,190,488 | 6,224,817 |
| Investment in subsidiaries, VIE, and VIEs' subsidiaries | 48,218,876 | 30,532,534 |
| **TOTAL ASSETS** | $ 54,409,364 | $ 36,757,351 |
| **LIABILITIES** | | |
| **CURRENT LIABILITIES** | | |
| Accrued expenses and other current liabilities | $ 464,044 | $ - |
| TOTAL CURRENT LIABILITIES | 464,044 | - |
| | | |
| **Shareholders' equity** | | |
| Class A common stock, $0.001 par value, 40,000,000 shares authorized, 17,710,471 and 8,491,177 shares issued and outstanding as of December 31, 2019 and 2018 respectively. | 17,710 | 8,491 |
| Class B common stock, $0.001 par value, 10,000,000 shares authorized, nil and 7,778,400 shares issued and outstanding as of December 31, 2019 and 2018 respectively. | - | 7,778 |
| Additional paid-in capital | 28,369,076 | 13,361,447 |
| Retained earnings | 27,472,766 | 24,732,776 |
| Accumulated other comprehensive income (loss) | (1,914,232) | (1,353,141) |
| Total shareholders' equity | 53,945,320 | 36,757,351 |
| Total liabilities and shareholders' equity | $ 54,409,364 | $ 36,757,351 |

b)  Condensed statements of comprehensive income

| | For the year ended December 31, | | |
|---|---|---|---|
| | 2019 | 2018 | 2017 |
| Selling and marketing | $ (15,005) | $ - | $ (175,523) |
| Administrative | (408,656) | (2,093,307) | (1,858,689) |
| Other income (expense) | (820) | (686) | (236,304) |
| Share of profit (loss) in subsidiaries, VIEs and VIEs' subsidiaries | 3,164,471 | $ (3,050,722) | $ 9,406,903 |
| Net income (loss) | 2,739,990 | (5,144,715) | 7,136,387 |
| Other comprehensive income | | | |
| Foreign currency translation adjustment | (561,091) | (1,755,528) | 2,249,081 |
| Comprehensive income (loss) | $ 2,178,899 | $ (6,900,243) | $ 9,385,468 |

F-31

**Note 22 — RESTRICTED NET ASSETS - continued**

c)  Condensed statement of cash flows

| | | For the years ended December 31, | | |
|---|---|---|---|---|
| | | 2019 | 2018 | 2017 |
| Cash flows from operating activities: | | | | |
| Net income(loss) | $ | 2,739,990 | $ (5,144,715) | $ 7,136,387 |
| Adjustments to reconcile net income to net cash used in operating activities | | | | |
| Share of earnings in subsidiaries, VIEs and VIEs' subsidiaries | | (3,164,471) | 3,050,722 | (9,406,903) |
| Impairment charge recognized | | - | 923,094 | - |
| Due from intercompany and others | | (38,561) | 1,170,749 | 2,271,273 |
| Accrued expenses and other current liabilities | | 467,648 | - | - |
| Net cash provided by (used in) operating activities | | 4,606 | (150) | 757 |
| Net (decrease)/increase in cash and cash equivalents | | 4,606 | (150) | 757 |
| Cash and cash equivalents at beginning of the year | | 607 | 757 | - |
| Cash and cash equivalents at end of the year | $ | 5,213 | $ 607 | $ 757 |

*Basis of presentation*

Condensed financial information is used for the presentation of The Group, or the parent company. The condensed financial information of the parent company has been prepared using the same accounting policies as set out in The Group's consolidated financial statements except that the parent company used the equity method to account for investment in its subsidiaries and VIEs.

The parent company records its investment in its subsidiaries and VIEs under the equity method of accounting as prescribed in FASB ASC 323, Investments-Equity Method and Joint Ventures. Such investments are presented on the condensed balance sheets as "Investment in subsidiaries and VIEs" and their respective profit or loss as "Equity in profits of subsidiaries and VIEs" on the condensed statements of comprehensive income. Equity method accounting ceases when the carrying amount of the investment, including any additional financial support, in a subsidiary and VIE is reduced to zero unless the parent company has guaranteed obligations of the subsidiary and VIE or is otherwise committed to provide further financial support. If the subsidiary and VIE subsequently reports net income, the parent company shall resume applying the equity method only after its share of that net income equals the share of net losses not recognized during the period the equity method was suspended.

The parent company's condensed financial statements should be read in conjunction with the Group's consolidated financial statements.

**The original version in Chinese shall prevail. The English version just for reference only**

Lessor: Shanghai Ningsheng Enterprise Management Group Co., Ltd. (hereinafter referred to as Party A)

Lessee: Fintech (Shanghai) Digital Technology Co., Ltd. (hereinafter referred to as Party B)

In accordance with the provisions of the contract law of the people's Republic of China, the regulations of Shanghai Municipality on Housing leasing (hereinafter referred to as the regulations) and other laws and regulations, Party A and Party B, on the basis of equality, voluntariness, fairness and good faith, have reached an agreement through consultation on the matters that Party B rents the housing that Party A can legally rent

### Article 1 rental housing

1.  Basic information of the house Location: building C9, No. 99, Danba Road, Putuo District, Shanghai Location of the rental house: on the fourth and a half floors, the electricity and network shall be arranged for Party B (Note: ensure that the network cable port from the desktop to the computer room is unobstructed), and Party B shall be responsible for the specific opening matters.

2.  Party A, as the other obligee stipulated by the law of the house, has established a lease relationship with Party B. before signing this contract, Party A has told Party B to set up a mortgage for the house. Meanwhile, during the duration of the above lease relationship, Party A is responsible for providing water and electricity, property and one open broadband during the use of the house; Party B declares that it has fully understood the ownership, current situation and surrounding site of the house before signing this contract, and is willing to bear all risks related to the house and the site.

3.  the use scope, conditions and requirements of the public or shared parts of the house, the existing decoration, auxiliary facilities and equipment conditions, and the contents, standards and relevant matters to be agreed upon by Party A for Party B self decoration and additional auxiliary facilities shall be listed by Party A and Party B respectively in Appendix I of this contract.

**Article 2 purpose of lease**

1.  Party B promises to Party A that it will rent the house for office use and abide by the laws and regulations of the state and this Municipality on the use of the house and property management.

2.  Party B guarantees that it will not change the use purpose as agreed above without the written consent of Party A and the approval of relevant departments as required.

**Article 3 delivery date and lease term**

1.  Party A and Party B agree that the lease term of the house shall be from May, 2009 to LQ, 2014, totaling months, and Party A shall deliver the house to Party B for use on the date of destruction of the house.

2.  upon the expiration of the lease term, Party A has the right to recover the house, and Party B shall return it as scheduled. If Party B wants to continue to lease the house, it shall inform Party A in writing one month before the expiration of the lease term, and both parties shall sign a new lease contract with the consent of Party A.

**Article 4 rent, payment method and time limit**

1.  Party A and Party B agree that the monthly rent of the house is 80000 yuan (in words: only RMB ten thousand yuan); the monthly rent includes the property fee, water and electricity fee, office equipment value-added tax invoice tax. If Party B needs a special VAT invoice, other taxes incurred shall be borne by Party B.

2.  From October 20, 2021 to October 19, 2023, the rent increases by 5% on the basis of the previous standard, which is RMB 84000 / month (in words: RMB four thousand only).

2

3.  Party B shall pay Party A every month before. In case of overdue payment, Party B shall pay liquidated damages at 5% of the unpaid rent for one day overdue.

4.  Party B shall pay the rent as follows: the rent shall be paid in advance, and the payment method shall be: monthly payment, bank transfer or payment

Account designated by Party A
Bank of deposit of Party A: Industrial Bank Shanghai Peoples Square
Branch Account Name: Shanghai Ningsheng Enterprise Management Group Co., Ltd
account number: 216290100124723

**Article 5 deposit and other expenses**

1.  Within days after signing this contract, Party B shall pay Party A the rent of RMB 178707 equivalent to one month of the lease term of this contract, and Party A shall issue a receipt to Party B after receiving the rent.

When the lease relationship is terminated, the house rental deposit collected by Party A shall be used to offset the expenses agreed in the contract to be borne by Party B, and the remaining part shall be returned to Party B without interest within seven legal working days after the termination date of the lease relationship.

2.  During the lease period, Party B shall bear the parking fee, network and other expenses incurred in using the house.

**Article 6 use requirements and maintenance responsibilities of the house**

1.  During the lease period, Party B shall reasonably use and take good care of the house and its ancillary facilities. In case of any damage or failure of the house and its ancillary facilities, Party B shall promptly notify Party A to repair them. Party A shall maintain the house and its ancillary facilities within working days after receiving the notice from Party B

If the repair is not carried out within the time limit, Party B may carry out the repair on behalf of Party A at the expense of Party A.

3

2. during the lease period, if the house and its auxiliary facilities are damaged or malfunctioned due to Party B's improper or unreasonable use, Party B shall be responsible for the maintenance. If Party B refuses to repair, Party A may repair on behalf of Party B, and the cost shall be borne by Party B.

3. During the lease period, Party A shall guarantee the normal serviceable and safe condition of the house and its auxiliary facilities. In case that Party A conducts inspection and maintenance of the house, it shall notify Party B in advance of working days, and Party B shall cooperate in the inspection and maintenance. Party A shall reduce the impact on Party B's use of the house.

4. in addition to the appendix of this contract, if Party B needs to decorate or add additional auxiliary facilities and equipment, it shall obtain the written consent of Party A in advance, and if it is approved by the relevant department according to the regulations, it shall also be reported to the relevant department for approval according to the regulations before proceeding. Party B shall be responsible for the additional auxiliary facilities and equipment and their maintenance responsibilities.

5. Party B's employees, agents, contractors, invitees, customers, visitors in the rental housing and the overall property

   Activities within the enclosure shall comply with relevant laws and regulations and Party A's property management regulations. The appellant violated the law and arrow-

   Party A or any third party's personal and property losses caused by laws and regulations, Party A's property management regulations and this contract

   Party B shall be liable for compensation. If Party B fails to make compensation or fails to make compensation in time and in full, it shall be deemed as a breach of contract under this contract, and shall be liable for breach of contract and maintenance.

6. during the lease term, without the written consent of Party A, Party B shall not install, transform or add water supply and drainage equipment, wires or install any other equipment or devices, so as to require additional wires and water pipes, or within the lease area (external doors, windows, walls, cabinets, public stairs, corridors, lobbies, bathrooms, etc.) post and issue advertisements and signs, place, stack and hang any objects, strictly store inflammable and explosive dangerous goods, and strictly prevent fire. Otherwise, Party A has the right to deal with these objects, unilaterally terminate the contract, and Party B shall be responsible for compensation and maintenance of the losses caused to Party A or the third party.

---

**Article 7 state of the house at the time of return**

1.  In addition to Party A's consent to Party B's renewal of the lease, Party B shall return the house on the day after the expiration of the lease of this contract. In case of overdue return of the house without Party A's consent, Party B shall pay Party A the occupancy and use fee of the house at double daily rent for each overdue day.

2.  Party B shall return the leased house to Party A in good condition, and Party A and Party B shall jointly check the leased house and its supporting facilities to ensure the state of the house delivered by Party A to Party B (except normal loss). When returning the house, it shall be accepted by Party A, and each party shall settle its own expenses.

**Article 8 sublease, transfer and exchange**

1.  During the lease term, Party B shall not sublease, transfer, sublease, lend, associate, share or exchange with others.

2.  during the lease term, if Party B really needs to transfer the house to others for use, it must consult with Party A in advance

    Party B shall obtain Party A's written consent, otherwise Party A shall have the right to take back the house immediately and terminate this contract.

**Article 9 change, cancellation and termination of the contract**

(1)  Party A and Party B agree that in case of any of the following circumstances during the lease term, this contract shall be terminated and both parties shall not be liable for each other:

    1.  the land-use right within the occupied area of the house is recovered in advance according to law;

    2.  the house is expropriated according to law due to the social and public interests;

    3.  the house is listed in the scope of house demolition permit according to law due to the need of urban construction;

    4.  The house is damaged, lost or identified as a dangerous house;

5

(2) BOTH PARTIES AGREE THAT IF ONE PARTY HAS ANY OF THE FOLLOWING CIRCUMSTANCES, IT SHALL BE DEEMED AS A BREACH OF CONTRACT. THE OBSERVANT PARTY MAY NOTIFY THE BREACHING PARTY IN WRITING TO TERMINATE THIS CONTRACT. THE BREACHING PARTY SHALL BEAR THE RESPONSIBILITY ACCORDING TO LAW. THE BREACHING PARTY SHALL PAY THE OTHER PARTY THE ANNUAL RENT AS LIQUIDATED DAMAGES. IF THE LIQUIDATED DAMAGES ARE NOT ENOUGH TO MAKE UP FOR THE OTHER PARTY'S LOSSES, IT SHALL MAKE UP FOR THEM.

1. Party B fails to or fails to pay Party A the initial rent, deposit or other initial expenses in full;

2. Party B fails to deliver the house on time due to Party A's own reasons and fails to deliver the house within 1 month after Party B's urging;

3. Party B causes damage to the main structure of the house;

4 Party B fails to pay the rent for more than half a month (including half a month)

5. Party B uses the house to store dangerous goods, carry out illegal criminal activities or operate projects that affect the surrounding environment and damage the public interest without permission;

6. Party B subleases, transfers, subleases, lends, associates, shares or exchanges with others without authorization;

**Article 10 liability for breach of contract**

1. During the lease period, if Party A cancels this contract without authorization and takes back the house in advance, Party A shall pay Party B the annual 3-month rent as liquidated damages.

2. during the lease period, if Party B withdraws the lease without permission in the middle of the lease period, it shall compensate Party B for such withdrawal

   Cause Party A's loss of all rents (the standard is the rent amount of this contract) during the empty warehouse period. And pay Party A 3-month rent as liquidated damages.

3. if Party B delays in paying the rent and the relevant fees stipulated in the contract, Party B shall pay Party A the late fee at the rate of 0.5% of the total annual rent and other overdue fees per day for each day overdue.

4. if the contract is terminated due to Party B's breach of contract, Party A shall not be liable for any compensation and compensation for the renovation, reconstruction, decoration and other investment.

**Article 11 other provisions**

1. During the lease term, Party A shall only be responsible for the property insurance of the house and buildings, while Party B shall be responsible for the insurance of its own equipment, property, storage goods and employees, including but not limited to the thousand property all risks insurance and liability insurance. If Party A and Party B fail to purchase the above insurance, all compensation and liability arising therefrom shall be borne by the buyer.

2. during the lease period, the contract is terminated due to force majeure, including but not limited to the relocation of thousands of municipalities, state administrative intervention, demolition and construction of district and county governments and other reasons, which cause the leased house unable to continue to be used. Party A and Party B shall return the corresponding deposit in accordance with Clause 1 of Article 5 of this contract, and Party A shall not bear any liability and expenses for breach of contract.

3. for matters not covered in this contract, both parties can reach an agreement through consultation and conclude a supplementary agreement, which has the same effect as this contract.

4. When signing this contract, both parties shall clearly understand their respective responsibilities and rights, and are willing to strictly implement the contract. If one party violates the contract, the observant party has the right to claim for compensation or terminate the contract in accordance with the contract.

5. any dispute arising from the performance of this contract by both parties shall be settled through consultation; if the negotiation fails, a lawsuit may be brought to the local people's court where the lease is located according to law.

6. Party B undertakes not to engage in any business in violation of national laws and regulations, otherwise it will be deemed as breach of contract, and all losses caused shall be borne by Party B itself, which has nothing to do with Party A. if any loss is caused to Party A, Party B shall make compensation.

7. during the lease term, Party B shall be fully responsible for all matters (including personal safety) occurring in the house, which has nothing to do with Party A.

8. opening hours of Party A's air conditioner: 9:00 a.m. to 18:00 p.m. Monday to Friday; Party A has the right to inspect before Party B leaves work

   Check the switch of air conditioner;

9 After the expiration of the lease term, if the office furniture and auxiliary facilities provided by Party A are damaged artificially, Party A has the right to recover from Party B, We have the right to deduct the loss from the rental deposit.

10 This contract is made in duplicate, with each party holding one copy. After being signed and sealed by Party A and Party B, this contract shall come into force on the date of signing and sealing by both parties.

7



甲 方：上海宁圣企业管理集

法人代表：

（授权委托人）

Group Co., Ltd. Party B: fantaike banenhai) J Iavestment

Holding Co., Ltd. legal representative:

(authorized

delegation

Signed on: V month, noisy, day, Yuzhu year

8

Enclosure:

Regulations against commercial bribery

Party A: Shanghai Ningsheng Enterprise Management Group Co., Ltd
Address: 20, Lane 599, Yunling East Road, Putuo District, Shanghai No. 2 floor

Party B: Van tilke (Shanghai) Investment Holding Co., Ltd
Address: Floor 2, No.20, Lane 599, Yunling East Road, Putuo District, Shanghai

9

In order to jointly stop commercial bribery and corruption, safeguard the common legal rights and interests of Party A and the units and individuals with interest relationship with Party A and the legitimate rights and interests of Party B during the period of cooperation with Party A, the following anti-commercial bribery and anti-corruption agreement has been reached through friendly negotiation between Party a and Party B, so that both parties can abide by it That's ok:

1. The commercial bribery referred to in this agreement refers to "in order to obtain the benefits of cooperation and cooperation with Party A, Party B or its staff give Party A's employees, including but not limited to: money, kickbacks, material gifts, services, pornographic bribery, tourism and other forms of good points.".

2. Prohibition of commercial bribery: in addition to strictly abiding by the Anti Unfair Competition Law of the people's Republic of China, the criminal law and other provisions concerning the prohibition of commercial bribery, Party A and Party B shall firmly refuse the gifts of commercial bribery, bribery and other improper commercial behaviors agreed in this agreement.

3. Any employee or department of Party A shall not take advantage of his position to embezzle, steal, cheat or seek personal interests by other improper means, and shall not ask for or receive money, articles and gifts in any form from Party B in the name of Party A.

4. Party B or Party B's staff shall not, in the name of Party B or an individual, directly or indirectly give gifts, articles, securities or other disguised means to any employee or department of Party A, or violate the commercial bribery prohibition agreement. Otherwise, it shall be deemed as a breach of contract against Party a's interests, and Party B shall bear the liability for breach of contract.

5, the following are exceptions:

   5.1 Basic business etiquette, small gifts with appropriate price, local specialties, etc;

   5.2 Jiqian business reception etiquette, provide working meals, accommodation, transportation and other work convenience related to the performance of the contract.

6. If Party B violates the provisions of this agreement, Party A has the right to stop all cooperation contract business with Party B, which is not considered as breach of contract, and take measures such as freezing all accounts payable to Party B in accordance with the law, and file corresponding arbitration to Shanghai Arbitration Commission for corresponding legal liabilities. At the same time, the Audit Department of Party A will make an internal announcement in Party A's company The list of defaulting parties will not allow any business cooperation with Party A and its affiliated companies in any form for not less than five thousand years.

7. regardless of whether the main contract signed by both parties is confirmed and protected by judicial or arbitration authorities, this Agreement shall exist independently, and shall still have judicial binding force on both parties within 5 years after the end of the legal effect of the main contract.

8 This agreement is made in two copies, one for each party, with the same legal effect.

10



Party A (seal)

Date: next (?)?
Party B (seal)



Date: mm / DD / yyyy

11

**Exhibit 4.3**

协议一

## 商标、技术及管理顾问服务协议

## Trademarks, Technologies & Management and Consulting Services Agreement

本协议由以下双方于 2019 年 05 月 17 日在中国上海签署

This Trademarks, Technologies & Management and Consulting Services Agreement (this "Agreement") is being made and entered into on 17th May, 2019 (the "Effective Date") in Shanghai, the People's Republic of China.

甲方：宁臣（上海）企业管理有限公司

PARTY A: Ning Chen (Shanghai) Enterprise Management Group Co., Ltd.

住所：上海市金山区张堰镇花贤路 69 号 B4115 室

Address: Room B4115, No.69 Huaxian Road, Jinshan District, Shanghai, China

统一社会信用代码：91310000MA1JBRWO3M

Unified Social Credit Code: 91310000MA1JBRWO3M

类型：有限责任公司（台港澳法人独资）

Type: Limited liability Company (Taiwan, Hong Kong and Macao's sole proprietorship of legal person)

法定代表人：江鹏

**Legal Representative:** JIANG Peng

乙方：范太克(上海)投资控股有限公司

**PARTY B:** Fintech (Shanghai) Investment Holding Co., Ltd.

类型：有限责任公司（自然人投资或控股）

Type: Limited Liability Company (invested by or controlled by natural person)

住所：上海市浦东新区砖桥路 49-83 号（单）、园林路 92-108 号（双）、90 弄 1-18 号 2039 室

Address: 49-83(Odd) Zhuanqiao Road, 92-108(Even) Yuanlin Road, Room 2039, No. 1-18, Lane 90 Yuanlin Road, Pudong New Area, Shanghai

统一社会信用代码：91310115MA1H7DJGXJ。

Unified Social Credit Code: 91310115MA1H7DJGXJ.

法定代表人：江鹏

**Authorized Representative:** JIANG Peng

上海宁圣企业管理集团有限公司，现持有范太克(上海)投资控股有限公司 95%的股权

Shanghai Nisun Enterprise Management Group Co., Ltd., holds 95% of the equity interest of Fintech (Shanghai)

Investment Holding Co., Ltd.;

类型：有限责任公司（自然人投资或控股）

Type: Limited Liability Company (invested by or controlled by natural person)

住所：中国（上海）自由贸易试验区富特西一路155号C座底层173部位

Address: Unit 173 at the Bottom Level of Block C, No. 155 Futexi Yi Road, Shanghai Free Trade Pilot Area, China

统一社会信用代码：91310115086229075T。

Unified Social Credit Code: 91310115086229075T.

法定代表人：刘伯党

Authorized Representative: LIU Bodang

江鹏，身份证号为342524198404240014，男，1982年4月24日出生，住址：上海市宝山区涵青路398弄44号902室，现持有范太克（上海）投资控股有限公司5%的股权；

JIANG Peng, PRCID No.: 342524198404240014, male, born 24th April, 1984, residing at Room 902, No. 44, Lane 398, Hanqing Road, Baoshan District, Shanghai, holds 5% of the equity interest of Fintech (Shanghai) Investment Holding Co., Ltd.;

协议一

鉴于:

**WHEREAS,**

1. 乙方系一家依照中华人民共和国法律注册成立的有限责任公司;

1. Party B is a limited liability company incorporated and validly existing under the laws of the People's Republic of China.

2. 乙方包括范太克(上海)投资控股有限公司及持有范太克(上海)投资控股有限公司全部股权的全体股东,在本协议中,范太克(上海)投资控股有限公司及其股东(包括上海宁圣企业管理集团有限公司、江鹏先生)作为协议共同的一方。

2. Party B shall mean Fintech (Shanghai) Investment Holding Co., Ltd. (the "Company") together with all the equity interest holders of the Company. In this Agreement, the Company and the equity interest holders (ie Shanghai Nisun Enterprise Management Group Co., Ltd. and JIANG Peng) are collectively referred as the same party of this Agreement.

3. 乙方同意将其拥有的范太克(上海)投资控股有限公司的商标、技术及相关知识产权无偿转让给甲方。同时乙方聘请甲方为其公司独家的管理及顾问服务机构。服务内容包括独家管理及顾问、客户管理及市场推广咨询、企业管理及咨询、财务咨询、员工培训等。

3. Party B agrees to donate all trademarks, technologies and intellectual property rights as gift to Party A.  Party B engages Party A as an exclusive management and consulting services agent including client management, marketing counseling, corporate management and counseling, finance consulting and personnel training.

4. 甲方同意作为独家的管理及顾问服务机构为乙方提供服务，同时将其拥有的范太克（上海）投资控股有限公司的商标、技术及相关知识产权授权乙方使用。

4. Party A agrees to be appointed as an exclusive management and consultancy services agent to provide such services to Party B, also agrees to authorise Party B to use trademarks, technologies and related intellectual property rights held by Fintech (Shanghai) Investment Holding Co., Ltd.

依据《中华人民共和国公司法》及有关法律规定，经双方在平等互利、友好协商的前提下，双方就保护达成如下协议：

NOW, THEREFORE, pursuant to the PRC Company Act and relevant laws and regulations, and with mutual respects and friendly negotiations of the Parties, the Parties reached the following terms and conditions:

第一条：声明、陈述与保证

# ARTICLE I

## REPRESENTATIONS AND WARRANTIES

甲乙双方互相向对方声明、陈述和保证如下：

Each Party respectively herein, states, represents and warrants as follows:

1. 其有能力从事本协议项下之合作，而该合作符合其经营范围之规定；

1. Each party is qualified to engage in the performances contemplated in this Agreement and the performances hereof are in line with the provisions of their business scope.

2. 其授权代表已获得充分授权可代表其签署本协议；

2. Each of the designated authorized representatives has been fully authorized to sign this Agreement.

3. 其有能力履行其于本协议项下之义务；并且该等履行义务的行为不违反任何 对其有约束力的适用法律的限制，也不会侵犯任何第三方之合法权益。

3. Each Party has the ability to perform the obligations pursuant to this Agreement and the performance of the obligations thereto does not violate any provisions of the laws or infringe any legal rights of a third party.

协议一

4. 任何一方违反了上述声明、陈述和保证即被视为违反了本协议的约定，应按　本协议的规定承担违约责任。

4. Should a Party fail to perform above representations, warranties and statements, such Party shall bear the liability in accordance with this Agreement.

第二条：服务周期：

## ARTICLE II

## TERM AND TERMINATION

本协议服务期限在甲方认为需要终止时或乙方公司不可再续存的情况下，方可终止。（但双方合同附件另有约定的除外。）

This Agreement shall be effective as of the date hereof and shall remain effective until the date when Party A intends and does terminate such Agreement or Party B ceases to exist and subsist. (Except terminated pursuant to any provisions of any attachment herein).

第三条：服务费用：

## ARTICLE III

## THE SERVICES FEE

考虑到甲方提供的以上服务，乙方应支付与范太克（上海）投资控股有限公司的税后所得利润等额的商标、技术及管理顾问服务费予

协议一

甲方或甲方指定的第三方。

In consideration of the management, consulting and financial services to be rendered, Party B agrees to pay Party A or a designated party of Party A as management and consulting fees equivalent to all its net profits after tax of the Company.

管理及顾问服务费如下：

The management and consulting fees are as follows:

1. 本协议期间，商标、技术及管理顾问服务费应等额于范太克（上海）投资控股有限公司的税后所得，也就是每月收入扣除运营成本、费用和税金的所得。

1. During the term of this Agreement, the management and consulting fees shall be equivalent to the after-tax income of the Company, meaning all the monthly incomes by deducting operational costs and expenses and taxes.

2. 如税前所得为零，范太克（上海）投资控股有限公司无须支付商标、技术及管理顾问服务费。如发生亏损，结转至次月，范太克（上海）投资控股有限公司应当将上月的连同本月的商标、技术及管理顾问服务费一起支付甲方。

2. If the pre-tax income is zero, there is no need for the Company to pay the trademarks and technologies & management and consulting fees to Party A. If any loss is recorded, the amount shall be brought forward to the following month and

the amount of the trademarks and technologies & management and consulting fees to payable by the Company to Party A for the following month shall be that of the previous month(s) plus that of the following month.

3. 乙方应在次月 15 号前支付本月的管理及顾问服务费。

3. Party B agrees to pay the management and consulting fees on or before 15th of the following month.

4. 上述每月商标、技术及管理顾问服务费应在每季度末之后纳税申报表之前调整一次（季度调整），使范太克（上海）投资控股有限公司该季度的税后利润为零。

4. The abovementioned monthly trademarks and technologies & management and consulting fees should be adjusted between each and every quarter end and before tax declaration (quarterly adjustment) to ensure the net profit of the Company to be zero.

5. 上述每月商标、技术及管理顾问服务费应在每个会计年度末后、年度纳税申报表之前进行调整（年度调整），使范太克（上海）投资控股有限公司的年度税后利润为零。

5. The abovementioned monthly trademarks and technologies & management and consulting fee should be adjusted between each and every accounting year end and before yearly tax

declaration (annual adjustment) to ensure the net profit of the Company to be zero.

第四条：效力

本协议由双方授权代表签字盖章之日起生效。

## ARTICLE IV

## VALIDITY

This Agreement shall be effective from the date of signing by the Parties and stamping with the company seals of the Parties.

第五条：违约责任

协议期间，违反本协议的任一条款即视为违约，违约方需承担因违约而造成非违约方的损失。

## ARTICLE V

## DEFAULT

During the term of this Agreement, if any terms and conditions herein is breached, it amounts a breach of this Agreement and the breaching party shall be responsible for the loss and damage of the non-breaching party.

第六条：不可抗力

任何一方如因不可抗力而未能履行合同或合同的部分条款，不应认定为违约。受影响的一方，需第一时间收集不可抗力的证据，因不可抗力而未能履行合同导致的后果由双方协商解决。

协议一

## ARTICLE VI

## FORCE MAJEURE

If a Party fails to perform this Agreement or part of this Agreement due to a force majeure, such party shall not be considered as a breaching party. The affected party shall collect all evidence on such force majeure and all consequences of non performance resulted from force majeure shall be negotiated by the Parties.

第七条：适用法律

本协议的执行、效力、解释、和履行，及由本协议产生的争议的解决，均受中华人民共和国争议发生时现行有效的法律管辖。

## ARTICLE VII

## GOVERNING LAW

This Agreement is made and shall be governed in all respects, including validity, interpretation and effect and the dispute resolution thereof, by the current laws of People's Republic of China.

第八条：争议解决

因本协议而产生的任何争端应首先通过友好协商解决。如果通过协商没有解决，任何一方均有权将争议提交中国广东省深圳市福田区

人民法院以诉讼方式解决。

## ARTICLE VIII

### DISPUTE RESOLUTION

The Parties may settle any disputes arising out of this Agreement through friendly consultation. If the parties fail to resort the dispute by means of friendly consultation, the Parties may apply to FuTian District People's Court of Shenzhen Guangdong Province for litigation.

第九条：保密条款

1. 无司法当局或政府部门的法律要求或协议另一方同意，协议双方应使有权接 触和了解本协议条款的雇员或代表严格保密，不得向第三方透露任何条款，否则该一方或人员应承担相应的法律责任。

2. 第一条保密义务不因本协议终止而终止。

## ARTICLE IX

### CONFIDENTIALITY

The Parties agree that the terms and conditions of this Agreement shall be kept strictly confidential and unless with the consent of the other party, a Party, including their respective employees and or agents, shall not reveal or divulge to any third party or entities other than pursuant to a court order.  Or otherwise the declosing party shall bear the legal

responsibilities therefrom.

第十条: 可分性条款

1. 由于法律和条例而导致本协议的任何某一条款无效或无法执行，则该条款无效，但不影响剩余其他条款的效力。

2. 在前一段的情况下，当事人双方应通过友好协商，尽快准备补充协议以取代无效条款。

## ARTICLE X

## SEVERABILITY

If any term or conditions of this Agreement is determined to be invalid, illegal or incapable of being enforced by any law or regulation of PRC, all other terms and conditions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any party.

Upon such determination that any term or condition is invalid, illegal or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in an acceptable manner to the end that transactions contemplated hereby are fulfilled to the extent possible.

第十一条：不可转移条款

除非本协议具体规定，无另一方的事先书面同意，任何一方均不得分派本协议中的任何权利和义务给第三方，也不得为第三方提供担保或类似行为。

## ARTICLE XI

## ASSIGNMENT

Unless as agreed by other provisions provided herein, neither party may assign, transfer or convey all or part of its rights, obligations or interest under this Agreement without the prior written consent of the other party and neither party may provide any form of security or otherwise to any third party.

第十二条：其他事项

## ARTICLE XII

## MISCELLANEOUS

1. 因执行本协议而产生的所有税费，应依照法律法规由缔约双方分别承担。

1. Each Party shall bear all their respective taxes and expenses arising from the execution of this Agreement.

2. 在本协议生效后由双方达成的任何修订应成为本协议的整体组成部分，并具有同等的法律效力。在修订与本协议不一致的情况下，应以修订为准。 如有多次修正的情况下，以最新修订日期为准。

2, Any amendment and/or supplement to this Agreement by the Parties will form integral parts of the Agreement and shall have same legal effect. In the event of inconsistency between the amendment or supplement and this Agreement, such amendment or supplement shall prevail. In the event that there are multiple amendments or supplements, the latest amendment or supplement shall prevail.

3. 本协议系中英文一体式版本, 一式五份。协议三方各执协议原件一份, 其余文件以作完成相关程序之用。每份协议原件均有同等法律效力。当中英文的解释产生冲突时, 应以中文为准。

3. The Agreement was made with English and Chinese original versions in five copies. Each party of this Agreement shall hold one of its original versions and the rest of its original versions shall be used for related procedure. Each of them shall have the same legal force. In case of discrepancy between Chinese and English version, original version in Chinese shall prevail.

4. 该协议自双方签订之日起执行。

4. This Agreement shall come into force from the date it is signed by the authorized representatives of both parties.

协议一

甲方：宁臣（上海）企业管理有限公司

Party A:ON BEHALF OF Ning Chen (Shanghai) Enterprise
Management Group Co., Ltd.

法定代表人：

Legal Representative

乙方：范太克（上海）投资控股有限公司

Party B: ON BEHALF OF Fintech (Shanghai) Investment Holding
Co., Ltd.

法定代表人：JIANG Peng

Legal Representative:

江鹏（签名）：

上海宁圣企业管理集团有限公司（盖章）：

Shanghai Nisun Enterprise Management Group Co., Ltd.

日期:2019 年 5 月 17 日

Date: May 17, 2019

Exhibit 4.4

协议二

## 股权质押协议

## The Equity Interest Pledge Agreement

本协议由以下三方于 2019 年 05 月 17 日在中国上海签署

This Equity Interest Pledge Agreement (this "Agreement") is executed on 17ᵗʰ May, 2019 (the "execution date") in Shanghai, the People's Republic of China.

THIS AGREEMENT is between

甲方（质押权人）：宁臣（上海）企业管理有限公司

PARTY A: PLEDGEE:   Ning Chen (Shanghai) Enterprise Management Group Co., Ltd.

住所：上海市金山区张堰镇花贤路 69 号 B4115 室

Address: Room B4115, No.69 Huaxian Road, Jinshan District, Shanghai, China

统一社会信用代码：91310000MA1JBRWO3M

Unified Social Credit Code: 91310000MA1JBRWO3M

类型：有限责任公司（台港澳法人独资）

Type: Limited liability Company (Taiwan, Hong Kong and Macao's sole proprietorship of legal person)

法定代表人：江鹏

Legal Representative: JIANG Peng

1 / 14

协议二

乙方（质押人）：

PARTY B: PLEDGOR

上海宁圣企业管理集团有限公司，现持有范太克（上海）投资控股有限公司 95%的股权

Shanghai Nisun Enterpeise Management Group Co., Ltd., holds 95% of the equity interest of Fintech (Shanghai) Investment Holding Co., Ltd.;

类型：有限责任公司（自然人投资或控股）

Type: Limited Liability Company (invested by or controlled by natural person)

住所：中国（上海）自由贸易试验区富特西一路 155 号 C 座底层 173 部位

Address: Unit 173 at the Bottom Level of Block C, No.155 Futexi Yi Road, Shanghai Free Trade Pilot Area, China

统一社会信用代码：91310115086229075T。

Unified Social Credit Code: 91310115086229075T.

法定代表人：刘伯党

Authorized Representative: LIU Bodang

江鹏，身份证号为 342524198404240014，男，1982 年 4 月 24 日

协议二

出生，住址：上海市宝山区涵青路 398 弄 44 号 902 室，现持有范太克(上海)投资控股有限公司 5%的股权；

JIANG Peng, PRCID No.: 342524198404240014, male, born 24th April, 1984, residing at Room 902, No. 44, Lane 398, Hanqing Road, Baoshan District, Shanghai, holds 5% of the equity interest of Fintech (Shanghai) Investment Holding Co., Ltd.;

(Collectively "Party B")

丙方：范太克(上海)投资控股有限公司

PARTY C:

Fintech (Shanghai) Investment Holding Co., Ltd.

类型：有限责任公司（自然人投资或控股）

Type: Limited Liability Company (invested by or controlled by natural person)

住所：上海市浦东新区砖桥路 49-83 号(单)、园林路 92-108 号(双)、90 弄 1-18 号 2039 室

Address: 49-83(Odd) Zhuanqiao Road, 92-108(Even) Yuanlin Road, Room 2039, No. 1-18, Lane 90 Yuanlin Road, Pudong New Area, Shanghai

统一社会信用代码：91310115MA1H7DJGXJ。

Unified Social Credit Code: 91310115MA1H7DJGXJ

协议二

法定代表人：江鹏

**Legal Representative:** JIANG Peng

(Collectively the "Parties")

鉴于：

**WHEREAS:**

1. 甲方宁臣（上海）企业管理有限公司系一家依照中华人民共和国法律注册成立并有效存续的有限责任公司。

1. Party A is a limited liability company incorporated and validly existing under the laws of the People's Republic of China.

2. 乙方包括范太克（上海）投资控股有限公司的所有股东，这些股东合法持有范太克（上海）投资控股有限公司的所有股份；乙方共2个自然人，包括上海宁圣企业管理集团有限公司、江鹏先生在内作为本协议中的共同一方。

2. Party B represents all the equity interest holders who hold all the equity interest and assets of Fintech (Shanghai) Investment Holding Co., Ltd. Party B herein consists of two equity interest holders of natural persons, viz: Shanghai Nisun Enterprise Management Group Co., Ltd., and LI Wei.

协议二

3.丙方范太克（上海）投资控股有限公司系一家依照中华人民共和国法律在中国境内注册成立并有效存续的企业，注册资本为人民币5000万元；法定代表人：江鹏；统一社会信用代码：91310115MA1H7DJGXJ。

3.Party C is Fintech (Shanghai) Investment Holding Co., Ltd. is a company incorporated and validly existing under the law of the People's Republic of China with a registered capital of RMB 50,000,000 (50 million), and its legal representative is JIANG Peng. The Unified Social Credit Code is 91310115MA1H7DJGXJ.

4.甲方拟共出借200元人民币给乙方，分别是上海宁圣企业管理集团有限公司人民币一百元(RMB100.00)；江鹏(身份证号：342524198404240014) 人民币一百元(RMB100.00)。借款期限为100年。三方约定：乙方只能在借款到期日或在甲方同意赎回的情况下方可还款。为保护甲方利益，乙方同意将其拥有的范太克（上海）投资控股有限公司100%股权质押给甲方；

4. Party A is intending to loan totally RMB Two Hundred Yuans (RMB200.00) to Party B, Shanghai Nisun Enterprise Management Group Co., Ltd. RMB One Hundred Yuans (RMB100.00) and JIANG Peng (ID No.: 342524198404240014) RMB One Hundred Yuan (RMB100.00. The loan term is 100 years. Party B has agreed that repayment of the loan can only happen on the loan maturity date or Party

协议二

A agrees to collect the loan. To ensure that Party B fully performs its obligations, Party B herein agrees to pledge all of the equity interest of Benefactum Alliance Business Consulting (Beijing) Co., Ltd which Party B holds to Party A as security.

5. 甲方同意接受乙方的股权质押。

5. Party A agrees to accept Party B's pledge.

依照中华人民共和国现行有效的法律和法规，协议各方本着平等互利原则，通过友好协商达成以下条款，以兹共同遵守：

In accordance with the laws and regulations in force in People's Republic of China, and under the principles of mutual benefits, the Parties have agreed to execute this Agreement with the following terms and conditions:

一：担保义务

质押的股权应保证由甲方和乙方参与的所有协议中赋予给乙方的权利和利益。

## ARTICLE I

## SECURITY OBLIGATIONS

协议二

The equity interest hereby pledged to Party A by Party B should ensure the rights, privileges and concessions of Party B in all the Agreements signed by Party A and Party B.

二：质押物

本协议所称的质押物为：现由乙方持有的范太克（上海）投资控股有限公司的 100%股权及由此产生的合法收益。

## ARTICLE II

## PLEDGED PROPERTY

The pledged property herein contains 100% of the equity interest of Fintech (Shanghai) Investment Holding Co., Ltd. held by Party B and legitimate interests generated during the term of Pledge.

三：担保义务的范围

担保义务的范围包括甲方和乙方参与签署的所有协议中赋予乙方的权利和利益。

## ARTICLE III

## SCOPE OF SECURITY OBLIGATIONS

The scope of the obligations of security is all the rights and

协议二

interests of Party B in all the agreements signed by Party A and Party B.

四：质押流程和质押登记

在本协议签署后 7 个工作日内，乙方应在上海市工商行政管理局办理与质押股权有关的质押登记手续，或在甲方需要的情况下乙方需按甲方时间要求立即办理该股权质押登记。

## ARTICLE IV

## THE PLEDGE REGISTRATION

Within the 7 days from the date of signing this Agreement, or at the request of Party A, Party B agrees to complete the Pledge registration in Beijing Administration Bureau for Industry and Commerce as requested.

五：质押股权的转让

在本协议期间，未经甲方书面允许，乙方不得转让质押的股权

## ARTICLE V

## TRANSFER OF THE PLEDGED PROPERTY

During the term of the Pledge set forth in this Agreement, Party B shall not transfer the equity interest to any third party

协议二

without Party A's prior written consent.

六：协议效力、修改和终止

## ARTICLE VI

## TERMINATION AND MODIFICATION

1. 本协议自甲乙丙三方签字、盖章并经授权代表签署后生效；

The Agreement shall become to effect on execution date and continue in full force once signed by three parties' authorized representatives.

2. 一旦协议生效后，除非协议三方同意，任何一方不得修改或终止本协议。在三方协商后，任何修改或终止应以书面形式呈现。在三方书面同意修改或终止本协议前，本协议的条款仍对协议三方具有约束力。

2. No provision of this Agreement may be amended, modified, supplemented, discharged or terminated, unless all Parties consent thereto in writing. Prior to any modifications or termination as agreed by all Parties, all terms and conditions of this Agreement shall bind all the Parties herein.

七：适用法律

协议二

本协议的执行、效力、解释、和履行，及由本协议产生的争议的解决，均受中华人民共和国人民法院管辖并适用争议发生时现行有效的和中华人民共和国法律。

## ARTICLE VII

## GOVERNING LAW

This Agreement is made and shall be governed in all respects, including execution, validity, interpretation, effect and dispute resolution of this Agreement, by the court of People's Republic of China and be applied by the laws of People's Republic of China.

八：违约责任

任何违反本协议的条款、未能完全履行或错误履行本协议约定的义务、作出的任何不实承诺、对任何重大事项未作出重要披露或遗漏、或未能履行本协议条款的任何一方即构成违约。违约方应依照适用法律对其违约事项负责。

## ARTICLE VIII

## LIABILITY FOR BREACH OF CONTRACT

Any breach, failure in full performance, mistake in performance any obligations, any misrepresentations made, non-disclosure

协议二

of material facts or failure to disclose any material facts, or non performance of any provisions of this Agreement shall constitute a breach of this Agreement. The Defaulting Party shall be responsible for its default in accordance with law.

九：争议解决

因本协议理解或实施而产生的任何争端应首先通过友好协商解决。如果争议出现后 30 天内通过协商没有解决，任何一方均有权将争议提交中国上海市浦东新区人民法院以诉讼方式解决。

## ARTICLE IX

## DISPUTE RESOLUTION

The parties may settle any disputes regarding the interpretation or implementation arising out of this Agreement through consultation. If the Parties fail to resolve the dispute through consultation within 30 days, any parties may apply to People's Court of Pudong New Area for litigation.

十：可分性条款

1. 由于法律和法规而导致本协议的任何某一条款无效或无法执行，则本条款无效，但不影响剩余其他条款的效力。

协议二

2. 在前述条款发生的情况下，协议三方应通过友好协商，尽快补充协议以取代无效条款。

## ARTICLE X

## SEVERABILITY

1. If any term or condition of this Agreement is determined to be invalid, illegal or incapable of being enforced by any law or regulation of PRC, all other terms and conditions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any party.

2 Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in an acceptable manner to the end that transactions contemplated hereby are fulfilled to the extent possible.

第十一条：其他事项

## ARTICLE XI

协议二

## MISCELLANEOUS

1. 本协议中的标题仅作参考之便，不影响本协议的理解、解释或条款的意义。

1. **CAPTIONS AND HEADINGS.** The captions and headings throughout this Agreement are for convenience and reference only, and shall in no way be deemed to define, limit or add to the meaning of any provision of this Agreement.

2. 本协议系中英文一体式版本，一式五份。协议三方各执协议原件一份，其余文件以作完成相关程序之用。每份协议原件均有同等法律效力。当中英文的解释产生冲突时，应以中文为准。

2. The Agreement was made with English and Chinese original versions in five copies. Each party of this Agreement shall hold one of its original versions and the rest of its original versions shall be used for related procedure. Each of them shall have the same legal force. In case of discrepancy between Chinese and English version, original version in Chinese shall prevail..

3. 在签署后，协议双方开始执行本协议。

3. The Agreement is effective on execution date.

甲方：宁臣（上海）企业管理有限公司

协议二

Party A: ON BEHALF OF **Ning Chen (Shanghai) Enterprise Management Group Co., Ltd.**

法定代表人： JIANG Peng

Legal Representative:

乙方：

PARTY B:

上海宁圣企业管理集团有限公司 Shanghai Nisun Enterprise Management Group Co., Ltd. :

江鹏 JIANG Peng:

丙方：范太克（上海）投资控股有限公司

Party C: ON BEHALF OF **Fintech (Shanghai) Investment Holding Co., Ltd.**

法定代表人:江鹏 JIANG Peng

Legal Representative:

日期:2019 年 05 月 17 日

Date: May 17, 2019

14 / 14

**Exhibit 4.5**

协议三

## 股东委托投票代理协议

## Equity Interest Holders' Voting Rights Proxy Agreement

本协议由以下双方于 2019 年 05 月 17 日在中国上海签署

This Equity Interest Holders' Voting Rights Proxy Agreement (this "Agreement") is executed on 17ᵗʰ May, 2019 (the "execution date") in Shanghai, the People's Republic of China.

甲方（委托人）：

PARTY A:

上海宁圣企业管理集团有限公司，现持有范太克（上海）投资控股有限公司 95%的股权

Shanghai Nisun Enterprise Management Group Co., Ltd., holds 95% of the equity interest of Fintech (Shanghai) Investment Holding Co., Ltd.;

类型：有限责任公司（自然人投资或控股）

Type: Limited Liability Company (invested by or controlled by natural person)

住所：中国（上海）自由贸易试验区富特西一路155号C座底层173部位

Address: Unit 173 at the Bottom Level of Block C, No. 155

Futexi Yi Road, Shanghai Free Trade Pilot Area, China

统一社会信用代码：91310115086229075T。

Unified Social Credit Code: 91310115086229075T.

法定代表人：刘伯党

Authorized Representative: LIU Bodang

江鹏，身份证号为342524198404240014，男，1982 年 4 月 24 日出生，住址：上海市宝山区涵青路 398 弄 44 号 902 室，现持有范太克（上海）投资控股有限公司 5%的股权；

JIANG Peng, PRCID No.: 342524198404240014, male, born 24th April, 1984, residing at Room 902, No. 44, Lane 398, Hanqing Road, Baoshan District, Shanghai, holds 5% of the equity interest of Fintech (Shanghai) Investment Holding Co., Ltd.;

乙方（受托人）：宁臣（上海）企业管理有限公司

PARTY B: Ning Chen (Shanghai) Enterprise Management Group Co., Ltd.;

住所：上海市金山区张堰镇花贤路 69 号 B4115 室

Address: Room B4115, No.69 Huaxian Road, Jinshan District, Shanghai, China

统一社会信用代码：91310000MA1JBRW03M

2 / 8

Unified Social Credit Code: 91310000MA1JBRW03M

类型：有限责任公司（台港澳法人独资）

Type: Limited liability Company (Taiwan, Hong Kong and Macao's sole proprietorship of legal person)

法定代表人：江鹏

**Legal Representative**: JIANG Peng

鉴于：

**WHEREAS**:

1. 乙方系一家依照中华人民共和国法律注册成立的有限责任公司；

1. Party B is a limited liability company incorporated and validly existing under the law of the People's Republic of China.

2. 上海宁圣企业管理集团有限公司、江鹏系范太克（上海）投资控股有限公司的全部股东，二人共持有范太克（上海）投资控股有限公司 100%的股份。

2. Shanghai Nisun Enterprise Management Group Co., Ltd. and JIANG Peng are the legal equity interest holders of Fintech (Shanghai) Investment Holding Co., Ltd. (the "Company") and lawfully hold 100% of the equity interest and assets of the Company.

3. 截至本协议签订日，甲方为范太克（上海）投资控股有限公司股东，

合法持有范太克（上海）投资控股有限公司所有股份。乙方同意指定由甲方委派的人员来行使其在范太克（上海）投资控股有限公司股东大会上的股东投票权，且甲方愿意委派这样的人员。

3. As of the execution date, Party A is the equity interest holders of Fintech (Shanghai) Investment Holding Co., Ltd.; and lawfully holds all the equity interest and assets of the Company. Party B intends to specify the representatives ("Representatives") appointed by Party A to exercise its voting right of equity interest holders in the general meeting of equity interest holders of the Company and Party A is willing to appoint such a Representative.

4、江鹏系中华人民共和国公民，在签订本协议时均具有完全民事行为能力。

4. JIANG Peng is the citizen of PRC with fully civil capacity when signing this Agreement.

5、上海宁圣企业管理集团有限公司系一家依照中华人民共和国法律注册成立的有限责任公司。

5. Shanghai Nisun Enterprise Management Group Co., Ltd. is a limited liability company incorporated and validly existing under the law of the People's Republic of China.

因此，依照中华人民共和国法律和法规，协议双方本着平等互利原则，

协议三

通过友好协商达成以下条款，以兹共同遵守：

The parties have agreed to execute this Agreement with provisions upon the laws and regulations of PRC as follows:

第一条. 甲方同意且不可撤销地指定由乙方委派的人员来独家代理行使其在范太克（上海）投资控股有限公司股东大会上由法律、公司章程规定、协议约定的股东投票权，委派和选举董事和董事长作为范太克（上海）投资控股有限公司法人代表。由乙方委派的人员应为甲方持股的范太克（上海）投资控股有限公司的董事。

1. Party A agrees to irrevocably specify Representatives appointed by Party B to exclusively exercise the equity interest holders' voting rights in the general meeting of equity interest holders of the Company in accordance with the provisions of laws and articles of the Company to appoint and elect the directors and Chairman of the Company to be the corporate representative. The Representatives appointed by Party B shall be directors of the Company held by Party A.

第二条. 乙方同意根据本协议第一条，委派代理人。这些代理人应代表甲方行使其股东投票权。

2. Party B agrees to appoint Representatives pursuant to the Article 1 of this Agreement to execute the voting rights on behalf of Party A.

第三条. 协议各方理解，不论范太克（上海）投资控股有限公司的股东权益发生任何变化，甲方应指定由乙方委派的人员来行使股东投票权。协议各方均同意，甲方不得将其在范太克（上海）投资控股有限公司的股东权益转让给除乙方或者乙方指定个人或企业以外的其他任何个人或公司。

3. The Parties herein understand that no matter what changes of equity interests of the Company, Party A shall specify the Representatives appointed by Party B to exercise its equity interest holders' voting rights. All the parties agree that Party A cannot transfer the equity interests of the Company held by Party A to any third party except for to Party B and Representatives appointed by Party B.

第四条. 甲方各成员理解，即使其中之一的成员不再拥有范太克（上海）投资控股有限公司股权，其仍应继续执行本协议，

4. Each Party A understands that they should continue to enforce this Agreement even if one equity interest holder of the Company (ie any individual Party A) no longer holds the equity interest of the Company.

第五条. 本协议经过双方授权代表签字、盖章后生效。

5. The Agreement shall be effective on the execution date.

第六条. 本协议在甲方按到期期限支付甲方借款前，不得终止。

6. The Agreement cannot be terminated before Party A completes

协议三

the repayment on the loan maturity date.

第七条. 本协议任何修改和终止均应经协议双方书面同意。

7. No provisions of this Agreement may be amended, modified, supplemented, discharged or terminated unless with the Parties consent thereto in writing.

第八条. 本协议订立、效力、解释、和履行，及由本协议产生的争议的解决，均受中华人民共和国争议发生时现行有效的法律管辖。

8. This Agreement is made and shall be governed in all respects, including execution validity, interpretation, effect and performance and any dispute resolution, by the laws of People's Republic of China.

第九条. 本协议系中英文一体式版本，一式五份。协议三方各执协议原件一份，其余文件以作完成相关程序之用。每份协议原件均有同等法律效力。当中英文的解释产生冲突时，应以中文为准。

9. The Agreement was made with English and Chinese original versions in five copies. Each party of this Agreement shall hold one of its original versions and the rest of its original versions shall be used for related procedure. Each of them shall have the same legal force. In case of discrepancy between Chinese and English version, original version in Chinese shall prevail..

第十条. 本协议自双方签订之日起执行。

10.    This Agreement shall be effective from date of this Agreement when the Parties signed this Agreement.

甲方:

**Party A:**

上海宁圣企业管理集团有限公司 Shanghai Nisun Enterprise Management Group Co., Ltd. (盖章):

江鹏 JIANG Peng (签名):

乙方: 宁臣(上海)企业管理有限公司

**Party B:** ON BEHALF OF Ning Chen (Shanghai) Enterprise Management Group Co., Ltd.;

法定代表人:

Legal Representative:

日期:2019 年 05 月 17 日

Date: May 17, 2019