# EXHIBIT 2

# (PART 3 of 4)

协议四

## 独家选择权协议

## Exclusive Right and Option to Purchase Agreement

本协议由以下双方于 2019 年 05 月 17 日在中国上海签署

This Exclusive Right and Option to Purchase Agreement (this "Agreement") is executed on 17th May, 2019 (the "execution date") in Shanghai, People's Republic of China.

*THIS AGREEMENT* is between

甲方：宁臣（上海）企业管理有限公司

**PARTY A: Ning Chen (Shanghai) Enterprise Management Group Co., Ltd.**

住所：上海市金山区张堰镇花贤路 69 号 B4115 室

**Address:** Room B4115, No. 69 Huaxian Road, Jinshan District, Shanghai, China

统一社会信用代码：91310000MA1JBRW03M

Unified Social Credit Code: 91310000MA1JBRW03M

类型：有限责任公司（台港澳法人独资）

Type: Limited liability Company (Taiwan, Hong Kong and Macao's sole proprietorship of legal person)

法定代表人：江鹏

**Legal Representative:** JIANG Peng

协议四

乙方：

**PARTY B:**

上海宁圣企业管理集团有限公司，现持有范太克（上海）投资控股有限公司 95%的股权

**Shanghai Nisun Enterprise Management Group Co., Ltd.,** holds 95% of the equity interest of Fintech (Shanghai) Investment Holding Co., Ltd. ;

类型：有限责任公司（自然人投资或控股）

Type: Limited Liability Company (invested by or controlled by natural person)

住所：中国（上海）自由贸易试验区富特西一路 155 号 C 座底层 173 部位

**Address**: Unit 173 at the Bottom Level of Block C, No. 155 Futexi Yi Road, Shanghai Free Trade Pilot Area, China

统一社会信用代码：91310115086229075T。

**Unified Social Credit Code:** 91310115086229075T.

法定代表人：刘伯党

**Authorized Representative:** LIU Bodang

江鹏，身份证号为 342524198404240014，男，1982 年 4 月 24 日出生，住址：上海市宝山区涵青路 398 弄 44 号 902 室，现持有范太克（上海）投资控股有限公司 5%的股权；

协议四

JIANG Peng, PRCID No.: 342524198404240014, male, born 24th April, 1984, residing at Room 902, No. 44, Lane 398, Hanqing Road, Baoshan District, Shanghai, holds 5% of the equity interest of Fintech (Shanghai) Investment Holding Co., Ltd.;

丙方：范太克(上海)投资控股有限公司

PARTY C: Fintech (Shanghai) Investment Holding Co., Ltd.

类型：有限责任公司（自然人投资或控股）

Type: Limited Liability Company (invested by or controlled by natural person)

住所：上海市浦东新区砖桥路 49-83 号(单)、园林路 92-108 号(双)、90 弄 1-18 号 2039 室

Address: 49-83(Odd) Zhuanqiao Road, 92-108(Even) Yuanlin Road, Room 2039, No.1-18, Lane 90 Yuanlin Road, Pudong New Area, Shanghai

统一社会信用代码：91310115MA1H7DJGXJ。

Unified Social Credit Code: 91310115MA1H7DJGXJ.

法定代表人：江鹏

Authorized Representative: JIANG Peng

协议四

鉴于:

WHEREAS:

1. 甲方、丙方两个公司系依照中华人民共和国法律注册设立且有效存续的有限责任公司。

1. Party A and Party C are the limited liability companies incorporated and validly existing under the laws of the PRC.

2. 截至本协议签订日,乙方为丙方的股东,合法持有丙方所有股权及权益。在本协议中,乙方,即,包括上海宁圣企业管理集团有限公司,系一家依照中华人民共和国法律注册成立的有限责任公司,以及江鹏先生在内的 2 个股东作为协议共同的一方。在签订本协议时,江鹏系中华人民共和国公民,且均具有完全民事行为能力。

2. As of the execution date of this Agreement, Party B lawfully holds 100% of the equity interests of Party C. Party C herein consists of two equity interest holders, ie a natural person, viz: LI Wei, and Shanghai Nisun Enterprise Management Group Co., Ltd., a limited liability company incorporated and validly existing under the laws of the People's Republic of China. He is a PRC citizen with fully civil capacity.

据此, 协议各方经过友好协商,达成如下协议以兹共同遵守:

After friendly consultation, all the Parties have agreed to execute this Agreement with the following terms and conditions:

协议四

第一条：购买选择权和行权

ARTICLE I

OPTION TO PURCHASE AND EXCERCISE

1. 承诺：乙方承诺甲方拥有不可撤消的独家购买选择权，甲方有权购买现由乙方持　股的丙方所有股份,该购买选择权是不可撤消的且只能由甲方或甲方指定人员行使。(这里的"人员"包括企业实体、公司、合伙企业、合资公司和非公司组织机构。)

1. **WARRANTIES.** Party B jointly and irrevocably hereby grants to Party A the exclusive right and option to purchase all assets and equity interest of Party C held by Party B. This exclusive right and option to purchase cannot be withdrawn by Party B and shall only be exercised by Party A or a designated party from Party A ( "a designated party" herein means corporate entity, company, partnership firm and unincorporated organization).

2. 行权流程：甲方在行使其购买选择权之前应书面通知乙方；在收到通知后的 7 天内,乙方和丙方协同甲方或甲方指定人员应立即编制准备一整套拟提交给政府机构批准的与行使选择权有关的转让股权文件,以便实现股权转让。一旦这些转让文件的编制准备工作完成并经甲方、乙方和丙方书面确认，则这些转让文件应即刻且无条件地获得授权批准，以便执行与行使选择权有关的丙方股权和资产的转让。

2. **EXERCISE OF OPTION.** By exercising its exclusive right to purchase the equity of Party C pursuant to this Agreement, Party

A shall serve written notice to Party B. Within 7 days of receiving the written notice, Party B and Party C should provide necessary assistance to Party A or a designated party to prepare a full set of documents regarding the transfer of equity interest to be submitted to the governmental organizations. Once the documents complied and confirmed by all the parties, they will be effectively and immediately unconditionally approved for the transfer of the asset and equity interest of Party C.

3. 行权条件：当甲方认为收购丙方是必要的且依照中华人民共和国法律和法规是可行的，以及按美国证券会要求是必须时，甲方可立即行使其购买丙方股东股权权益或资产的选择权，乙丙方无条件的全部同意。

3. **CONDITONS FOR OPTION.** When Party A considers it is of necessity, feasible under the laws and regulations of the People's Republic of China and mandatory at the request of the US Securities and Exchange Commission, Party A shall exercise its exclusive right and option to purchase the aforesaid equity interest and or assets and Party B and Party C shall agree such transaction unconditionally.

,

协议四

第二条：收购价格

## ARTICLE II

## PURCHASE PRICE

根据行使选择权的条件，甲方和乙方应签署与收购价格有关的相关协议。在收购不违反中国相关法律或法规且实质有效的前提下实施，收购价格为中华人民共和国法律范围内允许的最低价格。

Pursuant to the terms and conditions of the option to purchase, Party A and Party B shall sign an agreement relating to the purchase price.   Party A and Party B have agreed that the purchase price for the aforesaid equity interest and assets to be acquired shall be the lowest price as allowed by the laws and regulations of the People's Republic of China.

第三条：承诺和保证

## ARTICLE III

## REPRESENTATIONS AND WARRANTIES

1. 协议各方应向其它方保证：各协议签署方具有签署本协议并执行本协议中义务的 必要权利、能力和授权，且经过合法程序。

1. **AUTHORIZATION.** All parties have full power, legal capacity and authority to enter into this Agreement, to execute all attendant documents and instruments necessary to consummate the

transaction and are authorized by lawful procedure.

2. 乙方向甲方承诺：

## 2. WARRANTIES OF PARTY B TO PARTY A.

（1）乙方是合法登记的丙方股东，且已经对各自认缴的丙方注册资金全额出资。

A. Party B represents and warrants to Party A that Party B is the legally registered equity interest holder of Party C and has paid the registered capital as subscribed.

（2）除《股权质押协议》外，乙方未对其在丙方的股权做任何抵押或质押，也未以任何形式对其在丙方的股权实施担保物权或借款。

B. Apart from "The Equity Pledge Agreement" signed with Party A, Party B warrants that it has never pledged the equity of Party C to any third party.

（3）乙方没有或将来也不会将其在丙方的股东权益出售给任何第三方；

C. Party B warrants that it has not or shall not sell the equity of Party C to any third party.

3. 丙方向甲方承诺：

## WARRANTIES OF PARTY C TO PARTY A.

丙方是依照中华人民共和国法律注册登记且合法存在的有限责任公司，其业务经营均遵守了中华人民共和国现行法律。

Party C is a limited liability company registered and validly

existing under the laws of the People's Republic of China. Party C's business and operations are in compliance with the current laws of the People's Republic of China.

第四条: 协议约定

## ARTICLE IV

### REPRESENTATIONS AND WARRANTIES OF PARTY C

在甲方执行购买选择权, 收购丙方所有股权之前, 丙方:

Prior to Party A or a designated party executes the right and option to purchase all equity interest and assets of Party C, Party C represents and warrants to Party A as follows:

1. 不得出售、转让、抵押、或以其他方法处置丙方经营收益或与其收入有关的其他任何合法利益（除非这些出售、转让、抵押、处置已经告知甲方并经甲方书面同意）；

1. not to sell, transfer, pledge or otherwise dispose of any legal benefits of Party C to any third party (unless such sale, transfer, pledge ot disposal are with written consent of Party A);

2. 不得涉入任何可能对其资产、负债、经营、股东权益、或其他合法权利产生重大影响的交易（除非这些交易已经告知甲方并经甲方书面同意）；

2. not to involve in any transaction which might influence the assets, debt, operation, equity interest of holders and other legal interests of Party C (unless such transaction are with written

9 / 17

协议四

consent of Party A);

3. 不得以任何形式对其股东分配任何股利。

3. not to distribute dividends to shareholders in any form;

4. 未经甲方事先书面同意,乙方和丙方不得将其在本协议中的权利和义务转让给其 他第三方或者变相转让;

4. not to transfer any rights and obligations pursuant to this Agreement to any third party without written consent of Party A;

5. 乙方和丙方同意:只要甲方愿意,甲方有权将其在本协议中的权利和义务转让给 其他第三方。该转让只需甲方书面通知乙方和丙方,不需获得乙方和丙方的同意。

5. Party B and Party C agree that so long as Party A agrees, Party A shall have the right to transfer the rights and obligations pursuant to the Agreement to any third party. Party A shall give the written notice to Party B and Party C only on such transfer but no need to have prior consent of Party B and Party C.

第五条: 保密性

ARTICLE V

CONFIDENTIALITY

协议各方理解并确定与本协议有关的任何口头或书面的材料都具有机密性,都应对这些材料、内容、信息保密。未经其他方书面授权,任何一方都不得将任何材料泄露给第三方,但以下情形除外:

Parties understand and confirm that all materials whether in verbal form or in writing relating to this Agreement are of confidential and such materials, contents and information shall be kept confidential. Unless with authorization of the other Party, no party shall disclose to any third party, with the following exceptions:

1. 这些材料是公众所知或将为公众所知。

1. Such materials are of public knowledge.

2. 根据现行法律或条例或证券交易所条例，这些材料应该向公众披露；

2. Such material shall be disclosed to public pursuant to current laws and regulations or rules of a securities exchange.

3. 协议一方向其法律或财务顾问披露的材料与本协议中的交易预期相关，且这些法律或财务顾问应遵守本协议提到的保密条款。协议一方的雇员泄露任何保密材料视为该协议方泄露材料，则该协议方应为违反合同约定负责。本协议第五条保密条款不因本协议无效、修改、撤消、终止或因某种原因不能履行而终止。

3 A Party may disclose the material and the transactions relating to this Agreement to its legal and financial advisors and such legal and financial advisor shall observe the confidentiality clause of this Agreement. Any disclosure by the employee of a Party shall be deemed as disclosed by such Party and shall be responsible for the breach.   This Article V of Confidentiality shall survive in

协议四

regardless of any void, amendment, rescission, termination, or non-performance of this Agreement.

第六条：违约

ARTICLE VI

LIABILITY FOR BREACH OF CONTRACT

任何违反本协议的条款、未能完全履行或错误履行本协议约定的义务、作出的任何不实承诺、对任何重大事项未作出重要披露或遗漏、或未能履行本协议条款的任何一方即构成违约。违约方应依照适用法律对其违约事项负责。

Any breach, failure in full performance, mistake in performance any obligations, any misrepresentations made, non-disclosure of material facts or failure to disclose any material facts, or non performance of any provisions of this Agreement shall constitute a breach of this Agreement. The Defaulting Party shall be responsible for its default in accordance with law.

第七条：适用法律和争议解决

ARTICLE VII

GOVERNING LAW AND DISPUTE RESOLUTION

1.适用法律：本协议的执行、效力、解释、和履行，及由本协议产生的争

议的解决，均受中华人民共和国争议发生时现行有效的法律管辖。

1. GOVERNING LAW. This Agreement is made and shall be governed in all respects, including validity, interpretation, effect and performance, by the laws of People's Republic of China.

2. 争议解决： 因本协议理解或实施而产生的任何争端应首先通过友好协商解决。如果争议出现后 30 天内通过协商没有解决，任何一方均有权将争议提交给中国广东省深圳市福田区人民法院，以诉讼方式解决。

2. DISPUTE RESOLUTION. The parties may settle any disputes regarding the interpretation or implementation arising out of this Agreement through consultation. If the Parties fail to resolve the dispute through consultation within 30 days, any parties may apply to FuTian People's Court of Shenzhen Guangdong for litigation.

.

第八条：协议效力和协议终止

ARTICLE VIII

EFFECT AND TERMINATION

1. 本协议在协议各方签订、盖章后生效；

1. This Agreement shall take legal effect on the Execution Date after this Agreement is signed by and stamped by the Parties.

2. 除非甲方提前 30 天通知其他方终止本协议，否则无协议各方全体一致同意，本协议不得终止。

协议四

Unless or until terminated by 30 day notice by Party A in advance, this Agreement shall be in full force.

第九条：协议修改和完整性

ARTICLE IV

ENTIRE AGREEMENT AND MODIFICATION

1. 协议修正、修改和补充：本协议的修改和补充需协议各方书面同意。由协议方执行的修改和补充部分应视为本协议整体组成部分，并同本协议一样具有法律效力。

1. MODIFICATION AND AMENDMENT. No provisions of this Agreement may be amended, modified, supplemented, discharged or terminated, unless the parties consent thereto in writing.   Any amendments and supplements made hereof by the Parties shall form an integral part of this Agreement and shall have the same legal effect.

2. 完整条款：协议各方确认，本协议构成与合同标的物有关的协议各方的完整协议，并取代所有以前或同期协定和口头或书面形式的理解；

2. ENTIRE AGREEMENT. This Agreement contains the entire agreement between the Parties and supersedes all prior agreements, understandings and writings between the Parties with respect to the subject matter hereof.

协议四

第十条：可分性条款

ARTICLE X

SEVERABILITY

如果根据中国法律或法规，本协议的任何条款被宣告无效或无法执行，则该条款

仅仅在中国范围内被视为无效，而剩余其他条款的有效性、合法性、和可执行性不应受任何影响。协议各方应本着诚实精神，通过友好协商，准备有效协议以取代无效或无法执行的条款，以便取代条款能带来该无效或无法执行的条款拟产生的相同经济影响。

If any term or condition of this Agreement is determined to be invalid, illegal or incapable of being enforced by any laws or regulations of PRC, all other terms and conditions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any party. Upon such determination that any term or condition is invalid, illegal or incapable of being enforced, the Parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in an acceptable manner to the end that transactions contemplated hereby are fulfilled to the extent possible.

第十一条：其他事项

协议四

## ARTICLE XI

## MISCELLANEOUS

1. 本协议中的标题仅作参考之便，不影响本协议的理解、解释或条款的意义。

1. CAPTIONS AND HEADINGS. The captions and headings throughout this Agreement are for convenience and reference only, and shall in no way be deemed to define, limit or add to the meaning of any provision of this Agreement.

2. 本协议系中英文一体式版本，一式五份。协议三方各执协议原件一份，其余文件以作完成相关程序之用。每份协议原件均有同等法律效力。当中英文的解释产生冲突时，应以中文为准。

2. The Agreement was made with English and Chinese original versions in five copies. Each party of this Agreement shall hold one of its original versions and the rest of its original versions shall be used for related procedure. Each of them shall have the same legal force. In case of discrepancy between Chinese and English version, original version in Chinese shall prevail..

3. 在签署后，协议双方执行本协议。

3. The Parties shall perform this Agreement after signing this Agreement..

协议四

甲方：宁臣（上海）企业管理有限公司

Party A: ON BEHALF OF **Ning Chen** (Shanghai) Enterprise Management

Group Co., Ltd. ;

法定代表人：

Legal Representative:

乙方：

Party B：

上海宁圣企业管理集团有限公司：

Shanghai Nisun Enterprise Management Group Co., Ltd.

江鹏 JIANG Peng:

丙方:范太克（上海）投资控股有限公司

Party C: ON BEHALF OF Fintech (Shanghai) Investment Holding Co.,

Ltd.

法定代表人:江鹏 JIANG Peng

Legal Representative:

日期:2019 年 05 月 17 日

Date: May 17, 2019

# SHARE PURCHASE AGREEMENT

between

**Bodang Liu**

and

**Hebron Technology Co., Ltd.**

dated as of

July 12, 2019

# SHARE PURCHASE AGREEMENT

This Share Purchase Agreement (this "**Agreement**"), dated as of July 12, 2019, is entered into between Bodang Liu, citizen of the People's Republic of China ("**Seller**"), and Hebron Technology Co., Ltd., a British Virgin Islands company limited by shares ("**Buyer**"). Capitalized terms used in this Agreement have the meanings given to such terms herein.

## RECITALS

**WHEREAS**, Seller owns all 50,000 of the issued and outstanding common shares, $1.00 par value (the "**Shares**"), of NiSun International Enterprise Management Group (British Virgin Islands) Co., Ltd., a British Virgin Islands limited company (the "**Company**"); and

**WHEREAS**, Seller wishes to sell to Buyer, and Buyer wishes to purchase from Seller, the Shares, subject to the terms and conditions set forth herein;

**NOW, THEREFORE**, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE I
## PURCHASE AND SALE

**Section 1.01 Purchase and Sale.** Subject to the terms and conditions set forth herein, at the Closing (as defined in Section 2.01), Seller shall sell to Buyer, and Buyer shall purchase from Seller, the Shares, free and clear of any mortgage, pledge, lien, charge, security interest, claim, community property interest, option, equitable interest, restriction of any kind (including any restriction on use, voting, transfer, receipt of income, or exercise of any other ownership attribute), or other encumbrance (each, an "**Encumbrance**"), for the consideration specified in Section 1.02.

**Section 1.02 Purchase Price.** The aggregate purchase price for the Shares shall be $7,000,000 (the "**Purchase Price**"). Buyer shall pay the Purchase Price to Seller at the Closing in accordance with the instructions set forth in Section 1.02 of the Disclosure Schedules. The term "**Disclosure Schedules**" means the disclosure schedules delivered by Seller concurrently with the execution, closing, and delivery of this Agreement.

## ARTICLE II
## CLOSING

**Section 2.01 Closing.** The closing of the transactions contemplated by this Agreement (the "**Closing**") shall take place simultaneously with the execution of this Agreement on the date of this Agreement (the "**Closing Date**") at the offices of Buyer, or such other place or manner as the parties may mutually agree upon. The consummation of the transactions contemplated by this Agreement shall be deemed to occur at 12:01 a.m. China Standard Time on the Closing Date.

**Section 2.02 Seller Closing Deliverables.** At the Closing, Seller shall deliver to Buyer the following:

(a) Share certificates evidencing the Shares, free and clear of all Encumbrances, duly endorsed in blank or accompanied by stock powers or other instruments of transfer duly executed in blank.

(b) A certificate of good standing for the Company certified by the Governmental Authority of each jurisdiction where the Company is required to be qualified to do business. For purposes of this Agreement, "**Governmental Authority**" means any government or political subdivision thereof, or any agency or instrumentality of such government or political subdivision, or any arbitrator, court, or tribunal of competent jurisdiction.

**Section 2.03 Buyer's Deliveries.** At the Closing, Buyer shall deliver the following to Seller:

(a) The full amount of the Purchase Price.

(b) A certificate of the Secretary (or other officer) of Buyer certifying (i) that attached thereto are true and complete copies of all resolutions of the board of directors of Buyer authorizing the execution, delivery, and performance of this Agreement and the Transaction Documents and the consummation of the transactions contemplated hereby and thereby, and that such resolutions are in full force and effect, and (ii) the names, titles, and signatures of the officers of Buyer authorized to sign this Agreement and the other Transaction Documents.

**ARTICLE III**
**REPRESENTATIONS AND WARRANTIES OF SELLER**

Seller represents and warrants to Buyer that the statements contained in this ARTICLE III are true and correct as of the date hereof. For purposes of this ARTICLE III, "Seller's knowledge," "knowledge of Seller," and any similar phrases shall mean the actual or constructive knowledge of any director or officer of Seller, after due inquiry.

**Section 3.01 Authority of Seller.** Seller has the full legal capacity, power and authority to execute and deliver this Agreement and to perform his obligations hereunder. This Agreement is a valid and binding obligation of Seller, enforceable in accordance with its terms, except as such enforceability may be limited by general principles of equity or applicable bankruptcy, insolvency, reorganization, moratorium, liquidation or similar laws relating to, or affecting generally, the enforcement of applicable creditors' rights and remedies.

**Section 3.02 Organization, Authority, and Qualification of the Company.** The Company is a company duly organized, validly existing, and in good standing under the Laws of the British Virgin Islands and has full corporate power and authority to own, operate, or lease the properties and assets now owned, operated, or leased by it and to carry on its business as it has been and is currently conducted. Section 3.02 of the Disclosure Schedules sets forth each jurisdiction in which the Company is licensed or qualified to do business, and the Company is duly licensed or qualified to do business and is in good standing in each jurisdiction in which the properties owned or leased by it or the operation of its business as currently conducted makes such licensing or qualification necessary.

**Section 3.03 Capitalization.**

(a) The authorized shares of the Company consist of 50,000 common shares, $1.00 par value, of which 50,000 shares are issued and outstanding and constitute the Shares. All of the Shares have been duly authorized, are validly issued, fully paid and nonassessable, and are owned of record and beneficially by Seller, free and clear of all Encumbrances. Upon the transfer, assignment, and delivery of the Shares and payment therefor in accordance with the terms of this Agreement, Buyer shall own all of the Shares, free and clear of all Encumbrances.

2

(b) All of the Shares were issued in compliance with applicable Laws. None of the Shares were issued in violation of any agreement or commitment to which Seller or the Company is a party or is subject to or in violation of any preemptive or similar rights of any individual, corporation, partnership, joint venture, limited liability company, Governmental Authority, unincorporated organization, trust, association, or other entity (each, a "**Person**").

(c) There are no outstanding or authorized options, warrants, convertible securities, share appreciation, phantom shares, profit participation, or other rights, agreements, or commitments relating to the common shares of the Company or obligating Seller or the Company to issue or sell any shares of, or any other interest in, the Company. There are no voting trusts, shareholder agreements, proxies, or other agreements in effect with respect to the voting or transfer of any of the Shares.

**Section 3.04 Subsidiaries.** The Company's corporate structure consists of the following legal entities. Other than the following, the Company does not have, or have the right to acquire, an ownership interest in any other company. The term Company shall be understood to include each of the following subsidiaries and related parties, as the context herein may require.

(a) NiSun International Enterprise Management Group (British Virgin Islands) Co., Ltd. ("NiSun BVI"), a limited company established under the laws of the British Virgin Islands on January 17, 2019.

(b) NiSun International Enterprise Management Group (Hong Kong) Co., Limited ("NiSun HK"), a limited company established under the laws of Hong Kong on January 25, 2019, a wholly-owned subsidiary of NiSun BVI.

(c) NingChen (Shanghai) Enterprise Management Co., Ltd ("NingChen" or "WFOE"), a PRC company established on April 10, 2019, a wholly-owned subsidiary of NiSun HK. We refer to NingChen as "WFOE" because it is a Wholly Foreign-Owned Enterprise.

(d) Fintech (Shanghai) Investment Holding Co., Ltd ("Fintech" or "VIE"), a PRC company incorporated on January 20, 2016 by the same group of shareholders as NiSun BVI. Fintech provides online recommendation services of institutional financial products through its online marketplace in the PRC. We refer to Fintech as "VIE" because it is a Variable Interest Entity.

**Section 3.05 No Conflicts or Consents.** The execution, delivery, and performance by Seller of this Agreement and the other Transaction Documents to which Seller is a party, and the consummation of the transactions contemplated hereby and thereby, do not and will not: (a) violate or conflict with any provision of the articles of incorporation, bylaws, or other governing documents of Seller or the Company; (b) violate or conflict with any provision of any statute, law, ordinance, regulation, rule, code, treaty, or other requirement of any Governmental Authority (collectively, "**Law**") or any order, writ, judgment, injunction, decree, determination, penalty, or award entered by or with any Governmental Authority ("**Governmental Order**") applicable to Seller or the Company; (c) require the consent, notice, or filing with or other action by any Person or require any Permit, license, or Governmental Order; (d) violate or conflict with, result in the acceleration of, or create in any party the right to accelerate, terminate, or modify any contract, lease, deed, mortgage, license, instrument, note, indenture, joint venture, or any other agreement, commitment, or legally binding arrangement, whether written or oral (collectively, "**Contracts**"), to which Seller or the Company is a party or by which Seller or the Company is bound or to which any of their respective properties and assets are subject; or (e) result in the creation or imposition of any Encumbrance on any properties or assets of the Company.

**Section 3.06 Financial Statements.** Complete copies of the Company's audited financial statements consisting of the balance sheet of the Company as at December 31, 2018 and 2017 and the related statements of income and retained earnings, shareholders' equity, and cash flow for the years then ended (the "**Financial Statements**") have been delivered to Buyer. The Financial Statements have been prepared in accordance with generally accepted accounting principles in effect in the United States from time to time ("**GAAP**"), applied on a consistent basis throughout the period involved. The Financial Statements are based on the books and records of the Company and fairly present the financial condition of the Company as of the respective dates they were prepared and the results of the operations of the Company for the periods indicated. The balance sheet of the Company as of December 31, 2018 is referred to herein as the "**Balance Sheet**" and the date thereof as the "**Balance Sheet Date**". The Company maintains a standard system of accounting established and administered in accordance with GAAP.

**Section 3.07 Undisclosed Liabilities.** The Company has no liabilities, obligations, or commitments of any nature whatsoever, whether asserted, known, absolute, accrued, matured, or otherwise (collectively, "**Liabilities**"), except: (a) those which are adequately reflected or reserved against in the Balance Sheet as of the Balance Sheet Date; and (b) those which have been incurred in the ordinary course of business consistent with past practice since the Balance Sheet Date and which are not, individually or in the aggregate, material in amount.

**Section 3.08 Absence of Certain Changes, Events, and Conditions.** Since the Balance Sheet Date, and other than in the ordinary course of business consistent with past practice, there has not been, with respect to the Company, any change, event, condition, or development that is, or could reasonably be expected to be, individually or in the aggregate, materially adverse to the business, results of operations, condition (financial or otherwise), or assets of the Company.

**Section 3.09 Material Contracts.**

(a) Section 3.09(a) of the Disclosure Schedules lists each Contract that is material to the Company (such Contracts, together with all Contracts concerning the occupancy, management, or operation of any Real Property (as defined in Section 3.10(a)), being "**Material Contracts**"), including the following:

(i) each Contract of the Company involving aggregate consideration in excess of $50,000;

(ii) all Contracts that provide for the indemnification by the Company of any Person or the assumption of any Tax (as defined in Section 3.19(a)), environmental, or other Liability of any Person;

(iii) all Contracts relating to Intellectual Property (as defined in Section 3.11(a)), including all licenses, sublicenses, settlements, coexistence agreements, covenants not to sue, and permissions;

(iv) except for Contracts relating to trade receivables, all Contracts relating to indebtedness (including, without limitation, guarantees) of the Company; and

(v) all Contracts that limit or purport to limit the ability of the Company to compete in any line of business or with any Person or in any geographic area or during any period of time.

(b) Each Material Contract is valid and binding on the Company in accordance with its terms and is in full force and effect. None of the Company or, to Seller's knowledge, any other party thereto is in breach of or default under (or is alleged to be in breach of or default under), or has provided or received any notice of any intention to terminate, any Material Contract. Complete and correct copies of each Material Contract (including all modifications, amendments, and supplements thereto and waivers thereunder) have been made available to Buyer.

**Section 3.10 Real Property; Title to Assets.**

(a) Section 3.10(a) of the Disclosure Schedules lists all real property in which the Company has an ownership or leasehold (or subleasehold) interest (together with all buildings, structures, and improvements located thereon, the "**Real Property**"), including: (i) the street address of each parcel of Real Property; (ii) for property that is leased or subleased by the Company, the landlord under the lease, the rental amount currently being paid, and the expiration of the term of such lease or sublease, and any termination or renewal rights of either party; and (iii) the current use of such property. Seller has delivered or made available to Buyer true, correct, and complete copies of all Contracts, title insurance policies, and surveys relating to the Real Property.

4

(b) The Company has good and valid (and, in the case of owned Real Property, good and indefeasible fee simple) title to, or a valid leasehold interest in, all Real Property and personal property and other assets reflected in the Financial Statements or acquired after the Balance Sheet Date (other than properties and assets sold or otherwise disposed of in the ordinary course of business consistent with past practice since the Balance Sheet Date). All Real Property and such personal property and other assets (including leasehold interests) are free and clear of Encumbrances except for those items set forth in Section 3.10(b) of the Disclosure Schedules.

(c) The Company is not a sublessor or grantor under any sublease or other instrument granting to any other Person any right to possess, lease, occupy, or use any leased Real Property. The use of the Real Property in the conduct of the Company's business does not violate in any material respect any Law, covenant, condition, restriction, easement, license, permit, or agreement and no material improvements constituting a part of the Real Property encroach on real property owned or leased by a Person other than the Company.

**Section 3.11 Intellectual Property.**

(a) "**Intellectual Property**" means any and all of the following in any jurisdiction throughout the world: (i) issued patents and pending patent applications; (ii) trademarks, service marks, trade names, and other similar indicia of source or origin, together with the goodwill connected with the use of and symbolized by, and all registrations, applications for registration, and renewals of, any of the foregoing; (iii) copyrights, including all applications and registrations; (iv) trade secrets, know-how, inventions (whether or not patentable), technology, and other confidential and proprietary information and all rights therein; (v) internet domain names and social media accounts and pages; and (vi) other intellectual or industrial property and related proprietary rights, interests, and protections.

(b) Section 3.11(b) of the Disclosure Schedules lists all issued patents, registered trademarks, domain names and copyrights, and pending applications for any of the foregoing and all material unregistered Intellectual Property that are owned by the Company (the "**Company IP Registrations**"). The Company owns or has the valid and enforceable right to use all Intellectual Property used or held for use in or necessary for the conduct of the Company's business as currently conducted or as proposed to be conducted (the "**Company Intellectual Property**"), free and clear of all Encumbrances. All of the Company Intellectual Property is valid and enforceable, and all Company IP Registrations are subsisting and in full force and effect. The Company has taken all necessary steps to maintain and enforce the Company Intellectual Property.

(c) The conduct of the Company's business as currently and formerly conducted and as proposed to be conducted has not infringed, misappropriated, or otherwise violated and will not infringe, misappropriate, or otherwise violate the Intellectual Property or other rights of any Person. No Person has infringed, misappropriated, or otherwise violated any Company Intellectual Property.

**Section 3.12 Material Customers and Suppliers/Vendors.**

(a) Section 3.12(a) of the Disclosure Schedules sets forth each customer who has paid aggregate consideration to the Company for goods or services rendered in an amount greater than or equal to $50,000 for each of the two most recent fiscal years (collectively, the "**Material Customers**"). The Company has not received any notice, and has no reason to believe, that any of its Material Customers has ceased, or intends to cease after the Closing, to purchase or use its goods or services or to otherwise terminate or materially reduce its relationship with the Company.

(b) Section 3.12(b) of the Disclosure Schedules sets forth each supplier to whom the Company has paid consideration for goods or services rendered in an amount greater than or equal to $50,000 for each of the two most recent fiscal years (collectively, the "**Material Suppliers**"). The Company has not received any notice, and has no reason to believe, that any of its Material Suppliers has ceased, or intends to cease, to supply goods or services to the Company or to otherwise terminate or materially reduce its relationship with the Company.

**Section 3.13 Insurance.** Section 3.13 of the Disclosure Schedules sets forth a true and complete list of all current policies or binders of insurance maintained by Seller or its Affiliates (including the Company) and relating to the assets, business, operations, employees, officers, and directors of the Company (collectively, the "**Insurance Policies**"). Such Insurance Policies: (a) are in full force and effect; (b) are valid and binding in accordance with their terms; (c) are provided by carriers who are financially solvent; and (d) have not been subject to any lapse in coverage. Neither Seller nor any of its Affiliates (including the Company) has received any written notice of cancellation of, premium increase with respect to, or alteration of coverage under, any of such Insurance Policies. All premiums due on such Insurance Policies have been paid. None of Seller or any of its Affiliates (including the Company) is in default under, or has otherwise failed to comply with, in any material respect, any provision contained in any Insurance Policy. The Insurance Policies are of the type and in the amounts customarily carried by Persons conducting a business similar to the Company and are sufficient for compliance with all applicable Laws and Contracts to which the Company is a party or by which it is bound. For purposes of this Agreement: (x) "**Affiliate**" of a Person means any other Person that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person; and (y) the term "**control**" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise.

**Section 3.14 Litigation; Governmental Orders.**

(a) There are no claims, actions, causes of action, demands, lawsuits, arbitrations, inquiries, audits, notices of violation, proceedings, litigation, citations, summons, subpoenas, or investigations of any nature, whether at law or in equity (collectively, "**Actions**") pending or, to Seller's knowledge, threatened against or by the Company, Seller, or any Affiliate of Seller: (i) relating to or affecting the Company or any of the Company's properties or assets; or (ii) that challenge or seek to prevent, enjoin, or otherwise delay the transactions contemplated by this Agreement. No event has occurred or circumstances exist that may give rise to, or serve as a basis for, any such Action.

(b) There are no outstanding, and the Company is in compliance with all, Governmental Orders against, relating to, or affecting the Company or any of its properties or assets.

**Section 3.15 Compliance With Laws; Permits.**

(a) The Company has complied, and is now complying, with all Laws applicable to it or its business, properties, or assets.

(b) All permits, licenses, franchises, approvals, registrations, certificates, variances, and similar rights obtained, or required to be obtained, from Governmental Authorities (collectively, "**Permits**") that are required for the Company to conduct its business, including, without limitation, owning or operating any of the Real Property, have been obtained and are valid and in full force and effect. Section 3.15(b) of the Disclosure Schedules list all current Permits issued to the Company and no event has occurred that would reasonably be expected to result in the revocation or lapse of any such Permit.

**Section 3.16 Environmental Matters.**

(a) The Company has complied, and is now complying, with all Environmental Laws. Neither the Company nor Seller has received notice from any Person that the Company, its business or assets, or any real property currently or formerly owned, leased, or used by the Company is or may be in violation of any Environmental Law or any applicable Law regarding Hazardous Substances.

(b) As used in this Agreement: (i) "**Environmental Laws**" means all Laws, now or hereafter in effect, in each case as amended or supplemented from time to time, relating to the regulation and protection of human health, safety, the environment, and natural resources, including any federal, state, or local transfer of ownership notification or approval statutes; and (ii) "**Hazardous Substances**" means: (A) "hazardous materials," "hazardous wastes," "hazardous substances," "industrial wastes," or "toxic pollutants," as such terms are defined under any Environmental Laws; (B) any other hazardous or radioactive substance, contaminant, or waste; and (C) any other substance with respect to which any Environmental Law or Governmental Authority requires environmental investigation, regulation, monitoring, or remediation.

**Section 3.17 Employee Benefit Matters.**

(a) Section 3.17(a) of the Disclosure Schedules contains a true and complete list of each employee benefit plan, whether or not written, and each supplemental retirement, compensation, employment, consulting, profit-sharing, deferred compensation, incentive, bonus, equity, change in control, retention, severance, salary continuation, and other similar agreement, plan, policy, program, practice, or arrangement which is or has been established, maintained, sponsored, or contributed to by the Company or under which the Company has or may have any Liability (each, a "**Benefit Plan**").

(b) For each Benefit Plan, Seller has made available to Buyer accurate, current, and complete copies of each of the following: (i) the plan document with all amendments, or if not reduced to writing, a written summary of all material plan terms; (ii) any written contracts and arrangements related to such Benefit Plan, including trust agreements or other funding arrangements, and insurance policies, certificates, and contracts; (iii) any material notices, audits, inquiries, or other correspondence from, or filings with, any Governmental Authority relating to the Benefit Plan.

(c) Each Benefit Plan has been established, administered, and maintained in accordance with its terms and in compliance with all applicable Laws. Nothing has occurred with respect to any Benefit Plan that has subjected or could subject the Company or, with respect to any period on or after the Closing Date, Buyer or any of its Affiliates, to a civil action, penalty, surcharge, or Tax under applicable Law or which would jeopardize the previously-determined qualified status of any Benefit Plan. All benefits, contributions, and premiums relating to each Benefit Plan have been timely paid in accordance with the terms of such Benefit Plan and all applicable Laws and accounting principles. Benefits accrued under any unfunded Benefit Plan have been paid, accrued or adequately reserved for to the extent required by GAAP.

(d) No complete or partial termination of any Benefit Plan has occurred or is expected to occur.

(e) No Benefit Plan provides post-termination or retiree welfare benefits to any individual for any reason.

(f) Neither the execution of this Agreement nor any of the transactions contemplated by this Agreement will, either alone or in combination with any other event, (i) entitle any current or former director, officer, employee, independent contractor, or consultant of the Company to any severance pay, increase in severance pay, or other payment; (ii) accelerate the time of payment, funding, or vesting, or increase the amount of compensation (including share-based compensation) due to any such individual; (iii) limit or restrict the right of the Company to amend or terminate any Benefit Plan; or (iv) increase the amount payable under any Benefit Plan.

**Section 3.18 Employment Matters.**

(a) Section 3.18(a) of the Disclosure Schedules lists: (i) all employees, independent contractors, and consultants of the Company; and (ii) for each individual described in clause (i), the individual's title or position, hire date, and compensation, any Contracts entered into between the Company and such individual, and the fringe benefits provided to each such individual. All compensation payable to all employees, independent contractors, or consultants of the Company for services performed on or prior to the Closing Date have been paid in full.

7

(b) The Company is not, and has not been, a party to or bound by any collective bargaining agreement or other Contract with a union or similar labor organization (collectively, "**Union**"), and no Union has represented or purported to represent any employee of the Company. There has never been, nor has there been any threat of, any strike, work stoppage, slowdown, picketing, or other similar labor disruption or dispute affecting the Company or any of its employees.

(c) The Company is and has been in compliance with: (i) all applicable employment Laws and agreements regarding hiring, employment, termination of employment, plant closing and mass layoff, employment discrimination, harassment, retaliation, and reasonable accommodation, leaves of absence, terms and conditions of employment, wages and hours of work, employee classification, employee health and safety, engagement and classification of independent contractors, payroll taxes, and immigration with respect to all employees, independent contractors, and contingent workers; and (ii) all applicable Laws relating to the relations between it and any labor organization, trade union, work council, or other body representing employees of the Company.

**Section 3.19 Taxes.**

(a) All returns, declarations, reports, information returns and statements, and other documents relating to Taxes (including amended returns and claims for refund) ("**Tax Returns**") required to be filed by the Company on or before the Closing Date have been timely filed. Such Tax Returns are true, correct, and complete in all respects. All Taxes due and owing by the Company (whether or not shown on any Tax Return) have been timely paid. No extensions or waivers of statutes of limitations have been given or requested with respect to any Taxes of the Company. Seller has delivered to Buyer copies of all Tax Returns and examination reports of the Company and statements of deficiencies assessed against, or agreed to by, the Company for all Tax periods ending after July 12, 2019. The term "**Taxes**" means all federal, state, local, foreign, and other income, gross receipts, sales, use, production, ad valorem, transfer, franchise, registration, profits, license, lease, service, service use, withholding, payroll, employment, unemployment, estimated, excise, severance, environmental, stamp, occupation, premium, property (real or personal), real property gains, windfall profits, customs, duties, or other taxes, fees, assessments, or charges of any kind whatsoever, together with any interest, additions, or penalties with respect thereto.

(b) The Company has not been a member of an affiliated, combined, consolidated, or unitary Tax group for Tax purposes. The Company has no Liability for Taxes of any Person other than the Company, as transferee or successor, by contract, or otherwise.

(c) There are no liens for Taxes (other than for current Taxes not yet due and payable) upon the assets of the Company.

**Section 3.20 Books and Records.** The minute books and share record books of the Company, all of which are in the possession of the Company and have been made available to Buyer, are complete and correct.

**Section 3.21 Brokers.** No broker, finder, or investment banker is entitled to any brokerage, finder's, or other fee or commission in connection with the transactions contemplated by this Agreement or any other Transaction Document based upon arrangements made by or on behalf of Seller.

**Section 3.22 Full Disclosure.** No representation or warranty by Seller in this Agreement and no statement contained in the Disclosure Schedules to this Agreement or any certificate or other document furnished or to be furnished to Buyer pursuant to this Agreement contains any untrue statement of a material fact, or omits to state a material fact necessary to make the statements contained therein, in light of the circumstances in which they are made, not misleading.

**ARTICLE IV**
**REPRESENTATIONS AND WARRANTIES OF BUYER**

Buyer represents and warrants to Seller that the statements contained in this ARTICLE IV are true and correct as of the date hereof. For purposes of this ARTICLE IV, "Buyer's knowledge," "knowledge of Buyer," and any similar phrases shall mean the actual or constructive knowledge of any director or officer of Buyer, after due inquiry.

**Section 4.01 Organization and Authority of Buyer.** Buyer is a company duly organized, validly existing, and in good standing under the Laws of the British Virgin Islands. Buyer has full corporate power and authority to enter into this Agreement and the other Transaction Documents to which Buyer is a party, to carry out its obligations hereunder and thereunder, and to consummate the transactions contemplated hereby and thereby. The execution and delivery by Buyer of this Agreement and any other Transaction Document to which Buyer is a party, the performance by Buyer of its obligations hereunder and thereunder, and the consummation by Buyer of the transactions contemplated hereby and thereby have been duly authorized by all requisite corporate action on the part of Buyer. This Agreement and each Transaction Document constitute legal, valid, and binding obligations of Buyer enforceable against Buyer in accordance with their respective terms.

**Section 4.02 No Conflicts; Consents.** The execution, delivery, and performance by Buyer of this Agreement and the other Transaction Documents to which it is a party, and the consummation of the transactions contemplated hereby and thereby, do not and will not: (a) violate or conflict with any provision of the articles of incorporation, bylaws, or other governing documents of Buyer; (b) violate or conflict with any provision of any Law or Governmental Order applicable to Buyer; or (c) require the consent, notice, declaration, or filing with or other action by any Person or require any Permit, license, or Governmental Order.

**Section 4.03 Investment Purpose.** The Buyer has sufficient knowledge and experience in the Business, and in financial and business matters generally, so as to be capable of evaluating the merits and risks of its investment in the Shares. The Buyer is capable of bearing the economic risks of such investment, including a complete loss of its investment. Buyer is acquiring the Shares solely for its own account for investment purposes and not with a view to, or for offer or sale in connection with, any distribution thereof or any other security related thereto within the meaning of the Securities Act of 1933, as amended (the "**Securities Act**"). Buyer acknowledges that Seller has not registered the offer and sale of the restricted Shares under the Securities Act or any state securities laws, and that the Shares may not be pledged, transferred, sold, offered for sale, hypothecated, or otherwise disposed of except pursuant to the registration provisions of the Securities Act or pursuant to an applicable exemption therefrom and subject to state securities laws and regulations, as applicable.

**Section 4.04 Brokers.** No broker, finder, or investment banker is entitled to any brokerage, finder's, or other fee or commission in connection with the transactions contemplated by this Agreement or any other Transaction Document based upon arrangements made by or on behalf of Buyer.

**Section 4.05 Litigation; Governmental Orders.**

(a) There are no claims, actions, causes of action, demands, lawsuits, arbitrations, inquiries, audits, notices of violation, proceedings, litigation, citations, summons, subpoenas, or investigations of any nature, whether at law or in equity (collectively, "**Actions**") pending or, to Buyer's knowledge, threatened against or by the Buyer or any Affiliate of Buyer: (i) relating to or affecting the Buyer or any of the Buyer's properties or assets; or (ii) that challenge or seek to prevent, enjoin, or otherwise delay the transactions contemplated by this Agreement. No event has occurred or circumstances exist that may give rise to, or serve as a basis for, any such Action.

(b) There are no outstanding, and the Buyer is in compliance with all, Governmental Orders against, relating to, or affecting the Buyer or any of its properties or assets.

9

## ARTICLE V
## COVENANTS

**Section 5.01 Confidentiality.** From and after the Closing, Seller shall, and shall cause its Affiliates and its and their respective directors, officers, employees, consultants, counsel, accountants, and other agents ("**Representatives**") to hold, in confidence any and all information, in any form, concerning the Company, except to the extent that Seller can show that such information: (a) is generally available to and known by the public through no fault of Seller, any of its Affiliates, or their respective Representatives; or (b) is lawfully acquired by Seller, any of its Affiliates, or their respective Representatives from and after the Closing from sources which are not prohibited from disclosing such information by any obligation. If Seller or any of its Affiliates or their respective Representatives are compelled to disclose any information by Governmental Order or Law, Seller shall promptly notify Buyer in writing and shall disclose only that portion of such information which is legally required to be disclosed, *provided that* Seller shall use reasonable best efforts to obtain as promptly as possible an appropriate protective order or other reasonable assurance that confidential treatment will be accorded such information.

**Section 5.02 Further Assurances.** Following the Closing, each of the parties hereto shall, and shall cause their respective Affiliates to, execute and deliver such additional documents and instruments and take such further actions as may be reasonably required to carry out the provisions hereof and give effect to the transactions contemplated by this Agreement and the other Transaction Documents.

## ARTICLE VI
## TAX MATTERS

**Section 6.01 Tax Covenants.**

(a) Without the prior written consent of Buyer, Seller shall not, to the extent it may affect or relate to the Company: (i) make, change, or rescind any Tax election: (ii) amend any Tax Return; or (iii) take any position on any Tax Return, take any action, omit to take any action, or enter into any other transaction that would have the effect of increasing the Tax liability or reducing any Tax asset of Buyer or the Company in respect of any taxable period that begins after the Closing Date or, in respect of any taxable period that begins before and ends after the Closing Date (each such period, a "**Straddle Period**"), the portion of such Straddle Period beginning after the Closing Date.

(b) All transfer, documentary, sales, use, stamp, registration, value added, and other such Taxes and fees (including any penalties and interest) incurred in connection with this Agreement and the other Transaction Documents shall be borne and paid by Seller when due. Seller shall, at its own expense, timely file any Tax Return or other document with respect to such Taxes or fees (and Buyer shall cooperate with respect thereto as necessary).

(c) Buyer shall prepare, or cause to be prepared, all Tax Returns required to be filed by the Company after the Closing Date with respect to any taxable period or portion thereof ending on or before the Closing Date and all Straddle Period Tax Returns. Any such Tax Return shall be prepared in a manner consistent with past practice (unless otherwise required by Law) and without a change of any election or any accounting method.

**Section 6.02 Straddle Period.** In the case of Taxes that are payable with respect to a Straddle Period, the portion of any such Taxes that are allocated to Pre-Closing Tax Periods (as defined in Section 6.04) for purposes of this Agreement shall be: (a) in the case of Taxes (i) based upon, or related to, income, receipts, profits, wages, capital, or net worth, (ii) imposed in connection with the sale, transfer, or assignment of property, or (iii) required to be withheld, the amount of Taxes which would be payable if the taxable year ended with the Closing Date; and (b) in the case of other Taxes, the amount of such Taxes for the entire period multiplied by a fraction, the numerator of which is the number of days in the period ending on the Closing Date and the denominator of which is the number of days in the entire period.

**Section 6.03 Termination of Existing Tax Sharing Agreements.** Any and all existing Tax sharing agreements (whether written or not) binding upon the Company shall be terminated as of the Closing Date. After such date neither the Company, Seller, nor any of Seller's Affiliates and their respective Representatives shall have any further rights or liabilities thereunder.

10

**Section 6.04 Tax Indemnification.** Seller shall indemnify the Company, Buyer, and each Buyer Indemnitee (as defined in Section 7.01) and hold them harmless from and against (a) any loss, damage, liability, deficiency, Action, judgment, interest, award, penalty, fine, cost or expense of whatever kind (collectively, including reasonable attorneys' fees and the cost of enforcing any right to indemnification under this Agreement, "**Losses**") attributable to any breach of or inaccuracy in any representation or warranty made in Section 3.19; (b) any Loss attributable to any breach or violation of, or failure to fully perform, any covenant, agreement, undertaking, or obligation in ARTICLE VI; (c) all Taxes of the Company or relating to the business of the Company for all Pre-Closing Tax Periods (as defined below); (d) all Taxes of any member of an affiliated, consolidated, combined, or unitary group of which the Company (or any predecessor of the Company) is or was a member on or prior to the Closing Date; and (e) any and all Taxes of any Person imposed on the Company arising under the principles of transferee or successor liability or by contract, relating to an event or transaction occurring before the Closing Date. In each of the above cases, together with any out-of-pocket fees and expenses (including attorneys' and accountants' fees) incurred in connection therewith, Seller shall reimburse Buyer for any Taxes of the Company that are the responsibility of Seller pursuant to this Section 6.04 within ten business days after payment of such Taxes by Buyer or the Company. For purposes of this Agreement, a "**Pre-Closing Tax Period**" means any taxable period ending on or before the Closing Date and, with respect to any taxable period beginning before and ending after the Closing Date, the portion of such taxable period ending on and including the Closing Date.

**Section 6.05 Cooperation and Exchange of Information.** Seller and Buyer shall provide each other with such cooperation and information as either of them reasonably may request of the other in filing any Tax Return pursuant to this ARTICLE VI or in connection with any proceeding in respect of Taxes of the Company, including providing copies of relevant Tax Returns and accompanying documents. Each of Seller and Buyer shall retain all Tax Returns and other documents in its possession relating to Tax matters of the Company for any Pre-Closing Tax Period (collectively, "**Tax Records**") until the expiration of the statute of limitations of the taxable periods to which such Tax Records relate.

**Section 6.06 Survival.** Notwithstanding anything in this Agreement to the contrary, the provisions of Section 3.19 and this ARTICLE VI shall survive for the full period of all applicable statutes of limitations (giving effect to any waiver, mitigation, or extension thereof) plus 60 days.

**ARTICLE VII**
**INDEMNIFICATION**

**Section 7.01 Indemnification by Seller.** Subject to the other terms and conditions of this ARTICLE VII, Seller shall indemnify and defend each of Buyer and its Affiliates (including the Company) and their respective Representatives (collectively, the "**Buyer Indemnitees**") against, and shall hold each of them harmless from and against, and shall pay and reimburse each of them for, any and all Losses incurred or sustained by, or imposed upon, Buyer Indemnitees based upon, arising out of, with respect to, or by reason of:

(a) any inaccuracy in or breach of any of the representations or warranties of Seller contained in this Agreement or the other Transaction Documents; or

(b) any breach or non-fulfillment of any covenant, agreement, or obligation to be performed by Seller pursuant to this Agreement or the other Transaction Documents.

**Section 7.02 Indemnification by Buyer.** Subject to the other terms and conditions of this ARTICLE VII, Buyer shall indemnify and defend each of Seller and its Affiliates and their respective Representatives (collectively, the "**Seller Indemnitees**") against, and shall hold each of them harmless from and against, and shall pay and reimburse each of them for, any and all Losses incurred or sustained by, or imposed upon, Seller Indemnitees based upon, arising out of, with respect to, or by reason of:

(a) any inaccuracy in or breach of any of the representations or warranties of Buyer contained in this Agreement or the other Transaction Documents; or

(b) any breach or non-fulfillment of any covenant, agreement, or obligation to be performed by Buyer pursuant to this Agreement.

11

**Section 7.03 Indemnification Procedures; Third Party Claims.** Whenever any claim shall arise for indemnification hereunder, the party entitled to indemnification (the "**Indemnified Party**") shall promptly provide written notice of such claim to the other party (the "**Indemnifying Party**"). In connection with any claim giving rise to indemnity hereunder resulting from or arising out of any Action by a Person who is not a party to this Agreement, the Indemnifying Party, at its sole cost and expense and upon written notice to the Indemnified Party, may assume the defense of any such Action with counsel reasonably satisfactory to the Indemnified Party. The Indemnified Party shall be entitled to participate in the defense of any such Action, with its counsel and at its own cost and expense. If the Indemnifying Party does not assume the defense of any such Action, the Indemnified Party may, but shall not be obligated to, defend against such Action in such manner as it may deem appropriate, including settling such Action, after giving notice of it to the Indemnifying Party, on such terms as the Indemnified Party may deem appropriate and no action taken by the Indemnified Party in accordance with such defense and settlement shall relieve the Indemnifying Party of its indemnification obligations herein provided with respect to any damages resulting therefrom. The Indemnifying Party shall not settle any Action without the Indemnified Party's prior written consent (which consent shall not be unreasonably withheld or delayed), unless such settlement, compromise or consent includes an unconditional release of each Indemnified Party from all liability arising out of such claim, action or proceeding and does not include a statement as to an admission of fault, culpability or a failure to act on behalf of an Indemnified Party.

**Section 7.04 Survival.** Subject to ARTICLE VI, all representations, warranties, covenants, and agreements contained herein and all related rights to indemnification shall survive the Closing and shall remain in full force and effect until the date that is two years from the Closing Date; provided, that the representations and warranties in (a) Section 3.01, Section 3.03, Section 3.21, Section 4.01, and Section 4.04 shall survive indefinitely; and (b) Section 3.17 and Section 3.19 shall survive for the full period of all applicable statutes of limitations (giving effect to any waiver, mitigation, or extension thereof) plus 60 days. Subject to ARTICLE VI, all covenants and agreements of the parties contained herein shall survive the Closing indefinitely or for the period explicitly specified therein. Notwithstanding the foregoing, any claims which are timely asserted in good faith with reasonable specificity (to the extent known at such time) and in writing by notice from the non-breaching party to the breaching party prior to the expiration date of the applicable survival period shall not thereafter be barred by the expiration of the relevant representation or warranty and such claims shall survive until finally resolved.

**Section 7.05 Tax Claims.** Notwithstanding any other provision of this Agreement, the control of any claim, assertion, event, or proceeding in respect of Taxes of the Company (including, but not limited to, any such claim in respect of a breach of the representations and warranties in Section 3.19 hereof or any breach or violation of or failure to fully perform any covenant, agreement, undertaking, or obligation in ARTICLE VI) shall be governed exclusively by ARTICLE VI hereof.

## ARTICLE VIII
## MISCELLANEOUS

**Section 8.01 Expenses.** All costs and expenses incurred in connection with this Agreement and the transactions contemplated hereby shall be paid by the party incurring such costs and expenses; provided, however, that if one party advanced any costs and expenses on behalf of and with the consent of another party, the paying party shall be entitled to reimbursement

**Section 8.02 Notices.** Any notices, consents, waivers or other communications required or permitted to be given under the terms of this Agreement must be in writing and will be deemed to have been delivered: (i) upon receipt, when delivered personally; (ii) upon receipt, when sent by facsimile (provided confirmation of transmission is mechanically or electronically generated and kept on file by the sending party); or (iii) one Business Day after deposit with an overnight courier service, in each case properly addressed to the party to receive the same. If to the Buyer or Sellers, notice shall be sent to such address and/or facsimile number and/or to the attention of such other person as the recipient party has specified by written notice given five (5) days prior to the effectiveness of such change. Written confirmation of receipt (A) given by the recipient of such notice, consent, waiver or other communication, (B) mechanically or electronically generated by the sender's facsimile machine containing the time, date, recipient facsimile number and an image of the first page of such transmission or (C) provided by an overnight courier service shall be rebuttable evidence of personal service, receipt by facsimile or receipt from an overnight courier service in accordance with clause (i), (ii) or (iii) above, respectively. Any document shall be deemed to have been duly served if marked for the attention of the agent for service of process at its address.

**Section 8.03 Interpretation; Headings.** This Agreement shall be construed without regard to any presumption or rule requiring construction or interpretation against the party drafting an instrument or causing any instrument to be drafted. The headings in this Agreement are for reference only and shall not affect the interpretation of this Agreement.

**Section 8.04 Severability.** If any term or provision of this Agreement is invalid, illegal, or unenforceable in any jurisdiction, such invalidity, illegality, or unenforceability shall not affect any other term or provision of this Agreement.

**Section 8.05 Entire Agreement.** This Agreement and the other Transaction Documents constitute the sole and entire agreement of the parties to this Agreement with respect to the subject matter contained herein and therein, and supersede all prior and contemporaneous understandings and agreements, both written and oral, with respect to such subject matter. In the event of any inconsistency between the statements in the body of this Agreement and those in the other Transaction Documents and the Disclosure Schedules, the statements in the body of this Agreement will control.

**Section 8.06 Successors and Assigns.** This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns. Neither party may assign its rights or obligations hereunder without the prior written consent of the other party, which consent shall not be unreasonably withheld or delayed. No assignment shall relieve the assigning party of any of its obligations hereunder.

**Section 8.07 No Third Party Beneficiaries.** Except as otherwise expressly provided, nothing in this Agreement shall convey any rights upon any person or entity which is not a party or permitted designee of a party to this Agreement.

**Section 8.08 Amendment and Modification; Waiver.** This Agreement may only be amended, modified, or supplemented by an agreement in writing signed by each party hereto. No waiver by any party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the party so waiving. No failure to exercise, or delay in exercising, any right or remedy arising from this Agreement shall operate or be construed as a waiver thereof; nor shall any single or partial exercise of any right or remedy hereunder preclude any other or further exercise thereof or the exercise of any other right or remedy.

**Section 8.09 Governing Law; Submission to Jurisdiction.** All questions concerning the construction, validity, enforcement and interpretation of this Agreement shall be governed by the laws of the British Virgin Islands, without giving effect to any choice of law or conflict of law provision or rule that would cause the application of the laws of any jurisdictions other than the British Virgin Islands. Each party hereby irrevocably submits to the exclusive jurisdiction of the state and federal courts sitting in the city of Shanghai, China for the adjudication of any dispute hereunder or in connection herewith or with any transaction contemplated hereby or discussed herein, and hereby irrevocably waives, and agrees not to assert in any suit, action or proceeding, any claim that it is not personally subject to the jurisdiction of any such court, that such suit, action or proceeding is brought in an inconvenient forum or that the venue of such suit, action or proceeding is improper.

**Section 8.10 Counterparts.** This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by email or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

*[SIGNATURE PAGE FOLLOWS]*

13

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

**SELLER**
Bodang Liu

/s/ Bodang Liu
_____

**BUYER**
Hebron Technology Co., Ltd.

By:    /s/ Anyuan Sun
_____
Name: Anyuan Sun
Title: Chief Executive Officer

Exhibit 4.10

# Cooperation contract

## November 8, 2019

**Cooperation contract**

Party A: Tai'an Keyuan Infrastructure Industry Investment and Construction Co., Ltd.

Party B: NiSun International Enterprise Management Group (British Virgin Islands) Co., Ltd.

According to the investment cooperation framework agreement signed by Taishan District People's Government of Tai'an City and NiSun International Enterprise Management Group (British Virgin Islands) Co., Ltd., Party A and Party B, based on the principle of honesty and trustworthiness, realize win-win situation, have reached the following through friendly consultations on the establishment of Sino foreign joint venture (hereinafter referred to as joint venture) in Shandong Taishan economic development zone Investment cooperation agreement:

A. Cooperation program

1. both parties jointly initiate the establishment of a joint venture company (hereinafter referred to as the "joint venture company"), whose name is tentatively determined to be Shandong TAIDING International Investment Co., Ltd., and the final approval shall be subject to the industrial and commercial registration administration. The joint venture company shall be registered in the place where Party A is located, and the joint venture company shall pay taxes in the place where Party A is located.

2. Both parties shall manage and operate the joint venture in the manner agreed in this agreement.

1

3. both parties shall invest in the joint venture company with the same shares and rights, and share interests and risks according to the equity ratio.

4. business scope of the company: investment management, asset management, investment with its own funds, enterprise emergency lending service, international trade financing, financial consulting and consulting, business consulting (without the approval of the financial regulatory department, it is not allowed to engage in financial businesses such as deposit absorption, financing guarantee, agent Finance).

5. All major matters of the joint venture company shall be decided by both parties in accordance with the terms of reference and voting mechanism of the board of directors of the joint venture company as agreed in this agreement. The general manager of the joint venture company shall be responsible for the daily operation of the joint venture company and accept the supervision and inspection of both parties within the scope of authorization.

6. The joint venture company shall not provide guarantee for any other unit or individual.

2

B. Establishment of joint venture and equity ratio

1. Establishment of joint venture

The industrial and commercial registration procedures for the establishment of the joint venture company shall be handled immediately after the signing of this Agreement (the date when the joint venture company obtains the business license shall be deemed as the completion date). The registered capital of the joint venture company is 30 million US dollars, subscribed by both parties. The articles of association of the joint venture company shall be prepared and filed in accordance with the governance structure and operation management mode of the joint venture company as agreed in this agreement. The legal representative, director, chairman, supervisor, general manager, etc. of the joint venture company shall be generated and filed in accordance with the mode agreed in this agreement.

2. Equity ratio and paid in capital of the joint venture

After the registration of the joint venture company is completed, the equity structure of the joint venture company is that Party A contributes equivalent RMB at a ratio of 20:80, Party A contributes in RMB and settles at the exchange rate on the date of contribution, and Party B contributes US $24 million in spot exchange. After the completion of the registration of the joint venture, Party B shall pay US $15 million in spot exchange before March 30, and Party A shall pay US $3.75 million in spot exchange RMB. The remaining funds of both parties shall be in place within 12 months.

3

C. Governance structure of the joint venture

1. the joint venture company shall have a board of directors as the authority of the company, with [3] members in total. Party A shall appoint [1] and Party B shall appoint [2], including one chairman, who shall be appointed by Party B among the directors appointed by Party B, and one vice chairman, who shall be appointed by Party A.

2. The term of office of the directors (including the chairman) is three years. The principle of appointment of the directors and the chairman of the board of directors of each board of directors remains unchanged. After the expiration of the term of office, they can be reappointed after being appointed by the appointing party. Each party shall have the right to remove any director appointed by it before the expiration of his term of office. If a director

4

In case of any vacancy of a director's position due to retirement, resignation, incapacity or replacement of the appointing party, the appointing Party of the director shall appoint a successor to complete the remaining term of office of the director.

3. if the term of office of a director has not been re elected in time, or if the number of members of the board of directors is less than the quorum due to the resignation of a director during the term of office, the original director shall still perform the duties of a director in accordance with the provisions of laws, administrative regulations and the articles of association before the newly elected director takes office.

4. The board of directors shall meet at least once a year. The meeting of the board of directors shall be convened and presided over by the chairman; if the chairman is unable to perform his duties, the meeting shall be convened and presided over by the vice chairman.

6. To convene a meeting of the board of directors, all the directors shall be notified 10 days before the meeting is held, except that all the directors waive the notice period; the board of directors shall make minutes of the decisions on the matters discussed, and the directors attending the meeting shall sign the minutes.

5

7. For the voting of resolutions of the board of directors, one person one vote shall be adopted.

8. The following major matters of the joint venture company can be implemented only after the agreement of both parties:

1) Amend the articles of association of the joint venture;

2) Dissolution of the joint venture;

3) Adjust the registered capital of the joint venture;

4) Assets mortgage of the joint venture;

5) One or more parties transfer their cooperation conditions or interests in the joint venture;

6) Merger, division and change of organizational form of the joint venture;

In addition to the above matters, other matters can be approved by more than half of all directors.

6

9. The joint venture company shall have a general manager who shall be appointed by Party B and appointed by the board of directors

He will be dismissed. The general manager shall be responsible for organizing and leading the daily operation and management of the company, and shall be responsible for the board of directors, and shall exercise the following functions and powers:

1) To preside over the production, operation and management of the company and organize the implementation of the resolutions of the board of directors;

2) Organize the implementation of the company's annual business plan and investment plan;

3) To formulate plans for the establishment of the company's internal management organization;

4) Draft the basic management system of the company;

5) Formulate specific rules and regulations of the company;

6) Propose to appoint or dismiss the deputy general manager and financial principal of the company;

7

7) To decide on the appointment or dismissal of management personnel other than those to be decided by the board of directors;

8) Other functions and powers granted by the board of directors.

10. The general manager shall attend the meeting of the board of directors.

11. the joint venture company does not have a board of supervisors, but has one supervisor appointed by Party A. The term of office of the supervisor is three years. After the term of office, the principle of appointment remains unchanged. After the term of office expires, the supervisor can be reappointed after being appointed by the appointing Party.

12. The supervisor shall exercise the following functions and powers:

1) Check the company's finance;

2) Supervise the acts of the directors and senior managers in performing the duties of the company, and put forward proposals for the removal of the directors and senior managers who violate laws, administrative regulations, the articles of association or resolutions of the shareholders' meeting;

8

3) When the acts of the directors and senior managers damage the interests of the company, the directors and senior managers shall be required to make corrections;

4) Propose to hold an interim shareholders' meeting;

5) Put forward proposals to the shareholders' meeting;

6) In accordance with the provisions of the company law, bring a lawsuit against the directors and senior managers;

7) Other functions and powers stipulated in the articles of association.

13. The supervisor may attend the meeting of the board of directors as nonvoting delegates and raise questions or suggestions on the resolutions of the board of directors.

14. The legal representative of the joint venture shall be the chairman of the board of directors of the joint venture.

D. Operation and management of the joint venture

1. the joint venture company is an independent enterprise legal person with a corporate governance structure. The directors, supervisors, general manager and other senior managers of the joint venture company shall abide by the laws, this Agreement and the articles of association, and shall be diligent and conscientious.

9

2. Appointment of personnel of the joint venture:

Party B of the joint venture shall appoint one [general manager], Party A shall appoint one accountant, and the other management personnel shall be recruited and appointed by the general manager according to the business needs.

3. if the directors and supervisors appointed by both parties are not engaged in other daily full-time work in the joint venture company, their salaries and benefits shall be borne by the appointing party, and the salaries and benefits of the general manager appointed by Party B and the accountant appointed by Party A shall be borne by the appointing party. The remaining personnel of the joint venture shall sign labor contracts with the joint venture, and the salary and welfare benefits shall be borne by the joint venture.

4. Equity transfer:

Party B undertakes to purchase Party A's shares unconditionally within three years, and the purchase price shall be evaluated by an evaluation institution recognized and agreed by both parties according to the current market asset evaluation price.

10

5. Profit distribution

1) The joint venture shall bear all kinds of taxes according to law. Unless otherwise agreed in this agreement, Party A and Party B shall share profits and risks in accordance with the equity ratio.

2) The joint venture company shall issue financial statements to Party A and Party B every month.

3) The annual financial audit report of the joint venture (i.e. the basis for determining the company's profit and loss) shall be subject to the audit results of the accounting firm approved by the board of directors of the joint venture. If either party has any major doubt about the audit report, it may hire a qualified auditor to audit the accounts, but if there is any major error in the audit, it shall bear the audit cost.

4) In the case that the joint venture company has profit carry forward and profit distribution, the joint venture company shall distribute the after tax net profit to both parties according to relevant laws and the articles of association after the resolution of the shareholders' meeting of the joint venture company is passed.

5) The capital contributed by Party A shall be maintained and increased during the existence of the joint venture company. If the value cannot be maintained, Party B shall make up for the loss of Party A's paid in capital.

11

E. Rights and obligations of both parties

1. Rights and obligations of Party A

(1) Party A and Party B shall pay the registered capital at the prescribed proportion simultaneously.

(2) Party A and Party B shall jointly strive for preferential policies for foreign investment, including but not limited to all supporting policies of the state, province, city and district.

(3) Party A and Party B shall jointly strive for project support and reward policies of Taian City and Taishan District.

(4) Party A and Party B shall jointly handle all kinds of formalities of the joint venture company.

(5) Party A and Party B jointly strive for local finance such as Taian bank and Taishan Rural Commercial Bank

The organization supports the joint venture.

2. Rights and obligations of Party B

(1) Party B shall pay in cash within 12 months from the date of signing the agreement $24 million of registered capital.

12

(2) Party B promises that all the business activities carried out by the joint venture company are legal and compliant; the business is beyond the scope and illegal.

(3) Party B undertakes that all insurances of the joint venture company shall be covered by insurance companies in China.

(4) Party B promises that the joint venture will give priority to investment in the enterprises within the jurisdiction of Taishan District.

(5) Party B undertakes that the joint venture company shall not provide guarantee for any other unit or individual.

F. Company liquidation and equity withdrawal

1. after the termination of the cooperation or expiration of the cooperation through consultation, the remaining assets that cannot be realized by the joint venture company can be purchased by both parties through negotiation or through competitive bidding, then the project tax liquidation and profit distribution can be carried out, and finally the joint venture company liquidation, remaining assets distribution and industrial and commercial cancellation procedures can be handled.

13

2. if the joint venture cannot be cancelled, one party may purchase the equity of the other party for consideration, and the other party may withdraw.

3. The withdrawing shareholders shall assist the acquirer in handling the relevant equity withdrawal procedures within 30 days.

4. The taxes involved in the liquidation, cancellation and equity acquisition of the company shall be borne by both parties according to the law.

G. Guarantee

1. Guarantee that the signing of this agreement has been legally authorized and has the ability to perform this agreement.

2. the transfer or transfer of equity, subscribed capital contribution and other matters have been authorized, permitted, approved, filed, and specific procedures have been performed (including but not limited to the approval of superior units, asset evaluation, access to property rights exchange transactions required for state-owned assets or collective assets), and agree to bear the expenses incurred by the party.

14

3. According to the agreement and the equity ratio, the company undertakes to make capital contributions on time and does not transfer the interests of the joint venture unilaterally in any form during the period of managing the joint venture.

4. except for the equity pledge set for the financing of the joint venture, neither party shall pledge the equity of the joint venture held by it to any third party without the consent of the other party.

5. Neither party shall terminate this Agreement without the consent of the other party.

6. Neither party shall violate its obligations under this agreement or make any improper act that damages the operation of the joint venture or the shareholders' rights and interests of the other party.

H. Liability for breach of contract

Both parties shall strictly perform the provisions of this contract. If one party fails to perform the contract, it will constitute a breach of contract. The breaching party shall compensate the other party for the economic losses caused by its breach of contract, and the observant party shall have the right to require the breaching party to fulfill its obligations within ten days, otherwise, the observant party shall have the right to terminate this contract, and all losses caused to the observant party due to the above reasons shall be borne by the breaching party.

I. Contract signing

This contract is made in quadruplicate, with the same legal effect. Party A and Party B hold two copies respectively, which shall come into force as of the date of signing and sealing by both parties.

J. Supplementary provisions of the contract

Both parties may sign a supplementary contract with the same legal effect as the main contract.

K. Where any discrepancy arises between the English translation and the original Chinese version, the Chinese version shall prevail.

Party A: legal representative or entrusted agent (signature) of Taian Keyuan Infrastructure Industry Investment and Construction Co., Ltd. (official seal):

Party B: legal representative or entrusted agent (signature) of NiSun International Enterprise Management Group (British Virgin Islands) Co., Ltd. (official seal):

November 8, 2019

16

**SHARE PURCHASE AGREEMENT**

**THIS SHARE PURCHASE AGREEMENT** (the "**Agreement**") is dated as of December 6, 2019, by and among Hebron Technology Co., Ltd., a British Virgin Islands company, (the "**Company**"), and each of the parties listed on Schedule of Buyers hereto (each, a "**Buyer**").

**WHEREAS**:

A. The Company and each Buyer are executing and delivering this Agreement in reliance upon the exemption from securities registration afforded by Section 4(a)(2) of the Securities Act of 1933, as amended (the "**1933 Act**"), and Rule 506 of Regulation D ("**Regulation D**") as promulgated by the United States Securities and Exchange Commission (the "**SEC**") under the 1933 Act.

B. Each Buyer wishes to purchase, and the Company wishes to sell, upon the terms and conditions stated in this Agreement, that number of Class A common shares (the "**Shares**") of the Company, $0.001 par value per share, set forth opposite the Buyer's name in the Schedule of Buyers.

**NOW, THEREFORE**, the Company and each Buyer hereby agree as follows:

1. <u>PURCHASE AND SALE OF SHARES</u>.

(a) <u>Sale of Shares</u>. Subject to the satisfaction (or waiver) of the conditions set forth in Sections 5 and 6 below, the Company shall issue and sell to the Buyer, and the Buyer agrees to purchase from the Company on the Closing Date (as defined below), such number of Shares as is set forth opposite the Buyer's name in the Schedule of Buyers (the "**Closing**").

(b) <u>Closing</u>. The date and time of the Closing (the "**Closing Date**") shall be 10:00 a.m., Eastern Standard Time, within five (5) days after confirmation that NASDAQ prior notification and approval processes are completed and after notification of satisfaction (or waiver) of the conditions to the Closing set forth in Sections 5 and 6 below at the offices of Kaufman & Canoles, P.C., Two James Center, 14th Floor, 1021 East Cary Street, Richmond, Virginia 23219. The parties intend that the Closing Date shall be on or before December 23, 2019.

(c) <u>Purchase Price</u>. The aggregate purchase price for the Shares to be purchased by the Buyer at the Closing (the "**Purchase Price**") shall be the amount set forth opposite the Buyer's name in the Schedule of Buyers.

(d) <u>Form of Payment</u>. On the Closing Date, (i) the Buyer shall pay its Purchase Price to the Company for the Shares to be issued and sold to the Buyer at the Closing, by wire transfer of immediately available funds in accordance with the Company's written wire instructions and (ii) the Company shall instruct its transfer agent to issue to the Buyer the Shares which the Buyer is then purchasing.

2. **BUYER'S REPRESENTATIONS AND WARRANTIES.** The Buyer, severally and not jointly, represents and warrants to the Company with respect to only itself that:

(a) <u>No Sale or Distribution</u>. The Buyer is acquiring the Shares for its own account and not with a view towards, or for resale in connection with, the public sale or distribution thereof, except pursuant to sales registered or exempted under the 1933 Act. The Buyer is acquiring the Shares hereunder in the ordinary course of its business. The Buyer does not presently have any agreement or understanding, directly or indirectly, with any Person to distribute any of the Shares.

(b) <u>Accredited Investor Status</u>. The Buyer is an "accredited investor" as that term is defined in Rule 501(a) of Regulation D.

(c) <u>Reliance on Exemptions</u>. The Buyer understands that the Shares are being offered and sold to it in reliance on specific exemptions from the registration requirements of United States federal and state securities laws and that the Company is relying in part upon the truth and accuracy of, and the Buyer's compliance with, the representations, warranties, agreements, acknowledgments and understandings of the Buyer set forth herein in order to determine the availability of such exemptions and the eligibility of the Buyer to acquire the Shares.

(d) <u>Information</u>. The Buyer and its advisors, if any, have been furnished with all materials relating to the business, finances and operations of the Company and materials relating to the offer and sale of the Shares that have been reasonably requested by the Buyer. The Buyer and its advisors, if any, have been afforded the opportunity to ask questions of the Company. Neither such inquiries nor any other due diligence investigations conducted by the Buyer or its advisors, if any, or its representatives shall modify, amend or affect the Buyer's right to rely on the Company's representations and warranties contained herein. The Buyer understands that its investment in the Shares involves a high degree of risk and is able to afford a complete loss of such investment. The Buyer has sought such accounting, legal and tax advice as it has considered necessary to make an informed investment decision with respect to its acquisition of the Shares.

(e) <u>No Governmental Review</u>. The Buyer understands that no United States federal or state agency or any other government or governmental agency has passed on or made any recommendation or endorsement of the Shares or the fairness or suitability of the investment in the Shares nor have such authorities passed upon or endorsed the merits of the offering of the Shares.

(f) <u>Transfer or Resale</u>. The Buyer understands that (i) the Shares have not been and are not being registered under the 1933 Act, and may not be offered for sale, sold, assigned or transferred unless (A) subsequently registered thereunder or (B) the Buyer shall have delivered to the Company an opinion of counsel, in a form reasonably acceptable to the Company, to the effect that such Shares to be sold, assigned or transferred may be sold, assigned or transferred pursuant to an exemption from such registration; and (ii) neither the Company nor any other Person is under any obligation to register the Shares under the 1933 Act or any state securities laws or to comply with the terms and conditions of any exemption thereunder.

2

(g) Lock-Up. The Shares may not be sold until one year following issuance thereof. Beginning on the one-year anniversary of issuance, each Buyer may sell up to twenty percent (20%) of such Buyer's Shares pursuant to registration or exemption from registration. The parties acknowledge that this lock-up shall be memorialized in the restrictive legend described in the Section 2(h) hereof.

(h) Legends. The Buyer understands that the share certificates, unless and until registered, shall bear a restrictive legend in substantially the following form (and a stop-transfer order may be placed against transfer of such share certificates):

"THE SECURITIES EVIDENCED BY THIS CERTIFICATE ARE GOVEREND BY THAT CERTAIN SHARE PURCHASE AGREEMENT DATED DECEMBER 6, 2019 (THE "PURCHASE AGREEMENT") AND HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR THE SECURITIES LAWS OF ANY STATE OR OTHER JURISDICTION. THE SECURITIES MAY NOT BE OFFERED, SOLD, PLEDGED OR OTHERWISE TRANSFERRED EXCEPT (1) PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT OR (2) PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT, IN EACH CASE IN ACCORDANCE WITH ALL APPLICABLE STATE SECURITIES LAWS AND THE SECURITIES LAWS OF OTHER JURISDICTIONS, AND IN THE CASE OF A TRANSACTION EXEMPT FROM REGISTRATION, UNLESS THE COMPANY HAS RECEIVED AN OPINION OF COUNSEL REASONABLY SATISFACTORY TO IT THAT SUCH TRANSACTION DOES NOT REQUIRE REGISTRATION UNDER THE SECURITIES ACT AND SUCH OTHER APPLICABLE LAWS. MOREOVER, NONE OF THE SHARES REPRESENTED BY THIS CERTIFICATE MAY BE OFFERED, SOLD, PLEDGED OR OTHERWISE TRANSFERRED PRIOR TO DECEMBER 5, 2020; COMMENCING ON DECEMBER 6, 2020, AND CONTINUING ON EACH ANNIVERSARY THEREOF, TWENTY PERCENT (20%) OF THE INITIALLY ISSUED NUMBER OF SHARES SHALL BE RELEASED FROM SUCH LOCK-UP AND MAY BE OFFERED, SOLD, PLEDGED OR OTHERWISE TRANSFERRED."

The legend set forth above shall be removed and the Company shall issue a certificate without such legend to the holder of the Shares upon which it is stamped, if, unless otherwise required by state securities laws, (i) such Shares are registered for resale under the 1933 Act or (ii) in connection with a sale, assignment or other transfer, such holder provides the Company with a legal opinion reasonably acceptable to the Company, to the effect that such sale, assignment or transfer of the Shares may be made without registration under the applicable requirements of the 1933 Act.

3

(i) <u>Validity; Enforcement</u>. This Agreement has been duly and validly authorized, executed and delivered on behalf of the Buyer and shall constitute the legal, valid and binding obligations of the Buyer enforceable against the Buyer in accordance with their respective terms, except as such enforceability may be limited by general principles of equity or to applicable bankruptcy, insolvency, reorganization, moratorium, liquidation and other similar laws relating to, or affecting generally, the enforcement of applicable creditors' rights and remedies.

(j) <u>No Conflicts</u>. The execution, delivery and performance by the Buyer of this Agreement and the consummation by the Buyer of the transactions contemplated hereby will not (i) result in a violation of the organizational documents of the Buyer or (ii) conflict with, or constitute a default (or an event which with notice or lapse of time or both would become a default) under, or give to others any rights of termination, amendment, acceleration or cancellation of, any agreement, indenture or instrument to which the Buyer is a party, or (iii) result in a violation of any law, rule, regulation, order, judgment or decree (including federal and state securities laws) applicable to the Buyer, except in the case of clauses (ii) and (iii) above, for such conflicts, defaults, rights or violations which would not, individually or in the aggregate, reasonably be expected to have a material adverse effect on the ability of the Buyer to perform its obligations hereunder.

(k) <u>Residency</u>. The Buyer is a resident of that jurisdiction specified below its address on the Schedule of Buyers.

(l) <u>Certain Trading Activities</u>. Other than with respect to the transactions contemplated herein, since the time that the Buyer was first contacted by or contacted the Company or any other Person regarding the investment in the Company set forth herein, neither the Buyer nor any Affiliate of the Buyer which (x) had knowledge of the transactions contemplated hereby, (y) has or shares discretion relating to the Buyer's investments or trading or information concerning the Buyer's investments and (z) is subject to the Buyer's review or input concerning such Affiliate's investments or trading (collectively, "**Trading Affiliates**") has directly or indirectly, nor has any Person acting on behalf of or pursuant to any understanding with the Buyer or Trading Affiliate, (i) effected or agreed to effect any purchase or sale of the Shares, (ii) taken, directly or indirectly, any action designed to cause or to result, or that could reasonably be expected to cause or result, in the stabilization or manipulation of the price of any security of the Company, or (iii) paid or agreed to pay to any person any compensation for soliciting another to purchase or sell any securities of the Company.

(m) <u>No Consideration</u>. The Buyer has not paid any consideration, directly or indirectly, to any officer, director or employee of the Company or any Subsidiary.

4

## 3. REPRESENTATIONS AND WARRANTIES OF THE COMPANY.

The Company represents and warrants to the Buyer that:

(a) Organization and Qualification. The Company and its "**Subsidiaries**" (which for purposes of this Agreement includes any joint venture or any entity in which the Company, directly or indirectly, owns any of the capital stock or holds an equity, contractual or other interest) are entities duly organized and validly existing and, to the extent legally applicable, in good standing under the laws of the jurisdiction in which they are formed, and have the requisite power and authorization to own their properties and to carry on their business as now being conducted. Each of the Company and its Subsidiaries is duly qualified as a foreign entity to do business and, to the extent legally applicable, is in good standing in every jurisdiction in which its ownership of property or the nature of the business conducted by it makes such qualification necessary, except to the extent that the failure to be so qualified or be in good standing would not reasonably be expected to have a Material Adverse Effect. As used in this Agreement, "**Material Adverse Effect**" means any material adverse effect on the business, properties, assets, operations, results of operations, condition (financial or otherwise) or prospects of the Company and its Subsidiaries, individually or taken as a whole, or on the transactions contemplated hereby or by the agreements and instruments to be entered into in connection herewith, or on the authority or ability of the Company to perform its obligations under this Agreement.

(b) Authorization; Enforcement; Validity. The Company has the requisite power and authority to enter into and perform its obligations under this Agreement and to issue the Shares in accordance with the terms hereof. The execution and delivery of the Agreement by the Company and the consummation by the Company of the transactions contemplated hereby, including, without limitation, the reservation for issuance and the issuance of the Shares have been duly authorized by the Company's Board of Directors and no further filing, consent, or authorization is required by the Company, its Board of Directors or its shareholders. This Agreement has been duly executed and delivered by the Company, and constitutes the legal, valid and binding obligations of the Company, enforceable against the Company in accordance with its terms, except as such enforceability may be limited by general principles of equity or applicable bankruptcy, insolvency, reorganization, moratorium, liquidation or similar laws relating to, or affecting generally, the enforcement of applicable creditors' rights and remedies.

(c) No Conflicts. The execution, delivery and performance of this Agreement by the Company and the consummation by the Company of the transactions contemplated hereby will not (i) result in a violation of the Company's Articles of Incorporation or Bylaws (the "**Organizational Documents**") or any certificate of designations or other constituent documents of the Company or any of its Subsidiaries, any capital stock of the Company or any similar governing documents of its Subsidiaries or (ii) unless such conflict or default could not reasonably be expected to result in a Material Adverse Effect, conflict with, or constitute a default (or an event which with notice or lapse of time or both would become a default) in any respect under, or give to others any rights of termination, amendment, acceleration or cancellation of, any agreement, indenture or instrument to which the Company or any of its Subsidiaries is a party, or (iii) result in a violation of any law, rule, regulation, order, judgment or decree (including foreign, federal and state securities laws and regulations and the rules and regulations of The NASDAQ Capital Market (the "**Principal Market**")) and applicable laws of the People's Republic of China ("**China**")) applicable to the Company or any of its Subsidiaries or by which any property or asset of the Company or any of its Subsidiaries is bound or affected.

(d) Consents. Neither the Company nor any of its Subsidiaries is required to obtain any consent, authorization or order of, or make any filing or registration with, any court, governmental agency or any regulatory or self-regulatory agency or any other Person in order for it to execute, deliver or perform any of its obligations under or contemplated by this Agreement in accordance with the terms hereof, except for the following consents, authorizations, orders, filings and registrations (none of which is required to be filed or obtained before the Closing): (i) the filing with the SEC of one or more proxy statements to seek Shareholder Approval of the issuance of the Shares to the Buyer, (ii) the filing of such forms with the Principal Market as may be required to be filed reflecting the issuance of the Shares to the Buyer, which shall be done pursuant to the rules of the Principal Market, (iii) the filing with the SEC of Form D, and (v) the Shareholder Approval. The Company and its Subsidiaries are unaware of any facts or circumstances that might prevent the Company from obtaining any of the application or filings pursuant to the preceding sentence.

5

(e) Acknowledgement Regarding Buyer's Purchase of Shares. The Company acknowledges and agrees that the Buyer is acting solely in the capacity of an arm's length purchaser with respect to this Agreement and the transactions contemplated hereby and that no Buyer is (i) an officer or director of the Company, (ii) an "affiliate" of the Company or any of its Subsidiaries (as defined in Rule 144) or (iii) to the knowledge of the Company, a "beneficial owner" of more than 10% of the Ordinary Shares (as defined for purposes of Rule 13d-3 of the Securities Exchange Act of 1934, as amended (the "**1934 Act**")).

(f) No General Solicitation. Neither the Company, nor any of its Subsidiaries or affiliates, nor any Person acting on its or their behalf, has engaged in any form of general solicitation or general advertising (within the meaning of Regulation D) in connection with the offer or sale of the Shares.

(g) No Integrated Offering. None of the Company, its Subsidiaries, any of their affiliates, and any Person acting on their behalf has, directly or indirectly, made any offers or sales of any security or solicited any offers to buy any security, under circumstances that would require registration of any of the Shares under the 1933 Act or cause this offering of the Shares to be integrated with prior offerings by the Company for purposes of the 1933 Act or any applicable shareholder approval provisions, including, without limitation, under the rules and regulations of any exchange or automated quotation system on which any of the securities of the Company are listed or designated. None of the Company, its Subsidiaries, their affiliates and any Person acting on their behalf will take any action or steps referred to in the preceding sentence that would require registration of any of the Shares under the 1933 Act or cause the offering of the Shares to be integrated with other offerings.

(h) Equity Capitalization. As of the date hereof, the authorized capital stock of the Company consists of 50,000,000 Common Shares (40,000,000 Class A Shares and 10,000,000 Class B Shares), of which as of the date hereof, 16,269,577 Class A and 0 Class B Common Shares are issued and outstanding. All of such outstanding shares have been, or upon issuance will be, validly issued and are fully paid and nonassessable. The Company has furnished to the Buyer true, correct and complete copies of the Company's Organizational Documents, as amended and as in effect on the date hereof, and the terms of all securities convertible into, or exercisable or exchangeable for, Shares and the material rights of the holders thereof in respect thereto.

(i) Manipulation of Price. The Company has not, and to its knowledge no one acting on its behalf has, (i) taken, directly or indirectly, any action designed to cause or to result, or that could reasonably be expected to cause or result, in the stabilization or manipulation of the price of any security of the Company, (ii) paid or agreed to pay to any person any compensation for soliciting another to purchase any other securities of the Company.

(j) No Consideration. The Company is not aware of any consideration being paid by any Buyer, directly or indirectly, to any officer, director or employee of the Company or any Subsidiary.

6

## 4. COVENANTS.

(a) Best Efforts. Each party shall use its best efforts to timely satisfy each of the conditions to be satisfied by it as provided in Sections 5 and 6 of this Agreement.

(b) Form D. The Company agrees to timely file a Form D with respect to the Shares as required under Regulation D. The Company shall, also take such action as the Company shall reasonably determine is necessary in order to obtain an exemption for or to qualify the Shares for sale to the Buyer at the Closing pursuant to this Agreement under applicable securities laws of the United States (or to obtain an exemption from such qualification). The Company shall make all filings and reports relating to the offer and sale of the Shares required under applicable securities laws of the United States following the Closing Date.

(c) Limitation on Trading. The Buyer agrees for itself and its Trading Affiliates that neither it nor its Trading Affiliates will conduct any activities in the Trading Market with respect to the Shares, including purchases, sales, or the securing of shares to borrow, for a period commencing on the Closing Date and ending at the close of trading on the Trading Market on the one (1) year anniversary of the Closing Date (or the next Trading Day, if such date is not a Trading Day).

## 5. CONDITIONS TO THE COMPANY'S OBLIGATION TO SELL.

The obligation of the Company hereunder to issue and sell the Shares to the Buyer at the Closing is subject to the satisfaction, at or before the Closing Date, of each of the following conditions, provided that these conditions are for the Company's sole benefit and may be waived by the Company at any time in its sole discretion by providing the Buyer with prior written notice thereof:

(i) The Buyer shall have executed each of the Transaction Documents to which it is a party and delivered the same to the Company.

(ii) The Buyer shall have delivered to the Company the Purchase Price for the Shares being purchased by the Buyer at the Closing by wire transfer of immediately available funds pursuant to the wire instructions provided by the Company.

(iii) The representations and warranties of the Buyer shall be true and correct in all material respects (except for those representations and warranties that are qualified by materiality or Material Adverse Effect, which shall be true and correct in all respects) as of the date when made and as of the Closing Date as though made at that time (except for representations and warranties that speak as of a specific date, which shall be true and correct as of such specified date), and the Buyer shall have performed, satisfied and complied in all material respects with the covenants, agreements and conditions required by this Agreement to be performed, satisfied or complied with by the Buyer at or prior to the Closing Date.

7

6. <u>CONDITIONS TO THE BUYER'S OBLIGATION TO PURCHASE.</u>

The obligation of the Buyer hereunder to purchase the Shares at the Closing is subject to the satisfaction, at or before the Closing Date, of each of the following conditions, provided that these conditions are for the Buyer's sole benefit and may be waived by the Buyer at any time in its sole discretion by providing the Company with prior written notice thereof:

(i) The Company shall have delivered to the Buyer a certificate, executed by the Secretary of the Company and dated as of the Closing Date, as to the resolutions consistent with Section 3(b) as adopted by the Company's Board of Directors in a form reasonably acceptable to the Buyer.

(ii) The representations and warranties of the Company shall be true and correct in all material respects (except for those representations and warranties that are qualified by materiality or Material Adverse Effect, which shall be true and correct in all respects) as of the date when made and as of the Closing Date as though made at that time (except for representations and warranties that speak as of a specific date, which shall be true and correct as of such specified date) and the Company shall have performed, satisfied and complied in all material respects with the covenants, agreements and conditions required by this Agreement to be performed, satisfied or complied with by the Company at or prior to the Closing Date.

(iii) The Shares (i) shall be designated for quotation or listed on the Principal Market and (ii) shall not have been suspended, as of the Closing Date, by the SEC or the Principal Market from trading on the Principal Market.

(iv) The Company shall have obtained all governmental, regulatory or third party consents and approvals, if any, necessary for the sale of the Shares.

7. <u>MISCELLANEOUS.</u>

(a) <u>Governing Law; Jurisdiction; Jury Trial</u>. All questions concerning the construction, validity, enforcement and interpretation of this Agreement shall be governed by the internal laws of the Commonwealth of Virginia, without giving effect to any choice of law or conflict of law provision or rule (whether of the Commonwealth of Virginia or any other jurisdictions) that would cause the application of the laws of any jurisdictions other than the Commonwealth of Virginia. Each party hereby irrevocably submits to the exclusive jurisdiction of the state and federal courts sitting in the City of Richmond, for the adjudication of any dispute hereunder or in connection herewith or with any transaction contemplated hereby or discussed herein, and hereby irrevocably waives, and agrees not to assert in any suit, action or proceeding, any claim that it is not personally subject to the jurisdiction of any such court, that such suit, action or proceeding is brought in an inconvenient forum or that the venue of such suit, action or proceeding is improper.

(b) <u>Counterparts</u>. This Agreement may be executed in two or more identical counterparts, all of which shall be considered one and the same agreement and shall become effective when counterparts have been signed by each party and delivered to the other party; provided that a facsimile signature shall be considered due execution and shall be binding upon the signatory thereto with the same force and effect as if the signature were an original, not a facsimile signature.

8

(c) Headings. The headings of this Agreement are for convenience of reference and shall not form part of, or affect the interpretation of, this Agreement.

(d) Severability. If any provision of this Agreement shall be invalid or unenforceable in any jurisdiction, such invalidity or unenforceability shall not affect the validity or enforceability of the remainder of this Agreement in that jurisdiction or the validity or enforceability of any provision of this Agreement in any other jurisdiction.

(e) Entire Agreement; Amendments. This Agreement and the other Transaction Documents supersede all other prior oral or written agreements between the Buyer, the Company, their affiliates and Persons acting on their behalf with respect to the matters discussed herein, and this Agreement contain the entire understanding of the parties with respect to the matters covered herein and, except as specifically set forth herein, neither the Company nor any Buyer makes any representation, warranty, covenant or undertaking with respect to such matters. No provision of this Agreement may be amended other than by an instrument in writing signed by the parties hereto. No provision hereof may be waived other than by an instrument in writing signed by the party against whom enforcement is sought.

(f) Notices. Any notices, consents, waivers or other communications required or permitted to be given under the terms of this Agreement must be in writing and will be deemed to have been delivered: (i) upon receipt, when delivered personally; (ii) upon receipt, when sent by facsimile (provided confirmation of transmission is mechanically or electronically generated and kept on file by the sending party); or (iii) one Business Day after deposit with an overnight courier service, in each case properly addressed to the party to receive the same. The addresses and facsimile numbers for such communications shall be:

If to the Company:

Hebron Technology Co., Ltd.
No. 936, Jinhai 2nd Road, Konggang New Area
Longwan District
Wenzhou City, Zhejiang Province
People's Republic of China
Attention: Anyuan Sun, Chief Executive Officer

Copy (for informational purposes only) to:

Kaufman & Canoles, P.C.
Two James Center, 14th Floor
1021 East Cary Street
Richmond, Virginia 23219
Telephone: (804) 771-5700
Facsimile: (804) 771-5777
Attention: Anthony W. Basch, Esq.

If to a Buyer, to its address and facsimile number set forth on the Schedule of Buyers, with copies to the Buyer's representatives as set forth on the Schedule of Buyers, or to such other address and/or facsimile number and/or to the attention of such other Person as the recipient party has specified by written notice given to each other party five (5) days prior to the effectiveness of such change. Written confirmation of receipt (A) given by the recipient of such notice, consent, waiver or other communication, (B) mechanically or electronically generated by the sender's facsimile machine containing the time, date, recipient facsimile number and an image of the first page of such transmission or (C) provided by an overnight courier service shall be rebuttable evidence of personal service, receipt by facsimile or receipt from an overnight courier service in accordance with clause (i), (ii) or (iii) above, respectively.

Any document shall be deemed to have been duly served if marked for the attention of the agent for service of process at its address (as set forth in the Schedule of Buyers) or such other address in the United States as may be notified to the party wishing to serve the document and delivered in accordance with the notice provisions set forth in this Section 7(f).

(g) <u>Successors and Assigns</u>. This Agreement shall be binding upon and inure to the benefit of the parties and their respective successors and assigns.

(h) <u>No Third Party Beneficiaries</u>. This Agreement is intended for the benefit of the parties hereto and their respective permitted successors and assigns, and is not for the benefit of, nor may any provision hereof be enforced by, any other Person.

(i) <u>Survival</u>. The representations and warranties of the Company and the Buyer contained in Sections 2 and 3 and the agreements and covenants set forth in Sections 4, 5 and 6 shall survive for one (1) year following the Closing and the delivery and exercise of Shares, as applicable.

(j) <u>Further Assurances</u>. Each party shall do and perform, or cause to be done and performed, all such further acts and things, and shall execute and deliver all such other agreements, certificates, instruments and documents, as any other party may reasonably request in order to carry out the intent and accomplish the purposes of this Agreement and the consummation of the transactions contemplated hereby.

(k) <u>No Strict Construction</u>. The language used in this Agreement will be deemed to be the language chosen by the parties to express their mutual intent, and no rules of strict construction will be applied against any party.

**[Signature Pages Follow]**

10

**IN WITNESS WHEREOF,** the Buyer and the Company have caused their respective signature page to this Share Purchase Agreement to be duly executed as of the date first written above.

**COMPANY:**

**Hebron Technology Co., Ltd.**

By:

Name:  Anyuan Sun

Its:    Chief Executive Officer

By:

Name:  Changjuan Liang

Its:    Chief Financial Officer

**IN WITNESS WHEREOF,** the Buyer and the Company have caused their respective signature page to this Share Purchase Agreement to be duly executed as of the date first written above.

**BUYER:**

Jupiter Trading Co., Ltd (BVI)

By:

Name:   Du Xuezhen

Its:     Director

**IN WITNESS WHEREOF,** the Buyer and the Company have caused their respective signature page to this Share Purchase Agreement to be duly executed as of the date first written above.

**BUYER:**

Loong Fang Trading Co., Ltd (BVI)

By: _____
Name:   Jiang Shan
Its:      Director

Exhibit 4.13

## SHARE EXCHANGE AGREEMENT

This Share Exchange Agreement (this "Agreement") is made and entered into as of December 15, 2019 by and among (i) Hebron Technology Co., Ltd., a British Virgin Islands company, (the "Purchaser"), (ii) Beijing Heng-Tai Pu-Hui Information Service Co. Ltd, a company incorporated under the law of the People's Republic of China ("PRC") (the "Company") and (iii) each of the shareholders of the Company named on Exhibit A hereto (collectively, the "Sellers"). The Purchaser, the Company and the Sellers are sometimes referred to herein individually as a "Party" and, collectively, as the "Parties". Capitalized terms, unless otherwise defined, shall have the meanings ascribed to such terms in Article hereof.

### RECITALS:

WHEREAS, the Sellers collectively own 100% of the issued and outstanding shares of the Company (the "Shares"); and the Company conducts the operations of a financial advisory business (the "Business") in the PRC;

WHEREAS, the Purchaser is a company with its shares listed on the NASDAQ Capital Market with the ticker symbol "HEBT";

WHEREAS, the Sellers desire to sell to the Purchaser, and the Purchaser desires to purchase from the Sellers, all of the issued and outstanding shares and any other equity interests in or of the Company in exchange for newly issued Class A common shares, par value $0.001, of the Purchaser ("Purchaser Shares"), subject to the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the premises set forth above, which are incorporated in this Agreement as if fully set forth below, and the representations, warranties, covenants and agreements contained in this Agreement, and intending to be legally bound hereby, the Parties agree as follows:

### ARTICLE I
### DEFINITIONS

1.1. **Definitions**. The following terms, as used herein, have the following meanings:

"Act" or "Securities Act" means United States Securities Act of 1933, as amended.

"Action" means any action, suit, investigation, hearing or proceeding, including any audit for taxes or otherwise.

"Additional Agreements" means any other agreement and/or instruments that all parties hereto agree to enter into for the deal contemplated in this Agreement.

"Affiliate" means, with respect to any Person, any Person directly or indirectly controlling, controlled by, or under common control with such other Person. With respect to any natural person, the term Affiliate shall also include any member of said person's immediate family, any family limited partnership, limited liability company or other entity in which said person owns any beneficial interest and any trust, voting or otherwise, of which said person is a trustee or of which said person or any of said person's immediate family is a beneficiary.

"Agreement" means this Share Exchange Agreement.

"Arbitrator" has the meaning set forth in Section 12.1(b).

"Appraised Value" means the market value of the Company which is determined by an independent appraiser in accordance with common practice appraisal procedures in the industry on the market value and prospects of the Company.

"Authority" shall mean any governmental, regulatory or administrative body, agency or authority, any court or judicial authority, any arbitrator, or any public, private or industry regulatory authority, whether international, national, Federal, state, or local.

"Books and Records" means all books and records, ledgers, employee records, customer lists, files, correspondence, and other records of every kind (whether written, electronic, or otherwise embodied) owned or used by the Company and its Subsidiaries or in which the Company's or any Subsidiaries' assets, business, or transactions are otherwise reflected.

"Business" has the meaning set forth in the Recitals.

"Business Day" means any day other than a Saturday, Sunday or a legal holiday on which commercial banking institutions in China are not open for business.

"Charter Documents" has the meaning set forth in Section 3.3.

"Closing" has the meaning set forth in Section 2.2

"Closing Date" has the meaning set forth in Section 2.2

"Closing Share Price" means, with respect to each Trading Day, the closing price of the shares of the Purchaser as reported on the NASDAQ Capital Market.

"Code" means the Internal Revenue Code of 1986, as amended.

"Company" has the meaning set forth in the Preamble. "Company Consent" has the meaning set forth in Section3.8.

"Company Indemnitees" has the meaning set forth in Section 11.2.

"Contracts" has the meaning set forth in Section 3.15(a).

"Core Employees" means any employee of the Company who is a member of senior management personnel, or a senior executive member of the Subsidiaries.

2

"Employment Agreements" means the agreements between the Subsidiaries and the Core Employees.

"Exchange Act" means the Securities Exchange Act of 1934.

"Exchange Act Filings" means filings under the Exchange Act made by the Purchaser prior to the Closing Date.

"GAAP" means generally accepted accounting principles, consistently applied and interpreted in the People's Republic of China.

"Interim Financial Statements" means the unaudited consolidated financial statements of the Company for the month ended October 31, 2019, including the consolidation of financial statements of The Company and the Subsidiaries.

"Indebtedness" includes with respect to any Person, (a) all obligations of such Person for borrowed money, or with respect to deposits or advances of any kind (including amounts by reason of overdrafts and amounts owed by reason of letter of credit reimbursement agreements) including with respect thereto, all interest, fees and costs, (b) all obligations of such Person evidenced by bonds, debentures, notes, liens, mortgages or similar instruments, (c) all obligations of such Person under conditional sale or other title retention agreements relating to property purchased by such Person, (d) all obligations of such Person issued or assumed as the deferred purchase price of property or services (other than accounts payable to creditors for goods and services incurred in the ordinary course of business), (e) all Indebtedness of others secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any lien or security interest on property owned or acquired by such Person, whether or not the obligations secured thereby have been assumed, (f) all obligations of such Person under leases required to be accounted for as capital leases under GAAP, and (g) all guarantees by such Person.

"Intellectual Property" means any and all of the following: (A) U.S., international and foreign patents, patent applications and statutory invention registrations; (B) trademarks, licenses, inventions, service marks, trade names, trade dress, slogans, logos and Internet domain names, including registrations and applications for registration thereof; (C) copyrights, including registrations and applications for registration thereof, the software and copyrightable materials; (D) trade secrets, know-how and similar confidential and proprietary information; (E) u.r.l.s, Internet domain names and Websites; and (F) any other type of Intellectual Property right in each case which is owned or filed by the Company (or by the Sellers with respect to the Company) or any Subsidiaries whether registered or unregistered or domestic or foreign.

"Knowledge of the Company" or "Company's Knowledge" means, with respect to any matter in question, the actual knowledge of any executive officer of the Company after reasonable inquiry.

"Law" means, with respect to any Person, any national, provincial or local law (statutory, common or otherwise), constitution, treaty, convention, ordinance, code, rule, regulation, order, injunction, judgment, decree, ruling or other similar requirement enacted, adopted, promulgated or applied by a Authority that is binding upon or applicable to such Person, as amended unless expressly specified otherwise.

3

"Leases" has the meaning set forth in Section 3.12.

"Lien" means, with respect to any asset, any mortgage, lien, pledge, charge, security interest or encumbrance of any kind in respect of such asset, including any agreement to give any of the foregoing and any conditional sale and including any voting agreement or proxy.

"Lock-Up Agreements" means each of the Lock-Up Agreements for lock up of the shares of Purchaser as hold by the Sellers, between the Purchaser, the Sellers and other relevant parties in the form to be agreed to by Sellers after the date of this Agreement.

"Losses" has the meaning set forth in Section 11.1.

"Material Adverse Change" means a material adverse change in the business, assets, condition (financial or otherwise), liabilities, results of operations or prospects of the Business individually or in the aggregate; provided, however, without prejudicing whether any other matter qualifies as a Material Adverse Change, any matter individually or in the aggregate involving a loss or payment in excess of $100,000 shall constitute a Material Adverse Change, per se, provided that, except to the extent that any of the following disproportionately affect the Company and the Subsidiaries, taken as a whole, compared to similarly situated businesses, none of the following shall be deemed to constitute a Material Adverse Effect or shall be taken into account in determining whether a Material Adverse Change has occurred or would reasonably be expected to occur (A) any changes (after the date hereof) in GAAP or applicable Law, (B) any acts of God or acts of war, armed hostilities, sabotage or terrorism, (C) any changes in general economic, business or market conditions or affecting United States or foreign economies in general or (D) any changes in conditions affecting the industries or markets in which the Company operates.

"Material Adverse Effect" means a material adverse effect on the business, assets, condition (financial or otherwise), liabilities, results of operations or prospects of the Business individually or in the aggregate; provided, however, without prejudicing whether any other matter qualifies as a Material Adverse Effect, any matter individually or in the aggregate involving a loss or payment in excess of $100,000 shall constitute a Material Adverse Effect, per se, provided that, except to the extent that any of the following disproportionately affect the Company and the Subsidiaries, taken as a whole, compared to similarly situated businesses, none of the following shall be deemed to constitute a Material Adverse Effect or shall be taken into account in determining whether a Material Adverse Effect has occurred or would reasonably be expected to occur (A) any changes (after the date hereof) in GAAP or applicable Law, (B) any acts of God or acts of war, armed hostilities, sabotage or terrorism, (C) any changes in general economic, business or market conditions or affecting United States or foreign economies in general or (D) any changes in conditions affecting the industries or markets in which the Company operates.

"Offices" means offices, warehouses or business locations of the Company and each Subsidiaries.

4

"Order" means any decree, order, judgment, writ, award, injunction, rule or consent of or by an Authority.

"Outside Closing Date" has the meaning set forth in Section 13.1.

"Owned Intellectual Property" has the meaning set forth in Section 3.13(a).

"Permits" has the meaning set forth in Section 3.16.

"Person" means an individual, a corporation, a partnership, a limited liability company, an association, a trust or other entity or organization, including a government, domestic or foreign, or political subdivision thereof, or an agency or instrumentality thereof.

"PRC" means the People's Republic of China, but solely for the purposes of this Agreement and the other Additional Agreements, excluding Hong Kong, Macau and Taiwan.

"Proceeding" has the meaning set forth in Section 3.21(b).
"Purchaser" has the meaning set forth in the Preamble.

"Purchaser Shares" means the Class A common shares, $0.001 par value per share, of Purchaser which is issued to Sellers or its nominees as the Purchase Price.

"Purchase Price" has the meaning set forth in Section 2.3(a)

"Real Property" means, collectively, all real properties and interests therein (including the right to use), together with all buildings, fixtures, trade fixtures, plant and other improvements located thereon or attached thereto; all rights arising out of the use thereof (including air, water, oil and mineral rights); and all subleases, franchises, licenses, permits, easements and rights-of-way which are appurtenant thereto.

"Regulation D" has the meaning set forth in Section 4.5(a).

"SEC" means the Securities and Exchange Commission.

"Exchange Shares" means all the issued and outstanding shares of the Company, which is currently owned by Guoya Investment Holding Co. Ltd. (BVI) as to 80% of equity interest and HongKong D&L Technology Co., Limited as to 20% of equity interest, free and clear of any Liens.

"Subsidiary" or "Subsidiaries" means one of the Company's direct or indirect subsidiaries or all of the Company's direct and indirect subsidiaries, as applicable.

"Tangible Assets" means all tangible personal property and interests therein, including inventory, machinery, computers and accessories, furniture, office equipment, communications equipment, and other tangible property.

"Tax" has the meaning set forth in Section 3.21(c).

"Tax Liability" has the meaning set forth in Section 3.21(b).

"Tax Return" has the meaning set forth in Section 3.21(c).

"Third Party Claim" has the meaning set forth in Section 11.3(a).

"Trading Day" means any day when the NASDAQ Capital Market is open for trading.

"Transaction" has the meaning set forth in the Recitals.

"Website(s)" shall mean all of the internet domain names for the Company.

## ARTICLE II
## PURCHASE AND SALE OF SHARES

2.1. **Purchase and Sale of Shares**. At the Closing and subject to and upon the terms and conditions of this Agreement, the Sellers shall sell, transfer, convey, assign and deliver to the Purchaser, and the Purchaser shall purchase, acquire and accept from the Sellers, all of the issued and outstanding shares of the Company (collectively, the "Exchange Shares"), free and clear of all Liens (other than potential restrictions on resale under applicable securities Laws).

2.2. **Closing**. The closing of the transactions contemplated by this Agreement (the "Closing") shall take place at the offices of Kaufman & Canoles, P.C., Two James Center, 14th Floor, 1021 East Cary Street, Richmond, Virginia 23219, at 10:00 a.m., Eastern Standard Time, on the second Business Day after all conditions to the Closing set forth in hereof have been satisfied or waived, or such other place, time or date as the Purchaser and the Sellers agree in writing. The date of the Closing shall be referred to herein as the "Closing Date." The parties intend that the Closing Date shall be on or before December 31, 2019. In addition to those obligations set forth elsewhere in the Agreement, at the Closing:

(a) the Purchaser shall deliver the Purchaser Shares (as set forth in Section 2.3 below) to the Sellers;

(b) the Sellers shall deliver (or to cause to be delivered by the Sellers) to the Purchaser stock certificate(s) evidencing the Exchange Shares held by it, or pledge their equity ownership officially to Purchaser's Chinese subsidiary NingChen (Shanghai) Enterprise Management Co. Ltd. together with duly executed stock transfer deeds, which shall be duly stamped and shall be executed in favor of the Purchaser; and

(c) the Parties hereto shall execute and deliver a Registration Rights Agreement, in the form attached hereto as Exhibit G (the "Registration Rights Agreement"), pursuant to which the Purchaser has agreed to provide certain registration rights with respect to the Registrable Securities (as defined in the Registration Rights Agreement), under the 1933 Act and the rules and regulations promulgated thereunder, and applicable state securities laws.

6

2.3. **Purchase Price**.

(a)  The aggregate purchase price for the Exchange Shares shall be the Appraised Price determined by an independent appraiser mutually appointed by the Purchaser and the Sellers (the "Purchase Price"). The Purchaser and the Sellers agree to engage Valuelink to appraise owners' equities of the Company for the purpose of determination of the Appraised Price. The Purchaser and the Sellers acknowledge that the appraisal report attached hereto as Exhibit E (the "Appraisal Report") reflects the market value of the Company and the Purchase Price for the Exchange Shares shall be Chinese RMB 80 million. The Purchase Price shall be paid by the Purchaser to the Sellers by means of certain number of the Purchaser Shares as determined herein, with the restrictions set forth in the Transaction according to Section 6.5 herein. The number of Purchaser Shares payable to the Sellers pursuant to this Section 2.3(a) shall be calculated by the Purchase Price divided by the weighted average of the Closing Share Price ("VWAP") of the Purchaser Shares for five (5) Trading Days up to the date immediately prior to the date of this Agreement; provided however, the VWAP shall not be lower than the Closing Share Price as of the Closing of the Trading Date immediately prior to the date of this Agreement, and with the number of Purchaser Shares rounded up to the nearest whole number.

(b)  Each Seller shall receive its pro rata share of the Purchaser Shares based on the percentage of the Exchange Shares owned by such Seller as compared to the total number of the Exchange Shares owned by all Sellers (such Seller's "Pro Rata Share"). The Parties agree that the payment of the Purchase Price and delivery of the Purchaser Shares to the Sellers shall be made as follows: (1) eighty-percent (80%) of the Purchase Price by way of delivery of the Purchaser Shares shall be made at the Closing Date; (2) ten percentage (10%) of the Purchaser Shares shall be delivered within thirty (30) days following the receipt by the Purchaser of the Company's audited financial statements for 2019; and (3) the remaining ten percentage (10%) of the Purchaser Shares shall be delivered within thirty (30) days following the receipt by the Purchaser of the Company's audited financial statements for 2020. To the extent the net income of the Company falls below RMB 8.0 million in 2019 or RMB 10.0 million in 2020, the above agreed-upon Purchaser Shares to be delivered for such year shall be reduced pro rata based on the actual net income for such year.

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES OF
## THE COMPANY AND THE SELLERS

The Company and the Sellers hereby represent and warrant to the Purchaser:

3.1. **Corporate Existence and Power**. The Company and each Subsidiaries are duly formed, validly existing and in good standing under and by virtue of the Laws of the jurisdiction of its organization, and has all power and authority, corporate and otherwise, and all governmental licenses, franchises, permits, authorizations, consents and approvals required to own and operate its properties and assets and to carry on its business as now conducted and as proposed to be conducted. Neither the Company nor any Subsidiaries has taken any action, adopted any plan, or made any agreement in respect of any Transaction, consolidation, sale of all or substantially all of its respective assets, reorganization, recapitalization, dissolution or liquidation, except as explicitly set forth in this Agreement.

**3.2. Corporate Authorization**. The execution, delivery and performance by each of Company and the Sellers of this Agreement and each of the Additional Agreements to which any of the Company and the Sellers are named as a party and the consummation by the Company and the Sellers of the transactions contemplated hereby and thereby are within the corporate powers of the Company and the Sellers and have been duly authorized by all necessary action on the part of the Company and the Sellers. This Agreement constitutes, and, upon their execution and delivery, each of the Additional Agreements will constitute, a valid and legally binding agreement of the Company and the Sellers, enforceable against the Company and the Sellers in accordance with their respective terms, subject to (i) laws of general application relating to bankruptcy, insolvency and the relief of debtors, or (ii) rules of law governing specific performance, injunctive relief or other equitable remedies.

**3.3. Charter Documents; Legality**. The Company has heretofore made available to the Purchaser true and complete copies of the certificate of incorporation, articles of association, bylaws, operating agreements or other comparable organizational documents minute books and stock books, if applicable (the "Charter Documents"), as in effect or constituted on the date hereof. The execution, delivery, and performance by the Company and the Sellers of this Agreement and any Additional Agreement to which the Company or any other party hereto is to be a party has not violated and will not violate, and the consummation of the transactions contemplated hereby or thereby will not violate, any of the Charter Documents or any Law. The Company has not taken any action that is in violation of its Charter Documents.

**3.4. Subsidiaries**. The Company and each of the Subsidiaries are not a party to any agreement relating to the formation of any joint venture, association or other Person. The Exhibit B of this Agreement discloses all of the outstanding shares of such Subsidiaries, which are validly issued, fully paid and non-assessable and are held free and clear of any Liens; (ii) there are no consignments, contracts and/or equity transfer arrangements, options, warrants or other contractual rights or arrangements outstanding which give any Person the right to acquire or Control any capital stock or any substantial part of assets of any such Subsidiaries whether or not such right is presently exercisable; and (iii) there are no contracts and/or equity transfer arrangements, options, warrants or other contractual rights (oral or written), trusts or other arrangements of any nature which give any Person the right to any stock rights or equity interests in or from any such Subsidiaries.

**3.5. Capitalization and Ownership**. No Person other than the Sellers owns any securities of the Company. There is no Contract that requires or under any circumstance would require the Company or any Subsidiaries to issue, or grant any right to acquire, any securities of the Company or any Subsidiaries, or any security or instrument exercisable or exchangeable for or convertible into, the capital stock or membership interest of the Company or any Subsidiaries or to merge, consolidate, dissolve, liquidate, restructure, or recapitalize the Company or any Subsidiaries. The Shares and the securities of each Subsidiaries (i) have been duly authorized and validly issued and are fully paid and nonassessable, and (ii) were issued in compliance with all applicable Laws.

**3.6. Affiliates**. Other than the Sellers, the Company and the Subsidiaries are not controlled by any Person and are not under the control of any other Person. With respect to related party transaction Schedule 3.6 lists each Contract, arrangement, or understanding to which the Company, the Subsidiaries and the Sellers or any Affiliate of the Sellers, the Company or the Subsidiaries is a party. Except as disclosed in Schedule 3.6, neither the Sellers, nor the Company nor the Subsidiaries nor any of their respective Affiliates (i) own, directly or indirectly, in whole or in part, any tangible or intangible property (including Intellectual Property rights) that the Company or any Subsidiaries uses or the use of which is necessary for the conduct of the Business, or (ii) have engaged in any transaction with the Company or any Subsidiaries.

8

3.7. **Assumed Names**. Schedule 3.7 is a complete and correct list of all assumed or "doing business as" names currently or formerly used by the Company or any Subsidiaries. Neither the Company nor any Subsidiaries has used any name other than the names listed on Schedule 3.7 to conduct its business. The Company and each Subsidiaries have filed appropriate "doing business as" certificates in all applicable jurisdictions. Except as indicated on Schedule 3.7, all Websites are in good working order.

3.8. **Consents.** The Contracts listed on Schedule 3.8 are the only on-going material agreements, commitments, arrangements, contracts or other instruments binding upon the Company, any Subsidiaries or any of their respective properties requiring a consent, approval, authorization, order or other action of or filing with any Person as a result of the execution, delivery or performance of this Agreement or any of the Additional Agreements or the consummation of the transactions contemplated hereby or thereby (each of the foregoing, a "Company Consent").

3.9. **Financial Statements.**

(a) The Audited Financial Statements (i) have been prepared from the Books and Records; (ii) except as set forth on Schedule 3.9, have been prepared in accordance with GAAP; (iii) fairly and accurately present the Company's financial condition and the results of its operations as of their respective dates and for the periods then ended; (iv) contain and reflect all necessary adjustments and accruals for a fair presentation of the Company's financial condition as of their dates; (v) contain and reflect adequate provisions for all reasonably anticipated liabilities for all material income, property, sales, payroll or other Taxes applicable to the Company with respect to the periods then ended, and (vi) all liabilities of the Company are disclosed in the Audited Financial Statements and there are no other liabilities.

(b) Except as specifically disclosed on the Audited Financial Statements and the unaudited interim financial statements of the Company as of October 31, 2019 (the "Interim Financial Statements") and for liabilities and obligations of a similar nature and in similar amounts incurred in the ordinary course of business since the date of the Interim Financial Statements and except as set forth on Schedule 3.9(b), there are no debts relating to the Company.

(c) The Audited Financial Statements and the Interim Financial Statements accurately reflects the outstanding Indebtedness of the Company as of the respective dates thereof.

(d) All Books and Records of the Company have been properly and accurately kept and completed in all material respects, and there are no material inaccuracies or discrepancies of any kind contained or reflected therein. The Company has none of its records, systems controls, data or information recorded, stored, maintained, operated or otherwise wholly or partly dependent on or held by any means (including any mechanical, electronic or photographic process, whether computerized or not) which (including all means of access thereto and therefrom) is not under the exclusive ownership (excluding licensed software programs) and direct control of the Company and which is not located at the Offices or at locations set forth on Schedule 3.9(d).

9

3.10. **Books and Records.**

(a) The Books and Records accurately and fairly, in reasonable detail, reflect the Company and any of the Subsidiaries' transactions and dispositions of assets. The Company and any of the Subsidiaries maintain a system of internal accounting controls to procure:

(i) transactions are executed in accordance with management's authorization;

(ii) access to assets is permitted only in accordance with management's authorization; and

(iii) recorded assets are compared with existing assets at reasonable intervals, and appropriate action is taken with respect to any differences.

(b) The Company and any of the Subsidiaries have heretofore made all of its Books and Records available to the Purchaser for its inspection and has heretofore delivered to the Purchaser complete and accurate copies of documents referred to in the Schedules or as the Purchaser otherwise has requested.

3.11. **Absence of Certain Changes**.

(a) Except as set forth in Schedule 3.11(a), since their respective incorporation date, the Company and each Subsidiaries have conducted its respective business in the ordinary course of business, and with respect to the Company and each Subsidiaries other than in the ordinary course of business there has not been:

(i) any income or fund of the Company or its Subsidiaries which has not been stated in the Audited Financial Statements;

(ii) any capital expenditure except in the ordinary course of business consistent with past practice (including with respect to kind and amount);

(iii) any sale, lease, license or other disposition of any of its assets except (i) pursuant to existing Contracts or commitments disclosed herein and (ii) sales of products or inventory in the ordinary course of business consistent with past practice;

(iv) acceptance of any returns except in the ordinary course of business, consistent with past practice (including with respect to kind and amount);

(v) the incurrence of Liens on any of its assets;

10

(vi) any transaction or consolidation with or acquisition of any other Person;

(vii) any change in its accounting principles or methods;

(viii) any change in location where it conducts business;

(ix) any extension of any loans, other than travel or other expense advances to employees in the ordinary course of business consistent with past practice, exceeding $100,000 individually;

(x) any dividend or distribution to the shareholder; or

(xi) any agreement to do any of the foregoing.

(b) Except as set forth on Schedule 3.11(b) and actions taken in good faith to invest in the Company's Business, since execution of this Agreement, through and including the Closing Date, neither the Company nor any Subsidiaries have taken any action nor have had any event occur that would have violated any covenants of the Company and the Sellers set forth in ARTICLE VI hereof.

3.12. **Real Property**. The use and operation of the Real Property or real property lease (the "Leases") by the Company or its Subsidiaries are in full compliance in all material respects with covenants, conditions, restrictions, easements, disposition agreements and similar matters affecting the Real Property and, effective as of the Closing, each of the Company and its Subsidiaries shall have the right under all Laws to continue the use and operation of the Real Property in the conduct of their businesses. Neither the Company nor any Subsidiaries have breached or violated and is not in default under any of the Leases, the breach or violation of which could individually or in the aggregate have a Material Adverse Effect, and no notice from any Person has been received by the Company or any Subsidiaries or served upon the Company, any Subsidiaries or the Sellers claiming any violation of any Lease.

(a) Each piece of Tangible Assets is in operating condition and repair and functions in accordance with its intended use (ordinary wear and tear excepted), has been properly maintained, and is suitable for its present uses.

(b) The Company or any of the Subsidiaries have, and upon consummation of the transactions contemplated hereby and in the Additional Agreements will continue to have, good, valid and marketable title in and to each piece of Tangible Assets free and clear of all Liens, except as set forth on Schedule 3.13(b).

(c) The Company or any of the Subsidiaries has good title to, or valid leasehold or license interest in, all its respective properties and assets (whether tangible or intangible), free and clear of all Liens. The personal and other properties and assets owned by the Company or any Subsidiaries or leased or licensed by the Company or any Subsidiaries from a third party constitute all such properties and assets used in and necessary to the Business as presently conducted and as presently proposed to be conducted.

(d) Other than those possessed by the Company or its Subsidiaries' employees with the purchase invoice amount above RMB 5,000 as disclosed in the Schedule 3.13(d) of the Disclosure Schedule, all Tangible Assets are located at the Offices.

11

3.13. **Intellectual Property**.

(a) Schedule 3.13(a)(i) sets forth a true and complete list of all Intellectual Property rights owned by the Company or any Subsidiaries (the "Owned Intellectual Property").

(b) The Owned Intellectual Property, together with the licensed intellectual property rights which the Company and the Subsidiaries can obtain from the public market without substantial difficulties, constitute all the Intellectual Property necessary to, or used or held for use in, the conduct of the business of the Company and the Subsidiaries as currently conducted. The consummation of the transactions contemplated by this Agreement will not alter, encumber, impair or extinguish any Owned Intellectual Property.

(c) Neither the Company's nor any Subsidiaries' ownership and use in the ordinary course of the Owned Intellectual Property infringes upon or misappropriates valid Intellectual Property rights, privacy rights or other right of any third party. There is no Proceeding (as defined below) pending against, or, to the Knowledge of the Company, threatened against or affecting, the Company, any of the Subsidiaries, any present or former officer, director or employee of the Company or any of the Subsidiaries (i) based upon, or challenging or seeking to deny or restrict, the rights of the Company or any Subsidiaries in any of the Owned Intellectual Property, (ii) alleging that the use of the Owned Intellectual Property or any services provided, processes used or products manufactured, used, imported or sold by the Company or any Subsidiaries do or may conflict with, misappropriate, infringe or otherwise violate any Intellectual Property of any third party or (iii) alleging that the Company or any of the Subsidiaries have infringed, misappropriated or otherwise violated any Intellectual Property of any third party. None of the Company and any Subsidiaries have received from any third person an offer to license any Intellectual Property rights of such third person.

(d) Except as set forth in Schedule 3.13(d), the Company or any Subsidiaries are entitled to use, and is using in the Business, the Owned Intellectual Property in the ordinary course. The Company and the Subsidiaries hold all right, title and interest in and to all Owned Intellectual Property, free and clear of any Lien. In each case where a patent or patent application, trademark registration or trademark application, service mark registration or service mark application, or copyright registration or copyright application included in the Owned Intellectual Property is held by assignment, the assignment has been duly recorded with the Authority from which the patent or registration issued or before which the application or application for registration is pending. To the Knowledge of the Company, the Company and the Subsidiaries have taken all actions necessary to maintain and protect the Owned Intellectual Property, including payment of applicable maintenance fees and filing of applicable statements of use.

(e) To the Knowledge of the Company, no Person has infringed, misappropriated or otherwise violated any Owned Intellectual Property. The Company and the Subsidiaries have taken reasonable steps in accordance with normal industry practice to maintain the confidentiality of all confidential Intellectual Property. None of the Intellectual Property of the Company or any Subsidiaries that are material to the business or operation of the Company or any Subsidiaries and the value of which to the Company or any Subsidiaries are contingent upon maintaining the confidentiality thereof, has been disclosed other than to employees, representatives and agents of the Company or any Subsidiaries all of whom are bound by written confidentiality agreements substantially in the form previously disclosed to the Purchaser.

3.14. **Litigation**. Except as set forth in Schedule 3.14, there is no Action (or any basis therefor) pending against, or to the Knowledge of the Company or any Subsidiaries, threatened against or affecting the Company or any Subsidiaries, any of their respective officers or directors, the Sellers, the business of the Company or any Subsidiaries before any court or arbitrator or any governmental body, agency or official or which in any manner challenges or seeks to prevent, enjoin, alter or delay the transactions contemplated hereby and in the Additional Agreements. There are no outstanding judgments against the Company or any Subsidiaries. Neither the Company nor any Subsidiaries are now, nor have they been in the past five years, subject to any proceeding with the Federal Trade Commission or the Equal Employment Opportunity Commission or any comparable body of any state or political subdivision in China.

3.15. **Contracts.**

(a) Each contract to which the Company or any Subsidiaries are a party (each, a "Contract") is a valid and binding agreement, and is in full force and effect, and neither the Company nor any Subsidiaries, as applicable, nor, to the Knowledge of the Company or any Subsidiaries, any other party thereto, is in breach or default (whether with or without the passage of time or the giving of notice or both) under the terms of any such valid and binding Contract. Neither the Company nor any Subsidiaries has assigned, delegated, or otherwise transferred any of its rights or obligations with respect to any Contracts, or granted any power of attorney with respect thereto. The Company and each Subsidiaries have given a list of each material valid and binding Contract to Purchaser with contract value higher than US$50,000.

(b) Schedule 3.15(b) lists each material valid and binding Contract (other than the Charter Documents) of the Company and each of Subsidiaries, including:

(i) any sales, distribution or other similar Contract providing for the sale by the Company or any Subsidiaries of materials, supplies, goods, services, equipment or other assets;

(ii) any Contract for the purchase of materials, supplies, goods, services, equipment or other assets providing for either (A) annual payments by the Company and the Subsidiaries of $50,000 or more or (B) aggregate payments by the Company and the Subsidiaries of $50,000 or more;

(iii) (A) any lease of real property or (B) any lease of personal property providing for either annual rental payments of $50,000 or more or aggregate rental payments of $50,000 or more;

(iv) any partnership, joint venture or other similar Contract;

13

(v) any Contract relating to the acquisition or disposition of any business (whether by merger, sale of stock, sale of assets or otherwise) or any real property;

(vi) any Contract (A) relating to Indebtedness (in either case, whether incurred, assumed, guaranteed or secured by any asset) or (B) creating or granting a material Lien (including Liens upon properties acquired under conditional sales, capital leases or other title retention or security devices), other than Permitted Liens;

(vii) any Contract under which the Company or any Subsidiaries have, directly or indirectly, made any loan, capital contribution to, or other investment in, any Person (other than (x) any loan to, capital contribution to, or other investment in any wholly-owned Subsidiaries and (y) interests in marketable securities acquired, in the ordinary course of business consistent with past practices);

(viii) any Contract that contains any provisions (A) restricting the Company or any Subsidiaries from competing in any line of business or with any Person or in any area or engaging in any activity or business (including with respect to the development, manufacture, marketing or distribution of their respective products or services), or pursuant to which any benefit or right is required to be given or lost as a result of so competing or engaging, or (B) which would have any such effect on any Person who acquires all of the outstanding capital stock of the Company;

(ix) any Contract that (A) grants any exclusive license, exclusive supply or exclusive distribution rights or other exclusive rights, (B) grants any "most favored nation" rights, rights of first refusal, rights of first negotiation or similar rights with respect to any product, service or Intellectual Property rights, or (C) contains any provision that requires the purchase of all or a given portion of the Company's or any Subsidiaries' requirements from a given third party, or any other similar provision;

(x) any Contract (including any prime contract, subcontract, teaming agreement or arrangement, joint venture, basic ordering agreement, letter contract, purchase order, delivery order, change order or other arrangement of any kind in writing) (A) between the Company or any Subsidiaries and (x) any Authority (acting on its own behalf or on behalf of another country or international organization), (y) any prime contractor to any Authority or (z) any subcontractor with respect to any contract

described in clauses (x) or (y) above, (B) financed by any Authority or (C) subject to the rules and regulations of any Authority concerning procurement;

(xi) any Contract entered into in the last five years in connection with the settlement or other resolution of any Proceeding that (A) has any continuing material obligations, liabilities or restrictions, (B) involves any Intellectual Property rights or (C) involved payment of more than $10,000;

(xii) any Contract with (A) the Company or any of its Affiliates, (B) any Person directly or indirectly owning, controlling or holding with power to vote, 5% or more of the outstanding voting securities of the Company or any of its Affiliates, (C) any Person 5% or more of whose outstanding voting securities are directly or indirectly owned, controlled or held with power to vote by the Company or any of its Affiliates or (D) any director or officer of the Company or any of its Affiliates or any "associates" or members of the "immediate family" (as such terms are respectively defined in Rule 12b-2 and Rule 16a-1 of the 1934 Act) of any such director or officer; or

(xiii) any other "material contract" (as such term is defined in Item 601(b)(10) of Regulation S-K of the SEC, other than those agreements and arrangements described in Item 601(b)(10)(iii)) with respect to the Company and the Subsidiaries, taken as whole

14

3.16. **Licenses and Permits.** Each of the Company and its Subsidiaries possess all permits necessary for the ownership and operation of their businesses (the "Permits"). True, complete and correct copies of the Permits issued to the Company and its Subsidiaries have previously been delivered to the Purchaser. Such Permits are valid and in full force and effect and, assuming the related Company Consents, if any, have been obtained or waived prior to the Closing Date, none of the Permits will be terminated or impaired or become terminable as a result of the transactions contemplated hereby. The Company or any Subsidiaries has all Permits necessary to operate the Business other than those Permits whose absence individually or in the aggregate would not cause a Material Adverse Effect.

3.17. **Employees.** Schedule 3.17 sets forth a true and complete list of the names, ID numbers and titles of the employees of the Company and each of Subsidiaries as of the execution date of this agreement.

3.18. **Employment Contracts** The Core Employees shall have entered into employment agreements, including customary confidentiality clauses, non-competition clauses and Intellectual Property assignment clauses with the Company or any of Subsidiaries (the "Employment Agreements"), the terms and conditions of which may ensure that the Core Employees keep confidential of information of the Company or Subsidiaries during the employment period and after the employment period, the Core Employees shall not directly or indirectly conduct the compete Business with the Company or its Subsidiaries during the employment period and within two (2) years after the employment period, all the Intellectual Property developed by the Core Employees during the employment period shall be owned by the Subsidiaries. The photocopies of such Employment Agreements have been delivered to the Purchaser.

3.19. **Compliance with Labor Laws and Agreements.** The Company and each of Subsidiaries have complied with all applicable Laws and Orders relating to employment or labor other than those Laws and Orders with which it could fail to comply, either individually or in the aggregate, without causing a Material Adverse Effect. No present or former employee, officer or director of the Company or any Subsidiaries has, or will have at the Closing Date, any claim for any matter including for wages, salary, vacation, severance, or sick pay except for the same incurred in the ordinary course of business for the last payroll period prior to the Closing Date. There is no:

(a) unfair labor practice complaint against the Company or any Subsidiaries pending before the labor Authority;

(b) pending labor strike or other material labor trouble affecting the Company or any Subsidiaries;

15

(c) material labor grievance pending against the Company or any Subsidiaries;

(d) pending representation question respecting the employees of the Company or any Subsidiaries; or

(e) pending arbitration proceeding arising out of or under any collective bargaining agreement to which the Company or any Subsidiaries are a party.

In addition, to the Company's Knowledge: (i) none of the matters specified in Sections (a) through (e) above is threatened against the Company or any Subsidiaries; (ii) no union organizing activities have taken place with respect to the Company or any Subsidiaries; and (iii) no basis exists for which a claim may be made under any collective bargaining agreement to which the Company or any Subsidiaries are a party.

3.20. **Employment Matters**. The Audited Financial Statements contain an accurate and complete list of each director's and officer's incentive, bonus, profit sharing, retirement, deferred compensation, equity, phantom equity, option, equity purchase, equity appreciation right or severance plan of the Company now in effect or under which the Company has or might have any obligation, or any understanding between the Company and any employee concerning the terms of such employee's employment that does not apply to such company's employees generally.

3.21. **Tax Matters.**

(a) Compliance Generally. Where required by law, the Company has (A) duly and timely filed all Tax Returns required to be filed on or prior to the Closing Date, which Tax Returns are true, correct and complete in all material respects, and (B) duly and timely paid all Taxes due and payable in respect of all periods up to and including the date which includes the Closing Date or has made adequate provision in its books and records and the Audited Financial Statements in accordance with GAAP for any such Tax which is not due on or before such time. Prior to the Closing Date, the Company shall provide the Purchaser with a schedule, which sets forth each Taxing jurisdiction in which the Company or Subsidiaries have filed or are required to file Tax Returns and whether the Company or Subsidiaries have filed consolidated, combined, unitary or separate income or franchise Tax Returns with respect to each such jurisdiction, and a copy of such Tax Returns as shall have been requested by the Purchaser. Any Tax Returns of the Company filed subsequent hereto and on or prior to the Closing Date were or will be consistent with the Tax Returns furnished to the Purchaser and did not and will not make, amend or terminate any election with respect to any Tax or change any accounting method, practice or procedure. The Company and each Subsidiaries have complied with all applicable Law relating to the reporting, payment, collection and withholding of Taxes and has duly and timely withheld or collected, paid over and reported all Taxes required to be withheld or collected on or before the date hereof.

16

(b) <u>No Audit</u>. (A) No taxing authority has asserted any adjustment that could result in an additional Tax for which the Company or any Subsidiaries are or may be liable or that could result in a Lien on any of its assets which has not been fully paid or adequately provided for on the Interim Financial Statements (collectively, "Tax Liability"), or which adjustment, if asserted in another period, would result in any Tax Liability, (B) there is not pending any audit, examination, investigation, dispute, proceeding or claim (collectively, "Proceeding") relating to any Tax Liability and, to the Knowledge of the Company, no taxing authority is contemplating such a Proceeding and there is no basis for any such Proceeding, (C) no statute of limitations with respect to any Tax Liability has been waived or extended (unless the period to which it has been waived or extended has expired), (D) there is no outstanding power of attorney authorizing anyone to act on behalf of the Company or any Subsidiaries in connection with any Tax Liability, Tax Return or Proceeding relating to any Tax, (E) there is not any outstanding closing agreement, ruling request, request to consent to change a method of accounting, subpoena or request for information with or by any taxing authority with respect to the Company or any Subsidiaries, its income, assets or business, or any Tax Liability, (F) the Company or any Subsidiaries are not required to include any adjustment under Section 481 of the Code (or any corresponding provision of applicable Law) in income for any period ending after the Closing Date, (G) the Company or any Subsidiaries are not and has never been a party to any Tax sharing or Tax allocation agreement, arrangement or understanding, (H) the Company or any Subsidiaries are not and has never been included in any consolidated, combined or unitary Tax Return, (I) all taxable periods for the assessment or collection of any Tax Liability are closed by agreement or by operation of the normal statute of limitations (without extension) or will close by operation of the normal statute of limitations for such Taxes (in each case determined without regard to any omission, fraud or other special circumstance other than the timely filing of the Tax Return), and (J) no taxing authority has ever asserted that the Company or any Subsidiaries should file a Tax Return in a jurisdiction where it does not file.

(c) <u>Taxes and Tax Return Defined.</u> For purposes of this Agreement, "Tax" shall mean all federal, state, local and foreign tax, charge, fee, levy, deficiency or other assessment of whatever kind or nature (including without limitation, any net income, gross income, gross receipts, sales, use, ad valorem, transfer, franchise, profits, license, withholding, payroll, employment, unemployment, excise, estimated, severance, stamp, occupation, real property, personal property, intangible property, occupancy, recording, minimum, environmental and windfall profits tax), including any liability therefor as a transferee, as a result of any Tax sharing or similar agreement, together with any interest, penalty, addition to tax or additional amount imposed by any federal, state, local or foreign taxing authority. For purposes of this Agreement, "Tax Return" includes any return, declaration, report, claim for refund or credit, information return or statement, and any amendment thereto, including without limitation any consolidated, combined or unitary return or other document (including any related or supporting information or schedule), filed or required to be filed with any federal, state, local or foreign governmental entity or agency in connection with the determination, assessment, collection or payment of Taxes or the administration of any laws, regulations or administrative requirements relating to Taxes.

3.22. <u>**Business Operations; Servers.**</u> The Company and each Subsidiaries owns all of its servers and other computer equipment (other than webservers) necessary to operate its Business as conducted as of the date hereof and as such Business will be conducted as of the Closing.

3.23. <u>**Powers of Attorney and Suretyships.**</u> Neither the Company nor any Subsidiaries have any general or special powers of attorney outstanding (whether as grantor or grantee thereof) or any obligation or liability (whether actual, accrued, accruing, contingent, or otherwise) as guarantor, surety, co-signer, endorser, co-maker, indemnitor or otherwise in respect of the obligation of any Person.

17

3.24. **Other Information**. Neither this Agreement, nor any of the documents or other information made available to the Purchaser or its Affiliates, attorneys, accountants, agents or representatives pursuant hereto or in connection with the Purchaser's due diligence review of the Business or the transactions contemplated by this Agreement contained, contains or will contain any untrue statement of a material fact.

3.25. **Money Laundering Laws**. The operations of the Company and each Subsidiaries are and have been conducted at all times in compliance with laundering statutes in all applicable jurisdictions, the rules and regulations thereunder and any related or similar rules, regulations or guidelines, issued, administered or enforced by any governmental authority (collectively, the "Money Laundering Laws") and no Action involving the Company or any Subsidiaries with respect to the Money Laundering Laws is pending or, to the Knowledge of the Company, threatened.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF THE SELLERS

The Sellers represents to the Purchaser as follows, and at the Closing the Sellers will represent:

4.1. **Ownership of Shares; Authority**.

(a) The Sellers have good and marketable title to the Exchange Shares, free and clear of any and all Liens.

(b) The Sellers have full legal capacity, power and authority to execute and deliver this Agreement and the Additional Agreements to which it is named as a party, to perform its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby. This Agreement and the Additional Agreements to which the Sellers is named as a party have been, or at Closing will be, duly executed and delivered by the Sellers and are, or upon their execution and delivery will be, valid and legally binding obligations of the Sellers, enforceable against the Sellers in accordance with their respective terms, subject to (i) laws of general application relating to bankruptcy, insolvency and the relief of debtors, or (ii) rules of law governing specific performance, injunctive relief or other equitable remedies.

(c) Neither the execution and delivery by the Sellers of any or all of this Agreement and the Additional Agreements to which the Sellers is a party, nor the consummation by the Sellers of the transactions contemplated thereby, will (i) conflict with, result in a breach of, constitute (with or without due notice or lapse of time or both) a default under, or require any notice, consent or waiver under, any instrument, contract, agreement or arrangement to which the Sellers is a party or by which the Sellers is bound, or (ii) result in the imposition of any Lien upon the Exchange Shares.

18

4.2. **Approvals**. Except as contemplated by this Agreement, no consent, approval, waiver, authorization or novation is required to be obtained by the Sellers from, and no notice or filing is required to be given by the Sellers to or made by the Sellers with, any Authority or other Person in connection with the execution, delivery and performance by the Sellers of this Agreement and each of the Additional Agreements, and the sale and transfer of the Exchange Shares.

4.3. **Non-Contravention**. The execution, delivery and performance by the Sellers of this Agreement and each of the Additional Agreements, and the consummation of the transactions contemplated thereby, do not and will not (a) violate any provision of the organizational documents of the Sellers, or (b) violate or result in a breach of or constitute a default under any Law, judgment, injunction, Order, decree or other restriction of any Authority to which the Sellers, or the Exchange Shares, are subject.

4.4. **Litigation and Claims**. There is no civil, criminal or administrative action, suit, demand, claim, hearing, proceeding or disclosed investigation pending or, to the knowledge of the Sellers, threatened, against the Sellers and the Sellers is not subject to any Order, writ, judgment, award, injunction or decree of any Authority of competent jurisdiction or any arbitrator that would prevent consummation of the transactions contemplated hereby or materially impair the ability of the Sellers to perform its obligations hereunder.

4.5. **Investment Representations**. The Sellers are "accredited investors" as such term is defined in Rule 501 of Regulation D promulgated under the Act or are not U.S. persons as defined in Regulation S promulgated under the Act. The Sellers acknowledges that the Purchaser has the right to require evidence of its status as an accredited investor, if necessary.

4.6. **Lock-Up**. The Sellers understand that the Purchaser Shares may not be sold until one year following issuance thereof. Beginning on the one-year anniversary of issuance, each Seller may sell up to twenty five percent (25%) of such Seller's Purchaser Shares pursuant to registration or exemption from registration. The parties acknowledge that this lock-up shall be memorialized in the restrictive legend described in the Section 4.7 hereof.

4.7. **Legends**. The Sellers understand that the share certificates of the Purchaser, unless and until registered or exempt from registration, shall bear a restrictive legend in substantially the following form (and a stop-transfer order may be placed against transfer of such share certificates):

"THE SECURITIES EVIDENCED BY THIS CERTIFICATE ARE GOVERNED BY THAT CERTAIN SHARE EXCHANGE AGREEMENT DATED DECEMBER 15, 2019 (THE "AGREEMENT") AND HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR THE SECURITIES LAWS OF ANY STATE OR OTHER JURISDICTION. THE SECURITIES MAY NOT BE OFFERED, SOLD, PLEDGED OR OTHERWISE TRANSFERRED EXCEPT (1) PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT OR (2) PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT, IN EACH CASE IN ACCORDANCE WITH ALL APPLICABLE STATE SECURITIES LAWS AND THE SECURITIES LAWS OF OTHER JURISDICTIONS, AND IN THE CASE OF A TRANSACTION EXEMPT FROM REGISTRATION, UNLESS THE COMPANY HAS RECEIVED AN OPINION OF COUNSEL REASONABLY SATISFACTORY TO IT THAT SUCH TRANSACTION DOES NOT REQUIRE REGISTRATION UNDER THE SECURITIES ACT AND SUCH OTHER APPLICABLE LAWS. MOREOVER, NONE OF THE SHARES REPRESENTED BY THIS CERTIFICATE MAY BE OFFERED, SOLD, PLEDGED OR OTHERWISE TRANSFERRED PRIOR TO THE ONE YEAR ANNIVERSARY DATE OF THE ISSUANCE DATE, DECEMBER 31, 2020; COMMENCING ON JANUARY 1, 2021, AND CONTINUING ON EACH ANNIVERSARY THEREOF, TWENTY FIVE PERCENT (25%) OF THE INITIALLY ISSUED NUMBER OF SHARES SHALL BE RELEASED FROM SUCH LOCK-UP AND MAY BE OFFERED, SOLD, PLEDGED OR OTHERWISE TRANSFERRED."

19

The legend set forth above shall be removed and the Company shall issue a certificate without such legend to the holder of the Purchaser Shares upon which it is stamped, if, unless otherwise required by state securities laws, (i) such Shares are registered for resale under the 1933 Act or (ii) in connection with a sale, assignment or other transfer, such holder provides the Company with a legal opinion reasonably acceptable to the Company, to the effect that such sale, assignment or transfer of the Purchaser Shares may be made without registration under the applicable requirements of the 1933 Act.

## ARTICLE V

### REPRESENTATIONS AND WARRANTIES OF THE PURCHASER

The Purchaser represents and warrants to the Company and the Sellers as follows:

5.1. **Due Incorporation**. The Purchaser is a company duly organized, validly existing and in good standing under the Laws of the British Virgin Islands, the Class A common shares of which are listed on the NASDAQ Capital Market.

5.2. **Corporate Authorization**. Except for internal approval of the transaction contemplated by this Agreement in accordance with the Charter Documents of the Purchaser, the execution, delivery and performance by the Purchaser of this Agreement and each of the other Additional Agreements to which it is a party and the consummation by the Purchaser of the transactions contemplated hereby and thereby are within the corporate powers of the Purchaser and have been duly authorized by all necessary corporate action on the part of the Purchaser. This Agreement constitutes, and upon their execution and delivery, each of the Additional Agreements will constitute, the valid and legally binding agreement of the Purchaser, as applicable, enforceable against it in accordance with their respective terms.

20

5.3. **Governmental Authorization**. None of the execution, delivery or performance by the Purchaser of this Agreement or any Additional Agreement requires any consent, approval, license or other action by or in respect of, or registration, declaration or filing with, any Authority by Purchaser, other than those required under U.S. laws and regulations including but not limited to the filings with the U.S. Securities and Exchange Commission (the "SEC").

5.4. **No Violation.** Neither the execution and delivery of this Agreement or any Additional Agreements to be executed by the Purchaser hereunder nor the consummation of the transactions contemplated herein and therein will (a) violate any provision of the Purchaser's or the Purchaser's charter documents; (b) violate any Laws or Orders to which the Purchaser or its property is subject, or (c) violate the provisions of any material agreement or other material instrument binding upon or benefiting the Purchaser.

5.5. **Consents**. Except for internal approval of the transaction contemplated by this Agreement in accordance with the Charter Documents of the Purchaser to approve the transaction contemplated by this Agreement, there are no agreements, commitments, arrangements, contracts or other instruments binding upon the Purchaser or any of its properties requiring a consent, approval, authorization, order or other action of or filing with any Person as a result of the execution, delivery and performance of this Agreement or any of the Additional Agreements or the consummation of the transactions contemplated hereby or thereby.

5.6. **Issuance of Purchaser Shares.** The Purchaser Common Shares, when issued in accordance with this Agreement, will be duly authorized and validly issued and nonassessable, with the lock-up restrictions as set forth in Section 6.5 and Applicable Law.

5.7. **Capitalization and Ownership of the Purchaser.** Except as set forth in the Exchange Act Filings, there is no Contract that requires or under any circumstance would require the Company to issue, or grant any right to acquire, any securities of the Purchaser, or any security or instrument exercisable or exchangeable for or convertible into, the capital stock of the Purchaser or to merge, consolidate, dissolve, liquidate, restructure, or recapitalize the Purchaser.

5.8. **Ownership of Purchaser Shares**. Upon issuance and delivery of the Purchaser Shares to the Sellers pursuant to this Agreement against payment of the consideration therefor, the Purchaser Shares will be duly authorized and validly issued, fully paid and nonassessable, free and clear of all Liens, other than (i) restrictions arising from applicable Laws, (ii) any Lien created by or through the Sellers; or (iii) any Lien created in connection with the transactions contemplated by this Agreement and the Additional Agreements. The issuance and sale of the Purchaser Shares pursuant hereto will not be subject to or give rise to any preemptive rights or rights of first refusal.

5.9. **Litigation.** There is no action, suit, investigation, hearing or proceeding pending against any of its officers or directors, or the business of Purchaser, before any court or arbitrator or any governmental body, agency or official which if adversely determined against Purchaser, has or could reasonably be expected to have a Material Adverse Effect on the business, assets, condition (financial or otherwise), liabilities, results or operations or prospects of Purchaser, or which in any manner challenges or seeks to prevent, enjoin, alter or delay the transactions contemplated hereby. There are no outstanding judgments against the Purchaser.

21

**ARTICLE VI**
**COVENANTS OF THE COMPANY AND THE SELLERS**

The Company and the Sellers covenant and agree that:

6.1. **Conduct of the Business.** From the date hereof through the Closing Date, the Company and each Subsidiaries shall conduct the Business only in the ordinary course (including the payment of accounts payable and the collection of accounts receivable), consistent with past practices, and shall not enter into any material transactions without the prior written consent of the Purchaser, and use its commercially reasonable efforts to preserve intact the Company's business relationships with employees, suppliers, customers and other third parties. Without limiting the generality of the foregoing, from the date hereof until the Closing Date, without the Purchaser's prior written consent, neither the Company nor any Subsidiaries shall:

(a) except in the ordinary course of business, amend, waive any provision of, terminate prior to its scheduled expiration date, or otherwise compromise in any way, any Contract (including contracts described in Section (b) below), or any other right or asset;

(b) except as contemplated by this Agreement, enter into any contract, agreement, lease, license or commitment, which (i) is with respect to real property, (ii) except in the ordinary course of business, extends for a term of one year or more or (iii) obligates the payment of more than $10,000 (individually or in the aggregate);

(c) make any capital expenditures in excess of $10,000 (individually or in the aggregate);

(d) sell, lease, license or otherwise dispose of any assets or assets covered by any Contract except (i) pursuant to existing contracts or commitments disclosed herein;

(e) pay, declare or promise to pay any dividends or other distributions with respect to its capital stock, or pay, declare or promise to pay any other payments to the Company and the Sellers or any Affiliate of the Company and the Sellers;

(f) authorize any salary increase of more than 10% for any employee or change the bonus or profit sharing policies of the Company;

(g) obtain or suffer to exist any Indebtedness in excess of $10,000 in the aggregate other than in the ordinary business consistent with past practice;

(h) suffer or incur any Lien on any asset except for Liens existing as of the date hereof as set forth on Schedule 3.13(b);

(i) suffer any material damage, destruction or loss of property related to any assets that is not covered by insurance;

22

(j) delay, accelerate or cancel any receivables or Indebtedness or write-off or make further reserves against the same, except in the ordinary course of business;

(k) merge or consolidate with or acquire any other Person or be acquired by any other Person;

(l) suffer any insurance policy protecting assets to lapse;

(m) make any change in its accounting principles or methods or write down the value of any assets;

(n) change the place of business of the Company or any Subsidiaries;

(o) extend any loans to any Person, other than travel or other expense advances to employees in the ordinary course of business;

(p) issue, redeem or repurchase any shares of its capital stock;

(q) effect or agree to any change in any practices or terms, including payment terms, with respect to customers or suppliers;

(r) make or rescind any election related to Taxes, file any amended income Tax Return or make any changes in its methods of Tax accounting; or

(s) agree to do any of the foregoing.

None of the Company and the Sellers will (i) take or agree to take any action that might make any representation or warranty of the Company, any Subsidiaries or the Sellers hereunder inaccurate in any respect at, or as of any time prior to, the Closing Date or (ii) omit to take, or agree to omit to take, any action necessary to prevent any such representation or warranty from being inaccurate in any respect at any such time.

6.2. **Access to Information**. From the date hereof until and including the Closing Date, the Company and each Subsidiaries shall (a) continue to give the Purchaser, its counsel and other representatives full access to the Books and Records of each of them, (b) furnish to the Purchaser, its counsel and other representatives such information relating to the Business as such Persons may request and (c) cause the employees, counsel, accountants and representatives of the Company and each Subsidiaries to cooperate with Purchaser in its investigation of the Business.

6.3. **Notices of Certain Events**. The Company and any Subsidiaries shall promptly notify the Purchaser of:

(a) any notice or other communication from any Person alleging or raising the possibility that the consent of such Person is or may be required in connection with the transactions contemplated by this Agreement or that the transactions contemplated by this Agreement might give rise to any claims or causes of action or other rights by or on behalf of such Person or result in the loss of any rights or privileges of the Company or any Subsidiaries to any such Person;

23

(b) any notice or other communication from any Authority in connection with the transactions contemplated by this Agreement;

(c) any actions, suits, claims, investigations or proceedings commenced or threatened against, relating to or involving or otherwise affecting the Company, any Subsidiaries or the Business or that relate to the consummation of the transactions contemplated by this Agreement; and

(d) the occurrence of any fact or circumstance which might make any representation made hereunder by the Company, any Subsidiaries, and/or the Sellers false in any respect or result in the omission or the failure to state a material fact.

6.4. **Retaining the Core Employees** The Company shall cause members of the senior management to maintain the employment relationship with Company or its Subsidiaries for a period no less than three (3) years following the Closing Date and to sign non-competition agreement providing that they will not compete with the business currently conducted by the Company for at least three years following the Closing Date.

6.5. **Lock-Up**. The Sellers will enter into Lock-Up Agreements pursuant to which the Sellers will not be entitled to sell, hypothecate or otherwise transfer, in any way, shape or form, the Purchaser Shares issued to them pursuant to the terms of this Agreement for a period of twelve months following the Closing Date of this Agreement. The Sellers shall cause their respective shareholding structure to remain unchanged within such lock-up period. If the Sellers breach their liabilities under the Section 6.4 above, the Sellers agree to transfer the Purchase Common shares which are in the lock-up period to the Purchaser free of charge.

6.6. **Legends**. The Seller understands that the share certificates, unless and until registered, shall bear a restrictive legend in substantially the following form (and a stop-transfer order may be placed against transfer of such share certificates):

"THE SECURITIES EVIDENCED BY THIS CERTIFICATE ARE GOVERNED BY THAT CERTAIN SHARE EXCHANGE AGREEMENT DATED DECEMBER 15, 2019 (THE "AGREEMENT") AND HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR THE SECURITIES LAWS OF ANY STATE OR OTHER JURISDICTION. THE SECURITIES MAY NOT BE OFFERED, SOLD, PLEDGED OR OTHERWISE TRANSFERRED EXCEPT (1) PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT OR (2) PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT, IN EACH CASE IN ACCORDANCE WITH ALL APPLICABLE STATE SECURITIES LAWS AND THE SECURITIES LAWS OF OTHER JURISDICTIONS, AND IN THE CASE OF A TRANSACTION EXEMPT FROM REGISTRATION, UNLESS THE COMPANY HAS RECEIVED AN OPINION OF COUNSEL REASONABLY SATISFACTORY TO IT THAT SUCH TRANSACTION DOES NOT REQUIRE REGISTRATION UNDER THE SECURITIES ACT AND SUCH OTHER APPLICABLE LAWS. MOREOVER, NONE OF THE SHARES REPRESENTED BY THIS CERTIFICATE MAY BE OFFERED, SOLD, PLEDGED OR OTHERWISE TRANSFERRED PRIOR TO THE ONE YEAR ANNIVERSARY DATE OF THE ISSUANCE DATE, DECEMBER 31, 2020; COMMENCING ON JANUARY 1, 2021, AND CONTINUING ON EACH ANNIVERSARY THEREOF, TWENTY FIVE PERCENT (25%) OF THE INITIALLY ISSUED NUMBER OF SHARES SHALL BE RELEASED FROM SUCH LOCK-UP AND MAY BE OFFERED, SOLD, PLEDGED OR OTHERWISE TRANSFERRED."

The legend set forth above shall be removed and the Company shall issue a certificate without such legend to the holder of the Purchaser Shares upon which it is stamped, if, unless otherwise required by state securities laws, (i) such Shares are registered for resale under the 1933 Act or (ii) in connection with a sale, assignment or other transfer, such holder provides the Company with a legal opinion reasonably acceptable to the Company, to the effect that such sale, assignment or transfer of the Purchaser Shares may be made without registration under the applicable requirements of the 1933 Act.

6.7. **Post-Closing Obligations**. Immediately after the Closing Date, the Company and the Sellers shall deliver common seals, all original corporate documents, financial documents, commercial agreements and/or other documents relating to the Company and the Subsidiaries to the Purchaser, subject to requirement of the Purchaser at the time of delivery of such documents.

**ARTICLE VII**
**COVENANTS OF THE PURCHASER**

7.1. **Conduct of Business.** The Purchaser covenants and agrees it shall not take or agree to take any actions that would cause a breach in Purchaser's representations or warranties contained in this Agreement or prevent the Purchaser from performing its covenants hereunder.

7.2. **Fulfillment of Conditions**. From the date hereof to the Closing Date, the Purchaser shall use its commercially reasonable efforts to fulfill the conditions specified in ARTICLE IXX to the extent that the fulfillment of such conditions is within its control. The foregoing obligation includes (a) the execution and delivery of documents necessary or desirable to consummate the transactions contemplated hereby, and (b) taking or refraining from such actions as may be necessary to fulfill such conditions (including conducting the business of the Purchaser in such manner that on the Closing Date the representations and warranties of the Purchaser contained herein shall be accurate as though then made).

7.3. **Non-Solicitation**. The Purchaser and its Affiliates, prior to the Closing or in any future time within three (3) years after the execution date of this Agreement if the deal contemplated in this Agreement fails to close, may not directly or indirectly through any other individual, person or entity, maliciously employ, solicit or induce any individual who is, or was at any time during the period from the execution date of this Agreement to the Closing Date ("Restriction Period"), an employee or consultant of the Company or its Subsidiaries to terminate or refrain from renewing or extending his or her employment by or consulting relationship with the Company or its Subsidiaries, or to become employed or enter into a consulting relationship with the Purchaser or any of its Affiliates immediately prior to the Closing Date, or any other individual, person or entity.

25

7.4. **Disclosure of Certain Matters**. The Purchaser shall give the Sellers prompt written notice of any event or development that occurs that had it existed or been known on the date hereof (a) would cause any of the representations and warranties of the Purchaser contained herein to be materially inaccurate or otherwise misleading, or (b) would require any amendment or supplement to this Agreement.

### ARTICLE VIII
### COVENANTS OF ALL PARTIES HERETO

The parties hereto, as applicable, covenant and agree that:

8.1. **Commercially Reasonable Efforts; Further Assurances**. Subject to the terms and conditions of this Agreement, each party shall use its commercially reasonable efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary or desirable under applicable Laws, to consummate and implement expeditiously the transactions contemplated by this Agreement. The parties hereto shall execute and deliver such other documents, certificates, agreements and other writings and take such other actions as may be necessary or desirable in order to consummate or implement expeditiously the transactions contemplated by this Agreement.

8.2. **Confidentiality of Transaction**. Any information (except publicly available or freely usable material obtained from another source) respecting any party or its Affiliates will be kept in strict confidence by all other parties to this Agreement and their agents. Except as required by Law or Authority, neither the Purchaser nor the Company and the Sellers, nor any of their respective Affiliates, directors, officers, employees or agents will disclose the terms of the transactions contemplated hereunder at any time, currently, or on or after the Closing, regardless of whether the Closing takes place, except as necessary to their attorneys, accountants and professional advisors, in which instance such persons and any employees or agents of the Purchaser or Sellers, as the case may be, shall be advised of the confidential nature of the terms of the transaction and shall themselves be required by the Purchaser nor the Company and the Sellers, as the case may be, to keep such information confidential. Except as required by Law or Authority, each party shall retain all information obtained from the other and their lawyers on a confidential basis except such information may be discussed as necessary to their attorneys, accountants and professional advisors, in which instance such persons and any employees or agents of such party shall be advised of the confidential nature of the terms of the transaction and shall themselves be required by such party to keep such information confidential. In the event of disclosure as required by Law or Authority, the Parties may have a friendly consultation with each other regarding how to disclose information.

8.3. **Commercially Reasonable Efforts to Obtain Consents**. Each party hereby agrees to use its reasonable commercially reasonable efforts to obtain each respective consent required to consummate the Transaction as promptly as practicable hereafter.

26

**ARTICLE IX**
**CONDITIONS TO CLOSING**

9.1. **Condition to the Obligations of the Parties.** The obligations of the Purchaser, the Company and the Sellers to consummate the Closing are subject to the satisfaction of all the following conditions:

(a) No provision of any applicable Law or Order shall prohibit or impose any condition on the consummation of the Closing or limit in any material way the Purchaser's right to control or operate the Company, or any material portion of the Business.

(b) There shall not be pending or threatened any proceeding by a third-party to enjoin or otherwise restrict the consummation of the Closing.

9.2. **Conditions to Obligations of the Purchaser.** In addition to the terms and provisions of Section 2.3, the obligation of Purchaser to consummate the Closing is subject to the satisfaction, or the waiver at Purchaser's sole and absolute discretion, of all the following further conditions:

(a) (i) Each of the Company and the Sellers shall have duly performed in all material respects all of their respective obligations hereunder required to be performed by them at or prior to the Closing Date, (ii) the representations and warranties of the Company and the Sellers contained or referred to in this Agreement, the Additional Agreements and in any certificate or other writing delivered by the Company and the Sellers pursuant hereto, disregarding all qualifications and exceptions contained therein relating to materiality or Material Adverse Effect, shall be true and correct at and as of the Closing Date, as if made at and as of such date with only such exceptions as could not in the aggregate reasonably be expected to have a Material Adverse Effect, (iii) there shall have been no event, change or occurrence which individually or together with any other event, change or occurrence, could reasonably be expected to have a Material Adverse Change or a Material Adverse Effect, regardless of whether it involved a known risk.

(b) The Purchaser shall have received (i) copies of resolutions duly adopted by (a) the Board of Director(s), Shareholders or Members of the Sellers, the Company and each of Subsidiaries, authorizing this Agreement and the Additional Agreements (if necessary) and the transactions contemplated hereby and thereby, (ii) the updated register of shareholder or members and/or the register of directors of the Company and Sellers reflecting the change of shareholders, members and directors for the purpose of this Transaction, which shall be certified by their registered agents, (iii) a share certificate of Company reflecting owning all the Exchange Shares by the Sellers; (iv) a PRC legal opinions on the Company and Subsidiaries, the form and content of which has been attached hereto as Exhibit F, and (v) a certificate of the chairman or person in the similar position of the Sellers, the Company and each of Subsidiaries certifying each of the foregoing, completion of covenants and correctness of representations and warranties and as to signatures of the officer(s) authorized to execute this Agreement and any certificate or document to be delivered pursuant hereto.

(c) The Purchaser shall have received updated Disclosure Schedules to this Agreement as of a date within three days prior to the Closing Date.

(d) The original stock ledgers and minute books of the Company shall be delivered to the Purchaser.

27

(e) The Additional Agreements shall be in full force and effect or become effective on the Closing Date.

9.3. **Conditions to Obligations of the Company and the Sellers**. In addition to the terms and provisions of Section 2.3, the obligation of the Company and the Sellers to consummate the Closing is subject to the satisfaction, or the waiver at the Company and the Sellers' discretion, of all the following further conditions:

(a) The Purchaser shall have duly performed in all material respects its obligations hereunder required to be performed by it at or prior to the Closing Date, (ii) the representations and warranties of the Purchaser contained in this Agreement, the Additional Agreements and in any certificate or other writing delivered by the Purchaser pursuant hereto, disregarding all qualifications and expectations contained therein relating to materiality, shall be true and correct in all material respects at and as of the Closing Date, as if made at and as of such date, provided, however, that the Purchaser and/or its Affiliates, are permitted to enter into such arrangements as would be necessary for the Purchaser to secure the approval of its stockholders of the transactions contemplated by this Agreement (including such arrangements as would require the combined company to use monies available to satisfy its obligations due to the transactions contemplated by this Agreement), if any; and (iii) the Sellers and the Company shall have received a certificate signed by an authorized officer of Purchaser to the effect set forth in Sections (i) and (ii) of this Section 9.3(a).

(b) The Company and the Sellers shall have received (i) a copy of the organizational documents of the Purchaser, (ii) copies of resolutions duly adopted by the Board of Directors of the Purchaser authorizing this Agreement and the Additional Agreements (if necessary) and the transactions contemplated hereby and thereby, (iii) a certificate of the CEO or CFO of the Purchaser certifying each of the foregoing, completion of covenants and correctness of representations and warranties and as to signatures of the officer(s) authorized to execute this Agreement and any certificate or document to be delivered pursuant hereto, together with evidence of the incumbency of such Secretary, and (iv) a recent good standing certificate regarding the Purchaser from the office of the Secretary of State of its respective jurisdiction of organization and each other jurisdiction in which each of Purchaser is qualified to do business, and (v) share certificates of the Purchaser reflecting owning the Purchaser Shares pursuant to this Agreement by the Sellers and/or its nominees.

**ARTICLE X**
**RELIANCE ON REPRESENTATIONS AND WARRANTIES**

10.1. **Reliance on Representations and Warranties of the Company and the Sellers**. Notwithstanding any right of the Purchaser to fully investigate the affairs of the Company, and each of Subsidiaries and notwithstanding any knowledge of facts determined or determinable by the Purchaser pursuant to such investigation or right of investigation, the Purchaser shall have the right to rely fully upon the representations, warranties, covenants and agreements of the Company and the Sellers contained in this Agreement.

10.2. **Reliance on Representations and Warranties of the Purchaser**. Notwithstanding any right of the Company and the Sellers to investigate the affairs of the Purchaser and notwithstanding any knowledge of facts determined or determinable by the Company and the Sellers pursuant to such investigation or right of investigation, the Company and the Sellers shall have the right to rely fully upon the representations, warranties, covenants and agreements of Purchaser contained in this Agreement.

28

## ARTICLE XI
## INDEMNIFICATION

11.1. **Indemnification of the Purchaser.** In addition to other indemnity expressly provided in this Agreement, the Purchaser's sole indemnity under this Agreement is to rescind the agreement and request for delivering back of any and all Purchase Price as delivered to the Sellers.

11.2. **Indemnification of the Sellers.** In addition to other indemnity expressly provided in this Agreement, the Sellers' sole indemnity under this Agreement is to rescind the agreement and request for delivering back of any and all Exchange Share as delivered to the Purchaser.

11.3. **Insurance.** Any indemnification payments hereunder shall be reduced by any insurance proceeds or other third party reimbursement actually received by an Indemnified Party.

11.4. **Survival of Indemnification Rights.** The representations and warranties of the Company and the Sellers and the Purchaser shall survive until the 18 month anniversary of the Closing Date. The indemnification to which any Indemnified Party is entitled from the Indemnifying Parties pursuant to Section 11.1 or 11.2 for Losses shall be effective so long as it is asserted prior to the 18 month anniversary of the Closing Date in the case of all representations and warranties of the Company, the Subsidiaries, the Sellers and Purchaser hereunder.

## ARTICLE XII
## DISPUTE RESOLUTION

12.1. **Arbitration.**

(a) In the event a dispute arises relating to this Agreement, the parties agree to meet to resolve their disputes in good faith. Any party may seek injunctive relief, without the need to post a bond, pending the completion of arbitration under this Agreement for any breach or threatened breach of any covenant contained herein.

(b) If after good faith negotiations the dispute is not resolved, the parties shall promptly submit any dispute, claim, or controversy arising out of or relating to this Agreement, or any Additional Agreement (including with respect to the meaning, effect, validity, termination, interpretation, performance, or enforcement of this Agreement or any Additional Agreement) or any alleged breach thereof (including any action in tort, contract, equity, or otherwise), to binding arbitration by an arbitration panel set up and administered by China International Economic and Trade Arbitration Commission ("CIETAC") in accordance with the CIETAC rules in Beijing ("Arbitrator"). The parties agree that binding arbitration shall be the sole means of resolving any dispute, claim, or controversy arising out of or relating to this Agreement or any Additional Agreement (including with respect to the meaning, effect, validity, termination, interpretation, performance or enforcement of this Agreement or any Additional Agreement) or any alleged breach thereof (including any claim in tort, contract, equity, or otherwise).

29

(c) The laws of the PRC shall apply to any arbitration hereunder. In any arbitration hereunder, this Agreement and any agreement contemplated hereby shall be governed by the laws of the PRC applicable to a contract negotiated, signed, and wholly to be performed in the PRC, which laws the Arbitrator shall apply in rendering his decision. The Arbitrator shall issue a written decision, setting forth findings of fact and conclusions of law, within sixty (60) days after he shall have been selected. The Arbitrator shall have no authority to award punitive or other exemplary damages.

(d) The arbitration shall be held in Beijing in accordance with and under the then-current provisions of the rules of the CIETAC, except as otherwise provided herein.

(e) The Arbitrator may, at his discretion and at the expense of the party who will bear the cost of the arbitration, employ experts to assist him in his determinations.

(f) The costs of the arbitration proceeding and any proceeding in court to confirm any arbitration award or to obtain relief as provided in Section 12.1, as applicable (including actual attorneys' fees and costs), shall be borne by the unsuccessful party and shall be awarded as part of the Arbitrator's decision, unless the Arbitrator shall otherwise allocate such costs for the reasons set forth in such decision. The determination of the Arbitrator shall be final and binding upon the parties and not subject to appeal.

(g) Any judgment upon any award rendered by the Arbitrator may be entered in and enforced by any court of competent jurisdiction. The parties expressly consent to the personal and subject matter jurisdiction of the Arbitrator to arbitrate any and all matters to be submitted to arbitration hereunder. None of the parties hereto shall challenge any arbitration hereunder on the grounds that any party necessary to such arbitration (including the parties hereto) shall have been absent from such arbitration for any reason, including that such party shall have been the subject of any bankruptcy, reorganization, or insolvency proceeding.

(h) The parties shall indemnify the Arbitrator and any experts employed by the Arbitrator and hold them harmless from and against any claim or demand arising out of any arbitration under this Agreement or any agreement contemplated hereby, unless resulting from the willful misconduct of the person indemnified.

(i) This arbitration Section shall survive the termination of this Agreement and any agreement contemplated hereby.

12.2. **Attorneys' Fees**. The unsuccessful party to any court or other proceeding arising out of this Agreement that is not resolved by arbitration under Section 12.1 shall pay to the prevailing party all reasonable attorneys' fees and costs reasonably incurred by the prevailing party, in addition to any other relief to which it may be entitled.

30

## ARTICLE XIII
## TERMINATION

13.1. **Termination Without Default.** In the event that the Closing of the transactions contemplated hereunder has not occurred within ninety (90) days following the execution of this Agreement (the "Outside Closing Date") and no material breach of this Agreement by the party seeking to terminate this Agreement shall have occurred or have been made (as provided in Section 13.2 hereof), the Purchaser, on the one hand, and the Company and the Sellers, on the other hand, shall have the right, at its or their sole option, to terminate this Agreement without liability to the other side. Such right may be exercised by the Purchaser, on the one hand, or the Company and the Sellers, on the other, as the case may be, giving written notice to the other at any time after the Outside Closing Date.

13.2. **Termination Upon Default.**

(a) The Purchaser may terminate this Agreement by giving notice to the Company and the Sellers on or prior to the Closing Date, without prejudice to any rights or obligations the Purchaser may have, if the Company and the Sellers shall have materially breached any representation or warranty or breached any agreement or covenant contained herein or in any Additional Agreement to be performed prior to Closing and such breach shall not be cured within the earlier of the Outside Closing Date and five (5) days following receipt by the Company or the Sellers of a notice describing in reasonable detail the nature of such breach.

(b) The Company and the Sellers may terminate this Agreement by giving prior written notice to the Purchaser on or prior to the Closing, without prejudice to any rights or obligations the Company or the Sellers may have, if the Purchaser shall have materially breached any of its covenants, agreements, representations, and warranties contained herein to be performed prior to Closing and such breach shall not be cured within the earlier of the Outside Closing Date and five (5) days following receipt by the Purchaser of a notice describing in reasonable detail the nature of such breach.

13.3. **Survival.** The provisions of ARTICLE XI and ARTICLE XII and Sections 7.4, 8.2 and 14.4 shall survive any termination hereof pursuant to this ARTICLE XIII.

31

## ARTICLE XIV
## MISCELLANEOUS

14.1. **Notices**. Any notices, consents, waivers or other communications required or permitted to be given under the terms of this Agreement must be in writing and will be deemed to have been delivered: (i) upon receipt, when delivered personally; (ii) upon receipt, when sent by facsimile (provided confirmation of transmission is mechanically or electronically generated and kept on file by the sending party); or (iii) one Business Day after deposit with an overnight courier service, in each case properly addressed to the party to receive the same. The addresses and facsimile numbers for such communications shall be:

If to the Purchaser:

Hebron Technology Co., Ltd.
No. 936, Jinhai 2nd Road, Konggang New Area
Longwan District
Wenzhou City, Zhejiang Province
People's Republic of China
Attention: Changjuan Liang, Chief Financial Officer

Copy (for informational purposes only) to:

Kaufman & Canoles, P.C.
Two James Center, 14th Floor
1021 East Cary Street
Richmond, Virginia 23219
Telephone:    (804) 771-5700
Facsimile:    (804) 771-5777
Attention:    Anthony W. Basch, Esq.

If to the Company:

Beijing Heng-Tai Pu-Hui Information Service Co. Ltd.

Suite B605, TongTai Tower; 33 Jinrong Street; Beijing, China

Telephone: (86/10)5764-9350

If to a Seller, to its address and facsimile number set forth on the Schedule of Sellers, with copies to the Seller's representatives as set forth on the Schedule of Sellers, or to such other address and/or facsimile number and/or to the attention of such other Person as the recipient party has specified by written notice given to each other party five (5) days prior to the effectiveness of such change. Written confirmation of receipt (A) given by the recipient of such notice, consent, waiver or other communication, (B) mechanically or electronically generated by the sender's facsimile machine containing the time, date, recipient facsimile number and an image of the first page of such transmission or (C) provided by an overnight courier service shall be rebuttable evidence of personal service, receipt by facsimile or receipt from an overnight courier service in accordance with clause (i), (ii) or (iii) above, respectively.

Any document shall be deemed to have been duly served if marked for the attention of the agent for service of process at its address (as set forth in the Schedule of Sellers) or such other address in the United States as may be notified to the party wishing to serve the document and delivered in accordance with the notice provisions set forth in this Section 14.1.

32

14.2. **Amendments; No Waivers**.

(a) Any provision of this Agreement may be amended or waived if, and only if, such amendment or waiver is in writing and signed, in the case of an amendment, by each party hereto, or in the case of a waiver, by the party against whom the waiver is to be effective.

(b) No failure or delay by any party hereto in exercising any right, power or privilege hereunder shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege. The rights and remedies herein provided shall be cumulative and not exclusive of any rights or remedies provided by law.

14.3. **Ambiguities.** The parties acknowledge that each party and its counsel has materially participated in the drafting of this Agreement and consequently the rule of contract interpretation that, and ambiguities if any in, the writing be construed against the drafter, shall not apply.

14.4. **Publicity.** Except as required by Law or the rules and regulations of the SEC and/or the Nasdaq Stock Market, the parties agree that neither they nor their agents shall issue any press release or make any other public disclosure concerning the transactions contemplated hereunder without the prior approval of the other party hereto.

14.5. **Expenses**. Except as specifically provided in this Agreement, all costs and expenses incurred in connection with this Agreement and the transactions contemplated hereby shall be paid by the party incurring such cost or expense.

14.6. **Successors and Assigns**. The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns; provided, that (i) none of Company and the Sellers may assign, delegate or otherwise transfer any of its rights or obligations under this Agreement without the prior written consent of the Purchaser; and (ii) in the event the Purchaser assigns its rights and obligations under this Agreement to an Affiliate, the Purchaser shall continue to remain liable for its obligations hereunder. Except as specifically set forth in Section (ii) above, the Purchaser may not assign, delegate or otherwise transfer any of its rights or obligations under this Agreement without the prior written consent of the Subsidiaries and the Sellers.

14.7. **Governing Law**. This Agreement has been entered into in the PRC. This Agreement shall be construed in accordance with and governed by the laws of the PRC, without giving effect to the conflict of laws principles thereof.

14.8. **Counterparts; Effectiveness**. This Agreement may be signed by facsimile signatures and in any number of counterparts, each of which shall be an original and all of which shall be deemed to be one and the same instrument, with the same effect as if the signatures thereto and hereto were upon the same instrument.

14.9. **Entire Agreement**. This Agreement constitutes the entire agreement among the parties with respect to the subject matter hereof and supersedes all prior agreements, understandings and negotiations, both written and oral, among the parties with respect to the subject matter of this Agreement. No representation, inducement, promise, understanding, condition or warranty not set forth herein has been made or relied upon by any party hereto. Neither this Agreement nor any provision hereof is intended to confer upon any Person other than the parties hereto any rights or remedies hereunder other than Indemnified Parties as set forth in Section 11.1 and 11.2 hereof, which shall be third party beneficiaries hereof.

33

14.10. **Severability.** If any one or more provisions of this Agreement shall, for any reasons, be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provision of this Agreement, but this Agreement shall be construed as if such invalid, illegal or unenforceable provision had never been contained herein.

14.11. **Captions.** The captions herein are included for convenience of reference only and shall be ignored in the construction or interpretation hereof.

14.12. **Construction.** References in this Agreement to "Articles," "Sections," "Schedules" and "Exhibits" shall be to the Articles, Sections, Schedules and Exhibits of this Agreement, unless otherwise specifically provided; all Schedules to this Agreement are incorporated herein by reference; any use in this Agreement of the singular or plural, or the masculine, feminine or neuter gender, shall be deemed to include the others, unless the context otherwise requires; the words "herein", "hereof" and "hereunder" and words of similar import, when used in this Agreement, shall refer to this Agreement as a whole and not to any particular provision of this Agreement; the word "including" when used in this Agreement shall mean "including without limitation"; and except as otherwise specified in this Agreement, all references in this Agreement (a) to any agreement, document, certificate or other written instrument shall be a reference to such agreement, document, certificate or instrument, in each case together with all exhibits, schedules, attachments and appendices thereto, and as amended, restated, supplemented or otherwise modified from time to time in accordance with the terms thereof; and (b) to any law, statute or regulation shall be deemed references to such law, statute or regulation as the same may be supplemented, amended, consolidated, superseded or modified from time to time.

**[The remaining of this page is intentionally left blank]**

34

IN WITNESS WHEREOF, each Party has caused this Agreement to be duly executed by their respective authorized officers as of the day first above written.

*The Purchaser:*

**Hebron Technology Co., Ltd.**

By: /s/ Anyuan Sun
   Name: Anyuan Sun
   Title: Chief Executive Officer

By: /s/ Changjuan Liang
   Name: Changjuan Liang
   Title: Chief Financial Officer

*The Company:*

**Beijing Heng-Tai Pu-Hui Information Service Co. Ltd**

By: /s/ Zeng Lin
   Name: Zeng Lin
   Title: CEO

*The Sellers:*

**Guoya Investment Holding Co. Ltd. (BVI)**

By: /s/ Liping Peng
   Name: Liping Peng
   Title: Director

**HongKong D&L Technology Co., Limited**

By: /s/ Xiaoyun Huang
   Name: Xiaoyun Huang
   Title: Director

协议一

## 商标、技术及管理顾问服务协议

## Trademarks, Technologies & Management and Consulting Services

## Agreement

本协议由以下双方于 2019 年 12 月 31 日在中国上海签署

This Trademarks, Technologies & Management and Consulting Services Agreement (this "Agreement") is being made and entered into on Dec. 31, 2019 (the "Effective Date") in Shanghai, the People's Republic of China.

甲方：宁臣（上海）企业管理有限公司

PARTY A: Ning Chen (Shanghai) Enterprise Management Group Co., Ltd.

住所：上海市金山区张堰镇花贤路 69 号 B4115 室

Address: Room B4115, No. 69 Huaxian Road, Jinshan District, Shanghai, China

统一社会信用代码：91310000MA1JBRW03M

Unified Social Credit Code: 91310000MA1JBRW03M

类型：有限责任公司（台港澳法人独资）

Type: Limited liability Company (Taiwan, Hong Kong and Macao's sole proprietorship of legal person)




1 / 16

法定代表人：江鹏

Legal Representative: JIANG Peng

乙方：北京恒泰普惠信息服务有限公司

PARTY B: Beijing Hengtai Puhui Information Service Co., Ltd.

类型：有限责任公司（自然人投资或控股）

Type: Limited Liability Company (invested by or controlled by natural person)

住所：北京市西城区金融大街 33 号 B 座 6 层 605 单元

Address: Unit 605, 6th floor, Block B, No.33 financial street, Xicheng district, Beijing, China

统一社会信用代码：9111010833968793X7

Unified Social Credit Code: 9111010833968793X7

法定代表人：黄筱赟

Authorized Representative: HUANG Xiaoyun

国亚资产管理（深圳）有限公司，现持有北京恒泰普惠信息服务有限公司 100%的股权，其中包括恒泰先锋投资有限公司协议转让的 30%股权。

Guoya Asset Management (Shenzhen) Co., Ltd, holds 100% of the equity interest of Beijing Hengtai Puhui Information Service Co., Ltd., including the 30% equity agreed to transfer

协议一

by Hengtai Xianfeng Investment Co., Ltd.

类型：有限责任公司（自然人投资或控股）

Type: Limited Liability Company (invested by or controlled by natural person)

住所：深圳市前海深港合作区前湾一路 1 号 A 栋 201 室

Address: Room 201, Building A, No.1 Qianwan 1st road, Qianhai Shenzhen-Hong Kong cooperation zone, Shenzhen, China

统一社会信用代码：91440300MA5D870355

Unified Social Credit Code: 91440300MA5D870355

法定代表人：赵传海

Authorized Representative: ZHAO Chuanhai

鉴于：

WHEREAS,

1. 乙方系一家依照中华人民共和国法律注册成立的有限责任公司；

1. Party B is a limited liability company incorporated and validly existing under the laws of the People's Republic of China.

2. 乙方包括北京恒泰普惠信息服务有限公司及持有北京恒泰普惠信息服务有限公司全部股权的全体股东，在本协议中，北京恒泰普惠信

息服务有限公司及其股东国亚资产管理（深圳）有限公司作为协议共同的一方。

2. Party B shall mean Beijing Hengtai Puhui Information Service Co., Ltd. (the "Company") together with all the equity interest holders of the Company. In this Agreement, the Company and the equity interest holders Guoya Asset Management (Shenzhen) Co., Ltd. are collectively referred as the same party of this Agreement.

3. 乙方同意将其拥有的北京恒泰普惠信息服务有限公司的商标、技术及相关知识产权无偿转让给甲方。同时乙方聘请甲方为其公司独家的管理及顾问服务机构。服务内容包括独家管理及顾问、客户管理及市场推广咨询、企业管理及咨询、财务咨询、员工培训等。

3. Party B agrees to donate all trademarks, technologies and intellectual property rights as gift to Party A. Party B engages Party A as an exclusive management and consulting services agent including client management, marketing counseling, corporate management and counseling, finance consulting and personnel training.

4. 甲方同意作为独家的管理及顾问服务机构为乙方提供服务，同时将其拥有的北京恒泰普惠信息服务有限公司的商标、技术及相关知识产