UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE HEBRON TECHNOLOGY CO., LTD.
SECURITIES LITIGATION

20 Civ. 4420 (PAE)

<u>OPINION & ORDER</u>

PAUL A. ENGELMAYER, District Judge:

In this putative class action, lead plaintiff Edward A. Dahlke and plaintiff Michael Clynes
(together, "plaintiffs") claim that a Chinese holding company's failure to disclose alleged related
party dealings violated federal securities law.  Their Consolidated Second Amended Complaint,
Dkt. 38 ("SAC"), claims that Hebron Technology Co., Ltd. ("Hebron") and two of its officers,
defendants Anyuan Sun and Changjuan Liang (together, the "Individual Defendants," and with
Hebron, "defendants"), misrepresented and omitted material information in public statements by
failing to identify three transactions as related party transactions.  They allege violations of
§§ 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and the
corresponding rule of the Securities and Exchange Commission ("SEC"), 17 C.F.R. § 240.10b-5
("Rule 10b-5").[1]

Pending now is Hebron's motion to dismiss the SAC for failure to state a claim under
Federal Rule of Civil Procedure 12(b)(6).  For the following reasons, the Court grants the motion
and dismisses the SAC in its entirety.

---

[1] Specifically, plaintiffs bring claims under § 10(b) and Rule 10b-5 against all defendants and a
claim under § 20(a) against the Individual Defendants.  SAC ¶¶ 121, 131.

I.      **Background**[2]

A.      **The Parties**

Hebron—which recently changed its name to NiSun International Enterprise

Development Group Co., Ltd.—is a small public holding company that was incorporated under

the laws of the British Virgin Islands in 2012, with its principal executive offices in China.  SAC

¶¶ 2, 16, 20.  It conducts its business through subsidiaries, variable interest entities ("VIEs") and

subsidiaries of VIEs in China.  *Id.*  ¶¶ 2, 20.  It is an equipment and engineering service business

focusing on the research, development, and manufacture of fluid equipment, including valves

_____

[2] These facts are drawn primarily from the SAC.  Dkt. 38.  For the purpose of resolving the
motion to dismiss, the Court assumes all well-pled facts to be true and draws all reasonable
inferences in favor of plaintiffs.  *See Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir.
2012).

The Court has also considered the documents attached to the declaration of Matthew Tharp in
support of Hebron's motion to dismiss.  Dkt. 36 ("Tharp Decl.").  Because these documents were
incorporated into the SAC by reference, or are matters of public record, they are properly
considered on a motion to dismiss.  *See City of Pontiac Policemen's & Firemen's Ret. Sys. v.
UBS AG*, 752 F.3d 173, 179 (2d Cir. 2014) (in resolving motion to dismiss, court may consider,
*inter alia*, "any statements or documents incorporated in it by reference, as well as public
disclosure documents required by law to be, and that have been, filed with the SEC, and
documents that the plaintiffs either possessed or knew about and upon which they relied in
bringing the suit"); *see also Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 166 n.8 (2d Cir. 2000)
("[T]he district court may take judicial notice of well-publicized stock prices.").  The Court
considered these documents "not for the truth of the matters asserted therein," but only "for the
fact that the statements were made."  *Clark v. Kitt*, No. 12 Civ. 8061 (CS), 2014 WL 4054284,
at *7 (S.D.N.Y. Aug. 15, 2014); *see also, e.g., Finn v. Barney*, 471 F. App'x 30, 32 & n.1
(2d Cir. 2012) (district court did not abuse its discretion in taking judicial notice of SEC filings,
news articles regarding SEC order, and a section of a website containing disclosure information,
where judicial notice was "for the purpose of establishing that the information was publicly
available . . . [and the court] did not consider the documents for their truth"); *Staehr v. Hartford
Fin. Servs. Grp.*, 547 F.3d 406, 425 (2d Cir. 2008) ("[I]t is proper to take judicial notice of the
fact that press coverage, prior lawsuits, or regulatory filings contained certain information,
without regard to the truth of their contents." (emphasis omitted)); *Doron Precision Sys., Inc. v.
FAAC, Inc.*, 423 F. Supp. 2d 173, 179 n.8 (S.D.N.Y. 2006) ("For purposes of a 12(b)(6) motion
to dismiss, a court may take judicial notice of information publicly announced on a party's
website, as long as the website's authenticity is not in dispute and it is capable of accurate and
ready determination." (internal quotation marks and citation omitted)).

and pipefittings. *Id.* ¶¶ 2, 21.  On July 12, 2019, it began providing financial advisory service operations after its acquisition of NiSun International Enterprise Management Group (British Virgin Islands) Co., Ltd. ("NiSun BVI").  *Id.* ¶¶ 2, 21, 63.  Since 2016, Hebron has traded on NASDAQ under the symbol HEBT.  *Id.* ¶¶ 16, 22.  Since June 2019, Bodang Liu has been the company's largest and controlling shareholder, holding 46.94% of Hebron's stock.  *Id.* ¶ 23. Hebron's 2019 Annual Report identified Liu as also the "ultimate controlling shareholder" of Hebron, its subsidiaries, VIEs, and subsidiaries of its VIEs.  *Id.* ¶ 24.

The Individual Defendants are Anyuan Sun and Changjuan Liang.[3]

Sun was Hebron's Chief Executive Officer ("CEO") and chairman of its board of directors at all relevant times.  *Id.* ¶ 17.  On August 14, 2020, Sun resigned as CEO and chairman.  *Id.* ¶ 107.

Liang has served as Hebron's Chief Financial Officer ("CFO") since August 2019. *Id.* ¶¶ 18, 25.  Since May 2019, Liang has also served as CFO of Fintech (Shanghai) Investment Holding Co., Ltd, a subsidiary of NiSun BVI.  *Id.* ¶ 25.

Both named plaintiffs bought Hebron securities during the Class Period: between April 24, 2020 and June 3, 2020, inclusive.  *Id.* ¶ 1.  On June 1, 2020, lead plaintiff Edward Dahlke bought 500 shares of Hebron's stock.  On June 4, 2020, three days later, he sold these shares at a loss of $5,332.  *Id.* ¶ 15; Dkt. 8, Ex. A.  Plaintiff Michael Clynes purchased Hebron securities during the Class Period, and sold them afterwards, for a loss of $15,105.68.  *See* Dkt. 11, Ex. B.

---

[3] Consistent with the docket, Hebron's memorandum in support of its motion to dismiss, Dkt. 40 ("Hebron Mem."), states that the "Individual Defendants have not been served and are not yet appearing in this action." *Id.* at 1.

Dahlke and Clynes bring this lawsuit on behalf of all persons or entities who purchased or otherwise acquired U.S.-traded securities of Hebron during the Class Period.[4] SAC ¶ 1.

**B.      The Business Transactions Underlying Plaintiffs' Claims**

The SAC alleges that defendants made misleading statements, and omitted material information, in their public statements regarding three alleged related party transactions between December 2019 and May 2020. *Id.* ¶ 3. These are: (i) the Loong Fang PIPE Transaction; (ii) the Beijing Hengpu Acquisition; and (iii) the Nami Holding (Cayman) Acquisition. *Id.* ¶ 9.

The transactions are summarized below, along with the SAC's explanations—which require a more than ordinary degree of explication—as to why each ostensibly qualified as a related party transaction for Hebron. By way of overview, the SAC alleges that in general, transactions with related parties carry increased risk because they are not arms-length, and that disclosure of the related-party nature of such transactions would have influenced the judgment of a reasonable person relying on Hebron's statements, *see id.* ¶¶ 48, 62, 77, and the assessment of such an investor as to risk that the Hebron investment presented, *id.* ¶ 3. But, because the related-party nature of the transactions went undisclosed, the SAC alleges, the market was left with "an unrealistically positive assessment" of Hebron's "financial well-being and prospects," causing Hebron's share price to be artificially inflated throughout the Class Period. *Id.* ¶ 81. The SAC further alleges that the first of these transactions, the Loong Fang PIPE Transaction, was entered into solely to show that institutional investors were interested in the stock and "to push the stock price artificially higher." *Id.* ¶ 37. In each case, the SAC also alleges that the transaction was material. *See id.* ¶¶ 49 (Loong Fang PIPE Transaction was material because

---

[4] The putative class as defined excludes defendants; Hebron's officers and directors; members of their immediate families and their legal representatives, heirs, successors, or assigns; and "any entity in which Defendants have or had a controlling interest." SAC ¶ 108.

Hebron's stock price increased 34%, by $2.09, closing at $8.27 per share following the transaction); 61 (Beijing Hengpu Acquisition was material because of amount of the transaction); 79 (Nami Holding (Cayman) Acquisition was material because Hebron's stock price increased by $2.48, or nearly 18%, and closed at $16.28 per share, the day the transaction was announced).

In support of its claims that the three transactions were related party transactions, the SAC relies on (1) a June 3, 2020 research report issued by a short-seller, Grizzly Research, Tharp Decl., Ex. 5 (the "Grizzly Report"), which disclosed the purportedly related-party nature of the transactions, and (2) counsel's investigation, SAC ¶¶ 7, 9. This investigation, the SAC states, consisted of reviewing (a) Hebron's regulatory filings with the SEC; (b) Hebron's press releases and media reports; (c) Chinese corporate, legal, and regulatory filings, and media coverage; and (d) other publicly available information. *Id.* at 1.

### 1.   The Loong Fang PIPE Transaction

On December 9, 2019, Hebron filed a Form 6-K with the SEC. It disclosed that Hebron had entered into a share purchase agreement ("SPA") with two institutional investors: Jupiter Trading Co., Ltd. (BVI) ("Jupiter Trading") and the Loong Fang Trading Co., Ltd. (BVI) ("Loong Fang"). *Id.* ¶¶ 9, 36. Under the SPA, Hebron sold approximately 1.05 million of its common shares, at $6.21 per share, to these investors, yielding gross proceeds of approximately $6.5 million (the "Loong Fang PIPE Transaction"). *Id.*

The SAC alleges that Hebron's sale of its stock to Loong Fang (although not Jupiter Trading) was a related party transaction based on indirect links between Hebron's largest shareholder, Liu, and Loong Fang. *See id.* ¶¶ 37, 44. It alleges that Shan Jiang, who signed the Loong Fang PIPE Transaction SPA on behalf of Loong Fang, *id.* ¶ 38, became a supervisor in the following months at two companies owned by Benefactum, of which Liu owns 99%, *id.* ¶ 42.

On this basis, the SAC alleges, Loong Fang and Hebron were under common control of Liu, with Shan Jiang acting as Liu's "intermediary." *Id.* ¶ 42.

### 2. The Beijing Hengpu Acquisition

Beijing Hengtai Puhui Information Service Co., Ltd. ("Beijing Hengpu") is a financial technology platform that "focuses on companies in need of financing" that are listed on the NEEQ Exchange, one of China's stock exchanges. *Id.* ¶ 51.

On December 31, 2019, Hebron acquired Beijing Hengpu by issuing 1,440,894 shares of Hebron's common stock to Beijing Hengpu's shareholders (the "Beijing Hengpu Acquisition").[5] *Id.* ¶¶ 9, 50. The purchase price was approximately $11.4 million. *Id.* ¶ 52. The sellers of Beijing Hengpu were Guoya Investment Holding Co., Ltd. (BVI) ("Guoya BVI"), which had an 80% ownership interest, and HongKong D&L Technology Co., Ltd. ("HongKong D&L"), which held the remaining 20%. *Id.*

The SAC alleges that the acquisition was an undisclosed related party transaction, as a result of Hebron's ties to (a) Xiaoyun Huang, HongKong D&L's founder, director, and sole owner, who signed the share exchange agreement for HongKong D&L, *see id.* ¶ 54, and (b) Peng Jiang, who is affiliated with Beijing Hengpu, *see id.* ¶ 59.

#### a.    *Xiaoyun Huang*

The SAC alleges that Huang both controlled Beijing Hengpu and was linked, in several ways, to Hebron top shareholder Liu and his companies.

#### i.    Huang's control over Beijing Hengpu

On June 28, 2017, Huang registered as Beijing Hengpu's chairman. *Id.* ¶ 55. As of October 30, 2020, he remained Beijing Hengpu's legal representative. *Id.* And although Hebron

---

[5] The Share Exchange Agreement was dated December 15, 2019, *id.* ¶ 52, but allegedly took effect on December 31, 2019, *see id.* ¶¶ 9, 50.

has stated that Huang left Beijing Hengpu more than a year before the Beijing Hengpu

acquisition, the SAC alleges that "due to certain government regulatory policies that have

temporarily prohibited the company from changing its registration information," Huang

remained listed as the legal representative. *Id.* Thus, the SAC alleges, "[t]hrough these positions

held, Huang [possessed] the power to direct or cause the direction of Beijing Hengpu during the

time of the transaction on December 15, 2019." *Id.* (internal quotation marks omitted).

ii.      Huang's connections to Liu

The SAC alleges that Huang is connected to Liu because Huang holds positions at three

of Liu's companies: HuiYingJinFu, Benefactum, and NiSun Shanghai. According to articles

published in Chinese in June, August, and December 2019, Huang was CEO of Benefactum and

HuiYingJinFu. *Id.* ¶ 56. And according to Chinese media reports and press releases in May and

August 2019, Huang is also allegedly Vice President and Chief Fintech Officer of NiSun

Shanghai. *Id.* ¶ 57. As a result of Huang's connections at Beijing Hengpu and Liu's companies,

the SAC alleges that Huang acts as an intermediary between Beijing Hengpu and Liu. *Id.* ¶ 58.

*b.*      *Peng Jiang*

The SAC alleges that Peng Jiang holds positions at both Beijing Hengpu and companies

affiliated with Hebron. As to the former, since June 28, 2017, Peng Jiang has served as a

director and manager for Beijing Hengpu. *Id.* ¶ 59. As to the latter, since October 17, 2019,

Peng Jiang has been the legal representative and 99% shareholder of NiSun Shanghai, a

disclosed related party to Hebron. *Id.* He is also the legal representative of Fintech (Shanghi)

Digital Technology Co., Ltd. ("Shanghai Fintech"), which is a VIE company 100% owned by

Hebron. *Id.* Because of Peng Jiang's roles at Beijing Hengpu, NiSun Shanghai, and Shanghai

Fintech—which the SAC terms his "control relationships"—Peng Jiang is both an undisclosed

related party of Hebron's and to the Beijing Hengpu Acquisition. *Id.*

### 3.   The Nami Holding (Cayman) Acquisition

On May 22, 2020, Hebron announced that it had entered into a definitive SPA with Nami

Holding (Cayman) Co., Ltd. ("Nami Holding (Cayman)") to acquire all the outstanding shares of

Nami Holding (Cayman) for approximately $7.05 million in cash and 1,562,726 of Hebron Class

A common shares.  *Id.* ¶¶ 9, 65.  Hebron filed a Form 6-K with the SEC and a press release

announcing the arrangement (the "Nami Holding (Cayman) Acquisition").  *Id.* ¶ 64.

The SAC asserts that the Nami Holding (Cayman) Acquisition was a related party

transaction as a result of Hebron's ties to Jinbao Li and his company Shanghai Nami Financial

Consulting Co., Ltd. ("Shanghai Nami").  To that end, it alleges connections, first, between

Nami Holding (Cayman) and Shanghai Nami (via Li); and, second, between Li and Shanghai

Nami, on one hand, and Hebron, on the other.  The SAC alleges that, because Shanghai Nami is

a related party to Hebron, the Nami Holding (Cayman) Acquisition is an undisclosed related

party transaction.  That claim is based on statements of confidential witnesses ("CW-1" and

"CW-2"); an article published on the WeChat account of NiSun Shanghai, one of Liu's

companies; and an online *curriculum vitae* ("CV").

#### *a.*   *Confidential witnesses*

The CWs' allegations link a cluster of companies affiliated with Hebron and Liu—NiSun

Shanghai, Benefactum, and HuiYingJinFu—to Shanghai Nami and Li.  CW-1 was legal counsel

at NiSun Shanghai between July 2017 and July 2018 and states that Li's Shanghai Nami and

Liu's Benefactum (which operates HuiYingJinFu) and NiSun Shanghai were all the same

company.  *Id.* ¶ 69.  CW-2 was Li's assistant between February 2018 and February 2019,

reporting to him as President of Shanghai Nami.  CW-2 states that Shanghai Nami and

HuiYingJinFu were part of the same corporate group and that Li reported to Liu, who controlled

Shanghai Nami.  *Id.* ¶ 70.

### b.   *WeChat article*

On April 2, 2018, an article was published by NiSun Shanghai, one of Liu's companies, on its official WeChat account,[6] describing Shanghai Nami as a subsidiary of Huiying Financial, another of Liu's companies. *Id.* ¶ 71. It also reported that Li was CEO of a subsidiary controlled by both Huiying Financial and NiSun Shanghai, which "is believed to be Shanghai Nami." *Id.* The SAC alleges that Shanghai Nami is therefore an undisclosed related party to Hebron. *Id.* The SAC also cites the Grizzly Report's statement that this article was later altered, to replace the word "subsidiary" with "cooperation company." *Id.* ¶ 72; *see* Grizzly Report at 24. On July 31, 2020, Hebron confirmed this alteration in a press release filed with the SEC as an exhibit to a Form 6-K. SAC ¶ 73. The SAC alleges that, according to the Grizzly Report, Hebron was thereby "cover[ing] its tracks." *Id.* ¶ 72.

### c.   *Online CV*

The SAC cites a CV on "a popular Chinese online job board, for Ms. Zhao." *Id.* ¶ 74. Zhao—who is not mentioned elsewhere in the SAC, which does not supply her first name—is allegedly a human resources manager at NiSun Shanghai. The SAC alleges that her CV states that Li's Shanghai Nami is a subsidiary of Liu's NiSun Shanghai. *Id.* This, the SAC alleges, supports Liu's control over Nami Holding (Cayman). *Id.* ¶ 75.

### C.   **Relevant Statements During Class Period**

The SAC alleges that Hebron made material false statements and omitted material information in connection with the following statements during the Class Period.

---

[6] WeChat is a messaging service that "enables its corporate users to open an official account where companies can share press releases and any recent developments," *id.* ¶ 71.

### 1.   The 2019 Annual Report

On April 24, 2020, Hebron filed its 2019 Annual Report (the "Annual Report"). *Id.* ¶ 82. It was signed by individual defendant Sun. *Id.* Hebron also included certifications pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 ("SOX Certifications"), signed by Sun and Liang. *Id.* ¶ 91.

#### a.   *Statements Regarding Related Party Transactions*

The Annual Report described both the Loong Fang PIPE Transaction and the Beijing Hengpu Acquisition transactions. With respect to the former, the Annual Report stated that Hebron had entered into a definitive SPA "with certain investors." *Id.* ¶¶ 38, 84 (emphasis omitted). With respect to the latter, the Annual Report stated that Hebron had "acquired [Beijing] Hengpu from its original shareholders through VIE agreements" and elsewhere described "the original shareholders of [Beijing] Hengpu." *Id.* ¶ 87 (emphasis omitted).

The SAC alleges that the Annual Report's accounts of the transactions were materially false and misleading, because they did not disclose that these were related party transactions. *Id.* ¶¶ 82–83, 85, 88.

#### b.   *Statements Regarding Disclosure Controls*

The Annual Report stated, with respect to Hebron's disclosure controls, that:

As of December 31, 2019, the end of the fiscal year covered by this report, our management, under the supervision and with the participation of our Chief Executive Officer and Chief Financial Officer, performed an evaluation of the effectiveness of our disclosure controls and procedures. Based on the evaluation, our Chief Executive Officer and Chief Financial Officer concluded that, as of December 31, 2019, our disclosure controls and procedures were ineffective. Such conclusion is due to the presence of material weakness in internal control over financial reporting as described below. * * *

Based on the assessment, management determined that, as of December 31, 2019, we did not maintain effective internal control over financial reporting due to the existence of the following material weaknesses: The Company does not have adequate internal accounting personnel with sufficient knowledge of the US GAAP

and SEC reporting standards, which could lead to material misstatements being undetected in a timely manner.  * * *

The following changes in our internal controls over financial reporting occurred during the twelve months ended [sic] December 31, 2019 and have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting:  We have begun to maintain written policies and procedures, and prepare Board minutes and resolutions for significant transactions on a timely basis.  We believe these efforts will improve our internal controls.

*Id.* ¶ 89.  The SAC alleges that statements were materially false and/or misleading because they did not disclose Hebron's failure to disclose, as purportedly required, the related-party nature of the Loong Fang PIPE Transaction or the Beijing Hengpu Acquisition.  *Id.* ¶ 90.

In Exhibits 12.1 and 12.2 to the Annual Report, defendants Sun and Liang's signed certifications stated that the Individual Defendants

are responsible for establishing and maintaining disclosure controls and procedures . . . and internal control over financial reporting . . . for the [C]ompany and have:

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under [their] supervision, to ensure that material information relating to the company, including its consolidated subsidiaries, is made known to [them] by others within those entities . . . ;

(b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under [their] supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c) Evaluated the effectiveness of the company's disclosure controls and procedures and presented in [the Annual Report their] conclusions about the effectiveness of the disclosure controls and procedures . . . ; and

(d) Disclosed in this report any change in the company's internal control over financial reporting that occurred during the period covered by the annual report . . . ; and

(5) . . . have disclosed . . . to the company's auditors and the audit committee of the company's board of directors . . . :

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely

affect the company's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the company's internal control over financial reporting.

*Id.* ¶ 91 (alterations in original).  The SAC alleges that these statements were materially false and misleading for similar reasons: because Sun and Liang, in touting the adequacy of Hebron's controls, did not address the company's failure to disclose that the Loong Fang PIPE Transaction and the Beijing Hengpu Acquisition were related party transactions.  *Id.*  ¶ 92.

### 2.     The May 1, 2020 Form 6-K

On May 1, 2020, Hebron filed a Form 6-K with the SEC, signed by Sun, with a press release announcing the Loong Fang PIPE Transaction.  *Id.*  ¶¶ 39, 93.  The press release stated that Hebron had "sold to two private investors" and "entered into [an SPA] with the two private investors."  *Id.* ¶ 93 (emphasis omitted).

The SAC alleges that these statements were materially false and misleading because the Form 6-K did not disclose that the transaction was a related party transaction.  *Id.* ¶ 94.

### 3.     The May 22, 2020 Form 6-K

On May 22, 2020, Hebron filed a Form 6-K with the SEC, signed by Sun, with a press release announcing the Nami Holding (Cayman) Acquisition.[7]  *Id.* ¶ 95.  The Form 6-K quoted Sun describing the benefits that Nami Holding (Cayman) would provide to Hebron's financial advisory services:

[T]his acquisition, once completed, will greatly enhance our financial advisory services capacities and signify that we have reached a milestone in implementing our strategic transition from a traditional industrial technology-based product and service provider to an innovative technology-driven and industry-based financial

---

[7] Hebron did not file a Form 6-K or issue a press release announcing the acquisition of Beijing Hengpu.  *Id.* ¶ 50.

advisory services provider. We believe that Nami acquisition will further enhance our competitiveness in China's financial services marketplace.

*Id.* (emphasis omitted). The SAC alleges that these statements were materially false and/or misleading because the Form 6-K did not disclose that Nami Holding (Cayman), Li, Shanghai Nami, and Huiying Financial were related parties, and that the acquisition was therefore a related party transaction. *Id.* ¶ 96.

### D.   Post-Class Period Developments

On June 3, 2020, the final day of the Class Period, Siegfried Eggert, the CEO of Grizzly Research, a short-selling firm, presented, online, excerpts of—and published the entire—Grizzly Report. *Id.* ¶ 97. The Grizzly Report alleged that the Loong Fang PIPE Transaction, the Beijing Hengpu Acquisition, and the Nami Holding (Cayman) Acquisition were all related party transactions. *Id.* ¶¶ 98–99; *see also* Grizzly Report. That day, Hebron's share price fell by $8.26, or almost 37%, and closed at $14.29 per share. SAC ¶ 100. The following day, June 4, 2020, the share price fell by another $2.51, or almost 18%, and closed at $11.78 per share. *Id.*

### E.   Procedural History

On June 9, 2020, Clynes filed the original complaint in this action. Dkt. 1. On August 7, 2020, Dahlke filed a motion to consolidate his claims with Clynes' and to be appointed lead plaintiff. Dkt. 7. On August 10, 2020, Clynes moved for his appointment as lead plaintiff. Dkt. 9. On August 26, 2020, Clynes and Dahlke filed memoranda of law and declarations in support of their motions and in opposition to the other's motion, Dkts. 13–16. On September 2 and 4, 2020, respectively, Clynes and Dahlke filed replies, Dkts. 20, 21. On September 16, 2020, the Court consolidated the cases, granted Dahlke's motion to serve as lead plaintiff, and denied Clynes's motion. Dkt. 23.

On November 20, 2020, plaintiffs filed a Consolidated Amended Complaint. Dkt. 33. On December 21, 2020, Hebron filed a motion to dismiss, a memorandum of law in support, and the declaration of Matthew Tharp. Dkts. 34–36. On December 22, 2020, the Court ordered plaintiffs to file any amended complaint by January 20, 2021. Dkt. 37. On January 20, 2021, the plaintiffs filed the SAC. Dkt. 38. On February 19, 2021, Hebron filed its motion to dismiss. Dkts. 39, 40 ("Hebron Mem."). On March 12, 2021, plaintiffs filed their memorandum of law in opposition to that motion. Dkt. 41 ("Pl. Mem."). On March 19, 2021, Hebron filed its reply. Dkt. 42 ("Hebron Reply").

## II.   Applicable Legal Standards

### A.   Standards for Resolving a Motion to Dismiss

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim will only have "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A complaint is properly dismissed where, as a matter of law, "the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Twombly*, 550 U.S. at 558. Although the court must accept as true all well-pled factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor, *Steginsky v. Xcelera Inc.*, 741 F.3d 365, 368 (2d Cir. 2014), that tenet "is inapplicable to legal conclusions," *Iqbal*, 556 U.S. at 678.

"Securities fraud claims are subject to heightened pleading requirements that the plaintiff must meet to survive a motion to dismiss." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007); *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 321–23 (2007).

First, a complaint alleging securities fraud must meet the requirements of Federal Rule of Civil Procedure 9(b). *See ECA & Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 196 (2d Cir. 2009). Rule 9(b) states that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). "Allegations that are conclusory or unsupported by factual assertions are insufficient." *ATSI Commc'ns*, 493 F.3d at 99.

Second, such a complaint must comply with the pleading requirements of the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4(b). *See ECA*, 553 F.3d at 196. In particular, where a complaint's claims depend upon allegations that the defendant has made an untrue statement of material fact or that the defendant omitted a material fact necessary to make a statement not misleading, it "shall specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1). Thus, to adequately plead a claim of securities fraud, plaintiffs "must do more than say that the statements . . . were false and misleading; they must demonstrate with specificity why and how that is so." *Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004). In addition, the plaintiff "shall, with respect to each act or omission . . . state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A).

**B.      Elements of Plaintiffs' Claims**

The SAC brings claims under §§ 10(b) and 20(a) of the Exchange Act, and Rule 10b-5. SAC ¶¶ 119–133.

Section 10(b) makes it unlawful to "use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe . . ." 15 U.S.C. § 78j(b). The SEC's implementing rule, Rule 10b-5, provides that it is unlawful "[t]o make any untrue

statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading[.]" 17 C.F.R. § 240.10b-5.

To state a claim under § 10(b), a plaintiff must adequately plead "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37–38 (2011) (internal quotation marks and citation omitted).

To state a claim under § 20(a), "a plaintiff must show (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 236 (2d Cir. 2014) (quoting *ATSI Commc'ns*, 493 F.3d at 108). Where a plaintiff has not adequately alleged a primary violation, *i.e.*, a viable claim under another provision of the Exchange Act, the § 20(a) claims must be dismissed. *See id.*

Three elements of these statutes are implicated by Hebron's motion to dismiss the SAC: those requiring actionable misstatements or omissions, scienter, and loss causation.

### 1. False or Misleading Statements or Omissions

To survive a motion to dismiss, a complaint must adequately plead "that the defendant made a statement that was 'misleading as to a material fact.'" *Matrixx Initiatives*, 563 U.S. at 38 (emphasis omitted) (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 238 (1988)). Section 10(b) and Rule 10b-5 "do not create an affirmative duty to disclose any and all material information." *Id.* at 44; *see also Basic*, 485 U.S. at 239 n.17. "Disclosure of . . . information is not required . . . simply because it may be relevant or of interest to a reasonable investor." *Resnik v. Swartz*, 303

F.3d 147, 154 (2d Cir. 2002).  An omission of information not affirmatively required to be disclosed is, instead, actionable only when disclosure of such information is "necessary 'to make . . . statements made, in the light of the circumstances under which they were made, not misleading.'" *Matrixx Initiatives*, 563 U.S. at 44 (quoting 17 C.F.R. § 240.10b-5(b)); *see also In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 239–40 (2d Cir. 2016) ("[p]ure omissions" of information, absent a duty to disclose, are not actionable; however, "half-truths"—"statements that are misleading . . . by virtue of what they omit to disclose"—are).

The materiality requirement, meanwhile, "is satisfied when there is 'a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available.'" *Matrixx Initiatives*, 563 U.S. at 38 (quoting *Basic*, 485 U.S. at 231–32). As the Supreme Court has explained, a lower standard—such as defining a "material fact" as any "fact which a reasonable shareholder might consider important"—would lead corporations to "bury the shareholders in an avalanche of trivial information[,] a result that is hardly conducive to informed decisionmaking." *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 448–49 (1976). The "materiality hurdle" is, therefore, "a meaningful pleading obstacle." *In re ProShares Tr. Sec. Litig.*, 728 F.3d 96, 102 (2d Cir. 2013). However, because of the fact-intensive nature of the materiality inquiry, courts may not dismiss a complaint "on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *ECA*, 553 F.3d at 197 (internal quotation marks and citation omitted).

### 2.    Scienter

As noted, Rule 9(b) and the PSLRA require plaintiffs to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15

U.S.C. § 78u-4(b)(2); *see* Fed. R. Civ. P. 9(b).  "For an inference of scienter to be strong, 'a reasonable person [must] deem [it] cogent and *at least as compelling* as any opposing inference one could draw from the facts alleged,'" and "the court must take into account plausible opposing inferences." *ATSI Commc'ns*, 493 F.3d at 99 (alterations and emphasis in original) (quoting *Tellabs*, 551 U.S. at 324).  The requisite mental state is one "embracing intent to deceive, manipulate, or defraud." *Tellabs*, 551 U.S. at 319 (quotation marks and citation omitted).

Plaintiffs "may satisfy this requirement by alleging facts (1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." *ATSI Commc'ns*, 493 F.3d at 99.  Where a complaint does not sufficiently allege that defendants had a motive to defraud the public, it "must produce a stronger inference of recklessness." *Kalnit v. Eichler*, 264 F.3d 131, 143 (2d Cir. 2001).

Recklessness is "a state of mind approximating actual intent, and not merely a heightened form of negligence." *S. Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 109 (2d Cir. 2009) (emphasis and internal citation omitted).  To qualify as reckless, defendants' conduct must have been "highly unreasonable" and "an extreme departure from the standards of ordinary care." *Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000) (quoting *Rolf v. Blyth, Eastman Dillon & Co.*, 570 F.2d 38, 47 (2d Cir. 1978)).

A complaint can plead recklessness by adequately alleging that "defendants knew facts or had access to non-public information contradicting their public statements" and therefore "knew or should have known they were misrepresenting material facts." *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 76 (2d Cir. 2001) (citing *Novak*, 216 F.3d at 308).  Defendants may be found

to have acted recklessly if they "understood that their public statements were inaccurate, or were 'highly unreasonable' in failing to appreciate that possibility." *In re Sanofi Sec. Litig.*, 87 F. Supp. 3d 510, 534 (S.D.N.Y. 2015) (quoting *Novak*, 216 F.3d at 308), *aff'd sub nom. Tongue v. Sanofi*, 816 F.3d 199 (2d Cir. 2016). "The key, of course, is the honest belief of the management in the truth of information issued to the public." *In re AstraZeneca Sec. Litig.*, 559 F. Supp. 2d 453, 470 (S.D.N.Y. 2008), *aff'd sub nom. State Univ. Ret. Sys. of Ill. v. Astrazeneca PLC*, 334 F. App'x 404 (2d Cir. 2009).

### 3.    Loss Causation

To state a claim for securities fraud under § 10(b) and Rule 10b-5, a complaint must also adequately plead loss causation. *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta*, 552 U.S. 148, 157 (2008).

"Loss causation is the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff." *In re Lehman Bros. Sec. & Erisa Litig.*, 799 F. Supp. 2d 258, 304 (S.D.N.Y. 2011) (internal quotation marks omitted). "To make out loss causation, a plaintiff must allege . . . that the subject of the fraudulent statement or omission was the cause of the actual loss suffered." *Id.* (alteration in original) (internal quotation marks and emphasis omitted). A plaintiff may establish loss causation by demonstrating either "(1) a corrective disclosure or (2) a materialization of a concealed risk." *Id.*

"[P]laintiffs need not allege that their entire loss was caused by the misstatements and omissions complained of." *Id.* at 305. "To plead loss causation, the complaint must allege facts that support an inference that [the defendants'] misstatements and omissions concealed the circumstances that bear upon the loss suffered such that plaintiffs would have been spared all or an ascertainable portion of . . . that loss absent the fraud." *Id.* (quoting *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 175 (2d Cir. 2005)) (first alteration in original) (emphasis omitted). "Nor

are plaintiffs required to allege that the particular misstatements and omissions directly caused the alleged losses. . . . [M]isstatements or omissions that conceal a risk, the materialization of which causes all or part of the plaintiffs' loss, . . . suffice." *Id.*

## III.  Discussion

The SAC brings claims under § 10(b) of the Exchange Act and Rule 10b-5 against all defendants, and under § 20(a) of the Exchange Act against the Individual Defendants.  These claims all are based on Hebron's failure to disclose that three transactions—the Loong Fang PIPE Transaction, the Beijing Hengpu Acquisition, and Nami Holding (Cayman) Acquisition transactions—were related party transactions.  In each case, plaintiffs' theory as to why the transaction was a related party transaction is that Hebron and another party to the transaction were under common control (*e.g.*, by Liu).

In moving to dismiss the § 10(b) claims, Hebron argues the SAC does not adequately plead an actionable misstatement or omission, scienter, and loss causation.  And because there is not a viable § 10(b) claim, Hebron argues, the derivative § 20(a) claim must also be dismissed.

### A.    The SAC's Section 10(b) claims

The Court first considers defendants' argument that the SAC fails to adequately plead an actionable misstatement or omission.  In this analysis, the Court first addresses two threshold issues—the standards governing when parties to a transaction are related, and defendants' argument that dismissal is required because the SAC relies on a short-seller's report—and then evaluates, transaction by transaction, whether the SAC adequately pleads a failure to disclose that Hebron's counterparty was related.  The Court then considers defendants' argument that the SAC does not adequately plead scienter.  For the reasons that follow, the Court finds the SAC deficient in both respects, as it fails to adequately plead (1) an actionable statement or omission and (2) scienter.

1.   **Does the SAC Plead an Actionable Misstatement or Omission?**

    *a.*    *Standards Governing Related Party Transactions*

The parties take different positions as to the standard governing when a transaction requires disclosure as a material related party transaction.  The SAC alleges that Financial Accounting Standards Board Accounting Standard Codification 850 ("ASC 850") governs, because Hebron filed its financial statements in accordance with Generally Accepted Accounting Principles ("U.S. GAAP"), within which ASC 850 is the relevant standard.[8]  SAC ¶ 27.  Hebron counters that the relevant standard appears in the Item 7.B Instructions for SEC Form 20-F ("Item 7").  Hebron Mem. at 12.

    i.    ASC 850

ASC 850 "provides disclosure requirements for related party transactions and certain common control relationships."  ASC 850-10-05-1.  It defines related parties as: "affiliates of the entity;"[9] "[e]ntities for which investments in their equity securities would be required, absent the election of the fair value option under the Fair Value Option Subsection of [Financial Accounting Standards Board Accounting Standard Codification] 825-10-15, to be accounted for by the equity method by the investing entity," *i.e.*, to be recorded in proportion to the percentage of ownership; "[t]rusts for the benefit of employees, such as pension and profit-sharing trusts that

---

[8] Plaintiffs initially also alleged that Hebron violated the Committee of Sponsoring Organizations of the Treadway Commission Report, Internal Control—Integrated Framework—2013 ("COSO Framework").  *Id.* ¶ 33.  However, plaintiffs did not renew that argument in defending the SAC against dismissal; the Court treats it as abandoned.  *See* Pl. Mem. at 14–15; *Jackson v. Fed. Exp.*, 766 F.3d 189, 198 (2d Cir. 2014) "[A] court may, when appropriate, infer from a party's partial opposition that relevant claims or defenses that are not defended have been abandoned.").

[9] An affiliate is defined as "[a] party that, directly or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with an entity." ASC 850-10-20.

are managed by or under the trustee of management;" principal owners[10] and management[11] of the company and members of their immediate families; other parties "if one party controls or can significantly influence the management or operating policies of the other to an extent that one of the transacting parties might be prevented from fully pursuing its own separate interests;"[12] "[o]ther parties that can significantly influence the management or operating policies of the transaction parties;" and other parties "that have an ownership interest in one or more of the transacting parties and can significantly influence the other to an extent that one or more of the transacting parties might be prevented from fully pursuing its own separate interests." 850-10-20. If transactions take place between those parties, ASC 850-10-50-1 requires that "[f]inancial statements . . . include disclosures of material related party transactions," including, *inter alia*, "the nature of the relationship(s) involved" and "[a] description of each of the transactions."

ii.    Item 7

Item 7.B of SEC Form 20-F requires disclosure

> with respect to transactions or loans between the company and (a) enterprises that directly or indirectly through one or more intermediaries, control or are controlled by, or are under common control with, the company; (b) associates;[13] (c)

---

[10] A principal owner is defined as the "[o]wner[] of record or known beneficial owner[] of more than 10 percent of the voting interests of the entity." *Id.*

[11] "Management" is defined as "[p]ersons who are responsible for achieving the objectives of the entity and who have the authority to establish policies and make decisions by which those objectives are to be pursued." The term "normally includes members of the board of directors, the chief executive officer, chief operating officer, vice presidents in charge of principal business functions (such as sales, administration, or finance), and other persons who perform similar policy making functions." It may also include "[p]ersons without formal titles." *Id.*

[12] "Control" is defined as "[t]he possession, direct or indirect, of the power to direct or cause the direction of the management and policies of an entity through ownership, by contract, or otherwise." *Id.*

[13] "An associate is an unconsolidated enterprise in which the company has a significant influence or which has significant influence over the company." Item 7.B.

individuals owning, directly or indirectly, an interest in the voting power of the
company that gives them significant influence over the company, and close
members of any such individual's family;[14] (d) key management personnel, that is,
those persons having authority and responsibility for planning, directing and
controlling the activities of the company, including directors and senior
management of companies and close members of such individuals' families; and
(e) enterprises in which a substantial interest in the voting power is owned, directly
or indirectly, by any person described in (c) or (d) or over which such a person is
able to exercise significant influence.

Item 7.B. The standard includes "enterprises owned by directors or major shareholders of the

company and enterprises that have a member of key management in common with the

company." *Id.* If such transactions take place, the company must disclose, *inter alia*, "[t]he

nature and extent of any transactions or presently proposed transactions which are material to the

company or the related party, or any transactions that are unusual in their nature or conditions,

involving goods, services, or tangible or intangible assets, to which the company or any of its

parent or subsidiaries was a party." *Id.*

### iii.    Application

The parties' dispute as to the controlling standard is of no consequence. As plaintiffs

admit, "there is no significant difference between the related party transaction requirements" in

ASC 850 and Item 7. Pl. Mem. at 15. The ASC 850 and Item 7 standards do not differ in any

respect relevant here. Here, the relationship at issue is that involving an alleged "affiliate" (as

put in ASC 850) or an entity under "common control" (as put in Item 7), insofar as the SAC

alleges that Hebron's counterparties in the transactions at issue either to control, be controlled

---

[14] "Close members of an individual's family are those that may be expected to influence, or be
influenced by, that person in their dealings with the company." Moreover, "[s]ignificant
influence over an enterprise is the power to participate in the financial and operating policy
decisions of the enterprise but is less than control over those policies. Shareholders beneficially
owning a 10% interest in the voting power of the company are presumed to have a significant
influence on the company." *Id.*

by, or be under common control with Hebron.[15]  Given this scenario, the standards are all but

identical.  ASC 850's affiliate standard applies to "*a party* that, directly or indirectly through one

or more intermediaries, controls, is controlled by, or is under common control" with the

company (emphasis added); Item 7's common control standard similarly applies to "*enterprises*

that directly or indirectly through one or more intermediaries, control or are controlled by, or are

under common control with, the company" (emphasis added).[16]

> b.    *The SAC's Reliance on Short-Seller Reports*

Hebron argues that the SAC should "be dismissed *ab initio* because it relies almost

exclusively on a single short-seller report."  Hebron Mem. at 10 n.10.  That is wrong.  There is

no rule categorically excluding allegations derived from such sources.  Instead, as this Court has

canvassed, courts "critically analyze[]" "factual attributions to short-seller reports."  *Long Miao*

*v. Fanhua, Inc.*, 442 F. Supp. 3d 774, 801 (S.D.N.Y. 2020).  The issue in each case is whether

the allegations in the complaint, taken as a whole, state a claim.  And where there is a basis to

---

[15] *See, e.g.*, SAC ¶ 37 (Loong Fang "is actually an undisclosed related party to Hebron."); *id.* ¶ 43 ("Bodang Liu has control over [Loong Fang] . . . ."); *id.* ¶ 53 ("HongKong D&L, Benefactum and Beijing Hengpu are undisclosed related party affiliates of Hebron['s]." (emphasis omitted)); *id.* ¶ 58 ("Beijing Hengpu and Hebron are related parties under common control from intermediaries and/or affiliates with Bodang Liu."); *id.* ¶ 75 ("Nami Holding (Cayman), Huiying Financial, and Shanghai Nami are undisclosed related parties.") (emphasis omitted); *id.* ¶ 80 ("Loong Fang, Beijing Hengpu, and Nami Holding (Cayman) are all entities that entered into a financial transaction with Hebron and should have been disclosed as related parties to Hebron.").

[16] Plaintiffs at times confusingly suggest that individual participants in a transaction—Peng Jiang and Jinbao Li—had an undisclosed relationship to the transaction in addition to an undisclosed relationship to Hebron.  *See* SAC ¶ 59 ("Peng Jiang is an undisclosed related party of Hebron.  He is also is [sic] an undisclosed related party to the Beijing Hengpu Acquisition.") (emphasis omitted); *id.* ¶ 68 ("Jinbao Li is an undisclosed related party along with Nami Holding (Cayman)." (emphasis omitted)).  Notwithstanding this locution, the Court understands the SAC's claims relating to the transactions to be that Hebron failed to disclose its relationship to counterpart(ies) which—whether as a result of the role of these individuals or otherwise—qualified as affiliates (ASC 850) or entities under common control (Item 7).  *See id.* ¶ 80 (counterparties in the transactions "should have been disclosed as related parties to Hebron").

view the short seller's factual allegations as reliable as opposed to fabricated based on self-interest—for example, where facts are cited that tend to substantiate these allegations or reveal the basis for the short-seller's factual assertions—those allegations are more apt to be viewed as reliable. *See, e.g.*, *McIntire v. China MediaExpress Holdings, Inc.*, 927 F. Supp. 2d 105, 124 (S.D.N.Y. 2013) (on a motion to dismiss, the court will accept factual allegations drawn from short-seller reports as sufficiently reliable); *Ho v. Duoyuan Glob. Water, Inc.*, 887 F. Supp. 2d 547, 564 (S.D.N.Y. 2012) (noting that the reliability of a short-seller report of a question of fact inappropriate to resolve a motion to strike); *In re Longwei Petroleum Inv. Holding Ltd. Sec. Litig.*, No. 13 Civ. 214 (HB), 2014 WL 285103, at *4 (S.D.N.Y. Jan. 27, 2014) (courts in this District often accept allegations based on short-seller reports at motion to dismiss phase). That the SAC largely relies on the Grizzly Report is not cause, at the threshold, to dispense with its claims.

       *c.*     *Statements Regarding the Loong Fang PIPE Transaction*

The SAC's theory is that Loong Fang and Hebron are related parties as a result of Shan Jiang's ties to both entities. It alleges that, in December 2019, Shan Jiang signed the Loong Fang PIPE Transaction SPA on behalf of Loong Fang. SAC ¶ 38. In the following months, Shan Jiang started working at two companies as a supervisor: Qianhai Zhonghui Business Information Consulting Co., Ltd. ("Zhonghui"), where he became a supervisor on March 25, 2020, and Puhui Equity Investment Co., Ltd. ("Puhui Investment"), where he became a supervisor on April 14, 2020. *Id.* ¶ 42. Both are owned by Benefactum, of which Liu, Hebron's controlling shareholder, owns 99%. *Id.* Therefore, the SAC alleges, Liu had control over Loong Fang (via his control over Shan Jiang) as well as Hebron, making Hebron and Loong Fang related parties. *Id.* ¶ 43.

The SAC's theory of a failure by Hebron to disclose Loong Fang's status as a related party fails, however, for a simple reason: The SAC does not allege any relationship between

Loong Fang and Liu at the time of the Loong Fang PIPE Transaction.  It thus does not

adequately allege common control by Liu of the two companies at the pertinent point.  Per the

SAC's chronology, Shan Jiang did not begin working at Zhonghui or Puhui Investment until

three and four months, respectively, *after* the December 2019 SPA.  And the SAC does not plead

any facts indicative of common control as of December 2019.  As its claims relating to the

Loong Fang PIPE Transaction all turn on the premise that the two companies were then-related

parties, the SAC does not state a claim as to that transaction.  *See Lewy v. SkyPeople Fruit Juice,*

*Inc.*, No. 11 Civ. 2700 (PKC), 2012 WL 3957916, at *18–19 (S.D.N.Y. Sept. 10, 2012)

(dismissing where complaint's allegations did not plead that, at the time of the transaction, the

parties were related); *Sec. & Exch. Comm'n v. Saltsman*, No. 07 Civ. 4370, 2016 WL 4136829,

at *14 (E.D.N.Y. Aug. 2, 2016) (dismissing where SEC alleged related party status in connection

with loans in 2000 and 2001 between entities, but evidence of affiliate relationship related to

2002, after the loans occurred).

The SAC notes that, by the time of the Annual Report and the May 1, 2020 6-K, Shan

Jiang had assumed his positions subordinate to Liu at the two Benefactum-owned entities.  *See*

SAC ¶ 42.  But that is of no consequence, as the pertinent moment is the date of the transactions

described in those filings, not the date of the filings themselves.  *See In re China Mobile Games*

*& Entm't Grp., Ltd Sec. Litig.,* No. 14 Civ. 4471 (KMW), 2016 WL 922711, at *5 (S.D.N.Y.

Mar. 7, 2016) (holding that there is no actionable misstatement or omission where plaintiffs

failed to plead facts "showing that there were related-party transactions to disclose"); *In re*

*Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 571 (S.D.N.Y. 2014), *aff'd*, 604 F. App'x 62 (2d Cir.

2015) ("[W]ithout *contemporaneous* falsity, there can be no fraud." (emphasis in original)); *Fila*

*v. Pingtan Marine Enter. Ltd.*, 195 F. Supp. 3d 489, 495 (S.D.N.Y. 2016) (a statement is not

measured by literal truth "but by its ability to accurately inform rather than mislead prospective buyers") (quoting *Operating Local 649 Annuity Tr. Fund v. Smith Barney Fund Mgmt. LLC*, 595 F.3d 86, 92 (2d Cir. 2010)).

Even if the SAC had pled facts indicating that Shan Jiang had assumed his posts at the two companies as of the time of the Loong Fang PIPE Transaction, the facts pled would still not describe facts meeting the related party standard. That is because the SAC does not plead facts plausibly demonstrating how Shan Jiang's role at two companies controlled by Liu gave Liu control over Loong Fang, a third, and separate, company. The SAC adequately pleads that Liu controls Shan Jiang in his roles at Puhui Investment and Zhonghui, both of which Liu principally owns. SAC ¶ 43; Pl. Mem. at 5, 17–18. But the SAC does not plead facts supporting that Liu has control over Loong Fang. Indeed, no facts are pled that tie Liu to Loong Fang. The SAC's evident implication that Liu has all-purpose control over Shan Jiang is thus speculative. And despite reciting the governing standard, the SAC does not plead facts indicating Liu's control over Loong Fang, to wit, Liu's "possession, direct or indirect, of the power to direct or cause the direction of the management and policies of" Loong Fang. SAC ¶ 43 (quoting ASC 850); *see also* Pl. Mem. at 5, 17–18. For this separate reason, the SAC therefore fails to plead any actionable misstatement or omission, as it does not plead a related party relationship. *See SkyPeople*, 2012 WL 3957916, at \*18–19 (complaint did not plead with particularity sufficient facts to show that two of the individual defendants exercised control over a company).

The SAC therefore fails to plead an actionable misstatement or omission concerning the Loong Fang PIPE Transaction.

> d.      *Statements Regarding the Beijing Hengpu Acquisition*

The SAC articulates two theories as to why Hebron's December 2019 purchase of Beijing Hengpu was a related party transaction: because (1) Xiaoyun Huang, who was the sole

owner of Hong Kong D&L, whose 20% interest in Beijing Hengpu was bought by Hebron, had ties to Liu; and (2) Peng Jiang holds positions at both Hebron and Beijing Hengpu.

i.    Xiaoyun Huang

The SAC alleges that Huang had the power to control Beijing Hengpu as of the date of Hebron's purchase and that, by virtue of Liu's ties to Huang, Liu thereby could control Beijing Hengpu.  SAC ¶¶ 55, 58.

At the outset, defendants raise a substantial methodological challenge to whether the SAC's viably alleges that Huang had a relationship to Liu and his affiliated companies Benefactum, HuiYingJinFu, and NiSun Shanghai.  The SAC attributes these facts to Chinese-language newspapers,[17] which, Hebron states without refutation, plaintiffs have declined to translate.  *See* Hebron Mem. at 17 n.16.  Plaintiffs defend this approach as appropriate by limiting the purpose for which, they contend, they intend these citations to be put.  "[T]he articles," plaintiffs state, "merely support Plaintiffs' allegations that Huang *was reported to have these titles*."  Pl. Mem. at 20 n.13 (emphasis in original).  And, as to whether the Chinese-language articles so state, plaintiffs note, on a motion to dismiss, "the [C]ourt must assume that the facts alleged in the complaint are true."  *Id.*  But the fact that a newspaper or press release made factual statements about Huang is of no consequence in this lawsuit under § 10(b) and Rule 10b-5 unless those statements are treated as true.  And as plaintiffs' concession implicitly

---

[17] *See* SAC ¶ 56 (citing "[a] June 4, 2019 article on Sohu (published in Chinese)" that reported on Huang and Liu and described them as, respectively, the CEO and chairman of HuiYingJinFu); *id.* (citing "an August 7, 2019 interview by Guangfeng Energy Online (published in Chinese)" that refers to Huang as the CEO of Benefactum); *id.* ("On August 20, 2019, Xinhuanet reported Huang as the CEO of Benefactum in an article (published in Chinese) . . ."); *id.* ¶ 57 (citing a May 30, 2019 interview "published in Chinese" referring to Huang as the Chief Fintech Officer of NiSun Shanghai and "a May 30, 2019 profile (published in Chinese by Xinhua)" referring to Huang as the same); *see also id.* (citing "an August 19, 2019 press release published (in Chinese)" referring to Huang as NiSun Shanghai Vice President and Chief Fintech Officer).

recognizes, the fact that an article contained a statement of fact—without the critical context of the newspaper's basis for believing the fact to be true—does not supply a reliable basis to credit the fact. *See, e.g., Miller v. Lazard, Ltd.*, 473 F. Supp. 2d 571, 586 (S.D.N.Y. 2007) (noting that although plaintiffs may use news articles, those news articles still must state particularized facts); *In re Optionable Sec. Litig.*, 577 F. Supp. 2d 681, 690 (S.D.N.Y. 2008) (newspaper articles may be credited only to extent that factual allegations are sufficiently particular, detailed, and reliable).

In any event, even if the facts in the SAC regarding Huang's titles had been well pled, they would not make Hebron's acquisition of Beijing Hengpu a related party transaction. The SAC does adequately plead Huang's control over HongKong D&L, insofar as he is identified as that company's sole owner. SAC ¶ 54. But although the SAC alleges that Huang had served as Beijing Hengpu's chairman and legal representative, it acknowledges that he appeared to have left this position a year before the transaction, and retained these titles only formally thereafter, as a result of regulatory requirements. *Id.* ¶ 55.

Regardless, the above allegations at most substantiate Huang's ability to control the *seller* in the Beijing Hengpu acquisition. Absent are facts that either Huang controlled the *buyer* (Hebron), or that the buyer's principal, Liu, controlled Huang. At most, the SAC alleges other associations between Liu and Huang (*e.g.*, media articles stating that Huang holds the positions at NiSun Shanghai, of which Liu is a 99% shareholder, of Vice President and Chief Fintech Officer). *Id.* ¶ 57. But the fact of a separate association between the two men does not mean that Liu thereby controlled Huang in his capacity at HongKong D&L, so as to make Hebron's purchase of an interest in Beijing Hengpu from HongKong D&L a related party transaction. *See, e.g., China Mobile*, 2016 WL 922711, at *5 (describing continued control and decision-

making power as a "vital link" in order to find a related party transaction; and dismissing § 10(b) claim where complaint did not include any facts showing that the alleged controlling party actually held decision-making power); *Tabor v. Bodisen Biotech, Inc.*, 579 F. Supp. 2d 438, 450–51 (S.D.N.Y. 2008) (because plaintiffs did not allege ownership, management, control, or significant influence, there was no duty for the defendant to disclose its relationships or transactions).  And without a viable allegation that the transaction qualified as a related party transaction, plaintiffs' allegations based on Huang fail to state a claim.[18]

ii.      Peng Jiang

The SAC alternatively contends that the transaction involved related parties because Peng Jiang ostensibly controlled both the entity sold (Beijing Hengpu) and the buyer (Hebron).  Its allegations, however, are deficient as to Peng Jiang's control of each side, let alone both.

As to the former, the SAC declares that "Peng Jiang clearly had control over Beijing Hengpu" because he was "registered as Beijing Hengpu's director and manager."  SAC ¶ 59. But these spare factual allegations as to Peng Jiang's titles do not plausibly plead his control. The SAC does not allege that Peng Jiang was chief executive or controlling shareholder of Beijing Hengpu.  Nor does the SAC plead any factual particulars as to Peng Jiang's duties or sphere of authority, or why a position as a manager or a director at that company would give a person control over it.  Instead, the SAC makes the broad generalization that board members "hire and/or approve the hiring of top management in companies, which gives them a certain amount of control," and that managers "are involved setting [sic] and implementing company

---

[18] It is no moment that Hebron allegedly did not disclose Huang's reported positions at Beijing Hengpu or HongKong D&L.  Hebron did not have any independent obligation to disclose these positions, and the SAC does not allege Hebron made any inaccurate statement about these matters.  *See Vivendi, S.A.*, 838 F.3d at 239 ("Rule 10b-5 expressly requires an actual statement . . . that is either untrue outright or misleading by virtue of what it omits to state." (internal quotation marks and emphasis omitted)).

policies and procedures." *Id.*; Pl. Mem. at 20. But Peng Jiang is alleged to have been *a*—not the sole—board member, and the SAC is devoid of any claim that Peng Jiang controlled the board as a whole. It also lacks any allegations as to his concrete responsibilities as a manager, or that these had any bearing on whether Beijing Hengpu's 80% and 20% owners would sell their shares, or on what terms. The SAC's conclusory allegations thus fall well short of plausibly pleading control. *See ATSI Commc'ns*, 493 F.3d at 99; *Luce v. Edelstein*, 802 F.2d 49, 54 (2d Cir. 1986).

As to Peng Jiang's ostensible control over Hebron, the SAC alleges that he was a legal representative and 99% shareholder of NiSun Shanghai, a disclosed related party to Hebron, and a legal representative of Shanghai Fintech, a company owned by Hebron. SAC ¶ 59. But, whatever control these roles might have given Peng Jiang over *these* entities—the fact of 99% ownership would plausibly convey control over NiSun Shanghai, but the role of legal representative, without more, would not connote such control—the SAC does not explain why these roles gave Peng Jiang control over *Hebron*, as necessary for plaintiffs' theory here to survive. *See China Mobile*, 2016 WL 922711, at *5 (dismissing where complaint did not plead necessary relationships or supporting facts to plausibly allege related party relationship).

Although the SAC pleads facts that show connections between Liu and his companies on the one hand and Huang and Peng Jiang on the other, they do not show a related party transaction under ASC 850 and Item 7 because, as discussed, they fail to show a relationship of control, significant influence, or common control between Hebron and Beijing Hengpu. As pled, neither Huang nor Peng Jiang enabled Liu's control over Beijing Hengpu through their positions. The Court accordingly dismisses as inadequately pled the SAC's § 10(b) claims based on the Beijing Hengpu transaction.

e.    *Nami Holding (Cayman) Acquisition*

The SAC's final basis for claiming an actionable failure to disclose the related-party nature of a transaction involves the Nami Holding (Cayman) Acquisition. In that transaction, on May 22, 2020, Hebron announced a definitive agreement to buy from Nami Holding (Cayman) all its outstanding shares, with a combination of cash and Hebron common stock.

The SAC's theory is that Nami Holding (Cayman) is linked to a company, Shanghai Nami, that in turn is a related party to Hebron. The underlying facts pled are complex and the SAC's theory of common control is elusive. But the SAC's theory appears to turn on the relationship between two corporate families—one controlled by Li and led by Nami Holding (Cayman), of which Shanghai Nami is a part, and the other controlled by Liu.

First, the SAC alleges that Li is the majority owner and controls Nami Holding (Cayman), which is the parent company of Li's corporate group.[19] SAC ¶ 66. That corporate group includes Nami Holding (Hong Kong) Co., Limited ("Nami Holding (Hong Kong)"), which owns 100% of Shanghai Naqing Enterprise Management Co., Ltd. ("Shanghai Naqing"). *Id.* On May 20, 2020, Shanghai Naqing acquired Shanghai Nami, of which Li is also the CEO. *Id.* ¶ 67. Therefore, the SAC alleges, a chain of corporate ownership reaches from Nami Holding (Cayman) to Nami Holding (Hong Kong); to Shanghai Naqing; and to Shanghai Nami via Li.

The SAC then notes alleged ties between Li and Shanghai Nami, on the one hand, and companies affiliated with Liu, on the other, which it contends made the Nami Holding (Cayman)

---

[19] The SAC is not entirely clear about whether Li owns the group of which Nami Holding (Cayman) is the parent, or whether Li is the majority owner of Nami Holding (Cayman) itself, or both. *Compare* SAC ¶ 66 ("Nami Holding (Cayman) is the parent company of a financial services group that is majority-owned and controlled by [Li.]") *with id.*, Ex. C (diagram indicating that Li is the majority owner of Nami Holding (Cayman)) *and id.* ¶ 71 ("Li, who, as previously stated, is the majority owner of Nami Holding (Cayman) . . . ). Taking all inferences in the plaintiffs' favor, the Court reads the SAC to allege that Li is both the majority owner of Nami Holding (Cayman) and its corporate group.

Acquisition a related party event. To support this theory, the SAC cites statements from confidential witnesses ("CWs"), a WeChat post, and an online CV. However, on examination of the SAC's attributions to these sources, its theory that the transaction involved related parties proves ill-pled.

i.      Confidential witnesses

The SAC cites statements from two CWs linking Li's companies to Liu's companies, albeit in each instance more than a year before the transaction at issue. Both sets of statements thinly and generally allege duties, responsibilities, and sources of knowledge, and conclusorily state the connection between the corporate groups. CW-1 is described as having been legal counsel at NiSun Shanghai between July 2017 and July 2018, during which time CW-1 "prepared legal documents and contracts, and provided legal and compliance opinions for NiSun[] Shanghai's financial products and investment activities." *Id.* ¶ 69. CW-1 stated that Shanghai Nami (Li) was "really . . . the same company" as Benefactum and NiSun Shanghai (Liu), *id.* (emphasis omitted), and that Shanghai Nami had originally been a department within NiSun Shanghai before being "spun off due to compliance related issues," *id.* CW-2 is described as having been Li's assistant at Shanghai Nami between February 2018 and February 2019, during which time CW-2 allegedly reportedly to Li. CW-2 is alleged to have stated that, at the time, Li reported directly to Liu, who actually controlled Shanghai Nami's decision-making powers, notwithstanding Li's 85% ownership of Shanghai Nami. *Id.* ¶ 70.

These sparse allegations do not, however, satisfy the standards the caselaw has set for facts attributed to unidentified witnesses in complaints under the PSLRA and Rule 9(b). These precedents, as this Court has canvassed, "reflect[] the need to view such attributions with caution and care." *Long Miao*, 442 F. Supp. 3d at 797. In its first decision addressing such attributions, in 2000, the Second Circuit held that:

> [W]here plaintiffs rely on confidential personal sources but also on other facts, they
> need not name their sources as long as the latter facts provide an adequate basis for
> believing that the defendants' statements were false. Moreover, even if personal
> sources must be identified, there is no requirement that they be named, provided
> they are described in the complaint with sufficient particularity to support the
> probability that a person in the position occupied by the source would possess the
> information alleged.

*Novak*, 216 F.3d at 314. Following this decision, "courts in this District 'will credit confidential source allegations, generally, in two situations.'" *Long Miao*, 442 F. Supp. 3d at 798 (quoting *Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 590 (S.D.N.Y. 2011)). First, when a CW's statements are corroborated by independent, adequately pled facts, courts loosen their requirement of a description of the CW's job. *Id.* "Second, in the absence of such well-pled corroborative facts, courts will credit confidential sources whose positions and/or job responsibilities are described sufficiently to indicate a high likelihood that they actually knew facts underlying their allegations." *Id.* (internal quotation marks omitted). At the same time, the caselaw "reflects at least four contexts in which courts have been loath[], under *Novak*, to sustain as sufficiently particular securities fraud complaints based on uncorroborated statements by CWs:" first, where CWs are "insufficiently described," or if their descriptions do not demonstrate that they were in a position to know the facts that are attributed to them; second, where CWs "cannot establish that the challenged statements were knowingly false when made;" third, where CWs make "insufficiently particular" allegations; and fourth, where "uncorroborated statements of CWs . . . are sourced secondhand." *Id.* at 798–800 (collecting cases).

The factual allegations attributed to CW-1 and CW-2 fail these standards. First, the SAC does not plead facts indicating that either was in a position to know the important facts attributed to them, to the effect that Liu, *de facto*, controlled Li's companies. The SAC identifies the CWs, respectively, as (1) legal counsel who prepared compliance opinions and (2) an assistant to Li. Although a person in these posts could conceivably be privy to information as to who in fact

wielded corporate authority, without more, these threadbare descriptions of titles and functions do not indicate access to knowledge on the issues of control as to which, according to the SAC, they have opined. *See, e.g., China Mobile*, 2016 WL 922711, at *4 (disregarding statement of a CW who worked at a subsidiary) (citing *In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 358 (S.D.N.Y. 2011)); *In re Lehman Bros. Sec. & Erisa Litig.*, No. 09 MD 2017 (LAK), 2013 WL 3989066, at *4 (S.D.N.Y. July 31, 2013) (disregarding statements of CWs who were lower-level employees, rather than managers or officers who had a more comprehensive sense of corporate practices); *Frankfurt-Tr. Inv. Luxemburg AG v. United Techs. Corp.*, 336 F. Supp. 3d 196, 223 (S.D.N.Y. 2018), *aff'd sub nom. Kapitalforeningen Lægernes Inv. v. United Techs. Corp.*, 779 F. App'x 69 (2d Cir. 2019) (disregarding statements where employees worked within one unit and did not have insight into other units or corporate divisions). Notably, the SAC does not recite a single concrete example of Liu's actual exercise of his purported control. The CWs' statements to this effect are conclusory.

Second, even if CW-1 and CW-2 had earlier been well-positioned to perceive whether Liu in fact controlled the companies that Li owned, as of May 2020, the CWs—by the SAC's own account—were no longer employed by any relevant entity, even Shanghai Nami (which was not a party to the transaction) at the time of the acquisition. CW-1 had left nearly two years earlier and CW-2, some 15 months earlier. SAC ¶¶ 69, 70. Courts have disregarded the statements of CWs when the CWs left the company before the Class Period. *Francisco v. Abengoa, S.A.*, 481 F. Supp. 3d 179, 208 (S.D.N.Y. 2020).[20] The CWs' information is therefore

---

[20] *See also, e.g., Campo v. Sears Holding Corp.*, 635 F. Supp. 2d 323, 335 (S.D.N.Y. 2009), *aff'd*, 371 F. App'x 212 (2d Cir. 2010)); *China Mobile*, 2016 WL 922711, at *4 (describing plaintiffs' inability to allege forbidden activity during the class period as "fatal to their required showing of contemporaneous falsity"); *Lehman Bros.*, 2013 WL 3989066, at *4 (finding CW

stale. It cannot be given weight as to whether the corporate relationships, as of May 2020, made out a related party transaction. Because "[n]o CW sets forth facts that suggest that any of the . . . statements were false *when they were made*," *Lululemon*, 14 F. Supp. 3d at 579 (emphasis in original), their allegations cannot be sustained.

*Employees' Retirement System of Government of the Virgin Islands v. Blanford*, 794 F.3d 297 (2d Cir. 2015), in which the Second Circuit found worthy of credit attributions to CWs, is not to the contrary. The defendant had argued that to satisfy pleading standards, the CWs' statements "must be linked to *specific quarters*" within the fiscal year. *Id.* at 307 (emphasis added). The Second Circuit rejected this formalism, noting that it had held "that allegations concerning activity in one period can support an inference of similar circumstances in a subsequent period." *Id.* That analysis has no bearing here, where the CWs had left the company well over a year before the events at issue, and where the allegations are conclusory and devoid of detail.[21]

---

statements unworthy in part because they did not give the court any basis to find activity during the relevant time period); *In re Sierra Wireless, Inc. Sec. Litig.*, 482 F. Supp. 2d 365, 376 (S.D.N.Y. 2007) (disregarding CW allegations in part because CW had "an unspecified role (if any) at" the defendant company during the class period); *In re Francesca's Holdings Corp. Sec. Litig.*, No. 13 Civ. 6882 (RJS), 2015 WL 1600464, at *15 (S.D.N.Y. Mar. 31, 2015) (where there were only two months of overlap between CW's tenure and relevant events, discounting CW's allegations).

[21] Notably, too, in *Blanford*, one CW's out-of-quarter account was in fact "closely linked" to the defendant's "misleading statements during the second quarter investor call," which was a claimed basis for § 10(b) liability. 794 F.3d at 307.

The Court, accordingly, puts aside the attributions to the CWs here insofar as these relate to the issue at hand: whether the relationship between Li's and Liu's companies in May 2020 made the Nami Holding (Cayman) Acquisition a related party transaction.[22]

ii.    WeChat post

The SAC next cites an article, published on April 2, 2018, by NiSun Shanghai on its official WeChat account for NiSun companies. The article allegedly stated that Shanghai Nami is a subsidiary of Huiying Financial, whose chairman and controller is Liu, and described Li as the CEO of a subsidiary, allegedly Shanghai Nami, controlled both by Huiying Financial and NiSun Shanghai. SAC ¶ 71. Later, however, on a date that the SAC does not recite, NiSun Shanghai allegedly altered the WeChat article, to "revis[e] the words 'subsidiary Shanghai Nami' to 'cooperation company Shanghai Nami.'" *Id.* ¶ 72 (emphasis omitted). On July 31, 2020, after the original complaint in this case was filed, *see* Dkt. 1, Hebron filed a press release with the SEC, writing that the April 2, 2018 article had been altered after it was published, because the article had "mistakenly stated that NiSun Shanghai and [Shanghai Nami] were subsidiary companies . . . and that error was quickly revised[.]" SAC ¶ 73 (alterations in original). The SAC cites the Grizzly Report's accusation that, in issuing the press release, "NiSun Shanghai tried to cover its tracks" by describing Shanghai Nami as a "cooperation company" rather than as a "subsidiary." *Id.* ¶ 72 (internal quotation marks omitted).

---

[22] Nor do the other materials cited in the SAC—the WeChat post and the CV found online, each addressed *infra*—meaningfully corroborate the CWs' allegations, as the SAC suggests. *See* SAC ¶¶ 71, 74. CW-1 depicted Shanghai Nami, Benefactum, and NiSun Shanghai as "really all the same company," *id.* ¶ 69 (emphasis omitted), and CW-2 depicted Li as reporting directly to Liu, *id.* ¶ 70. The WeChat post and the CV, as relevant here, however, describe a different issue—the existence of subsidiary relationship, in that the former states that "Shanghai Nami is a subsidiary of Huiying Financial," *id.* ¶ 71, and the latter states that "Shanghai Nami is a subsidiary of NiSun Shanghai," *id.* ¶ 74.

On the facts pled, there is no basis to infer that the original formulation in the WeChat article—to the effect that a formal subsidiary relationship, as opposed to an informal but close working relationship, existed between NiSun Shanghai and Shanghai Nami—was correct. If a subsidiary relationship did exist, that would qualify as a related party relationship. *See* ASC 850-10-05-3 (citing transactions between a parent entity and its subsidiaries as an example related party transaction). But even then, only a relationship between NiSun Shanghai and Shanghai Nami—not Hebron and Nami Holdings (Cayman)—would be alleged. And on the pleadings, the statement was "quickly revised," meaning that it was revised perhaps two or so years before the Nami Holding (Cayman) Acquisition. There is no allegation that, at the time of the revision, that future transaction was contemplated by any person. On these circumstances, there is no basis to impute nefarious motives to Hebron or its affiliate NiSun Shanghai in making the revision, *e.g.*, to eliminate evidence that might one day bear on whether the Nami Holding (Cayman) Acquisition transaction would qualify as a related party transaction. *See Kraft v. Third Coast Mistream*, No. 19 Civ. 9398 (LJL), 2021 WL 860987, at *13 (S.D.N.Y. Mar. 8, 2021) (holding it insufficient under Rule 9(b) and Rule 12(b)(6) where plaintiffs alleged no facts that showed that the reasons that defendant gave were false, and rejecting their theory that the defendant was "acting for alternative, undisclosed and nefarious reasons, on speculation alone"). And the SAC does not allege that the persons responsible for posting the WeChat article were highly placed in NiSun Shanghai or Hebron, so as to be presumptively savvy to whether Shanghai Nami was, formally speaking, a corporate subsidiary. The Court thus treats as well pled the fact of the successive WeChat posting, but does not credit as well pled the SAC's accusation—which it attributes to Grizzly Research—that the revised posting was an attempt by NiSun Shanghai "to cover its tracks."

iii.     Online CV

Finally, the SAC relies on a CV that plaintiffs' counsel allegedly found on "a popular Chinese online job board" for a "Ms. Zhao" who was employed at NiSun Shanghai as a human resources manager starting in May 2018. SAC ¶ 74.  Ms. Zhao's Chinese-language CV, as alleged, stated that Shanghai Nami is a subsidiary of NiSun Shanghai.  *Id.*  To the extent that the SAC relies on this document to establish that a formal subsidiary relationship existed between the two entities at the time of the transaction, this source is problematic.

First, the online CV does not supply information as to how or why "Ms. Zhao" knew, or would have been in a position to know, of the corporate formality at issue—that Shanghai Nami was a subsidiary of NiSun Shanghai, as opposed to a company that worked closely with NiSun Shanghai.  Without more, her position as a human resources manager would not, by nature, vest such an employee with this knowledge.  *See China Mobile*, 2016 WL 922711, at *4; *Lehman Bros.*, 2013 WL 3989066, at *4; *Frankfurt Tr.*, 336 F. Supp. 3d at 223.  That the online CV is in Chinese raises, too, a question whether its author, Ms. Zhao, even intended to convey that a subsidiary relationship—in the formal sense conveyed by the SAC—was in place.  Second, the online CV does not state that "Ms. Zhao" was employed at the company at the time of the transaction.  The only date used on the online CV is May 2018, two years before the acquisition of Nami Holding (Cayman) by Hebron.  There is no indication that Ms. Zhao—who in posting the resume was presumably seeking to leave the company—was employed by NiSun Shanghai anytime close to the transaction date (or would have similarly described the corporate relationship as of that date).  *See Francisco*, 481 F. Supp. 3d at 208; *Lululemon*, 14 F. Supp. 3d at 579; *China Mobile*, 2016 WL 922711, at *4; *Lehman Bros.*, 2013 WL 3989066, at *4; *Sierra Wireless*, 482 F. Supp. 2d at 376; *Francesca's Holdings*, 2015 WL 1600464, at *15.  Third, there is no indication that plaintiffs' counsel vetted the statements on Ms. Zhao's online CV with its

putative author.  The caselaw reflects skepticism by courts of attributions to people "with whom plaintiffs' counsel have not themselves interacted." *Long Miao*, 442 F. Supp. 3d at 800.  Here, there is no indication that plaintiffs' counsel, after finding the online CV, personally spoke with, or even attempted to reach, "Ms. Zhao," for example, via the contact information on the CV—or that counsel took any steps to confirm the existence of a "Ms. Zhao" in such a post so as to validate the online CV as authentic and not fictitious.

In light of these deficiencies, the Court puts aside the online CV, too, as evidence of a formal subsidiary relationship between Shanghai Nami and NiSun Shanghai as of May 2020.[23]

#### iv.    Assessment

The surviving allegations in the SAC are insufficient to establish a related party transaction, within the meaning of ASC 850 and Item 7.  Those standards require, as noted, control or significant influence by one party over the other or that the two are under common control.  But although the SAC pleads facts—including the revised April 2, 2018 article— indicative of a cooperative and close relationship between companies owned or run by Liu (including Hebron's affiliate NiSun Shanghai) and companies owned by Li (notably Nami Holding (Cayman)), such cooperation is not tantamount to control or a parent-subsidiary relationship.  Transactions such as acquisitions among historical collaborators are common. Critically, the SAC does not plead concrete facts showing formal authority by Liu or his companies over Nami Holdings (Cayman) or its affiliates, or concrete facts indicative of their exercise, as of May 2020, of significant influence over the management or operating policies of these entities.  Absent well-pled facts to this effect, the SAC fails to adequately plead that the

---

[23] *Accord In re Millennial Media, Inc. Sec. Litig.*, No. 14 Civ. 7923 (PAE), 2015 WL 3443918, at *12 (S.D.N.Y. May 29, 2015) (discussing unverified attributions to CWs and noting "the unreasonableness of failing to undertake rudimentary fact-checking with a witness").

Nami Holding (Cayman) Acquisition was a related party transaction. Its claim of a material omission by Hebron in violation of § 10(b), to the extent based on this transaction, thus must also be dismissed.

f.      *Statements Regarding Insufficient Disclosure Controls*

As an alternative but related theory of § 10(b) liability, the SAC states that Hebron's statement about its disclosure controls were materially false and/or misleading because, insofar as the company failed to disclose as required the related nature of the Loong Fang PIPE Transaction and Beijing Hengpu Acquisition, its depiction of its disclosure controls as sound was errant. SAC ¶ 90. The SAC alleges that, for the same reason, the Individual Defendants' SOX certifications were materially false and misleading. *Id.* ¶ 92.

For two reasons, the Court dismisses these claims. First, plaintiffs—save to state as background that Hebron's "disclosure controls regarding related party transactions were ineffective," Pl. Mem. at 1—have not defended this theory of liability in their opposition to the motion to dismiss. *See id.* at 14. The SAC's claims of faulty disclosure controls are properly viewed as waived. *See Jackson*, 766 F.3d at 198. Second, on the merits, these claims fail. As pled, they are wholly derivative of the SAC's claims that Hebron serially failed to make required disclosures of related party transactions; the SAC does not allege an alternative factual basis for alleging that the company's controls were deficiently described. *See* SAC ¶¶ 89–92. The Court, however, has dismissed as ill-pled each of the SAC's claims of a disclosure failure with respect to a transaction. Therefore, even assuming that disclosure lapses as to multiple transactions would be a factually sufficient basis on which to claim a false statement or material omission

regarding the quality of a company's disclosure controls,[24] facts to this effect have not been capably pled here.

### 2.     Scienter

Defendants separately move to dismiss the SAC for failing to adequately plead scienter. For the purpose of this analysis, the Court assumes *arguendo* that the SAC had satisfactorily pled that the three transactions at issue were related party transactions, making Hebron's failure to so disclose a violation of accounting standards.  But more than a well-pled allegation of a GAAP violation or other accounting irregularity is needed to state a § 10(b) claim.  *See ECA*, 553 F.3d at 200 ("Only where such allegations are coupled with evidence of corresponding fraudulent intent might they be sufficient.") (quoting *Novak*, 216 F.3d at 309).

As noted, to survive a motion to dismiss, a complaint must "state with particularity facts giving rise to a strong inference" of scienter, 15 U.S.C. § 78u-4(b)(2), such that this inference is "*at least as compelling* as any opposing inference one could draw from the facts alleged," *ATSI Commc'ns*, 493 F.3d at 99 (emphasis in original) (quoting *Tellabs*, 551 U.S. at 324).  To satisfy this requirement, a complaint must plead facts "(1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." *Id.*

---

[24] *But see Barilli v. Sky Solar Holdings, Ltd.*, 389 F. Supp. 3d 232, 253–54 (S.D.N.Y. 2019) (holding that statements about the introduction of internal controls are not statements that those controls are adequate, and that even if those controls are later evaded, "descriptive statements about the implementation of such controls" are not necessarily false); *Barrett v. PJT Partners Inc.*, No. 16 Civ. 2841 (VEC), 2017 WL 3995606, at *6 (S.D.N.Y. Sept. 8, 2017) (holding that because complaint failed to allege with particularity the falsity of SOX Certifications, its claim about the certifications failed to plead an actionable misstatement).

*a.*        *Motive and Opportunity*

The SAC articulates two theories why the Individual Defendants had a motive to conceal the related-party nature of Hebron's transactions.[25]  First, it alleges, Sun and his brother had guaranteed Hebron's debt, "with recourse to their respective homes."  SAC ¶ 101 (emphasis omitted).  Second, it alleges that Liang is beholden to Liu because she earlier worked at companies he owned or controlled.  *Id.* ¶ 102.

On the facts pled, these theories fall well short of the mark.

As to the first theory, a corporate officer's speculative personal liability is insufficient to show scienter.  *See Kalnit*, 264 F.3d at 140.  The SAC alleges that Sun "was under tremendous financial pressures to get Hebron's debt repaid" and therefore had an incentive to participate in the fraud.  SAC ¶ 101.  But for a scienter claim to be plausible based on an officer's potential personal liability, the complaint must plead facts linking the alleged fraud to the officer's personal exposure.  *See Bd. of Trustees of City of Ft. Lauderdale Gen. Employees' Ret. Sys. v. Mechel OAO*, 811 F. Supp. 2d 853, 868–69 (S.D.N.Y. 2011), *aff'd sub nom. Frederick v. Mechel OAO*, 475 F. App'x 353 (2d Cir. 2012) (holding that allegations about personal exposure could not show scienter because complaint failed to provide facts explaining connection between the personal exposure and the alleged misrepresentations).  The SAC, however, is devoid of facts substantiating its naked claim here of a motive to commit securities fraud.  This shortcoming is particularly striking insofar as the omission here—failure to disclose not the terms of a transaction, but that it involved a related party as defined by the accounting rules—would not inherently make a corporate issuer more likely or sooner to default.  And the SAC does not plead

---

[25] Defendants' opportunity to commit securities fraud appears undisputed, as the SAC credibly alleges that "the Individual Defendants, as officers of Hebron, had an opportunity to commit securities fraud."  SAC ¶ 103.

any facts indicating that the risk of default by Hebron had materialized or was imminent. *See Mechel OAO*, 811 F. Supp. 3d at 868–69 (scienter inadequately pled where complaint did not plausibly allege a risk of default during Class Period). The SAC's theory of Sun's motive to cause Hebron to commit fraud, based on his status as a guarantor of Hebron's debt, is therefore wholly speculative.

*Janel World Trade, Ltd. v. World Logistics Services, Inc.*, No. 08 Civ. 1327 (RJS), 2009 WL 735072 (S.D.N.Y. Mar. 20, 2009), on which plaintiffs rely, is not at all to the contrary. The district court there differentiated potential and actual personal liability in finding an inference of scienter plausibly pled. *Id.* at *6. The factual allegations here, however, are exactly what the *Janel World Trade* Court would have found inadequate: They support only "the mere speculative possibility that, in the future, Defendants might be held liable," and not a "concrete and personal motive . . . to participate in a scheme to defraud Plaintiffs." *Id.*

As to motive, the SAC alternatively posits that Liang, Hebron's CFO, "is beholden to" Liu and owes her appointment to him. *See* SAC ¶ 102 (Liang's "appointment as CFO helped set the stage for Defendants' egregious wrongdoings"). Be that as it may, a corporate officer's mere relationship to a participant in a transaction does not, without more, plausibly plead the officer's scienter. *See Vogel v. Sands Bros. & Co.*, 126 F. Supp. 2d 730, 743 (S.D.N.Y. 2001) (holding that allegations of close relationship between two defendants did not constitute "the kind of circumstantial evidence necessary to support a claim of fraudulent or reckless intent"). That Liang and Hebron's controlling shareholder, non-defendant Liu, had a relationship does not indicate that Liang had a mental state "embracing intent to deceive, manipulate, or defraud." *Tellabs*, 551 U.S. at 319 (quotation marks omitted). Indeed, the SAC does not coherently explain why Liu, at whose behest it implies Liang acted, had any such motive.

b.     *Conscious misbehavior and recklessness*

Having failed to plausibly plead an inference of scienter via the motive route, plaintiffs

bear a "correspondingly greater" burden in alleging conscious misbehavior or recklessness.

*Kalnit*, 264 F.3d at 142 (internal quotation marks omitted).  This inference may arise where a

defendant's behavior, as pled, was "highly unreasonable" and "an extreme departure from the

standards of ordinary care."  *Novak*, 216 F.3d at 308 (internal quotation marks and citation

omitted).  In other words, the facts pled must indicate "a state of mind approximating actual

intent, and not merely a heightened form of negligence."  *Id.* at 312 (internal quotation marks

omitted).

The SAC's allegations fall far short of this standard.  At the outset, the Court notes, the

SAC—far from pleading an extreme departure from required standards—fails to plead any such

allegation.  Its allegations require the application of an accounting standard to complex if not

byzantine factual relationships, and, on its review, the Court has not found any misapplication,

let alone a blatant one.  The SAC posits conscious misbehavior and recklessness in four ways.

None can be taken seriously as plausible evidence of scienter.

First, the SAC notes that the Individual Defendants held the posts of CEO and CFO, and

posits that the company's ostensibly errant public statements about the three transactions, over a

six-month period, "would invariably be brought to the attention of senior executives in a small

company."  SAC ¶ 105; *see also* Pl. Mem. at 24 (citing *Alaska Elec. Pension Fund v. Asar*, 768

F. App'x 175, 188 (5th Cir. 2019) (stating that, in some circumstances, one consideration in

favor of scienter is the small size of a company)).  But that Hebron was a small company does

not in any coherent way signify that the Individual Defendants knew that the absence of a related

party disclosure in the company's public filings was errant.  *See Maloney v. Ollie's Bargain

Outlet Holdings*, 518 F. Supp. 3d 772, 781 (S.D.N.Y. 2021) ("tight-knit" and "hands-on"

45

management does not independently establish scienter); *Cohen v. Kitov Pharms. Holdings, Ltd.*, No. 17 Civ. 0917 (LGS), 2018 WL 1406619, at *8 (S.D.N.Y. Mar. 20, 2018) (holding that the company's size did not show the CFO's scienter).[26] And it is well established that allegations "founded on nothing more than a defendant's corporate position are entitled to no weight." *Fogel v. Wal-Mart de México SAB de CV*, No. 13 Civ. 2282 (KPF), 2017 WL 751155, at *16 (S.D.N.Y. Feb. 27, 2017) (quoting *Strougo v. Barclays PLC*, 105 F. Supp. 3d 330, 350 (S.D.N.Y. 2015)).[27]

Second, the SAC seizes on the "firing of [Hebron's] independent auditor," Friedman LLP ("Friedman"), and the hiring as successors of Wei, Wei & Co., LLP. SAC ¶ 106. It notes that Hebron's February 26, 2019 Form 6-K had stated that during the fiscal years 2016 and 2017, "there were no disagreements between Hebron and Friedman," and states that "Hebron was silent as to whether there were disagreements with Friedman" about fiscal year 2018. *Id.* From this, the SAC infers that the first set of auditors were fired to facilitate "egregious wrongdoings" with respect to the related party transactions. *Id.* But the SAC elides an aspect of the same Form 6-K

---

[26] Plaintiffs rely on *Cohen* because it considered an individual defendant's "position as CEO in a small organization" in its scienter analysis. *See* Pl. Mem. at 24 (citing 2018 WL 1406619, at *9). But the court there relied on other evidence as "critical to the finding of scienter," specifically, the statements of former employees. It held that "evidence from multiple former consultants, *combined* with [the CEO's] position as CEO of a small organization and news of the . . . regulatory investigation," gave rise to a plausible scienter inference. 2018 WL 1406619, at *9 (emphasis added).

[27] *See also, e.g., In re Rockwell Med., Inc. Sec. Litig.*, No. 16 Civ. 1691 (RJS), 2018 WL 1725553, at *14 (S.D.N.Y. Mar. 30, 2018) (describing this principle as "practically hornbook law"); *In re Sotheby's Holdings, Inc.*, 2000 WL 1234601, at *7 (S.D.N.Y. Aug. 31, 2000) (stating that it is "well established that boilerplate allegations that defendants knew or should have known of fraudulent conduct based solely on their . . . executive positions are insufficient to plead scienter"); *Chapman v. Mueller Water Prods., Inc.*, 466 F. Supp. 3d 382, 401 (S.D.N.Y. 2020) (citing *Plumbers & Steamfitters Local 773 Pension Fund v. Canadian Imperial Bank of Commerce*, 694 F. Supp. 2d 287, 300 (S.D.N.Y. 2010)).

that is inconsistent with this theory. The Form 6-K states that "through the dismissal of Friedman on February 26, 2019, there were no disagreements between [Hebron] and Friedman[.]" Tharp Decl., Ex. 8. at 3. The theory that plaintiffs imagine is therefore inconsistent with the very document on which their theory—that the auditors were ousted to enable fraud exclusively—relies. On the facts pled, the SAC therefore does not allege facts that show that "[Friedman's] resignation amounts to the level of fraud." *In re HEXO Corp. Sec. Litig.*, No. 19 Civ. 10965 (NRB), 2021 WL 878589, at *21 (S.D.N.Y. Mar. 8, 2021).

Third, the SAC cites Sun's resignation as CEO and chairman, announced on August 14, 2020 and official on September 4, 2020. SAC ¶ 107. But the SAC is devoid of facts tying that event to Hebron's failure to identify the three transactions as involving related parties. And it is black letter law that "[t]erminations or resignations of corporate executives are insufficient alone to establish an inference of scienter." *Woolgar v. Kingstone Companies, Inc.*, 477 F. Supp. 3d 193, 240 (S.D.N.Y. 2020). Instead, to raise a strong inference of scienter, a complaint must allege facts that link a resignation to the alleged fraud. *See id.*; *see also, e.g., In re UBS AG Sec. Litig.*, No. 07 Civ. 11225 (RJS), 2012 WL 4471265, at *18 (S.D.N.Y. Sept. 28, 2012), *aff'd sub nom. City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173 (2d Cir. 2014); *In re DRDGold Ltd. Sec. Litig.*, 472 F. Supp. 2d 562, 575 (S.D.N.Y. 2007); *Glaser*, 772 F. Supp. 2d at 598 (resignations cannot show scienter "without some indicia of highly unusual or suspicious circumstances"); *HEXO Corp.*, 2021 WL 878589, at *21; *Schiro v. Cemex, S.A.B. de C.V.*, 396 F. Supp. 3d 283, 303 (S.D.N.Y. 2019); *Francisco*, 481 F. Supp. 3d at 214. The SAC here, *see* SAC ¶ 107, instead offers only impermissible innuendo about Sun's departure, *see In re Diebold Nixdorf, Inc., Sec. Litig.*, No. 19 Civ. 6180 (LAP), 2021 WL 1226627, at *14 (S.D.N.Y. Mar. 30, 2021). Because it does not recite facts linking the resignation to the alleged fraud, this

dimension of the pleadings does not justify inferring scienter, in contrast to cases where the factual contexts of the resignations have been pled and suggested scienter. *See, e.g., In re Salix Pharms., Ltd.*, No. 14 Civ. 8925 (KMW), 2016 WL 1629341, at *15 (S.D.N.Y. Apr. 22, 2016) (resignations suggestive of scienter where executive resigned the day the issuer's earnings were announced, the board then exercised the clawback provisions in the executive's resignation agreement, and the issuer later issued restatements of its financial statements for the years in question).

Fourth, the SAC notes that two transactions—the Beijing Hengpu and Nami Holding (Cayman) Acquisitions—"relate to Hebron's financial services segment, one of its two core business segments." SAC ¶ 104. But courts have set a high bar for inferring scienter based on the centrality of the affected business unit. For the "core-operations doctrine" to apply,[28] the "operation in question [must] constitute nearly all of a company's business." *Tung v. Bristol-Myers Squibb Co.*, 412 F. Supp. 3d 453, 460 n.3 (S.D.N.Y. 2019) (quoting *Tyler v. Liz Claiborne, Inc.*, 814 F. Supp. 2d 323, 343 (S.D.N.Y. 2011)); *see also, e.g., Woolgar*, 477 F. Supp. 3d at 239; *Lipow v. Net1 UEPS Techs., Inc.*, 131 F. Supp. 3d 144, 163 (S.D.N.Y. 2015). The SAC falls short of that standard here, as it pleads no more than that the financial services unit, begun in July 2019, is "one of [Hebron]'s two core business segments," SAC ¶ 104; *see also id.* ¶¶ 2, 21. It does not allege that this unit constitutes all or even most of Hebron's business.

---

[28] Under the doctrine, a plaintiff may allege that officers should have known facts relating to the core operations of their business. *See, e.g., Wachovia*, 753 F. Supp. 2d at 353–54; *Cosmas v. Hassett*, 886 F.2d 8, 13 (2d Cir. 1989). The Second Circuit has yet to address whether the core operations doctrine survived the enactment of the PSLRA. *See Frederick v. Mechel OAO*, 475 F. App'x 353, 356 (2d Cir. 2012).

Even if the financial services segment of Hebron's business had been pled to qualify as a core operation, more is needed to adequately allege scienter. *See Marcu v. Cheetah Mobile Inc.*, No. 18 Civ. 11184 (JMF), 2020 WL 4016645, at *8 (S.D.N.Y. July 16, 2020) (describing core-operations allegations as supplementary, "[a]t best," rather than "independently sufficient means to plead scienter" (quoting *Wachovia*, 753 F. Supp. at 353)); *see also Plumbers & Pipefitters Loc. Union No. 630 Pension-Annuity Tr. Fund v. Arbitron, Inc.*, 741 F. Supp. 2d 474, 490 (S.D.N.Y. 2010), *as corrected* (Sept. 30, 2010). Other factual information—for example, "circumstantial allegations pertaining to the Individual Defendants' knowledge of [Hebron's] key products as part of its holistic assessment of the scienter allegations"—is needed before a strong inference of scienter can arise from the fact that the affected business unit was core. *See Mechel OAO*, 811 F. Supp. 2d at 871–73; *see also Diebold Nixdorf*, 2021 WL 1226627, at *15 ("[T]he core operations doctrine can only be a buoy, not a life raft."); *In re Inv. Tech. Grp., Inc. Sec. Litig.*, 251 F. Supp. 3d 596, 623–24 (S.D.N.Y. 2017). No such facts are pled here.

Plaintiffs' precedents are not to the contrary. In its summary order in *New Orleans Employees Retirement System v. Celestica*, 455 F. App'x 10 (2d Cir. 2011), the Second Circuit declined to address defendants' arguments regarding the core operations, GAAP violations, and removal of executives. While the Court stated those factors "can provide supplemental support . . . even if they cannot establish scienter independently," *id.* at 13 n.3, the SAC here does not plead other factors meaningfully indicative of scienter.[29]

---

[29] On the contrary, a factor that securities fraud complaints often cite in support of scienter—stock sales by individual defendants—disfavors plaintiffs here, as the Individual Defendants did not sell stock during the Class Period. *See, e.g., In re Bank of Am. AIG Disclosure Sec. Litig.*, 980 F. Supp. 2d 564, 585 (S.D.N.Y. 2013), *aff'd*, 566 F. App'x 93 (2d Cir. 2014) (holding that complaint failed to allege motive or opportunity because it did not allege that defendant sold any shares during class period); *In re eSpeed, Inc. Sec. Litig.*, 457 F. Supp. 2d 266, 289 (S.D.N.Y.

In sum, considering all facts alleged, the SAC does not "give rise to a strong inference," *Tellabs*, 551 U.S. at 323, that defendants were reckless in not disclosing that the transactions at issue involved related parties. On the contrary, the SAC falls far short of pleading that Hebron's decision not to so characterize these transactions bespoke fraudulent intent. *Novak*, 216 F.3d at 309.

The Court accordingly holds that the SAC fails to state a claim under § 10(b) and Rule 10b-5, because it does not adequately plead either an actionable misstatement or omission or the defendants' scienter.[30] The Court therefore dismisses the SAC's § 10(b) claims against all defendants.[31]

---

2006) ("the fact that neither [the CEO nor the CFO] sold stock during the putative class period undermines plaintiffs' motive allegations" for scienter); *In re Iconix Brand Grp., Inc.*, No. 15 Civ. 4860 (PGG), 2017 WL 4898228, at *16 (S.D.N.Y. Oct. 25, 2017) (collecting cases).

That Hebron commissioned an internal investigation similarly weighs against finding scienter. *See, e.g., Slayton v. Am. Exp. Co.*, 604 F.3d 758, 777 (2d Cir. 2010); *Long Miao*, 442 F. Supp. 3d at 808 ("Fanhua's initiation of an independent investigation here, if anything," weakens the inference of scienter.); *In re Veon Ltd. Sec. Litig.*, No. 15 Civ. 08672 (ALC), 2018 WL 4168958, at *20 (S.D.N.Y. Aug. 30, 2018).

[30] In light of these holdings, the Court does not have occasion to reach Hebron's alternative argument for dismissal, to wit, that the SAC fails inadequately to plead loss causation.

[31] Although the Individual Defendants were not served and therefore did not move for dismissal, dismissal of the claims against them is warranted because the Court's holdings above necessarily establish the inadequacy of the SAC's pleadings as to them. *See Hecht v. Com. Clearing House, Inc.*, 897 F.2d 21, 26 n.6 (2d Cir. 1990) (holding *sua sponte* dismissal of the complaint with respect to a defendant who had not entered an appearance or joined in the motion to dismiss appropriate because issues were substantially the same and party against whom motion was brought "had notice and a full opportunity to make out his claim" (citing *Perez v. Ortiz*, 849 F.2d 793, 797 (2d Cir.1988)); *Alki Partners, L.P. v. Vatas Holding GmbH*, 769 F. Supp. 2d 478, 499 (S.D.N.Y. 2011), *aff'd sub nom. Alki Partners, L.P. v. Windhorst*, 472 F. App'x 7 (2d Cir. 2012) (dismissing § 10(b) and 20(a) claims as to non-moving defendant who had not appeared where plaintiffs could not establish claims for the same reasons they failed as to moving defendants); *In re PetroChina Co. Ltd. Sec. Litig.*, 120 F. Supp. 3d 340, 368–69 (S.D.N.Y. 2015), *aff'd sub nom. Klein v. PetroChina Co., Ltd.*, 644 F. App'x 13 (2d Cir. 2016) (dismissing complaint against

**B.     Section 20(a) claims**

In light of the dismissal of the § 10(b) claims, dismissal is also warranted of the SAC's claims against the Individual Defendants under § 20(a) of the Exchange Act.  SAC ¶¶ 130–33.  That is because, to state a claim under § 20(a), a complaint must adequately allege "a primary violation by the controlled person."  *Carpenters Pension Tr. Fund*, 750 F.3d at 236 (quoting *ATSI Commc'ns*, 493 F.3d at 108).  Because the SAC has not done so, its § 20(a) claims must also be dismissed.  *See, e.g.*, *In re Lions Gate Entm't Corp. Sec. Litig.*, 165 F. Supp. 3d 1, 24–25 (S.D.N.Y. 2016) (dismissing § 20(a) claim based on failure to allege a primary violation).

**C.     Leave to Replead**

Plaintiffs seek leave, in the event of dismissal, to file yet another amended complaint.  Pl. Mem. at 25 n.17.  The Court denies this application, and dismisses the SAC with prejudice, for two independent reasons.

First, where the problems with a claim are "substantive" rather the result of an "inadequately or inartfully pleaded" complaint, an opportunity to replead would be futile and should be denied.  *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000) (citing *Hunt v. Alliance N. Am. Gov't Income Tr.*, 159 F.3d 723, 728 (2d Cir. 1998)).  That is so as to the deficiencies here, for the reasons noted.

Second, plaintiffs have had two opportunities to amend, and were notified before filing the SAC that it would be their last opportunity to amend.  No additional opportunity is warranted.  *See United States ex rel. Ladas v. Exelis, Inc.*, 824 F.3d 16, 28–29 (2d Cir. 2016) (finding no abuse of discretion where district court denied leave to amend following second amended complaint); *Lopez v. CTPartners Exec. Search Inc.*, 173 F. Supp. 3d 12, 44 (S.D.N.Y.

_____

non-moving individual defendants who had not been served because plaintiffs were on notice of ground for dismissal and had had opportunity to respond).

2016) (denying leave to replead securities fraud after plaintiff had two opportunities to amend complaint); *Thomas v. Shiloh Indus., Inc.*, No. 15 Civ. 7449 (KMW), 2018 WL 4500867, at *7 (S.D.N.Y. Sept. 19, 2018) (dismissing with prejudice where plaintiffs had an opportunity to amend and had been made aware of the asserted deficiency in their initial pleadings).

### CONCLUSION

For the foregoing reasons, the Court dismisses the SAC in its entirety. The dismissal is with prejudice as to all claims.

The Clerk of Court is respectfully directed to terminate the motions pending at dockets 34 and 39, and to close this case.

SO ORDERED.

Paul A. Engelmayer
United States District Judge

Dated: September 22, 2021
       New York, New York